UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. |
| v. ) | |
| ) | |
| NOKIA CORPORATION and ) | |
| NOKIA, INC., ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

### i. Introduction

1.     This is an action for breach of contract, misrepresentation, detrimental reliance, violation of G.L. c. 93A and other wrongdoing in connection with the parties' technology partnership.

2.     All of Collision's claims arise from the negotiation and intentional breach of the parties' binding agreement to become technology partners as well as from Nokia's misrepresentations and other stringing along conduct following Nokia's intentional breach of the parties' agreement.

3.     Following the parties' negotiations during the spring of 2017, on June 6, 2017, Collision and Nokia ultimately reached agreement on all the material contractual terms of their agreement for Nokia to license Collision's technology and for Collision to begin performing the work to integrate Collision's technology with Nokia's. Under this agreement, Collision agreed to provide a software solution to Nokia for their cellular base-station products. Prior to reaching agreement, Collision had to spend nearly a year running through many levels of proving to Nokia

the merits, quality, performance, and applicability of Collision's technology, as well as the ability to implement it in Nokia's products (including a Proof of Concept ("PoC")).

4.     When the parties finally did agree to all material terms of their partnership, Nokia proceeded to confirm numerous times in writing that the agreement was being memorialized in a written document which would contain all of the agreed-upon, material terms. These terms included, most notably, Nokia's payment to Collision of a $20 million licensing fee to license Collision's technology and another $3 million payment for an integration fee. Critically, because Nokia was aware of the unique, proprietary technology that Collision had developed, Nokia also required Collision to enter into an exclusivity arrangement with Nokia, which prohibited Collision from licensing its technology to Nokia's competitors.

5.     Following the parties' verbal agreement on the material terms, and while Collision was under its exclusivity commitment, Collision continued performing under the parties' agreement. As Collision was doing so, however, Nokia repeatedly made promises about finalizing the parties' written agreements and then later breached those promises. When Collision expressed concern to Nokia about this pattern of broken promises, Nokia provided repeated assurances that that the material terms of the parties' agreement remained unchanged and that only formalities remained to be completed to finalize the parties' written contract.

6.     After several months of this behavior, Nokia finally circulated written documents to Collision which contradicted and changed the material terms to which the parties had already agreed. Since Nokia was aware of the work in which Collision had engaged towards performing under the parties' agreement, Nokia plainly recognized that it could take advantage of Collision's commitment and renege on the parties' agreement in an effort to extract better terms for itself.

7.     In apparent recognition that its actions were in breach of the parties' agreement, Nokia asked Collision to agree that the parties had never reached an agreement back in June 2017, which Collision refused to do.

8.     The extent and scope of Nokia's intentional, misleading behavior cannot be overstated. Nokia first promised that it would finalize the parties' written agreement in a matter of weeks following their agreement on the material terms in June 2017. Instead, 538 days elapsed between the time of the parties' agreement to the material terms and when Nokia ultimately walked away completely on its numerous commitments to Collision. Throughout that time period, Collision continued to work on Nokia's behalf to deliver under the parties' agreement with Nokia's full awareness of the efforts which its representations were inducing. Nokia also repeatedly represented to Collision that finalization of the parties' written agreement was imminent. Nokia also reassured Collision about the significance of Collision's technology in the context of Nokia's products and roadmap, reported that top level executives had approved the specific deal terms, and expressed unconditional confidence that the deal was going to get done. Nokia eventually went so far as to confirm that Nokia's President of Mobile Networks had approved the deal and that the CFO had reserved the funds for the licensing and integration fees.

9.     Ultimately, in November 2018, after previously reneging on and trying to renegotiate the parties' June 2017 agreement, without warning, Nokia walked away completely from its obligations to Collision – refusing to pay Collision the licensing fee or the integration fee and refusing to compensate Collision for the millions of dollars it had invested for Nokia's benefit in reliance upon Nokia's explicit and repeated reassurances. Due to Nokia's insistence upon exclusivity, and the simple fact that performing the agreement with Nokia required all of Collision's resources, Collision lost numerous opportunities to license its technology to other

companies. Collision would never have agreed to the exclusive arrangement with Nokia or performed millions of dollars of work for Nokia were it not under a binding agreement with Nokia. Consequently, Nokia's breach of contract caused significant actual damages as well as detrimental and consequential damages.

