UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NOKIA SOLUTIONS AND NETWORKS )<br>OY, )<br>)<br>Defendant. ) | C.A. No. 1:19-cv-12251-ADB |

## COLLISION COMMUNICATIONS OPPOSITION TO
## NOKIA SOLUTIONS AND NETWORKS OY'S MOTION TO DISMISS

### i. **Introduction**

Plaintiff Collision Communications, Inc. ("Collision") opposes Nokia Solutions and Networks OY's ("Nokia") Motion Dismiss (Docket #16). As the Amended Complaint (the "Complaint") sets forth, Collision has valid claims against Nokia stemming from Nokia's repeated false promises, assurances, and representations, all of which caused Collision significant damages. Therefore, the Court should deny Nokia's motion in its entirety.

Collision is a start-up technology company focused on selling its technology to cellular infrastructure/Original Equipment Manufacturers ("OEMs") like Nokia. The parties held negotiations in 2017 regarding Collision's provision of a software solution to Nokia for their cellular base-station products. Collision's Jared Fry ("Jared") was principally involved in negotiations on behalf of Collision from his Massachusetts office. In June 2017, the parties reached a verbal agreement on all of the material contractual terms for Nokia to license Collision's technology. The final terms most notably included Nokia's payment to Collision of a $20 million licensing fee, another $3 million payment as compensation for Collision's efforts to integrate its technology with Nokia's, and, because Nokia was aware of the unique, proprietary technology that Collision had developed, an exclusivity arrangement with Nokia, which prohibited Collision from licensing its technology to Nokia's competitors.

Following their agreement, Nokia proceeded to confirm numerous times that the agreement was being memorialized in a written document which would contain all of the agreed-upon, material terms. Nokia repeatedly failed to produce the document, and when Collision expressed concern to Nokia about this pattern of broken promises, Nokia provided repeated assurances that that the material terms of the parties' agreement remained unchanged.

1

Nokia finally circulated a draft agreement to Collision months later, which contradicted and changed the parties' agreed-upon material terms. Since Nokia was aware of the work in which Collision had engaged towards performing under the parties' agreement, Nokia apparently decided to take advantage of Collision's commitment and renege on the parties' agreement in an effort to extract better terms for itself. Ultimately, in November 2018, after trying to renegotiate the parties' June 2017 agreement, Nokia walked away from its obligations completely.

Nokia's conduct more than amply supports Collision's claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), detrimental reliance (III), negligent/intentional misrepresentation (IV), quantum meruit (V), and Violation Of M.G.L. Chapter 93A (VI). Therefore, as more fully set forth below, Collision respectfully requests that the Court deny Nokia's motion to dismiss.[1]

## ii. Factual Allegations in the Complaint

The following facts alleged in the Complaint are to be taken as true and all reasonable inferences as may be drawn from them must be drawn in Plaintiff's favor. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).

*I.    Background Allegations Concerning Dealings Between Collision And Nokia*

Collision was formed in 2010 when it acquired certain intellectual property technology aimed at addressing interference in commercial cellular networks. See id., ¶¶16-18. Collision's business involves selling its technology to OEMs. See id. In order to integrate its technology into an OEM's cellular base-stations, Collision must take many steps with the support of the OEM. See id., ¶¶19-20. Collision's software solutions are unique and proprietary, and its

---

[1] There is a pending action in Delaware concerning the parties' dispute. Nokia filed that complaint on October 30, 2019, two minutes before Nokia's counsel sent Collision's counsel written notice declaring that Nokia was ending the parties' mediation process and related stand still agreement. In the Delaware action, Nokia seeks only declaratory relief. Collision's motion to dismiss or stay is currently pending in that action.

advanced technology typically replaces software that the OEM previously developed itself.  See id., ¶21.

Nokia began due diligence into Collision's technology in late 2015.  See id., ¶22. During this process, Nokia informed Collision that Nokia had tried to develop similar technology but had been unable to do so.  See id., ¶23.  After a successful diligence process, Nokia proposed moving into a "Proof of Concept ("PoC")" phase that would provide further information regarding Collision's technology.  See id., ¶¶23-25.  The parties entered into a written PoC agreement to govern this process.  See id., ¶¶25-26.  As the PoC process progressed, Collision and Nokia began discussing entering into a license agreement following the PoC.  See id., ¶27. As part of these discussions, in February 2017 representatives from Nokia came to Collision's offices.  See id., ¶¶28-29.  During their meetings, the parties established a plan for Collision to work with Nokia past the PoC to fully integrate its receiver into Nokia's hardware (called the "Airscale"), including milestones for their work.  See id., ¶30.  The parties agreed that the first two milestone would take place just a few months away, see id., and that Collision would be required to demonstrate its work for Nokia at a large industry event soon after.  See id., ¶32.

