UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NOKIA SOLUTIONS AND NETWORKS )<br>OY, )<br>)<br>Defendant. ) | C.A. No. 1:19-cv-12251-ADB |

**COLLISION COMMUNICATIONS' OPPOSITION TO
NOKIA SOLUTIONS AND NETWORKS OY'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

### i. **Introduction**

Plaintiff Collision Communications, Inc. ("Collision") hereby opposes Nokia Solutions

and Networks OY's ("Nokia") Motion to Dismiss for Lack of Personal Jurisdiction (Docket

#12). Due to Nokia's voluntary, persistent, and ongoing business communications to Collision in

Massachusetts, including the communications which form the basis of Collision's contract,

quasi-contract, and tort claims in this case, this Court has personal jurisdiction over Nokia under

the Massachusetts Long Arm Statute. Under the circumstances present here, this Court's exercise

of such jurisdiction comports with due process. Therefore, the Court should deny Nokia's motion

and permit this action to proceed without further delay.

This case arises out of the parties' technology partnership. As detailed in the Amended

Complaint in this matter (Docket # 6), all of Collision's claims (which include breach of

contract, fraud and misrepresentation, detrimental reliance, and violation of G.L. c. 93A) are

based entirely upon Nokia's promises, assurances, and misrepresentations – all of which Nokia

knowingly and purposefully communicated into Massachusetts in the course of the parties'

ongoing business relationship. Specifically, as confirmed in the Affidavit of Jared Fry, filed

herewith, Nokia knew that Mr. Fry (Nokia's chief of operations ("COO")) was running

Collision's operations from his office in Boston and managing Collision's negotiations and

performance under the parties' agreement from there. See Affidavit of Jared Fry, ¶¶ 4-6.

Therefore, when Nokia made promises and assurances concerning the negotiation and

finalization of the parties' technology partnership agreement and made further

misrepresentations intended to induce Collision to continue performing under that agreement,

Nokia knew that it was communicating those statements to Collision at its COO's office in

Boston, Massachusetts. See id. These statements, which form the basis of Collision's claims in

contract and tort and under c. 93A, are sufficient to establish this Court's personal jurisdiction

over Nokia.

As alleged in the Amended Complaint, Nokia's primary representative in most of these

communications with Collision was Francisco "Paco" Lopez Herrerias. See Amended

Complaint, ¶ 37. Conspicuously, however, Nokia offers no supporting affidavit from Mr.

Herrerias to dispute that he knew of Mr. Fry's presence in Boston during nearly all of their

communications. Indeed, Mr. Herrerias could not truthfully make such an averment under oath.

Another background fact here is that on July 18, 2019, Collision's Boston-based counsel

sent Nokia a demand letter setting forth all of Collision's claims under Massachusetts law. Nokia

responded via its own Boston-based counsel, who indicated that Nokia was willing to proceed to

mediation. As more fully detailed in Collision's accompanying Opposition to Nokia's motion to

stay, knowing full well that Collision intended to file suit here, Nokia nevertheless engineered a

race to the courthouse so that it could pre-emptively file a declaratory judgment action in

Delaware. If Nokia genuinely believed that Collision's claims in this litigation (which was filed contemporaneously with Nokia's Delaware declaratory judgment action) were subject to dismissal on substantive or jurisdictional grounds, there would have been no reason for Nokia to file an anticipatory action in Delaware since it could simply dismiss this action and be done. Nokia's litigation tactics, then, appear aimed primarily at driving up unnecessary, duplicative expenses for Collision, which Nokia knows is a small, pre-revenue startup operation. Nokia's tactics are not meritorious.

Therefore, as argued more fully below, this Court should deny Nokia's motion for the following reasons: (1) this Court has personal jurisdiction over Nokia under Section 3(a) of the Massachusetts Long-Arm Statute; (2) this Court also has jurisdiction over Nokia under Section 3(c) of the Massachusetts Long-Arm Statute; and (3) exercise of specific jurisdiction over Nokia is constitutionally permissible.

## ii. **Factual Background**

As set forth in the Amended Complaint, this is an action for breach of contract, misrepresentation, detrimental reliance, violation of G.L. c. 93A and other wrongdoing in connection with a technology partnership between Collision and Nokia. All of Collision's claims arise from statements which Nokia made in the course of its negotiation and intentional breach of the parties' binding agreement to become technology partners as well as from Nokia's misrepresentations and other stringing along conduct following Nokia's breach. See Amended Complaint, ¶ 2. Virtually all of the statements on which Collision premises its claims in this case were purposefully communicated by Nokia into Massachusetts, where Nokia knew that Collision's COO, Jared Fry, was running the company's operations and handling Collision's

negotiations and performance under the parties' agreements. See id., ¶ 11; Affidavit of Jared Fry, ¶¶ 4-6.