10.     Nokia's gross misconduct through its dealings with Collision is fully documented in the parties' written communications, which are already in Nokia's possession. Under Massachusetts law, Nokia's actions in intentionally breaching its agreement with Collision and then intentionally misleading Collision to string it along and induce Collision's continued work for Nokia's benefit is well-recognized to violate Chapter 93A and provide a basis for several common law causes of action.

## ii. **Parties**

11.     Collision is a Delaware corporation with a place of business located at 20 Depot Street, Suite 2A, Peterborough, NH 03458. The principals of Collision are Stan Fry and Jared Fry, who are father and son. While Stan Fry works in New Hampshire, Jared Fry works entirely out of his office in Boston, Massachusetts. In its extensive dealings with Jared on behalf of Collision, Nokia was aware that Jared was based in Boston. Nearly all of the complained of conduct in this action consists of statements made via telephone and email to Jared in Massachusetts.

12.     On information and belief, defendant Nokia Corporation is a Finnish corporation with its principal place of business at Karaportti 3, P.O. Box 1, FI-02022 Nokia Solutions and Networks, Espoo, Finland.

13.     On information and belief, defendant Nokia Inc. is a Delaware corporation with its principal place of business at 102 Corporate Park Drive, White Plains, New York 10604.

### iii. **Jurisdiction and Venue**

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims in this case occurred. Specifically, each Defendant does business and Massachusetts and, in the context of this dispute, purposefully availed itself of the rights and benefits of Massachusetts law when they conducted their due diligence, negotiated with, had regular, almost weekly (and at times daily), interactions with Collision's principal, Jared Fry, who was located in Massachusetts.

15.     Personal, diversity jurisdiction of this matter is proper in this judicial district under 28 U.S.C. § 1332(a)(1) by virtue of the fact that of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

### iv. **Factual Allegations**

**Background Concerning Collision And Its Technology**

16.     Collision was formed in late 2010 with the acquisition of fundamental technology out of a defense contractor (largely IP). This technology was focused in an area called Multi-User Detection (MUD).

17.     Traditionally, networks would treat interfering signals as noise, and thus just live with degraded network performance. In commercial networks, where interference was increasing quickly (due to user density and data demands), this degradation was significant.  Collision's approach was to recognize that all of these interfering signals have 'structure' to them because these signals arise from other users on the same network.

18.     Collision recognized that if these interferences had structure to them, it would be possible to develop and apply signal processing techniques to pull those interfering signals apart from each other (once received at an antenna) and improve network performance.

19.     This level of processing occurs in what is referred to as the "Physical Layer" of the communications system. Collision further developed this technology so that it would work on commercial networks that required efficient operations and developed several new supporting technologies in the process.

20.     Since its inception, Collision has been focused on selling its technology to cellular infrastructure/Original Equipment Manufacturers ("OEMs"). Collision's technology manifests itself as software that runs on cellular basestations. To integrate its technology into the OEM's products (the cellular basestation), Collision must perform the following:

   a.  "port" or write the code to be able to be run on the customer-OEM's processing platform (these software and processing platforms are not like Windows applications running on Intel x86 processors -- they are very heavy-duty processors that require processor-specific code to be able to be run on them). Nokia's platform is referred to as the Texas Instruments ("TI") Kepler2 ("K2") platform.
   b.  Integrate in a manner that is compatible with the customer-OEMs own software architecture. Collision needs to integrate its technology such that the resources of the chip (Processing cycles, memory, bus usage, peripheral usage, etc.) are shared and whereby neither party is preventing the other party's software from working correctly.
   c.  Interface with the customer-OEM's software to ensure that Collision's software module functions in the context of the customer-OEM's, interact with it, and transfer data.

21.     To perform these important tasks, Collision necessarily requires the support and documentation from the customer-OEM.

22.     The software solutions that Collision develops are unique and proprietary. This technology typically replaces software that the customer-OEM develops itself. That is, what Collision does functionally is something that is typically done internally at these companies.