Nokia and Collision understood and agreed that Collision would begin work as soon as possible to meet the fast-approaching deadlines.  See id.  Nokia expressly reassured Collision of the importance of meeting the parties' agreed upon deadlines, reassured Collision that it would pay Collision for its work and confirmed that the parties would formalize a license agreement, the terms of which the parties had begun to negotiate.  See id., ¶¶33-34.

II.     *The Parties Negotiate Towards And Reach A Final Agreement*

Soon after the workshop, so as to enable Collision to meet the agreed-upon milestone targets, Nokia (a) arranged delivery of an Airscale for Collision to develop its technology onto,

(b) arranged for support from Nokia experts to assist Collision in developing its work, and (c) worked to extend the PoC agreement to cover the first milestone, before a new contract was in place. See id., ¶36. Nokia further urged Collision to work toward the integration goal. See id., ¶39. Collision understood from Nokia's requests that Nokia intended for Collision to continue to work after completion of the PoC, that Collision should be paid for this work, and that risk of delay is a concern of Nokia's. See id.

On March 22, 2017, Francisco "Paco" Lopez Herrerias ("Herrerias") sent Collision a draft Extension to the PoC agreement. See id., ¶41. Collision completed the PoC effort prior to the parties executing the extension agreement, however, and Herrerias informed Collision that the parties should move directly to finalizing the full commercial agreement. See id., ¶42. The parties continued to work jointly towards commercial integration. See id., ¶43. On April 12, 2017, Herrerias sent Collision Nokia's software for Collision to integrate with its receiver software and asked Collision to begin the integration process. See id., ¶45. In doing so, Herrerias explicitly instructed Collision not to use the Nokia software "for any other purpose beyond our integration work and Nokia-CC PoC follow up activity." See id.

During this time period, Nokia repeatedly represented to Collision that Nokia's desire was to reach a full commercial licensing agreement and to have it done in a matter of weeks. See id., ¶¶46-47. Collision confirmed to Herrerias that it continued to work diligently on its project but expressed need to finalize the parties' agreement. See id., ¶48. In response, in early May 2017, Herrerias, on behalf of Nokia, reassured Collision that he would meet with them the following week to come to an agreement "to make the workshop happen[,]" even if they would not be able to commit that agreement to writing by that time, and proposed other measures intended "to show [Nokia's] commitment in our partnership." See id., ¶¶49-52. In reliance upon

Nokia's assurances that it would come under a commercial agreement and directions to keep working, Collision maintained its team working on the effort for Nokia. See id., ¶¶51, 53.

Herrerias did travel to meet with Collision in May 2017. See id., ¶54. During their meetings, Collision and Nokia came to an agreement on most material terms of their agreement, and Collision began drafting a licensing contract. See id., ¶¶54-55, 57-58. The parties continued to negotiate and ultimately agreed to all material terms, including, without limitation, the license amount ($20 million), the license window and the exclusivity period. See id., ¶59. Herrerias advised Collision that he had received all necessary approvals for the $20 million license fee, that he was working internally to have the contract signed and that he expected that the parties' agreement would be signed in June 2017. See id., ¶¶60, 62-63. Throughout negotiations, Herrerias prompted Collision to continue working on the project. See id., ¶62.

On June 8, 2017, Nokia announced that it would use its own template for the parties' written agreement, but re-assured Collision that it would be done in a matter of days. See id., ¶¶65-66. When Nokia did not provide the agreement within that time frame, it continued to represent to Collision that the material terms had not changed. See id., ¶¶69-71, 75-76, 77. Collision relied upon those representations and continued to perform its agreed-upon duties. See id., ¶70. In performing its obligations, Collision was in steady contact with Nokia's technical experts, who routinely provided necessary information to Collision. See id., ¶72.

III.    _Nokia Breaches The Agreement And Continues Stringing Along Collision Along_

On November 20, 2017, Nokia finally sent their draft agreements to Collision. Contrary to its representations, the draft agreements drastically changed material terms to which the parties had already agreed. See id., ¶78. Specifically, the license fee was lowered from $20

million to $7 million; all upfront payments were removed; Nokia was not in fact required to sell

Collision's solution or to pay the license fee; and Nokia would own Collision's source code. Id.

Collision advised Nokia that its draft was in breach of the parties' June 6, 2017

Agreement. See id., ¶¶79-81. In response, Nokia demanded that Collision agree that there had

never been an earlier agreement and threatened that it would not move forward at all unless

Collision made this agreement. See id., ¶¶79-82. Despite its threats, Nokia continued to string

Collision along by claiming that a suitable agreement was in place and close to being finalized.