Collision is a start-up technology company focused on selling its technology to cellular infrastructure/Original Equipment Manufacturers ("OEMs") like Nokia. See Amended Complaint, ¶ 19. The principals of Collision are Stan and Jared Fry, who are father and son. See id., ¶ 11. By contrast, Nokia is a multi-billion-dollar multi-national corporation. Nokia's website states that one of its worldwide offices is located in in Westford, Massachusetts. See https://www.nokia.com/worldwide/#americas (identifying Nokia office located at 1 Robbins Road, Westford, MA 01886).

In order to integrate its technology into an OEM's cellular base-stations, Collision must take many steps with the support of the OEM. See Amended Complaint, ¶¶ 19-20. Collision's software solutions are unique and proprietary, and its advanced technology typically replaces software that the OEM previously developed itself. See id., ¶ 21.

After expressing interest in Collision's technology, Nokia began due diligence into Collision's technology in late 2015. See id., ¶ 22. During this process, Nokia informed Collision that Nokia had tried to develop similar technology but had been unable to do so. See id., ¶ 23. After a successful diligence process, Nokia proposed moving into a "Proof of Concept ("PoC") phase that would provide further information regarding Collision's technology. See id., ¶¶ 23-25. The parties entered into a written PoC agreement to govern this process. See id., ¶¶ 25-26.

Following the parties' negotiations during the spring of 2017, on June 6, 2017, Collision and Nokia ultimately reached agreement on all the material contractual terms of their agreement for Nokia to license Collision's technology and for Collision to begin performing the work to

integrate Collision's technology with Nokia's. See id., ¶ 3. Under this agreement, Collision agreed to provide a software solution to Nokia for their cellular base-station products. See id.

After the parties agreed to all material terms of their partnership, Nokia proceeded to confirm numerous times in writing that the agreement was being memorialized in a written document which would contain all of the agreed-upon, material terms. See id., ¶ 4. These terms included, most notably, Nokia's payment to Collision of a $20 million licensing fee to license Collision's technology and another $3 million payment for an integration fee. See id. Critically, because Nokia was aware of the unique, proprietary technology that Collision had developed, Nokia also required Collision to enter into an exclusivity arrangement with Nokia, which prohibited Collision from licensing its technology to Nokia's competitors. See id.

Following the parties' verbal agreement on the material terms, and while Collision was under its exclusivity commitment, Collision continued performing under the parties' agreement. As Collision was doing so, however, Nokia repeatedly made promises about finalizing the parties' written agreements and then later breached those promises. See id., ¶ 5. When Collision expressed concern to Nokia about this pattern of broken promises, Nokia provided repeated assurances that that the material terms of the parties' agreement remained unchanged and that only formalities remained to be completed to finalize the parties' written contract. See id.

After several months of this behavior, Nokia finally circulated written documents to Collision which contradicted and changed the material terms to which the parties had already agreed. See id., ¶ 6. Since Nokia was aware of the work in which Collision had engaged towards performing under the parties' agreement, Nokia plainly recognized that it could take advantage of Collision's commitment and renege on the parties' agreement in an effort to extract better terms for itself. See id. In apparent recognition that its actions were in breach of the parties'

agreement, Nokia asked Collision to agree that the parties had never reached an agreement back in June 2017, which Collision refused to do. See id., ¶ 7.

Nokia first promised that it would finalize the parties' written agreement in a matter of weeks following their agreement on the material terms in June 2017. See id., ¶ 8. Instead, 538 days elapsed between the time of the parties' agreement to the material terms and when Nokia ultimately walked away completely on its numerous commitments to Collision. See id. Throughout that time period, in reliance upon Nokia's repeated statements and assurances, nearly all of which were communicated to Collision in Massachusetts, Collision continued to work on Nokia's behalf to deliver under the parties' agreement. See id.; Affidavit of Jared Fry, ¶ 8. These statements by Nokia included reassurances to Collision about the significance of Collision's technology in the context of Nokia's products and roadmap, reported that top level executives had approved the specific deal terms, and expressed unconditional confidence that the deal was going to get done. See Amended Complaint, ¶ 8. Ultimately, in November 2018, after previously reneging on and trying to renegotiate the parties' June 2017 agreement, without warning, Nokia walked away completely from its obligations to Collision – refusing to pay Collision the licensing fee or the integration fee and refusing to compensate Collision for the millions of dollars it had invested for Nokia's benefit in reliance upon Nokia's explicit and repeated reassurances. See id., ¶ 9.