6

Collision, however, is able to provide a significantly more advanced and compelling solution than customer-OEM's are able to provide internally.

**The Initial Dealings Between Collision And Nokia**

23.     After learning of Collision's technology, beginning in late 2015, Nokia commenced a significant due-diligence aimed at analyzing and assessing Collision and its technology for potential integration with Nokia's technology. As part of this due diligence process, Nokia asked Collision to run specially designed technology testing for Nokia.

24.     During this due diligence process, Nokia informed Collision that Nokia had tried to develop similar techniques to what Collision's technology offers, but had failed. Collision's solution to Nokia's network issues proposed to improve network performance by a factor of two. For Nokia, Collision was first to develop a solution known as "PUSCH Receiver for UL CoMP on the TI Kepler2."

25.     The due diligence period which Nokia completed was so promising, that Nokia eventually told Collision that had made a decision and that it intended to make an offer to acquire the company, such offer supported by senior management – an offer that never materialized.

**Collision's Proof Of Concept**

26.     Instead, Nokia next proposed to move from the due diligence period into a further demonstration of the technology known as a "Proof of Concept" (the "PoC"), which the parties agreed would occur pursuant to a written contract.

27.     Ultimately, the parties finalized and signed a written PoC agreement and Nokia gave Collision $600,000 for the PoC phase.

28.     Early in the PoC process, Collision and Nokia also began discussing what the commercial relationship after the PoC would look like. Though there was still a notion that Nokia might still propose to acquire Collision, Nokia also began to explore a commercial agreement in which Nokia would not acquire Collision, but would license Collision's technology.

29.     In furtherance of the effort to explore a commercial relationship between the companies, in early-February of 2017, representatives from Nokia came to Collision's offices for a three-day workshop to discuss the early results of the PoC, discuss efforts after the PoC to commercialize Collision's technology into Nokia's hardware, and engage in business discussions that would enable that commercialization.

30.     At this time, it was already clear that the PoC was going to be a success, and that Collision's receiver was going to perform as targeted (double the performance). Nokia expressed to Collision its enthusiasm over the preliminary results of the PoC.

31.     In that early-February workshop, the parties established a plan for Collision to further its efforts for Nokia past the PoC and fully integrate its receiver into Nokia's hardware (called the "Airscale").

32.     The plan which the parties established outlined how Collision would integrate into Nokia's hardware and software, including the steps to get there.  Further, this plan included milestone deadlines, with the first two deadlines Phase 1 and Phase 2 being in Q2 of 2017 (just a few months hence from the parties' February 2017 workshop), Phase 3 due in Q3, Phase 3.5  due in Q4, and later milestones that were necessary to line up with Nokia's version release schedule of FL18 P7. For technology to be released on schedule, it needs to be in a certain form by a certain date in order to go through testing and to make the release date.

8

33.     These deadlines also included a requirement that Collision be able to demonstrate its solution on Nokia hardware at Mobile World Congress (the most significant industry trade show) the following February. In order to have any possibility of making that deadline, the parties understood and agreed that Collision would need to commence work as soon as possible.

34.     In that early-February workshop, Nokia expressly reassured Collision about the significance of its technology and the importance of meeting the parties' agreed upon, scheduled deadlines.

35.     Given the need for Collision to commence work towards an eventual integration of its technology based on a commercial agreement, Nokia reassured Collision that it would be paid for its work and the parties would formalize a license agreement. As part of this discussion, the parties began negotiating many of the concepts related to the business terms of a subsequent commercial agreement, including the following terms: exclusivity, ownership, deal structure, and fees.

**The Parties Negotiate Towards And Reach A Final Agreement**

36.     Due to Collision's own concerns about the ability for Nokia to quickly finalize a license agreement, Collision suggested that the parties simply agree to an extension of the PoC agreement until a final, license agreement was in place.

37.     Soon after the early-February workshop, and so as to enable Collision to meet the milestone targets established in the early-February workshop, Nokia was actively (a) arranging the delivery of an Airscale for Collision to develop its technology onto, (b) arranging for related support from Nokia experts, and (c) working to extend the PoC agreement in an effort to cover the first milestone of that plan.