See id., ¶83. As a result, and because Collision had devoted all of its resources to the Nokia

project, Collision continued to perform on Nokia's behalf and to share its highly valuable

intellectual property with Nokia, until approximately November 2018. See id. During this time

period, Collision spent approximately $4 million performing work on Nokia's behalf. See id.

### iv. Standard of Review

In deciding a motion to dismiss, a court may consider only the factual allegations in the

complaint and documents outside the complaint that are "integral to or explicitly relied upon in

the complaint[.]" Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24,

32 (1st Cir. 2000); see also Chatman v. Gentle Dental Ctr. of Waltham, 973 F. Supp. 228, 232

(D. Mass. 1997).[2] A motion to dismiss should be denied where factual allegations in the

pleading are "enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S.

at 555. It is the plaintiff's burden "at the pleading stage [to make] allegations plausibly

suggesting (not merely consistent with)" the right to relief. Id., at 557. "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

---

[2] Courts have found "integral" documents to include, for example, the allegedly libelous magazine article in a libel
action, see Fudge v. Penthouse, Int'l, Ltd., 840 F.2d 1012, 1014-15 (1st Cir.1988); the advertisement copy in a claim
for false advertising, see Clorox Co. Puerto Rico, 228 F.3d at 32; and a town ordinance in a case involving that
ordinance. See York v. Town of Limington, Maine, 2003 WL 22290326, at *1 (D. Me. Oct. 7, 2003), report and
recommendation adopted sub nom. York v. Town of Limington, 2003 WL 22681544 (D. Me. Nov. 13, 2003).

that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Although mere legal conclusions are not sufficient to support a claim, factual allegations in the pleading must be taken as true. See id. (quoting Twombly, 550 U.S. at 555). Further, the Court must "draw all reasonable inferences in the plaintiff's favor." Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).

Here, Nokia attaches twelve exhibits to its motion to dismiss, all but two of which contain email chains reflecting various communications between the parties. These email chains are not part of the Complaint, are not integral to the Complaint, and raise numerous questions of fact that cannot be decided at the motion to dismiss stage. As a result, the Court should only consider Exhibits 1 and 2 and should disregard Exhibits 3 through 12.

### v. **Argument**

### I.   **MASSACHUSETTS LAW APPLIES TO ALL CLAIMS**

As a threshold matter, Nokia is incorrect to argue that Delaware law applies here because a Delaware choice of law provision happens to appear in an unexecuted draft agreement which Nokia itself maintains is not a valid agreement. It is, in fact, the height of irony that Nokia comes into this Court to dispute the validity of all the material terms of that unexecuted document, but then insists that a non-material choice of law provision is somehow binding on Collision. That can hardly be a basis for this Court to decide the choice of law question here.

Instead, Massachusetts applies "a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." See Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631 (1985). Here, since the impact of Nokia's actions occurred primarily in Massachusetts, Massachusetts law applies.

Specifically, the vast majority of the parties' negotiations and interactions – all of which underlie this action – took place by phone and email, between Nokia and Collision's COO, Jared Fry, who was running Collision's operations from his office in Boston, where he is based. See Complaint, ¶¶11, 13; Affidavit of Jared Fry, ¶¶ 4-5. Jared, one of Collision's principals, works primarily out of his Boston office. See id. As a result, numerous factors weigh in favor of applying Massachusetts law to Collision's claims, including that Nokia made numerous misrepresentations and promises to Jared which he received in Massachusetts; that the contract between the parties was formed through Nokia's negotiations with Jared while he was in Massachusetts; and that Jared directed Collusion's actions from Massachusetts based on the representations and agreements Nokia made to him. As a result, Massachusetts has a greater tie to, and interest in, this litigation than any other forum.

In light of these well-documented communications, Nokia's insistence that this Court should enforce the Delaware choice of law provision in the parties' draft written agreements, but not any other provision of those agreements, makes no sense; the parties' choice of law provision is not one of the material terms Collision is seeking to enforce. Similarly, Nokia cannot claim that New Hampshire law applies when it knew that it was relaying its binding commitments and, later, its misrepresentations, to Collision via its COO in Boston. Therefore, this Court should apply Massachusetts law.

## II.   COLLISION HAS STATED A VIABLE BREACH OF CONTRACT CLAIM

Nokia argues that Collision's breach of contract claim fails because there was never a contract, oral or otherwise. Given the standard at the motion to dismiss stage, the factual allegations in the Complaint are sufficient to show that the parties had a valid contract.