### iii. **Argument**

In a diversity suit such as this one, this Court acts as "the functional equivalent of a state court sitting in the forum state." Astro-Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d 1, 8 (1st Cir. 2009). Accordingly, to make a prima facie showing of personal jurisdiction in diversity cases, the plaintiff must demonstrate that the exercise of jurisdiction (1) is permitted by the

Massachusetts long-arm statute, M.G.L. c. 223A § 3, and (2) coheres with the Due Process

Clause of the Fourteenth Amendment of the United States Constitution by showing that each

defendant has "minimum contacts" with Massachusetts. <u>Daynard v. Ness, Motley, Loadholt,</u>

<u>Richardson & Poole, P.A.,</u> 290 F.3d 42, 52 (1st Cir. 2002).

      In ruling on a motion under Rule 12(b)(2) without an evidentiary hearing, the plaintiff

must merely meet the *prima facie* standard for establishing personal jurisdiction over the

defendant. <u>See</u> <u>A Corp. v. All Am. Plumbing</u>, 812 F.3d 54, 58 (1st Cir. 2016). Under this

standard, "the inquiry is whether the plaintiff has proffered evidence which, if credited, is

sufficient to support findings of all facts essential to personal jurisdiction." <u>Bluetarp Fin., Inc. v.</u>

<u>Matrix Constr. Co., Inc.</u>, 709 F.3d 72, 79 (1st Cir. 2013) (quoting <u>Phillips v. Prairie Eye Ctr.</u>, 530

F.3d 22, 26 (1st Cir. 2008)). "The plaintiff's properly documented evidentiary proffers are

accepted as true for purposes of making the prima facie showing, and we construe these proffers

in a light most favorable to plaintiff's jurisdictional claim." <u>Id.</u> The Court considers "the facts

from the pleadings and whatever supplemental filings (such as affidavits) are contained in the

record, giving credence to the plaintiff's version of genuinely contested facts." <u>Baskin-Robbins</u>

<u>Franchising LLC v. Alpenrose Dairy, Inc.</u>, 825 F.3d 28, 34 (1st Cir. 2016); see also <u>Nandjou v.</u>

<u>Marriott Int'l, Inc.</u>, No. 18-CV-12230-ADB, 2019 WL 2918043, at *1 (D. Mass. July 8, 2019)

(Burroughs, J.).

      The Court's jurisdiction may be either "specific" or "general." <u>United States v. Swiss</u>

<u>Am. Bank</u>, 274 F.3d 610, 618 (1st Cir. 2001). Specific jurisdiction requires a "demonstrable

nexus" between the claims of the plaintiff and the defendant's contacts in the forum

state. <u>Id.</u> Such contacts must demonstrate that the defendant "purposeful[ly] avail[ed] [itself] of

the privilege of conducting activities in the forum state." Noonan v. Winston Co., 135 F.3d 85, 90 (1st Cir. 1998).

## I.   THIS COURT HAS PERSONAL JURISDICTION OVER NOKIA UNDER SECTION 3(a) OF THE MASSACHUSETTS LONG ARM STATUTE

A court may exercise personal jurisdiction over a defendant under the Massachusetts long-arm statute when a claim arises from the defendant "transacting any business in [the] commonwealth." Mass. Gen. Laws c. 223A, § 3(a). This requires the plaintiff to show that (1) the defendant attempted to participate in the Commonwealth's economic life and (2) the transacted business was a "but for" cause of the alleged harm. See Tatro v. Manor Care, Inc., 416 Mass. 763 (1994).