38.     During this phase and subsequent phases of the parties' dealings, Collision was represented by Jared Fry and Stan Fry while Nokia was represented primarily by Francisco "Paco" Lopez Herrerias.

39.     As is clear from the parties' written communications, Nokia held out Herrerias, and Herrerias held himself out, to Collison as someone with apparent and actual authority to negotiate with Collision on behalf of Nokia. In addition, on dozens of occasions during the negotiating process, Herrerias confirmed that either he had received authority or was about to receive authority to memorialize the terms of the parties' agreement in a final document.

40.     For example, after the February 2017 workshop, on March 9, 2017, Mr. Herrerias of Nokia wrote to Collision that "I am drafting an extension of the PoC which will allow Collision to start right after the end of the PoC into porting the code to our AirScale" and, he continued, "[b]asically I am extracting part of the OPEX required for the M (reducing them) and assigning them to the PoC extension under the rationale of minimizing the risk of product delays." Collision understood these statements as clear indications that Nokia intended for Collision to continue to work after completion of the PoC, that Collision should be paid for this work, and that risk of delay is a concern of Nokia's.

41.     In response, on March 12, 2017, Jared Fry sent to Mr. Herrerias a draft of an extended PoC Agreement. Collision was aware that Mr. Herrerias was working on a draft as well – this draft was sent to aid Mr. Herrerias in establishing language if he needed it.

42.     On March 22, 2017, Mr. Herrerias sent to Collision a new draft Extension to the PoC agreement. Such draft started out with: "**WHEREAS** the Project Agreement between the Parties (Effective Date of November 16, 2016) is scheduled to be completed at the delivery of its Milestone 3 and the payment of the last milestone payment; **WHEREAS** Nokia wishes

10

Collision to engage in further development activities related to porting Collision's receiver technology to Nokia's Airscale product(s)." This draft extension included payment terms, whereby Nokia paid Collision at a rate of $275,000 per month, and was intended to cover the first milestone (the "L1 Call") of the plan established in the early-February workshop.

43.     Prior to the parties ever executing the PoC extension agreement, on April 4, 2017, Collision officially concluded the PoC effort with the delivery of the final results and report. This effort concluded successfully, with the two-times prior performance goal exceeded, and with the effort largely completed on-time.

44.     Following completion of the PoC, Collision maintained its Nokia project team in place working towards the commercial integration of its receiver solution into Nokia's hardware. Collision did so in reasonable reliance upon the following:

   a. The fact that there was a plan in place with milestones deadlines set.
   b. The first of the deadlines was only a matter of 2-3 months away.
   c. The fact that Nokia enticed Collision to perform to meet those deadlines through indicating if it met them, that Collision's solution would take over Nokia's solution roadmap.
   d. Collision was made to believe that the schedule of deadlines was important to meet so as to fit into Nokia's release schedule.
   e. The fact that Nokia was preparing an extension of the PoC Agreement to act as a stop-gap prior to a more full commercial agreement could be put in place, and so as to not jeopardize meeting the milestone deadlines.
   f. Nokia stated that it wanted to complete this Extension to the PoC in a matter of a week.

45.     Soon thereafter, given that the PoC process was now complete, Mr. Herrerias told Collision that Nokia wanted to skip the PoC agreement extension step and move directly to finalizing a full commercial agreement.

46.     On April 12, 2017, Mr. Herrerias sent Collision, software ("Open Event Machine" or "OpenEM" or "EM") for Collision to integrate with its receiver software. Mr. Herrerias had asked Collision to start integrating with that software. In doing so, he explicitly instructed that

the purpose for this integration work: "do not use for any other purpose beyond our integration work and Nokia-CC PoC follow up activity."

47.     In an April 21, 2017 email, Mr. Herrerias explained Nokia's desire was to speed up the process of reaching a full commercial licensing agreement and have it done in a matter of weeks: "I've stressed the topic to our BU [Business Unit] head, and expect to have a slot next week. The rationale is to speed up the decision making towards M2 [(a Nokia benchmark)] to be finished within the following weeks. I'll keep you updated in the next steps aside of the F2F meet Tobias-Joe. My target is to have a commercial agreement between both companies in place before the meeting, so we are comfortable when sharing architectural information, and would be have a more solid basis to split the work accordingly." Mr. Herreiras continued, "The M2 is a commitment to product and if we commit we need a commercial agreement beforehand. I am stressing this last with BU so that we could materialize it in few weeks, understanding the urgency of your company's concerns."