A. **The Statute of Frauds Does Not Bar Collision's Breach Of Contract Claim**

Nokia argues incorrectly that the oral agreement between Collision and Nokia cannot be enforced under the Statute of Frauds.  The Statute's application is not as broad as Nokia suggests, however, and clearly does not bar enforcement of the parties' agreement. While the Statute of Frauds prohibits any action based on an oral agreement "that is not to be performed within one year from the making thereof[,]"G.L. c. 259, § 1, courts only apply this section of the Statute where the alleged agreement includes a specific term of years. See e.g., Richard Tucker Assocs., Inc. v. Smith, 395 Mass. 648, 650 (1985) (oral agreement for a term of at least one year could not be performed within a year and was barred by the Statute of Frauds); Powers v. Bos. Cooper Corp., 926 F.2d 109, 110 (1st Cir. 1991) (oral contract lasting until a party's fixed age more than a year in the future was barred by the Statute of Frauds).

By contrast, where an oral agreement could **possibly** be performed within one year, the Statute of Frauds does not bar the claim.  See Boothby v. Texon, Inc., 414 Mass. 468, 479 (1993).  Specifically, "[t]he Statute of Frauds "applies only to contracts which by their terms **cannot** be performed within the year."  Id. (emphasis added).  Thus, "[i]t does not apply to contracts which may be performed within, although they may also extend beyond, that period." Id.; see also Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 551–52 (1st Cir. 1989) (contract for lifetime employment is not subject to the Statute of Frauds, because the contract may be performed within one year if the employee happens to die within the year).

Here, the agreement between Collision and Nokia did not contain a term of multiple years and potentially could have been performed within a year.  At the time the oral agreement was made, Collision had accomplished what was necessary to demonstrate that its technology could be integrated with Nokia's system through the PoC and the parties were entering into the

9

final stages of integrating Collision's technology.  Notwithstanding Nokia's numerous delays, there is no indication that performance by both parties within a year could not possibly have taken place.  In other words, the alleged agreement here does not, by its terms, make it impossible to perform within one year. As a result, the parties' agreement was not within the scope of the Statute of Frauds and the Court should deny Nokia's motion on this basis.

### B.   **The Integration Agreement Is Not Invalid Due To A Condition Precedent**

Nokia argues that the Integration Agreement is not valid because it contains a condition precedent requiring the License Agreement be executed before it becomes effective.  This argument ignores applicable case law concerning when a condition precedent actually applies. There are two types of conditions precedent.  See City of Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 719, 716 N.E.2d 138, 141 (1999).  The first type "involves issues of offer and acceptance which precede and determine the formation of a contract."  Id.  The second type "arises from the terms of a valid contract and defines an event which must occur before a right or obligation matures under the contract."  Id.  Regardless of type of condition precedent at issue, "Massachusetts law is clear: a party that prevents the other from satisfying a condition precedent cannot rely on the failure of the condition to avoid its own obligations under a contract." In re Access Cardiosystems, Inc., 361 B.R. 626, 646 (Bankr. D. Mass. 2007).

Here, Nokia 's argument ignores the fact that the parties had come to an oral agreement on June 6, 2017 reflecting all material terms of the parties' contract – the only terms necessary to form a valid contract.  Although those terms were later reflected in the draft agreements, those drafts merely memorialized the contract that the parties had already agreed to and were performing under, along with other administrative terms that had yet to be finalized.

Further, but for the actions and inactions of Nokia, the condition reflected in the written draft would have been executed. Ultimately, it was Nokia's delay, retraction of agreed upon material term, and ultimate breach of the parties' oral agreement that sabotaged the fulfillment of the written condition precedent. As a result, even if the condition precedent were a material term of the parties' agreement – which it is not – it would not be a basis to dismiss Collision's claim. Therefore, the Court should deny Nokia's motion.

## C. **Collision Has Stated A Valid Claim For Breach Of Contract**

Nokia argues that there was no valid contract because the parties did not intend to be bound by the agreement and not all material terms were included in the contract. These allegations depend on questions of fact and, therefore, are inappropriate to raise at the motion to dismiss stage. Therefore, the Court should deny Nokia's motion to dismiss this count.