Here, Collision's Amended Complaint and the supporting Affidavit of Jared Fry establish sufficient contacts by Nokia with Massachusetts to satisfy the first requirement. The term "transacting" is construed broadly. See Access Now, Inc. v. Otter Prods., LLC, 280 F. Supp. 3d 287, 291 (D. Mass. 2017). Indeed, the volume of business transacted "need not be substantial but merely definite and perceptible." Diamond Grp., Inc. v. Selective Distribution Int'l, Inc., 84 Mass. App. Ct. 545 (2013). Furthermore, a defendant need only "attempt" to transact business in Massachusetts. Cossart v. United Excel Corp., 804 F.3d 13, 19 (1st Cir. 2015). Such solicitation need not be successful to meet the transacting business standard. See id.; see also King v. Prodea Sys., Inc., No. CV 19-10016-NMG, 2019 WL 7039747, at *3 (D. Mass. Dec. 20, 2019).

Nokia is undoubtedly subject to jurisdiction under Section 3(a) of the liberally construed Massachusetts Long-Arm Statute, G.L. c. 223A § 3.  Specifically, Collision is able to satisfy both elements of that section, namely, that (1) Nokia transacted business in Massachusetts, and (2) Collision's claims arise from these contacts. See G.L. c. 223A § 3(a).

A.    <u>**Nokia Transacted Business In Massachusetts**</u>

Given the hundreds of communications that Nokia had with Collision in Massachusetts in connection with negotiating the parties' technology partnership and inducing Collision to perform under the parties' agreement, Nokia clearly "transacted business" in the Commonwealth. "The term 'transacting business' is broadly construed, and anything but the most incidental commercial contact is sufficient." <u>Cannonball Fund, Ltd. v. Dutchess Capital Mgmt., LLC</u>, 84 Mass. App. Ct. 75, 98 (2013) (internal citations omitted). It "applies to any purposeful act of the defendant, whether personal private, or commercial, and has been described as 'easy to satisfy.'" <u>Genis</u>, 2018 WL 2670662, at *4 (quoting <u>Saturn Mgmt. LLC v. Gem–Atreus Advisors</u>, <u>LLC</u>, 754 F.Supp.2d 272, 277 (D. Mass. 2010). Massachusetts courts "interpret that term to be expansive, or to mean that the volume of business need not be substantial but merely definite and perceptible." <u>Diamond Group</u>, 84 Mass. App. Ct. at 549. "The test is whether the defendant engaged in the intentional or purposeful conduct of business activity in the Commonwealth." <u>Id</u>.

In contract-based actions, "[t]ypically, 'the focus is on the contacts relating to the formation of the contract; those contacts ordinarily must be instrumental to its formation to establish jurisdiction. [E]xtensive post-contract communications that relate to the operation of the contract itself' may also be deemed transacting business." <u>Saturn</u>, 754 F.Supp.at 278 (internal citations omitted).

Both Nokia's pre-contract and post-contract contacts with Massachusetts easily satisfy this inquiry. Hundreds of phone calls and emails (which included the terms of the parties' agreement and the statements by Nokia on which Collision is suing) were directed by Nokia toward Collision in the negotiation, discussions, and performance of the parties' business

9

partnership over a period of more than two years. These communications directed at the Commonwealth hundreds and hundreds of emails and telephone calls which induced Collision to enter into negotiations with Nokia, to believe that the parties had reached an agreement, to commit all of its resources to begin performing under that agreement, to keep its technology away from Nokia's competitors, and then to continue performing under that agreement after Nokia tried to renegotiate the material terms. See Amended Complaint, ¶¶ 53-83; Affidavit of Jared Fry, ¶ 8. Nokia's intentional contacts with Massachusetts were far more prolific than other cases where courts have found § 3(a) to be satisfied.[1]

Following nearly two years of continuous and repeated business communications, Collision and Nokia each "contemplated an ongoing relationship between the parties" for a period of time that Collision's COO would be managing from Boston. Sonesta Intern. Hotels Corp. v. Central Florida Investments, Inc., 47 Mass. App. Ct. 154, 160 (1999); see also Affidavit of Jared Fry, ¶¶ 5-8. Indeed, Nokia continued to send emails, make phone calls, and send information to Collision's Jared Fry well into late 2018. Nokia continuously provided information to Collision in Massachusetts and received information from Collision in Massachusetts as an integral part of its discussion of the parties' working relationship, including through near daily contact. See Affidavit of Jared Fry, ¶ 5. This level of communication remained consistent from 2015 until late in 2018. These communications alone are more than