48.     Nokia next provided further assurances about the imminence of a commercial agreement between the Nokia and Collision. For example, also on April 21, 2017, "Now I just focus in getting green light to start the negotiation between us to agree in pricing and conditions. With a contract in place, the internal M2 would be much faster and easier to be achieved.  For now no need to step in a plane, but expect to meet us for negotiating in short once BU gives me green light. I am putting a lot of effort here and am optimistic about it."

49.     On April 23, 2017, Jared Fry wrote to Mr. Herrerias to ensure that Nokia knew that Collision was still working diligently towards completion of the parties' shared goals and deadlines, but an expressed need to finalize the parties' agreement.

50.     In response, on May 3, 2017, on behalf of Nokia, Mr. Herrerias reassured Collision: "My plan is to be there Tuesday over next week (arriving Monday night, stay Wednesday and fly back Thursday evening, so we'd accomplished 2 days discussion, hopefully with a verbal agreement in transfer costs and NRE fees, even if not signed on paper. At least to have the view from both sides and the 'handshake' on the potential conditions."

51.     The next day, Nokia provided this further assurance: "Even if we don't achieve to have everything signed on paper by then, our agreement will help to make the workshop happen."

52.     That same day, Stan Fry wrote to Nokia: "We have continued to have our engineers working on the project pending your visit based on your 'green light' directive.   The team has been working now for 6 weeks without an agreement in place.  We believe this meeting is critical and we are anxious to resolve some of the issues with you so that we can continue with more of a sense of certainty. Without the meeting and progress on an agreement, the company will need to remove the engineers to work on another project."

53.     In his response the next day, Mr. Herrerias proposed a visit between Collision and Nokia 'BU heads' with the purpose of "to show our [Nokia's] commitment in our partnership."

54.     In reliance upon Nokia's expressed, clear intention and direction to come under a commercial agreement, with target deadlines for delivery of a commercial solution, and with articulated senior business leaders' support, Collision maintained its team working on the effort for Nokia.

55.     As promised, Mr. Herrerias travels to meet with Collision on May 16 and 17, 2017 with the stated intended purpose to come to an agreement on the terms for commercializing Collision's solution into Nokia's hardware.  During this meeting, Collision and Nokia were able

to discuss and come to consensus on a number of topics that would then make up the material terms of the commercial agreement.  Further, Nokia and Collision came to an understanding and agreement on what the structure would be of the written agreement that memorialized the commercial agreement.

56.     Further, in this meeting, it was discussed whether a fee-model should be royalty-based or a lump sum.  It was mutually agreed to that a royalty model would not make as much sense for this deal, and the parties furthered their discussions around a lump sum license model with an integration/non-recurring engineering or "NRE" fee.

57.     After the first day, Collision had proposed (among other terms), a $30M license fee.  The next day, Mr. Herrerias had indicated that he spoke with his business leaders, and that they couldn't accept the $30M proposal by Collision, but that they could accept a license fee of $20M.  The parties further discussed these terms and other ideas were proposed.

58.     The meeting adjourned with an agreement being reached for most of the terms, with the continued discussion remaining related to the license fee amount.

59.     Collision drafted the license and integration agreements with Nokia's understanding and encouragement that Collision would take the lead in drafting the agreement.  Mr. Herrerias stated that Nokia did not know how to draft this agreement.  The initial drafts provided by Jared Fry had the following, open terms:

  a.  The license amount
  b.  The license window (number of years vs Perpetual)
  c.  Additional payment for schedule delays by Nokia
  d.  Payment for the exclusivity fee in the agreement was terminated

60.     During the subsequent days Collision and Nokia came to agreement on these final, open points as follows:

14

    a. The license fee ($20 Million, the amount for which Mr. Herrerias had obtained approval).

    b. That the license would be perpetual.  Nokia had communicated that the license term of 5 years was all that was needed as that was the length of the product/solution lifecycle, and as a result 5 years was effectively 'perpetual'.

    c. And the exclusivity period would be 1 year.

    d. Collision dropped its requests for an additional payment for schedule delays and payment for exclusivity in the interest of completing the agreement.