### 1. **Whether The Parties Intended To Be Bound Is A Question Of Fact**

The question of whether parties intended to be bound by a contract "is generally a question of fact." Valle v. Powertech Indus. Co., 381 F. Supp. 3d 151, 161 (D. Mass. 2019) (internal quotation omitted). Specifically, "so long as the evidence does not point unerringly in a single direction but is capable of supporting conflicting inferences, the question of whether a contract has been formed between two parties is a question of fact to be determined by the factfinder." Brettel v. Omron Sci. Techs., Inc., 302 F. Supp. 3d 469, 475 (D. Mass. 2018) (internal citation omitted).[3] "Assent to be bound to an agreement can be determined from the words and actions of each party." DeCaro v. Hasbro, Inc., 542 F.Supp.2d 141, 153 (D. Mass. 2008). The fact that parties make an oral agreement, which they intend to memorialize in writing, is not inconsistent with an intent to be bound. See Murphy v. Chichetto, 323 Mass. 11,

---

[3] As the Court will no doubt observe, in its memorandum, Defendant relies upon case law involving summary judgment decisions or judgments after trials, since the question of intent is inherently a factual determination. As a result, these cases are inappropriate authority for Nokia to use in justifying dismissal on the pleadings alone.

14 (1948).  In such circumstances, it is proper to look at the parties' performance of the agreement in order to determine intent.  See id.

Here, the Complaints alleges that Nokia repeatedly told Collision that an agreement was in place, that the parties had agreed to all material terms, and that Collision should "trust [Nokia's] process, we will make this a success."  See Complaint, ¶¶72, 77.  Moreover, Nokia repeatedly urged Collision to meet deadlines the parties had agreed to, necessitating Collision to work before a signed contract was in place.  See id., ¶¶79, 84.  When considering Nokia's actions as a whole, along with the contract in its entirety, the facts alleged in the Complaint are sufficient to show that Nokia intended to be bound by the material terms of the contract. More is not required at this stage.

### 2.  Whether The Parties Agreed On All Material Terms Is A Fact Question

The determination of whether all material terms are present is a question of fact, and where the facts are disputed, "is a question for resolution by a fact finder." Dennis v. Kaskel, 79 Mass. App. Ct. 736, 744 (2011).  This is particularly true where the disputed facts involve oral evidence.  See Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 879 (2000).

Here, the terms that were material to Nokia and Collision's agreement included the license amount, the license window, and the exclusivity period.  See id., ¶59.  These terms were agreed to as of the June 6, 2017 agreement.  See id.  Moreover, the parties acknowledged that the material terms had been agreed upon and Nokia confirmed on multiple occasions that the material terms had not changed.  See Complaint, ¶¶71,77.  This was reinforced by Nokia's communications urging Collision to continue to work on the deliverables while Nokia claimed to be finalizing the agreement on its end.  Nokia's and Collision's communications and actions are sufficient at the motion to dismiss stage to allege that all material terms were agreed upon.

### III.   THE CLAIM FOR BREACH OF THE IMPLIED COVENANT IS PROPER

Nokia argues that Collision's claim for breach of the covenant of good faith and fair dealing fails solely based on its position that there is no contract between the parties. As set forth above, there is a binding contract between the parties, so the Court should reject Nokia's motion to dismiss the good faith and fair dealing count.

### IV.   COLLISION'S CLAIM FOR DETRIMENTAL RELIANCE IS PROPER

Nokia asserts that the Complaint does not plead a claim for detrimental reliance/promissory estoppel for two reasons, first that "detrimental reliance" is not a claim, and second that the complaint does not allege reasonable reliance. Nokia's argument fails on both counts.

#### A.   Detrimental Reliance Is An Independent Cause Of Action

Detrimental reliance, a term that is used interchangeably with "estoppel," is a valid cause of action. See, e.g., Johnny's Oil Co. v. Eldayha, 82 Mass. App. Ct. 705, 714 (2012) (holding that "[d]etrimental reliance on an offer or a promise (also known as promissory estoppel) is a substitute for consideration"); Braunstein v. McCabe, 571 F.3d 108, 114 n. 2 (1st Cir. 2009) (recognizing that "[t]he [plaintiffs] characterized the claim as one for 'detrimental reliance[,]'" and that "[p]romissory estoppel is the more common name for the cause of action, but Massachusetts courts use both names"). As a result, whether termed a claim for "Detrimental Reliance" or "Promissory Estoppel," Count III sets forth a valid cause of action.

#### B.   The Complaint Properly Alleges Reasonable Reliance

Nokia argues that the Complaint does not allege facts that would show that Collision reasonably relied upon Nokia's representations, even though it is replete with allegations supporting Collision's reasonable reliance. A party's reliance is reasonable where that party

relied upon a clear commitment. See, e.g., Upton v. JWP Businessland, 425 Mass. 756, 760 (1997).