---

[1] See, e.g. Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 109 (D. Mass. 2003) (at least four telephone calls, five emails, and three facsimiles over three month period where such communications were instrumental to formation of contract in dispute, and contract would not have been formed but for the communications, although plaintiff initiated contact); Ealing Corp. v. Harrods, Ltd., 790 F.2d 978 (1 Cir., 1986), (one telex to plaintiff in Massachusetts); Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 932 (1st Cir. 1985) (mailing four letters and receiving at least one telephone call from plaintiff in Massachusetts in the course of negotiating a guaranty); Hahn v. Vermont Law School, 698 F.2d 48, 51 (1st Cir. 1983) (mailing to plaintiff in Massachusetts application information and an acceptance letter were "sufficient, without more").

sufficient to constitute "transacting business" under the Long-Arm Statute.[2]

In short, Nokia, "maintained an ongoing pattern of electronic contact with the Commonwealth" through numerous phone calls and emails with Collision. Diamond Group, 84 Mass. App. Ct. at 552. "Its activity was voluminous, repetitive, and long running," and it therefore satisfies the long-arm statute. Id. at 550; see also Saturn, 754 F.Supp.2d at 278 (numerous contacts before and after signing agreements, including hundreds of emails sent to plaintiff companies in Massachusetts constituted transacting business under long arm statute); Buctouche Fish Mkt., Ltd. v. City Sea Foods, Inc., 735 F. Supp. 441, 442 (D. Mass. 1990) ("[Defendant's president] engaged in telephone calls to [plaintiff]'s president, in Massachusetts during the negotiation of the contract, implementation of the contract and discussions concerning defendant[]'s refusal to pay for the lobster products.").

While Nokia contends it has no physical presence in Massachusetts and negotiated the contracts from Europe, little is gained by this line of argument. "The physical presence of a defendant in Massachusetts is not required" in order to "transact business" in Massachusetts. Fairview Mach. & Tool Co., Inc. v. Oakbrook Int'l, Inc., 56 F.Supp.2d 134, 137 (D. Mass.1999). This is because "[m]odern technology has taken us far beyond the point where two [persons] must stand in each other's physical presence to transact business. Widespread use of the telephone and the mails make[s] actual physical presence unnecessary in many cases." Good Hope, 378 Mass. at 11 (internal citations omitted); see also American Paper Recycling, Inc. v. Renew Bahamas, Ltd., 33 Mass.L.Rptr. 571, at *2 (Mass. Super. Ct. Sept. 23, 2016) (finding

---

[2] See Cannonball, 84 Mass. App. Ct. at 98-99 (defendant "transacted business" because had regular communication with offices in Massachusetts and gathered information that originated from those offices to prepare its reports); M-R Logistics, LLC v. Riverside Rail, LLC, 537 F. Supp. 2d 269, 277 (D. Mass. 2008) ("[T]he post-contract communications easily satisfy the requirements of the long-arm statute. Pursuant to the specific obligations set forth in the contract, [defendant] had daily contacts (indeed, multiple daily contacts) with [plaintiff] in the course of the operation of the contract….[Plaintiff] would not have been able to perform its contractual duties, or invoice [defendant], without that data.").

personal jurisdiction over defendant that never had an office in Massachusetts, did not own, rent or use property in MA, did not advertise or ship any good or materials in MA, and whose representatives had never travelled to MA).

In addition, Nokia's claim that it has no presence in Massachusetts appears to be false and is belied by the company's own website, which touts that one of its worldwide offices is located in Westborough, Massachusetts. See https://www.nokia.com/worldwide/#americas (identifying worldwide Nokia office located at 1 Robbins Road, Westford, MA 01886). While Nokia will surely protest that that office is actually leased by Nokia's wholly owned US subsidiary, Nokia of America, Nokia does not bother to draw this fine distinction anywhere on its website when describing its worldwide operations to the public. Regardless, Nokia plainly conducted extensive business directly with Collision in Massachusetts.

### B.   Collision's Claims Arise Out Of The Contacts Described Above

The second requirement under the long-arm statute – that the claim "arise from" the business transacted in Massachusetts – is also satisfied here. "The 'arising from' clause in [the long-arm statute] is . . . generously construed in favor of asserting personal jurisdiction, by applying a 'but for' causation test." Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 112 (D. Mass. 2003). This test asks whether the defendant's contacts with the Commonwealth constitute[d] the first step in a train of events that result[ed] in the [] injury." Geis v. Nestle Waters N. Am., Inc., 321 F. Supp. 3d 230, 238 (D. Mass. 2018) (internal citations omitted). Collision has brought contract, quasi-contract, and fraud/misrepresentation claims as well as a claim under Chapter 93A. These claims are all based on Nokia's communications to and with Collision in Massachusetts.  These claims would never have arisen "but for" the extensive communications to Collision in Massachusetts.