61.    The parties' June 6, 2017 agreement contemplated payment terms occurring in three tranches.  The first for 60% upon delivery, the second at 20% by March 1, 2018, and the last 20% upon final delivery.

62.    On June 1, 2017, after Collision had sent the draft License and Integration Agreements, Mr. Herrerias wrote to Collision as follows: "I got support from LTE Business Line and Portfolio Management heads, accepting my 20m proposal."

63.    Mr. Herrerias, besides indicating intent to sign a written agreement memorializing the terms agreed to, reiterated the importance of not jeopardizing meeting the target deadline for release FL18A: "There was a clear interest in further usability and improvements of the receiver, especially for mMIMO and 5G, expressing the truly interest in investing money for PoCs in this area in a near future, once we sign the agreement, and without jeopardizing the integration to achieve commercial availability by FL18A."  In a clear indication that Nokia understood that the parties had agreed to all material terms and only the formality of signing the contract remained, Mr. Herrerias continued: "I am internally organizing many calls to get to that point to eventually sign the contract."

64.    On June 6th, 2017, Mr. Herrerias and Jared Fry had a phone call where Mr. Herrerias stated to Jared that he had received all necessary approvals for Nokia's $20M license fee proposal. Mr. Herrerias further indicated (a) that he was expecting markups from Nokia Procurement that day, and (b) that Nokia Procurement was very pleased with the drafts provided

by Collision.  Once the parties had finalized their agreement as to the last, few open terms, Mr.

Herrerias gave no indication that the draft agreements prepared by Collision were missing or

misstating material terms. On the contrary, Mr. Herrerias stated that he expects them [the written

agreements] to be signed next week or the week of the 19th.

65.    In that June 6, 2017 telephone call, Mr. Herrerias indicated that the amount of

money agreed to crosses a 'mark' that required additional sign-offs to "release the funds."  In

saying this, Mr. Herrerias gave no indication that this sign-off was anything more than an

administrative formality and that this extra process should be done by the very beginning of next

week.

66.    Two days later, Mr. Herrerias wrote that Nokia preferred to use its own template

version of a written agreement, but he gave no indication that any material terms were still left to

be agreed upon.

67.    In confirmation of this, on June 9, 2017, Nokia Procurement wrote to Collision

that "our next step is to work on the merge of applicable terms from your draft template into our

Nokia Agreement template" and "My goal will be to provide you our draft for your

review/redlining by Wed Jun 14 EoB"

68.    During a previously scheduled trip to Nokia in Finland on June 12, 2017, Stan Fry

met with senior management at Nokia,m including Tero Kola, then Head of Radio Portfolio

Management and Strategy.  Nokia had proposed the meetings "to show our [Nokia's]

commitment in our partnership"

69.    In these meetings, Tero Kola expressed surprise to Stan Fry that the parties had

not yet executed their written agreements. Stan Fry explained that Collision had nevertheless

been working in reliance upon the parties' agreement. Mr. Kola reaffirmed his support and said

that he would get involved so that the documents would be completed.

**Nokia Resists Signing Written Documents To Memorialize The Agreement While Encouraging Collision To Continue Performing**

70.    On June 15, 2017, Stan wrote to Mr. Herrerias to express concern that the written

agreements had still not been signed and that now Nokia's Procurement was going to redraft

them.

71.    Mr. Herrerias responded reassuringly on June 21, 2017 that the material terms

have not changed.  His response, on which he copied to many others at Nokia, gave Collision

comfort that the parties' agreement was in place, notwithstanding the lack of a signed contract.

In reliance upon this, Collision continued to perform the development work based on Nokia's

statement that the terms have not changed.

72.    When Collision again expressed concern about the delay in getting the contracts

signed, on June 28, 2017, Mr. Herrerias responded with "trust our process, we will make this a

success."