Here, there are numerous allegations reflecting concrete commitments Nokia made to induce Collision to keep working: Nokia assured Collision that Collision would be paid for its work, (¶34); Nokia was drafting an extension to the PoC contract, so as to allow Collision to seamlessly continue its work on Nokia's behalf (¶39); Nokia urged Collision to meet tight deadlines before executing a written contract "through indicating if it met them, that Collision's solution would take over Nokia's solution roadmap" (¶43.c); Herrerias provided Collision with Nokia's software and instructed Collision to start integrating it with Collision's receiver software (¶45); the parties came to an agreement concerning all material terms of their anticipated written contract (¶58-59); Herrerias advised Collision that Nokia had agreed with the proposed $20 million licensing fee amount (¶61); Nokia continued to stress the importance of meeting looming deadlines (¶62); Nokia repeatedly asserted that the material terms of the parties' contract had not changed (¶¶70, 76); and Collision should "trust [Nokia's] process" because Nokia "will make this a success" (¶71). Nokia's specific statements and actions were designed to induce Collision to perform work on its behalf. Further, Collision's reliance on those concrete statements was particularly reasonable based on the existing relationship between the parties, the fact that the PoC phase had been a success, and the fact that Nokia continuously provided Collision the information and technology Collision needed to perform on Nokia's behalf.

Nokia attempts to evade the allegations in the Complaint supporting the element of reasonable reliance by relying on isolated statements it alleges rendered Collision's work "voluntary." For example, it relies on a statement of Tom Giers, made in response to Collision's assertion that Nokia was in breach, to claim that no agreement had been reached. Opposition, p.

14

15.  Given the self-serving nature of this statement and numerous contradictory interactions between the parties, this letter does not negate the reasonableness of Collision's reliance (and further, confirms that reasonable reliance should be determined following discovery).[4]

Further, the fact that the parties intended to enter into a signed agreement does not render Collision's reliance unreasonable.  Although Nokia cites two cases for this proposition (both of which are decided at the summary judgment stage not, as here, on a motion to dismiss), neither has any bearing.  Gruen Industries v. Biller, 608 F.2d 274, 280 stands only for the unrelated proposition that a party cannot recover expenses incurred in negotiating and drafting an agreement that does not come to fruition.  This is not the situation here.  Chromalloy Am. Corp. v. Universal Hous. Sys. of Am., Inc., 495 F. Supp. 544, 550 (S.D.N.Y. 1980), aff'd, 697 F.2d 289 (2d Cir. 1982), holds that reliance is not reasonable where a defendant "expressly disclaim[ed] any intention to be bound until the execution of [a written contract]."  No such express disclaimer was made here. Therefore, these cases are inapplicable and the Court should not hesitate to deny Nokia's motion on this ground as well.

## V.  THE COMPLAINT STATES A VIABLE CLAIM FOR MISREPRESENTATION

Collision's claim for negligent/intentional misrepresentation is pled with sufficient particularity and is supported by the facts alleged in the Complaint.

### A. Collision's Allegations Of Misrepresentation Are Sufficiently Pled

Under federal law, a plaintiff must plead allegations of fraud with particularity.  See Rodi v. S. New England Sch. Of Law, 389 F.3d 5, 15 (1st Cir. 2004).  The rule is designed "to apprise

---

[4] Indeed, this argument, as with all of Nokia's arguments, requires fact discovery. It is well-established that the question of whether a party's reliance is reasonable "depends on the specific facts of the case." Thrivent Fin. for Lutherans v. Strojny, 882 F. Supp. 2d 260, 270 (D. Mass. 2012); Kanamaru v. Holyoke Mut. Ins. Co., 72 Mass.App.Ct. 396, 405 (2008) (same). As a result, it is inappropriate to dismiss such a claim on motion under Fed. R. Civ. P. 12(b)(6) since "[w]hether reliance is reasonable is ordinarily a question of fact for a jury." Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 370 (D. Mass. 2002).

the defendant of fraudulent claims and of the acts that form the basis for the claim." Id. at 443.
"In other words, '[i]n cases in which fraud lies at the core of the action, the rule does not permit a
complainant to file suit first, and subsequently to search for a cause of action.'" Id. Thus, the
heightened pleading standard requires "specification of the time, place and content of an alleged
false representation, but not the circumstances or evidence from which fraudulent intent could be
inferred." Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985).

Collision has pled its claim for intentional/negligent misrepresentation with sufficient
particularity.  By way of example only, Collision alleges that: on June 1, 2017, Herrerias emailed
Collision and confirmed that Nokia had agreed to the $20 million license fee amount (¶61); that
on June 6, 2017, Herrerias called Jared and reported that he had received all necessary approvals
for Nokia's $20 million license fee proposal (¶63); and that on June 21, 2017, June 25, 2017, and
November 14, 2017 Herrerias emailed Collision to assure Collision that the material terms of
their agreement had not been change (¶¶70, 75, 77).  Based on Nokia's later draft agreement
setting the licensing fee at $7 million, these statements amounted to misrepresentations.