Even though, as Nokia asserts, some portion of Collision's work under their agreement was performed in nearby New Hampshire, there is "no doubt" that the "arising from" requirement "has been satisfied when the cause of action is for an alleged breach of contract and the business transacted was instrumental in the formation of the contract." Hahn, 698 F.2d at 51 (Section 3(a) satisfied where defendant's Massachusetts contacts were instrumental in the formation of the contract even though the activities from which the breach of contract action stemmed occurred in Vermont); Buctouche, 735 F. Supp. at 442 ("The cause of action arose from [defendant]'s transacting of business in Massachusetts because "the cause of action is for an alleged breach of contract and the business transacted was instrumental in the formation of the contract.'" (internal citations omitted)). This is especially so here where Collision claims that the statements on which its claims are based were all sent by Nokia into Massachusetts and Mr. Fry managed Collision's performance under the agreement from Massachusetts. Therefore, this element is also satisfied, so this Court has personal jurisdiction over Nokia and should deny the motion to dismiss.

## II.    THIS COURT ALSO HAS JURISDICTION OVER NOKIA UNDER SECTION 3(c) OF THE MASSACHUSETTS LONG-ARM STATUTE

Personal jurisdiction also exists under § 3(c) of the long-arm statute because Plaintiffs' claims "aris[e] from" Defendants "causing tortious injury by an act or omission in this commonwealth." G.L. c. 223A, § 3(c). When, as here, a defendant transmits intentional misrepresentations into Massachusetts, and the plaintiff relies on those misrepresentations in Massachusetts, the defendant has committed a tortious "act" in Massachusetts within the meaning of § 3(c). See Burtner v. Burnham, 13 Mass. App. Ct. 158, 163-64 (1982) (collecting cases); Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 664 (1st Cir. 1972); see also Liu v. DeFelice, 6 F. Supp. 2d 106, 108 (D. Mass. 1998). As the Massachusetts Appeals Court

explained in <u>Burtner</u>, "where a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state." <u>Id.</u> at 163 (internal quotation marks omitted).

That is precisely what Collision alleges occurred here. Collision claims that Nokia knowingly made false statements to Collision in order to string it along, keep it performing under the parties' agreement and, most importantly, keep Collision's technology from Nokia's competitors. <u>See</u> Amended Complaint, ¶¶ 53-83. Nokia knowingly communicated these false statements into Massachusetts as part of the parties' ongoing business dealings and Collision relied upon these statements in Massachusetts and suffered injury in Massachusetts. See Affidavit of Jared Fry, ¶¶ 5-8. Therefore, this Court has jurisdiction under Section 3(c) of the Massachusetts Long-Arm Statute as well.

## III.   EXERCISE OF SPECIFIC JURISDICTION OVER NOKIA IS CONSTITUTIONALLY PERMISSIBLE

Exercising jurisdiction over Nokia in this case also does not offend due process. This due process component involves three elements: (1) minimum contacts must arise from some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws"; (2) the claim must arise out of those contacts; and (3) "the assertion of jurisdiction over the defendant must not offend 'traditional notions of fair play and substantial justice.'" <u>Bulldog Inv'rs Gen. P'ship v. Sec'y of Com.</u>, 457 Mass. 210, 217 (2010) (internal citations omitted).  As explained above, Collision's claims arise out of Nokia's contacts with Massachusetts in negotiating and breaching the parties' agreement and then making further misrepresentations to string Collision along and keep Collision performing for Nokia's benefit.  <u>See American Paper</u>, 33 Mass.L.Rptr. at *7 (relatedness inquiry under due process analysis "functionally the same" as under § 3(a)). As

14

explained further below, the other two requirements – purposeful availment and fair play and substantial justice – are also satisfied, and thus exercise of jurisdiction over Nokia is constitutionally permissible.

### A.     Nokia Purposely Availed Itself of the Laws of Massachusetts

Nokia has purposely availed itself of the protections of the laws of Massachusetts through its contacts with Collision personnel in the Commonwealth both before and after the parties reached agreement.  See Workgroup, 246 F.Supp.2d. at 114 ("[T]he Court may look at all of the communications and transactions between the parties, before, during, and after the consummation of the contract, to determine the degree and type of contacts the defendant has with the forum, apart from the contract alone" in purposeful availment inquiry). "For purposeful availment, the 'key focal points' are the voluntariness of the defendants' relevant Massachusetts contacts and the foreseeability of the defendants falling subject to Massachusetts jurisdiction." Geis, 321 F.Supp.3d at 239 (internal citations omitted).