73.    Throughout the month of July there is a steady stream of communications

between Collision and some of Nokia's technical experts. These communications further assured

Collision that the agreement was in place and that Collision should continue performing under it.

74.    In August of 2017, Nokia told Collision that Nokia's version of the written

agreements were 95% complete.

75.    Without further communications from Nokia on the terms of the agreement,

Collision had no reason to believe that the material terms of the June 6, 2017 agreement had

changed (except for a concession by Collision related to the percentage of License Fee paid

upfront).

76.     On June 25, 2017, Jared Fry wrote to Nokia as follows: "Where is this process and when should we expect first drafts?  What has caused this process to draw out so long, and what has been the recent delay?  What are the remaining steps to go through?  Upon receiving drafts, how long is it expected to take to adjust negotiated terms as needed and to close it?  Alternatively, has this process or the deal contemplated taken a different path then from our last understanding?"

77.     In response, Mr. Herrerias further reassured Collision that the material terms had not changed and would be embodied in the written drafts from Nokia, stating that "All drafts are finished" and "The high level position has not varied in terms of overall NRE and technology license amounts."

78.     After further, unexplained delays coupled with customary assurances, on November 14, 2017, Mr. Herrerias again indicated that Nokia's drafts would be provided by Nokia early next week. Mr. Herrerias stated that there were not significant changes from the parties' agreed to terms and that he had instructed Procurement to use as much language as they can from the drafts supplied by Collision at the end of May 2017.

**Nokia Breaches The Agreement And Continues Stringing Collision Along**

79.     On November 20, 2017, Nokia finally sent their draft agreements to Collision. The terms of these agreements showed no resemblance to the terms the parties had agreed to the prior Spring.  These changes included:

   a. A reduction of the license fee from $20M to $7M
   b. No upfront payments
   c. No commitment to actually sell Collision's solution and pay the license fee
   d. Nokia would receive Collision's source code and 'own' (this was very problematic for number of reasons, one of which being that they had just conducted a Make-Buy study).

80.     Collision considered this to be a breach of the parties' Agreements reached on June 6, 2017. As a result, it notified Nokia that it was stopping its development effort on the Nokia integration.

81.     Mr. Herrerias instructed Collision to go ahead and make edits to the drafts and send them back.  Collision did just that, albeit with significant edits to make the agreement draft something that would be closer to acceptable. Collision also wrote a cover letter to Nokia that accompanied these edits, laying out its perspective of the situation.

82.     In response to Collision's edits and cover letter, Nokia's Tom Giers (Nokia Procurement) wrote a letter to Collision demanding that Collision agree that there had been no agreement between the parties.

83.     In obvious awareness that it had breached the agreement of June 2017, Nokia was now trying to pressure Collision into agreeing there was no agreement.  Further, that pressure included a threat of not moving forward if Collision did not agree.

84.     Thereafter, Nokia proceeded to engage in an egregious pattern of stringing Collision along to induce Collision to continue investing all of its resources in the parties' partnership, even as Nokia sought to change the material terms of that relationship. This stringing along behavior included repeated false assurances that an agreement was in place and was close to be finalized. These assurances were made by Nokia knowingly and intentionally to keep Collision on the hook, performing work for Nokia and sharing its highly valuable intellectual property with Nokia. During this period, which lasted until November 2018, Nokia induced Collision to expend approximately $4 million in detrimental reliance upon Nokia's false assurances.

### v. <u>Counts</u>

### <u>Count I: Breach of Contract</u>

85.     Plaintiff incorporates the foregoing paragraphs.

86.     As alleged above, the parties had a mutual agreement on all materials terms of their relationship and Collision had begun performing under that agreement.

87.     Defendants breached the material terms of that contract by their misconduct including without limitation, their attempt to change the terms of the agreement and thgeir improper purported termination of the parties' agreement and their refusal to perform under same.

88.     Defendants' breaches caused Plaintiffs significant damages in excess of $20 million.

### <u>Count II: Breach of Contract</u>

89.     Plaintiff incorporates the foregoing paragraphs.

90.     By the conduct alleged more particularly above, Nokia breached the covenant of good faith and fair dealing implied in all contracts, causing Collision damages in excess of $20 million.