Collision also alleges that Nokia made misrepresentations concerning the imminence of
the executed contract in order to string Collision along.  For example: on June 9, 2017, Nokia
Procurement emailed Collision and advised that its goal would be to provide a draft agreement
by Jun 14, 2017 (¶66); at a meeting in Finland on June 12, 2017, Nokia manager Tero Kola
advised Stan Fry that he would become involved in the process to ensure that a contract was
finalized soon (¶68); and on June 25, 2017, Herrerias emailed Jared and confirmed that the draft
agreement had been completed (¶76).  Ultimately, despite repeated assurances that the agreement
would be forthcoming, Nokia waited until November 20, 2017, after Collision had already

incurred significant expense on Nokia's behalf, to send a draft agreement to Collision.  These

allegations are more than sufficient to meet the requirements of Rule 9(b).

### B.  Collision's Complaint Adequately Alleges Reasonable Reliance

As set forth in section v.IV.B, *supra*, the Complaint properly alleges that Collision

reasonably relied upon Nokia's various representations.

### C.  The Economic Loss Doctrine Does Not Bar Collision's Claim

Nokia argues that Collision's claim for misrepresentation cannot stand because it is based

upon the same factors that support Collision's breach of contract claim.  This argument fails for

two reasons.  First, unlike New Hampshire law, on which Nokia improperly relies, courts in

Massachusetts will uphold tort claims to recover economic losses even where those claims are

based on failure to perform contractual obligations.  See, e.g., Szulik v. State St. Bank & Tr. Co.,

935 F. Supp. 2d 240, 270 (D. Mass. 2013).

Second, even if the economic loss rule were to apply, Nokia's argument ignores the fact

that Collision has pled alternative theories of liability and has pled quasi-contractual claims in

addition to its contract claim.  To the extent Collision ultimately recovers under its quasi-contract

theory and not its contract theory, the economic loss doctrine cannot apply.  As a result, since it

is proper for a party to plead in the alternative even where two theories of liability are mutually

exclusive, the economic loss doctrine does not prevent Collision from pursuing this claim.  See,

e.g., SiOnyx, LLC v. Hamamatsu Photonics K.K., 332 F. Supp. 3d 446, 473 (D. Mass. 2018).

## VI.   COLLISION'S CLAIM FOR QUANTUM MERUIT IS PROPERLY ALLEGED

In order to plead a claim for quantum meruit, a plaintiff must allege "(1) that it conferred

a measurable benefit upon the defendants; (2) that the claimant reasonably expected

compensation from the defendants; and (3) that the defendants accepted the benefit with the

knowledge, actual or chargeable, of the claimant's reasonable expectation." <u>Finard & Co., LLC</u>

<u>v. Sitt Asset Mgmt.</u>, 79 Mass. App. Ct. 226, 229 (2011).  The "underlying basis for awarding

quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust

detriment to the other party," which "equates with the defeat of a person's reasonable

expectations." <u>Liss v. Studeny</u>, 450 Mass. 473, 479-80 (2008).

     Nokia alleges that Collision cannot plead a claim for quantum meruit because Collision

did not confer any benefit on Nokia.[5]  This statement is undermined by Collision's factual

allegations, which must be taken as true, and reasonable inferences drawn therefrom.

Specifically, Collision alleges that through its assurances and representations, Nokia obtained

Collision's valuable intellectual property.  <u>See</u> Complaint, ¶83.  This intellectual property was

particularly valuable to Nokia, which had previously tried and failed to develop techniques

similar to Collision's.  <u>See</u> <u>id.</u>, ¶23.  Moreover, Nokia's misrepresentations  and assurances

caused Collision to perform work for Nokia and to stand ready to meet Nokia's milestones.  <u>See</u>

<u>id.</u>, ¶43.  The fact that Nokia later determined it did not want the work product does not relieve it

from its liability to Collision any more than an individual commissioning the building of a house

would be excused from payment after a change of heart over the completed home.

## VII.  <u>COLLISION'S CLAIM UNDER G.L. C. 93A IS PROPERLY ALLEGED</u>

     Collision's claim for violations of Chapter 93A meets each of the requirements of G.L. c.

93A, and thus should be allowed to proceed.