Nokia's voluminous contacts with Massachusetts, more fully described above and in the accompanying affidavit of Jared Fry, were wholly voluntary. Nokia knew from the outset of its communications with Collision's COO that he was based in Massachusetts and running the company's operations from there.  Not only did the parties engage in an extensive due diligence process before negotiating towards their agreement, but, as set forth in Mr. Fry's affidavit, his location in Boston was specifically and repeatedly referenced from the outset and all throughout the parties' communications. See Affidavit of Jared Fry, ¶ 4.

The phone from which Mr. Fry conducted hundreds of discussions with Nokia has a Boston area code. See id., ¶ 5. As in the seminal Supreme Judicial Court case on personal jurisdiction, Good Hope, where the defendant maintained close contact with the plaintiff in

Massachusetts for over a year, sent communications here, and initiated more than fifty phone calls to Massachusetts, providing information that it could have foreseen would result in the making of "significant managerial decisions" in Massachusetts, "[t]he defendant here had not participated in an isolated transaction without commercial consequences in Massachusetts. Rather, it had engaged in an enterprise of substantial dimension and duration with a party whose business headquarters…were known to be in Massachusetts." Good Hope, 378 Mass at 9.

Undertaking these contacts with a company Nokia knew was being run from Massachusetts made its involvement with the Commonwealth voluntary.[3]  Therefore, this element of the analysis is satisfied.

### B.      As The Claim Arises From Nokia's Massachusetts Contacts, This Action Was Foreseeable

As noted above, Nokia's own website touts that it has an office in Massachusetts. Regardless, Nokia "nonetheless acted in a manner that makes it foreseeable that it could be haled into Court here." Workgroup, 246 F.Supp.2d at 114; see also Carlson Corp. v. Univ. of Vermont, 380 Mass. at 109 ("[Defendant] deliberately chose to do business with a Massachusetts resident, presumably because it was to its advantage" so it is not "unfair or unreasonable in a constitutional sense to compel the [defendant] to defend this action in Massachusetts").  By reaching out to work with Collision, Nokia "sought to derive commercial benefit from their

---

[3] See Bulldog, 457 Mass. at 218 (finding purposeful availment where "[a]t the time of their communication with Hickey, the plaintiffs were on notice that Hickey was a resident of Massachusetts"); Sonesta, 47 Mass. App. Ct. at 162 (solicitation of contract with Massachusetts-based plaintiff and presumed cooperation with plaintiff under the agreement was purposeful availment); Saturn, 754 F.Supp.2d at 280 (defendant "specifically initiated a conversation with [plaintiff], who was in Boston at that time, about the prospect" of doing business together); Genis, 2018 WL 2670662 at *4 (purposeful availment where defendants solicited plaintiff in MA to assist them, utilized his services which he provided from MA, through the course of their several year relationship they engaged in frequent communications about his efforts all while he was here); Cannonball, 84 Mass. App. Ct. at 99 (agreeing to oversee funds based here, harvesting data from them, having an ongoing relationship with them, and providing asset calculations for them was purposeful availment); Am. Paper, 33 Mass.L.Rptr. at *7 (purposeful availment where defendant solicited and actively negotiated ongoing business relationship with plaintiff through calls and emails into the forum); Fairview, 56 F.Supp.2d at 139–140 (purposeful availment based on "voluntary contacts" where, pursuant to an agreement to purchase machinery from plaintiff, the defendants "exchanged multiple telephone calls, faxes, and letters including revisions to the agreement" with the plaintiff in Massachusetts).

interaction with [Collision].  Therefore, it would be unfair 'to escape having to account in [Massachusetts] for consequences that arise proximately from such activities.'" Bulldog, 457 Mass. at 218 (internal citations omitted).  In short, Nokia "voluntarily reached into Massachusetts" and "should have reasonably foreseen that they would be asked to defend themselves in Massachusetts." Saturn, 754 F.Supp.2d at 280.  "Had [Nokia] not desired to expose itself to a claim of Massachusetts jurisdiction, it was within its power to refuse to deal with the plaintiffs here." Good Hope, 378 Mass. at 12. Therefore, this element is satisfied.