### <u>Count III: Detrimental Reliance</u>

91.     Plaintiff incorporates the foregoing paragraphs.

92.     By the conduct alleged more particularly above, including without limitation, Nokia's repeated statements and assurances to Collision that the parties had reached an agreement and that Collision would be paid for the work that it was performing for Nokia's benefit, which work Nokia has explicitly directed to proceed in order to meet agreed upon

deadlines, Nokia made statements which Nokia knew or reasonably should have known would include the reliance of Collision.

93.     Collision reasonably relied upon Nokia's many statements and assurances to its detriment by materially changing its position, including by devoting all of its corporate resources towards performing work for Nokia in furtherance of the parties' contractual and business relationship.

94.     As a result of Collision's detrimental reliance upon Nokia's promises and assurances, Collision suffered damages in excess of $20 million and injustice can be avoided only by enforcement of Nokia's promises.

### Count IV: Negligent/Intentional Misrepresentation

95.     Plaintiff incorporates the foregoing paragraphs.

96.     By the conduct alleged more particularly above, including without limitation each of the specific statements made by Nokia in writing and by telephone to Collision's Jared Fry at his office in Massachusetts, Nokia made statements which it knew or should have known were false.

97.     These statements, as alleged specifically above, were statements of fact which were capable of knowledge by Nokia, including without limitation that Nokia would pay Collision for its work, that Nokia was prepared to sign contractual documents confirming the material terms of the parties' verbal agreements, and that Collision should keep performing work for the benefit of Nokia in reliance upon promises of compensation (including payment of licensing and integration fees).

98.     In making statements, as alleged specifically above, that Nokia knew or should have known were false, Nokia made material misrepresentations of fact to Collision, which Collision reasonably relied upon to its detriment.

99.     As a result of Nokia's misrepresentations, Nokia suffered damages in excess of $20 million.

### Count V: Quantum Meruit

100.    Plaintiff incorporates the foregoing paragraphs.

101.    Collision performed work for Nokia which is of the type for which parties normally expect to be compensated and are entitled to be compensated.

102.    Nokia knew that Collision was performing this work with the expectation of compensation and Nokia gained a benefit from the work that Collision performed.

103.    As a result of Nokia's failure to fairly compensate Collision for the work that it performed, Collision is entitled to damages in an amount to be proven at trial.

### Count VI: Violation Of M.G.L. Chapter 93A

104.    Plaintiff incorporates the foregoing paragraphs.

105.    Nokia and Collision are both engaged in trade or commerce in Massachusetts.

106.     The majority of the wrongful conduct in which Nokia engaged consisted of false statements and intentional breaches of Nokia's obligations which Nokia conveyed via email and telephone to Collision's Jared Fry, who was working out of and based in Boston, Massachusetts.

107.    At all times, Nokia was aware that Jared Fry was working out of and based in Boston, Massachusetts.

108.    The complained of conduct above, including intentional breaching known contractual obligations for the sake of gaining leverage in order to renegotiate contractual terms

and including misrepresenting facts for the sake of inducing reliance by the other party in their business dealings, is conduct which is unfair and deceptive under M.G.L. c. 93A.

109.    Nokia's unfair and deceptive was willful and knowing.

110.    Nokia's willful and knowing conduct in violation of c. 93A caused Collision more than $20 million in damages, which damages should be multiplied under c. 93A.

WHEREFORE, Collision respectfully requests that the Court enter judgment in favor of Collision and against Nokia on all counts of the Complaint and award Collision its damages in an amount to be proven at trial, which damages should be trebled under c. 93A along with an award of costs, interests, and attorneys' fees.

## JURY DEMAND

Plaintiff demands a jury on all counts so triable.

Respectfully submitted,

COLLISION COMMUNICATIONS,

/s/ Tyler Chapman
Tyler E. Chapman (BBO # 637852)
tchapman@toddweld.com
Maria Davis (BBO # 675447)
mdavis@toddweld.com
Tara D. Dunn (BBO # 699329)
tdunn@toddweld.com
Todd & Weld LLP
One Federal Street
Boston, MA 02110
617-720-2626

Dated:  November 1, 2019