### A.  <u>Massachusetts Law Applies to Collision's G.L c. 93A Claim</u>

     As set forth above, Massachusetts law governs Collision's claims.  As a result, Nokia's

93A violations – which are based upon Nokia's numerous misrepresentations made to Collusion

---

[5] Nokia relies on almost no caselaw for this proposition, citing a single case from 1949 to argue that there should be no recovery where the plaintiff did not confer benefits on the defendant.  Significantly, that case was under review after trial, when the factual record would have been complete.  <u>See</u> <u>Welch v. Coleman</u>, 95 N.H. 399, 402 (1949).

in Massachusetts and breach of the agreement it formed with Collusion in Massachusetts – are likewise governed by Massachusetts law.[6]

### B.  Collision Has Not Waived Its G.L. c. 93A Claim

Nokia asserts that Collision waived its G.L. c. 93A claim in the Integration and License Agreement.  This argument fails because the waiver included in the Integration and License Agreement does not encompass the 93A claim that Collision has asserted against Nokia.  As the cases Nokia cites make clear, in "some circumstances a 93A claim may be duplicative of a warranty claim, and therefore, a clause excluding consequential damages can also bar a 93A claim."  Boston Helicopter Charter, Inc. v. Agusta Aviation Corp., 767 F. Supp. 363, 377 (D. Mass. 1991) (holding 93A claim was barred where the contract excluded consequential damages and the 93A claim was based on product defects); see also Canal Elec. Co. v. Westinghouse Elec. Corp., 406 Mass. 369, 378 (1990) (same).  Here, Collision is not seeking consequential damages as a result of any warranty claim, so the waiver does not affect Collision's 93A claim.

Further, even if the waiver were to apply to Collision's 93A claims, it would have no bearing on Collision's claims for 93A violations sounding in quasi-contract or tort. This claim should be allowed to proceed.

### C.  The Conduct At Issue Occurred Primarily and Substantially In Massachusetts

To determine where conduct constituting a 93A violation took place, courts apply a "center of gravity" test.  Sonoran Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 546 (1st Cir.

---

[6] Even if the Court were to determine that Massachusetts law does not apply to Collision's contract claim, Collision has also asserted the tort claim of negligent/intentional misrepresentation, based on Nokia's stringing Collision along and continuously inducing Collision to perform on its behalf.  Any violation of 93A based on these actions would not be governed by any contractual choice of law provision.  See Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 11 (1st Cir. 1994) ("when a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered as a tort for choice-of-law purposes."); see also Plastic Surgery Assocs., S.C. v. Cynosure, Inc., 407 F. Supp. 3d 59, 78 (D. Mass. 2019) ("the choice of law provision in the SculpSure purchase agreements does not apply to Plaintiffs' claims under Chapter 93A, § 11 because those claims sound in tort, rather than in contract, and therefore fall outside the provision's scope.").

2009).  This test assesses where the impact of the unfair or deceptive acts or practices occurred.

See Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 638 (1985).  For example, in

Bushkin, the New York plaintiff, Bushkin, filed a 93A claim against Raytheon based on

Raytheon's false representations to Bushkin.  See id.  The statements had been made in

Massachusetts and the plaintiff had relied upon them in New York.  See id.  Based on those

facts, the Supreme Judicial Court held that the "[t]he alleged unfair or deceptive acts or practices

were statements made in Massachusetts but received and acted on in New York[,]" and thus that

"[a]ny loss was incurred in New York."  Id.  As a result, the court determined that the conduct

primarily and substantially occurred in New York and therefore that 93A could not apply.  See

id.; see also Sonoran Scanners, Inc., 585 F.3d at 546 (holding that deceptive conduct occurred in

Arizona, where a company "received and acted upon" the deceptive conduct).

Here, Nokia conducted negotiations with and made misrepresentations to Collision

through email and by telephone.  The vast majority of those communications were to Jared Fry,

Collision's COO who runs the company's operations from Boston and handled communications

with Nokia from there.  See Complaint, ¶¶11, 13.  Jared relied upon Nokia's representations in

Massachusetts and acted upon those representations by instructing the team working on Nokia's

project to continue working.  See id., ¶¶40, 48, 58, 63, 75-76.  As a result, the deceptive acts

occurred primarily and substantially in Massachusetts.

## vi. **Conclusion**

For the foregoing reasons, Collision Communications respectfully requests that Nokia's

motion to dismiss be denied in its entirety.  Collision requests oral argument on Nokia's Motion.

COLLISION COMMUNICATIONS, INC.

*/s/ Tyler Chapman*
Tyler E. Chapman (BBO # 637852)
tchapman@toddweld.com
Maria Davis (BBO # 675447)
mdavis@toddweld.com
Tara D. Dunn (BBO # 699329)
tdunn@toddweld.com
Todd & Weld LLP
One Federal Street
Boston, MA 02110
Tel: 617-720-2626

Dated:  February 21, 2020

## CERTIFICATE OF SERVICE

I, Tyler E. Chapman, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 21, 2020.

*/s/ Tyler E. Chapman*
Tyler E. Chapman