### C.     Assertion Of Jurisdiction Does Not Offend Traditional Notions Of Fair Play And Substantial Justice

The assertion of jurisdiction over Nokia also does not "offend 'traditional notions of fair play and substantial justice.'" Tatro v. Manor Care, Inc., 416 Mass. 763, 773 (1994) (internal citations omitted).  In practical terms, this element of the constitutional inquiry "means that an assertion of jurisdiction must be tested for its reasonableness[.]" Id. "[T]o determine the reasonableness of exercising personal jurisdiction, the Court looks to the 'Gestalt' factors: (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." Geis, 321 F.Supp.3d at 239 (internal citations omitted).

As for the first factor, "it is almost always inconvenient and costly for a party to litigate in a foreign jurisdiction." Workgroup, 246 F.Supp.2d at 115 (defendant having its only place of business in Nevada was insufficient to show burden under first factor).  Therefore, in order for this factor to have any meaning, Nokia must show that the exercise of jurisdiction over it in Massachusetts "is onerous in a special, unusual, or other constitutionally significant way." Id.

17

While Nokia argues that its business is headquartered in Finland, this is not a constitutionally significant burden for purposes of this inquiry. See Saturn, 754 F.Supp.2d at 281 (rejecting argument that defendant's principal place of business, key witnesses, and documents were in California and defendant had no offices nor conducted business in Massachusetts were constitutionally significant burdens under this factor). For an international company, travel between Finland and Massachusetts is not an unusual or constitutionally significant burden. Cf. Pritzker v. Yari, 42 F.3d 53, 62 (1st Cir. 1994) (concluding that travel between New York and Puerto Rico not unusual burden); Fairview, 56 F.Supp.2d at 140 (travel between Illinois and Massachusetts not "especially onerous"); Am. Paper, 33 Mass.L.Rptr. at *7 (travel between Massachusetts and the Bahamas did not "pose[] a special or unusual burden in the modern age"). Where Nokia is a publicly traded company that routinely transacts business around the world, "travel expense is not a burden…[and Nokia does] not raise in [its] affidavits any particularized burden with respect to traveling to Boston for this litigation." Alere, Inc. v. Wallace, 33 Mass.L.Rptr. 133, *5 (Mass. Super. Ct. Oct. 7, 2015).

In further confirmation that litigating this case in Massachusetts will not be a burden for Nokia, Nokia wisely has not made a *forum non conveniens* argument here. Nokia does, however, strongly argue that Collision has an office in New Hampshire, but Federal Court in New Hampshire is, of course, barely an hour away. Nokia, itself, took the precipitate step of filing suit down in Delaware. Its US subsidiary has a major research facility here. In addition, Nokia has long had highly competent Boston counsel representing it and it is revealing that Nokia's first response upon receiving Collision's demand letter was to turn promptly to those Boston attorneys for its defense. Nokia protestations about not expecting to be haled into Court in Massachusetts or finding it inconvenient to defend itself here, thus, ring hollow.

As for the other factors, Massachusetts has an interest in adjudicating the dispute because it will be decided, at least in part, under Massachusetts law, as Collision has brought a claim under Chapter 93A. Collision also has an interest in obtaining convenient and effective relief in Massachusetts. Collision has one of its more senior employees, its COO, operating the company from the Commonwealth, and it is convenient for Collision to litigate the case in Massachusetts. As the case could be effectively resolved here and there are no "substantive social policies" at play, the fourth and fifth factors remain neutral.

On balance, the "gestalt factors" are either neutral or favor Collision. Therefore, exercise of jurisdiction is neither unfair nor unreasonable in this case.

### iv. <u>Conclusion</u>

For the foregoing reasons, Collision Communications respectfully requests that Nokia's motion to dismiss be denied in its entirety. Collision requests oral argument on Nokia's Motion.

Respectfully submitted,

COLLISION COMMUNICATIONS,

*/s/ Tyler Chapman*
Tyler E. Chapman (BBO # 637852)
tchapman@toddweld.com
Maria Davis (BBO # 675447)
mdavis@toddweld.com
Tara D. Dunn (BBO # 699329)
tdunn@toddweld.com
Todd & Weld LLP
One Federal Street
Boston, MA 02110
Tel: 617-720-2626

Dated:  February 21, 2020

## CERTIFICATE OF SERVICE

I, Tyler E. Chapman, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 21, 2020.

/s/ *Tyler E. Chapman*
Tyler E. Chapman