## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NOKIA SOLUTIONS AND NETWORKS OY, <br><br> Defendant. | C.A. No. 19-CV-12251-ADB <br><br> **LEAVE TO FILE GRANTED** <br> **ON MARCH 5, 2020 (DKT. 31)** |

## NOKIA SOLUTIONS AND NETWORKS OY'S REPLY IN
## FURTHER SUPPORT OF ITS MOTION TO STAY AND DISMISS

Nokia Solutions and Networks Oy ("Nokia") submits this Reply in response to Collision Communications, Inc.'s ("Collision") Opposition (Dkt. 27) to Nokia's Motion to Dismiss (Dkt. 16).[1]

## DISCUSSION

## I. COLLISION'S CONTRACT CLAIMS FAIL AS A MATTER OF LAW[2]

### A. Collision's Breach of Contract Claim is Barred By the Statute of Frauds

In its Motion to Dismiss, Nokia argues that Collision's breach of contract claim (Count I) is barred by the Statute of Frauds. Collision responds that "the agreement between Collision and Nokia did not contain a term of multiple years and potentially could have been performed within a year." Opposition at 9. This argument contradicts the plain language of the Amended Complaint (the "Complaint") (Dkt. 1) and the record properly before the Court.

First, notwithstanding Collision's arguments in its Opposition, the Complaint expressly states that the alleged oral license Collision seeks to enforce contains a term of years. Paragraph 58 alleges that Collision drafted a license and integration agreements that left open four items, including "b. The license window (number of years vs Perpetual)." *Id.* The Complaint goes on to allege that in the next few days the parties agreed on the four open terms, including:

> b. That the license would be perpetual. Nokia had communicated that the license term of 5 years was all that was needed as that was the length of the product/solution lifecycle, and as a result 5 years was effectively 'perpetual'.

---

[1] For issues not addressed in this Reply, Nokia relies on the arguments made in its Memorandum of Law (Dkt. 17).

[2] This Reply focuses on Massachusetts law because: (a) the law on Collision's various claims is generally consistent; and (2) Collision insists that Massachusetts law applies. That said, Nokia disputes that Massachusetts law applies to this dispute. Under Massachusetts choice of law principles, "the Court must apply the substantive law of the state with the most significant relationship to the transaction in the litigation." *Levesque v. Schroder Inv. Mgmt. N. Am., Inc.*, 368 F. Supp. 3d 302, 310 (D. Mass. 2019). In this case: (1) Collision is based in New Hampshire while Nokia is based in Finland; (2) Collision intended to perform the alleged contracts at issue in New Hampshire; (3) New Hampshire is where Nokia and Collision representatives met in person on May 16 and 17, 2017, allegedly "to come to an agreement" (Complaint, ¶ 54); and (4) the harm alleged by Collision would have been suffered in New Hampshire. Indeed, the only connection to Massachusetts is that Collision employee Jared Fry (one of the individuals who negotiated the contract with Nokia (*see id.*, ¶ 37)) allegedly called and emailed Nokia from his home in Massachusetts. *See* Affidavit of Jared Fry, ¶ 4 (Dkt. 29) ("I handled Collision's side of the communications from my home office in Boston").

1

*Id.*, ¶ 59.b.  The parties' alleged oral agreement therefore clearly contains a term in excess of one year. *See*, *e.g.*, *Fabri-Com, Inc. v. Tex-Fi Indus., Inc.*, 696 N.Y.S.2d 447, 448–49 (1999) ("We find that insofar as plaintiff's claim was based on its contention that it was promised perpetual commissions … it was properly dismissed. Such a promise would not be capable of performance within a year and would therefore fall within the writing requirement of the Statute of Frauds.").

Second, it would have been impossible for the parties to perform the alleged oral agreement within one year because, among other things, the agreement required Collision to provide ongoing technical support to Nokia while the license was in effect.  Section 7.2 of the draft License Agreement which Collision proposed to Nokia states:

> Collision shall provide technical support to Nokia as provided in the Technical Support Plan, attached as Exhibit A, which may be updated from time to time by mutual agreement of the Parties.

*See id.* (Dkt. 17-2).[3]  "Exhibit A: Technical Support Plan" identifies the parties' "Commitment to provide such technical support ***over the lifecycle of Licensed Software***."  *Id.* (emphasis added).  It would be impossible for Collision to provide technical support during the term of the License Agreement, which exceeds one year, within one year.  Similarly, Section 4 of the proposed License Agreement requires Nokia to report after "each of Nokia's Fiscal quarters" the number of products sold "with the Licensed Software" and the "revenue booked or received attributable to the sales or enablement of the Licensed Software."  *Id.*  Obviously Nokia could not provide such reports within a year as Nokia's reporting obligations spanned the life of the license.  As the alleged agreement could not have been performed within a year, it fails under the Statute of Frauds.

### B. The Integration Agreement Fails Under its Own Terms

Nokia contends that the Integration Agreement is not enforceable because it was conditioned

---

[3] Collision does not object to the Court considering the License Agreement and Integration Agreement in deciding this Motion.  *See* Opposition at 7 ("the Court should only consider Exhibits 1 [the Integration Agreement (Dkt. 17-1)] and 2 [the License Agreement (Dkt. 17-2)] ….").

on the *execution* of the License Agreement, which never happened. In particular, section 6.1 of the Integration Agreement (Dkt. 17-1) states, "This Integration Agreement is conditioned on and only valid upon the contemporaneous execution of the License Agreement." *Id.*[4] As the License Agreement was never executed, the Integration Agreement never became valid.

In response, Collision argues that the Integration Agreement should be deemed to have taken effect nonetheless because Nokia somehow prevented Collision from satisfying this condition. *See* Opposition at 10. The rule Collision is relying on, called the "Prevention Doctrine," is set forth in the Restatement (Second) of Contracts § 245.[5] The doctrine does not apply here because Nokia was not obligated to sign either the License Agreement or the Integration Agreement. As Comment a. to Restatement (Second) of Contracts § 245 makes clear:

> The rule … only applies … where the lack of cooperation constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court. There is no breach if the risk of such a lack of cooperation was assumed by the other party or if the lack of cooperation is justifiable.

*Id. See also* 13 Williston on Contracts § 39:11 (4th ed.) ("The doctrine of prevention as an excuse for nonperformance of a contractual duty is inapplicable when the conduct alleged to have prevented performance was permissible under the express or the implied terms of the contract."). As Nokia was under no obligation to consummate a deal with Collision, the Prevention Doctrine does not apply.

### C. The Complaint Does Not Plausibly Allege A Meeting of the Minds

Collision argues that whether there is a meeting of the minds is generally a question of fact which cannot be decided on a motion to dismiss. Courts may, however, grant a motion to dismiss if

---

[4] Black's Law Dictionary, 6th Ed., p. 568, defines "execution" with respect to an instrument to mean "[c]ompletion of instrument, including signing and delivery."

[5] Collision cites *In re Access Cardiosystems, Inc.*, 361 B.R. 626, 646 (Bankr. D. Mass. 2007), to state the rule. *In re Access Cardiosystems*, in turn, cites *Ne. Drilling, Inc. v. Inner Space Servs., Inc.*, 243 F.3d 25, 40 (1st Cir. 2001) (among other cases) as authority for the rule. *Ne. Drilling., Inc.*, cites both the Restatement and Williston on Contracts as authority for the rule.

all of the elements of contract formation – including mutual assent – are not stated with "substantial certainty." *See*, *e.g.*, *Vieira v. First Am. Title Ins. Co.*, 668 F. Supp. 2d 282, 290 (D. Mass. 2009) (granting motion to dismiss a breach of contract claim, holding that "Plaintiffs fail to plead any facts—much less with 'substantial certainty'—that there was mutual assent …."). [6] *See also Kirin Produce Co. v. Lun Fat Produce, Inc.*, 93 Mass. App. Ct. 1106 (2018) (affirming grant of motion to dismiss contract claim because, among other things, "it is clear from this record that the parties had never reached a meeting of the minds ….").

In assessing whether the "substantial certainty" test has been met, the Court applies the traditional plausibility standard. "First, the Court must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).… Secondly, the Court must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." *Golub v. Ne. Univ.*, No. 19-CV-10478-ADB, 2019 WL 6115210, at *3 (D. Mass. Nov. 18, 2019) (citation and internal quotation marks omitted). Applying this standard, the Complaint's allegation that "the parties had a mutual agreement on all material terms" (Complaint, ¶ 85) is conclusory and must be disregarded. Looking to the Complaint's factual allegations, the Complaint alleges that a contract was formed on June 6, 2017, during a call between Mr. Fry and Mr. Herrerias. *Id.*, ¶ 63. The Complaint states:

- during this call "Mr. Herrerias further indicated (a) that he was expecting markups from Nokia Procurement that day" and that he expected written contracts to be signed "next week or the week of the 19th." *Id.*

- "Two days later, Mr. Herrerias wrote that Nokia preferred to use its own template version of a written agreement …." *Id.*, ¶ 65.

- Then, "[i]n confirmation of this, on June 9, 2017, Nokia Procurement wrote to Collision that 'our next step is to work on the merge of applicable terms from your draft template into our Nokia Agreement template' …." *Id.*, ¶ 66.

---

[6] The "substantial certainty" pleading requirement is discussed in greater detail in Section I.D. of this Reply.

4

These allegations do not plausibly suggest a present intention on Nokia's part to be bound on June 6, 2017, because Nokia expressly said that day that it intended to circulate edits to Collision's draft Agreements and contemplated signing those revised agreements in a week or so.

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and ***the parties must have a present intention to be bound by that agreement***." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000) (emphasis added).[7] The intention to be bound must exist "at the moment of [contract] formation." *Basis Tech. Corp. v. Amazon.com, Inc.*, 71 Mass. App. Ct. 29, 39 (2008).  Even under Collision's characterization of this June 6 call, Nokia indicated that it would be proposing different contract terms.  In other words, Nokia indicated that it was rejecting Collision's drafts and was planning on making a counterproposal.  It was therefore objectively clear on June 6 that Nokia did not intend to be bound that day.  *See* Restatement (Second) of Contracts § 27 (1981), Comment b. ("if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.").

Notably, this is not a case where the parties signed a term sheet or a memorandum of understanding agreeing to the material terms of their deal, intending to sign a more formal agreement later.  Rather, even as alleged in the Complaint, Nokia never signed any document and always made clear that it intended to submit a counter-offer by way of either markups to Collision's drafts or documents prepared by Nokia's procurement department.

---

[7] This is an objective standard.  *See Greene v. Ablon*, 794 F.3d 133, 147 (1st Cir. 2015) ("Although mutual assent is often misleadingly referred to as a 'meeting of the minds,' the formation of a valid contract under Massachusetts law requires objective, not subjective, intent.").  *See also* 1 Williston on Contracts § 3:5 (4th ed.) ("when the courts speak of the contractual intent of the parties, they are referring to an intent that is determined objectively, by considering what a reasonable person in the parties' position would conclude given the surrounding circumstances.").

5

### D. The Complaint Does Not Adequately State a Breach of Contract Claim

In response to Nokia's assertion that the Complaint fails because it fails to identify the parties' agreement with sufficient certainty, Collision argues that the determination of whether all materials terms are present in a contract is a question of fact that should not be decided in a motion to dismiss. This argument ignores settled First Circuit authority that, in order to state a viable breach of contract claim, the terms of the alleged contract must be pled with "substantial certainty." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) ("[I]t is essential to state with 'substantial certainty' the facts showing the existence of the contract and the legal effect thereof.") (citations omitted).[8]

Collision's breach of contract claim does not satisfy this pleading standard. Paragraphs 85 to 87 of the Complaint are merely conclusory boilerplate which are properly disregarded. With regards to the factual allegations of the Complaint, they fall far short of what the First Circuit requires. Collision seeks to circumvent the pleading standard by arguing that the only material terms of the parties' agreement are the license amount, the license window, and the exclusivity period, which are stated in the Complaint (Opposition at 12), but a license that only contains these three items is too indefinite to be enforceable. *See Venditto v. Cunningham*, 322 F. Supp. 3d 254, 258 (D. Mass. 2018) (granting motion to dismiss where the terms of the contract, as alleged in the complaint, were "too indefinite to state a contract.").[9]

---

[8] *See also Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 38 (1st Cir. 2007) (affirming dismissal of plaintiffs' complaint, holding that a breach of contract claim must "'explain what obligations were imposed on each of the parties by the alleged contract.'") (citation omitted); *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) ("Plaintiffs also must do more than allege, in conclusory fashion, that the defendant breached the contract, by describing, with 'substantial certainty,' the specific contractual promise the defendant failed to keep.").

[9] *See also Armstrong v. Rohm & Haas Co.*, 349 F. Supp. 2d 71, 81 (D. Mass. 2004) ("the alleged oral contract here is too imprecise to be enforceable as a matter of law. Plaintiffs' claim for breach of oral contract will be dismissed for failure to state a claim."); *Kasparian v. United States*, No. 16-CV-11551-ADB, 2017 WL 1843690, at *4 (D. Mass. May 8, 2017) (dismissing breach of contract claim for failing, among other things, to identify "the terms of the contract"); *Vieira v. First Am. Title Ins. Co.*, 668 F. Supp. 2d 282, 290 (D. Mass. 2009) (dismissing breach of contract claim, holding "Plaintiffs have not alleged with 'substantial certainty' facts showing the existence of a binding contract that included the term that First American allegedly breached."). Massachusetts state courts apply the same rule. *See Rodriguez v. MBTA*,

"In order to create an enforceable contract, '[i]t is a necessary requirement that [the] agreement ... be sufficiently definite to enable the courts to give it an exact meaning.' … A lack of definiteness in an agreement might be based on a lack of specificity regarding the time of performance, price to be paid, work to be done, or property to be transferred." *Armstrong*, 349 F. Supp. 2d at 78 (citing Williston on Contracts § 4:18 (4th ed. 1990)).  The *Armstrong* court further noted that it could not "supply the missing terms without 'writing a contract for the parties which they themselves did not make,'" which the court recognized it could not do. *Id.* at 80 (citation omitted).

Among other defects, the Complaint does not even identify with specificity what exactly Collision was agreeing to do for its $23 million.  For instance, paragraph 60 states, "The parties' June 6, 2017 agreement contemplated payment terms occurring in three tranches.  The first for 60% upon delivery, the second at 20% by March 1, 2018, and the last 20% upon delivery." *Id.*  The Complaint does not identify, however, what Collision was obligated to deliver, nor does it specify exactly what Collision was agreeing to license to Nokia.  Moreover, as Nokia's alleged obligation to pay Collision was predicated on Collision delivering something, and since the Complaint does not allege that Collision delivered anything, the Complaint does not even adequately allege a breach of contract.

Similarly, while the Complaint repeatedly states that the parties had agreed on all "material terms" of their deal (Complaint, ¶¶ 62, 65, 70, 74, 76), it fails to state what those terms were.  For instance, the Complaint says nothing about: (a) what exactly Collision was obligated to deliver and what rights Nokia had to ensure that Collision's deliverables were satisfactory to it; (b) what exactly Nokia was licensing and what specific rights Nokia had (*e.g.*, was it entitled to sublicense Collision's technology); (c) what rights Nokia had if the technology did not function as promised; (d) what rights Nokia had to terminate the agreement, and what obligations it would have if it exercised its

---

92 Mass. App. Ct. 26, 29–30 (2017) ("Because the complaint does not set forth the material terms of the claimed contract with sufficient precision, we discern no error in the dismissal of the breach of contract claim.").

7

termination rights; (e) whether Nokia was obligated to disclose its intellectual property ("IP") to Collision and, if so, what measures were in place to ensure that Nokia's IP and trade secrets were protected; and (f) whether Collision had to disclose its IP to Nokia and what measures were in place to ensure that Collision's IP was protected. In short, the Complaint fails to state a breach of contract claim because it fails to identify the parties' alleged agreement with sufficient certainty.[10]

While some of the missing details may arguably be present in the draft Integration and License Agreements (Dkts. 17-1 and 17-2), the Complaint does not allege that Nokia agreed to all of the terms in those agreements, or identify which terms it allegedly did agree to. At most, the Complaint alleges that Nokia may have agreed to some terms, but not others, because Nokia told Collision it would be marking up Collision's drafts. *See* Complaint, ¶ 63. Collision does not even contend that *it* agreed to all of the provisions in those Agreements. For instance, in its Opposition Collision argues that the Court should not give effect to the Delaware choice of law provisions in the Agreements. *See* Opposition at 7. In so arguing, Collision makes clear that it does not agree that it is bound by all of the provisions in those Agreements. This dynamic creates too much ambiguity to find that a sufficiently detailed agreement was entered into by the parties.

Moreover, even if all of the provisions of the Integration and License Agreements were agreed to by Nokia (which is contrary to what the Complaint alleges), the Agreements make clear that they were not intended to be final agreements and that significant additional negotiations were necessary before a final deal was consummated. For instance, Section 2.1 of the Integration Agreement captioned "Description of Work" simply refers to "Exhibit A" to define the parties' agreed upon

---

[10] *See Squeri v. Mount Ida Coll.*, No. CV 18-12438-RGS, 2019 WL 2249722, at *5 (D. Mass. May 24, 2019) (dismissing breach of contract claim for failing to allege, among other things, "the specific terms of the purported contract"); *Cousin v. Sofono, Inc.*, No. CIV. A. 01-30186-MAP, 2003 WL 22391233, at *5 (D. Mass. Oct. 17, 2003) ("though all terms of a contract need not be precisely specified, the writing must specify all the essential terms of the oral agreement before a court will enforce it."); *BBJ, Inc. v. MillerCoors*, LLC, No. 12-CV-11305-IT, 2017 WL 925004, at *5 (D. Mass. Mar. 8, 2017) (finding that a purchase order was too indefinite to create an enforceable contract as "it fails to set forth essential terms of the purported oral agreement between the parties.").

scope of work. *Id.* "**Exhibit A: DESCRIPTION OF WORK**" of the Integration Agreement then begins: "*Both Parties agree in good faith to develop and refine a reasonable Description of Work.*" *Id.* (emphasis in original). Similarly, in the License Agreement, "**Exhibit A: TECHNICAL SUPPORT PLAN**" begins by stating, "*Both Parties agree in good faith to negotiate and develop reasonable support and service terms.*" *Id.* Of course, an agreement to agree is not enforceable.[11]

The "Deliverable(s)" in Exhibit A to the Integration Agreement further make clear that essential terms still needed to be negotiated. The Description of Work states, "The following provides [a] high level description of the efforts needed and the anticipated approach" and then lists a number of terms as "TBD," such as the "Target Delivery Date" for the first deliverable. *See* Integration Agreement, Exhibit A. Likewise, Nokia's "Acceptance Terms" for Collision's Final Deliverable (an unquestionably material term) is listed as "TBD." *See id.* Other statements in Exhibit A similarly show that many essential terms had not yet been discussed. Exhibit A states:

- For the ultimate goal of a commercialized product with an integrated Collision receiver, tight integration is necessary and requires detailed joint architectural discussions between Nokia and Collision.

- In order to build a final commercial product, significant effort from Nokia is additionally necessary to determine joint architecture.

- *Both Parties agree in good faith to determine, develop, and negotiate reasonable support to each other and this Work as a result of the details herein being better understood.*

*Id.* (emphasis in original). On this record, Collision fails to state a viable breach of contract claim.[12]

---

[11]   *See Laudano v. 214 S. St. Corp.*, 608 F. Supp. 2d 185, 194 (D. Mass. 2009) ("Where there is an 'agreement to agree' on an essential term of a contract, there is no contract to enforce.") (citation omitted); *Selfridge v. Jama*, 172 F. Supp. 3d 397, 417–18 (D. Mass. 2016) ("An agreement to agree, standing alone, does not create an enforceable contract.").

[12]   Collision's failure to plead a viable breach of contract claim is also fatal to its breach of the implied covenant claim. *See Beauregard v. Meldon*, No. CV 19-10342-RGS, 2019 WL 6877185, at *4 (D. Mass. Dec. 17, 2019) ("Because no valid contract was formed, it follows that there is no violation of the implied covenant of good faith and fair dealing …."); *Durmic v. J.P. Morgan Chase Bank*, 2010 WL 4825632, at *5 (D. Mass. Nov. 24, 2010) ("[W]here no contract exists, there can be no derivative covenant of good faith and fair dealing.").

9

ME1 32754139v.5

## II.     COLLISION'S DETRIMENTAL RELIANCE CLAIM IS TOO INDEFINITE

Collision's lack of definiteness in its contract claim also dooms its "detrimental reliance" claim. "Under Massachusetts law, reliance replaces only consideration in contract formation; the other elements of a contract must still be proven." *Sunningdale Ventures, Inc. v. Martin*, No. CV 13-12512-DPW, 2018 WL 1582554, at *10 (D. Mass. Mar. 31, 2018) (citation omitted). One requirement for contract formation is a promise that is "definite and certain." *Id.* (citation omitted). "Without well-defined terms, the courts would be forced to 'make for the parties a contract which they did not make for themselves.'" *Id.* (citation omitted). For this reason, "[c]ourts have consistently required that promises be definite and certain to give rise to contractual liability under a theory of promissory estoppel, as well as under ordinary contract principles." *Id.* See also *Kiely v. Raytheon Co.*, 914 F. Supp. 708, 712 (D. Mass. 1996), aff'd, 105 F.3d 734 (1st Cir. 1997) (dismissing a promissory estoppel claim, holding that the plaintiff "has failed to plead a promise that was 'definite and certain.'") (citation omitted).

The Complaint does not identify any "definite and certain" promises made by Nokia. In its Opposition, Collision cites to a number of allegations from its Complaint which it claims reflect "concrete commitments Nokia made to induce Collision to keep working," Opp. at 14, but none of the identified statements pass legal muster. For instance, in paragraph 34 of the Complaint Collision alleges that "Nokia reassured Collision that it would be paid for its work" but does not identify what specific work Nokia was asking Collision to perform, how much Nokia agreed to pay Collision, or any other terms of the alleged contract. This statement is therefore much too indefinite to be enforced. The same can be said for the allegations in paragraphs 39, 43.c., 45, 58-59, 61, 62, 70, 71, and 76. None evidence a sufficiently definite and certain promise to state a claim for promissory estoppel.[13]

---

[13]    *See Santoni v. Fed. Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir. 1982) ("We hold that the alleged promises upon which appellants rely, taken together and considered as a whole, were too indefinite and uncertain to sustain a claim

## III.  COLLISION'S MISREPRESENTATION CLAIM FAILS UNDER RULE 9(B)

In response to Nokia's argument that Collision's misrepresentation claim does not comply with Rule 9(b), Collision's Opposition simply lists statements contained in the fact section of its Complaint. The Complaint does not, however, allege that any of those statements were false, made to induce Collision to act, or that Collision in fact relied on those statements to its detriment.[14]

Furthermore, not all statements which do not turn out to be correct are actionable. As was recently held in *von Schonau-Riedweg v. Rothschild Bank AG*, 95 Mass. App. Ct. 471 (2019):

> A statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment…. Moreover, false statements of opinion, of conditions to exist in the future, and promises to perform an act cannot sustain a claim for negligent misrepresentation ... unless the promisor had no intention to perform the promise at the time it was made.

*Id.* at 497 (citation and internal quotation marks omitted). Similarly, "[r]eliance is not reasonable where the alleged representations are vague or indefinite." *Armstrong*, 349 F. Supp. 2d at 81.

Here, even if Collision had pled that the statements identified on page 16 of its Opposition were false, material, made to induce reliance, and actually relied upon by Collision to its detriment (which the Complaint does not do), none of the identified statements are legally actionable. The first statement Collision references is Mr. Herreria's June 1, 2017, email to Collision. In that email (Dkt. 17-3), Mr. Herrerias does not "confirm[] that Nokia had agreed to the $20 million license fee amount" as Collision claims in its Opposition, but rather states:

---

of promissory estoppel."); *Tharpe v. Cisco Sys., Inc.*, No. CIVA 07-12279-RWZ, 2008 WL 687416, at *2 (D. Mass. Feb. 14, 2008) (granting motion to dismiss promissory estoppel claim, holding that "plaintiffs' promissory estoppel claims fail for the same reasons that their breach of contract claims fail, namely that the promise of financial compensation was far too indefinite to form an agreement binding upon the parties."); *Aretakis v. Gen. Signal, Inc.*, No. CIV.A. 05-10257-DPW, 2006 WL 1581781, at *7 (D. Mass. June 7, 2006) ("Plaintiffs' promissory estoppel claim fails for the same reasons that their breach of contract claim fails: the promise of equity in the anticipated spin-off company was far too indefinite to form a binding oral contract.").

[14]  "To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77 (1991).

11

> I got support from the LTE Business Line and Porfolio Management heads, accepting my 20m proposal (perpetual)… Meanwhile, the 20m (+3m NRE) is a bold number (consider this is around 200 high cost qualified engineers a year … Nokia could achieve a lot with this workforce), ***so I'll have to fund the case moving to higher layers (Marc Rouanne and possibly Rajeev) to release budget beyond annual plan from LTE BL***… For that I am internally organizing many calls to get to that point to eventually [sign] the contract.

*Id.* (emphasis added). This email clearly states that while certain Nokia managers supported Mr. Herrerias' $20 million proposal, the number was sufficiently high that higher level approvals were required. The statement that Mr. Herrerias wanted to get to the point of eventually signing a contract is a non-actionable statement of future intention.

The next statement Collision claims is a misrepresentation is that Mr. Herrerias told Collision "that he had received all necessary approvals for Nokia's $20M license fee proposal." Complaint, ¶ 63. The Complaint does not allege that this statement is false or that Collision relied on it. Moreover, the Complaint goes on to allege that Mr. Herrerias, during this same call, told Collision that "he was expecting markups from Nokia Procurement that day …." *Id.* Collision therefore was on notice that Nokia had not accepted all of the terms set forth in Collision's draft Integration and License Agreements and might counter with terms that were not acceptable to Collision. Under these facts, any purported reliance would not have been reasonable. *See Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 242–43 (D. Mass. 1999) ("It is settled law that a person who is confronted with inconsistent or contradictory representations may not reasonably rely on one side of the controversy without attempting to resolve the inconsistency or contradiction…. Reliance cannot be deemed reasonable … simply when a party 'close[s][its] eyes and passively accept[s] the contradictions' that exist in the information available to it.") (citations omitted).

In fact, as the Complaint alleges that Nokia did not provide draft agreements to Collision until November 20, 2017 (Complaint, ¶ 78) (while repeatedly informing Collision that drafts were being

prepared), any alleged reliance between June 6 and November 20, 2017, would not have been reasonable as a matter of law as Collision was on notice that Nokia may be proposing terms that would not be acceptable to Collision. *See Saxon Theatre Corp. of Bos. v. Sage*, 347 Mass. 662, 667 (1964) (affirming lower court demurrer, holding "We are of opinion that the plaintiff could not reasonably rely on a representation of an intention to draw up and execute a mutually acceptable lease when essential terms of it had not yet been stated or settled.").[15]

With regards to Mr. Herreria's June 21, 2017, email (Dkt. 17-7), the email makes clear that Nokia did not believe a contract was in place and that additional discussions were necessary. *See id.* ("Understand that … Nokia needs to safeguard as well for eventual risks…. We will discuss about this in calls during the coming days…. Fully understand your desire for a commitment and value of exclusivity, these items are the basis for the upcoming drafts.").

The June 25, 2017 email referenced in ¶ 75 of the Complaint (which is actually dated August 25, 2017) (Dkt. 17-10) is noteworthy because it was sent in response to Mr. Fry's email stating, "I … need to be able to justify our team's continued commitment to Nokia ***without a commitment from Nokia***." *Id.* (emphasis added). Mr. Herrerias responds, "***The process is at the moment in the final approval phase to allow procurement exchanging documents <u>and start contract negotiations</u>... <u>Once we get the final GO, Contract negotiations will start</u>***." *Id.* (emphasis added). Collision cannot cherry pick portions of Mr. Herrerias' emails to argue it detrimentally relied on them when other portions of those emails (as well as other contemporaneous emails) directly contract its claims. As the First Circuit explained in *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30 (1st Cir. 1988):

> Confronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying. A reasonable person does not gamble with the law of the excluded middle, he suspends judgment until further

---

[15] "Whether reliance is reasonable is ordinarily a question of fact for a jury. However, if, on the facts alleged in the complaint, no reasonable jury could find that the plaintiff's reliance was reasonable, the defendants are entitled to judgment as a matter of law." *Massachusetts Laborers' Health & Welfare Fund*, 62 F. Supp. 2d at 242.

> evidence is obtained. Explicit conflict engenders doubt, and to rely on a statement the veracity of which one should doubt is unreasonable. The law does not supply epistemological insurance. Nor does it countenance reliance on one of a pair of contradictories simply because it facilitates the achievement of one's goal. Similar reasoning stands behind the principle of tort law that "[t]he maker of a fraudulent misrepresentation is not liable to one who does not reply upon its truth but upon the expectation that the maker will be held liable in damages for its falsity." *See* Restatement, Second, Torts § 548.

*Id.* at 33–34.  Indeed, as shown in Nokia's opening brief, Collision's claimed reliance here is absolutely contrived as Collision was fully aware at all times that there was never a contract in place. That is why Collision objects to the Court reviewing Mr. Herrerias' actual emails referenced in the Complaint, arguing that the Court may only consider Collision's self-serving and out-of-context characterizations of them.  This argument is not, however, consistent with applicable First Circuit law.

Lastly, Mr. Herrerias' alleged November 14 statement that "there were not significant changes from the parties' agreed to terms and that he had instructed Procurement to use as much language as they can from the drafts supplied by Collision" (Complaint, ¶ 77), put Collision on notice that Nokia would be proposing changes and thus that a deal was not done.  Collision also does not allege that it relied on this statement, made just six days before it received Nokia's drafts (*id.*, ¶ 78).

Collision's claim that alleged statements made concerning "the imminence of the executed contract" are actionable (Opposition at 16) is also legally incorrect.  For instance, the statement in paragraph 66 of the Complaint that "My goal will be to provide you our draft for your review/redlining by Wed Jun 14 EoB," is simply a statement of future intention that is not actionable. Likewise, Mr. Kola's "surprise … that the parties had not yet executed their written agreements" during a June 12, 2017 meeting in Finland is also not actionable.  Lastly, the email where Mr. Herrerias states that "All drafts are finished," further states:

- The process is at the moment in the final approval phase to allow procurement exchanging documents ***and start contract negotiations.***  All drafts are finished, but still need this final concessions approval, what I cannot materially speed up more….

14

- Once we get the final GO, ***Contract negotiations will start***
- How long will they take I cannot answer (hopefully the less time possible)

*Id.* (Dkt. 17-10) (emphasis added).[16]  Looking at the actual email, rather than Collision's self-serving characterization of it, no reasonable jury could conclude that the above email was a material misrepresentation meant to induce Collision to act by falsely representing to Collision that a contract had been in place since June 6, 2017 which merely needed to be reduced to a formal writing. Collision's case is all the weaker when viewing all of these emails together, which the Court must do.

In fact, Collision's "stringing along" theory is simply inapplicable in cases, such as this, where the parties are still negotiating the terms of their deal.  *See Chedd-Angier Prod. Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, 939 (1st Cir. 1985) ("Chedd-Angier's reliance on *Cellucci v. Sun Oil Co.*, 2 Mass. App. 722, 320 N.E.2d 919 (1974), aff'd., 368 Mass. 811, 331 N.E.2d 813 (1975) is misplaced.  Although the basis of the misrepresentation in *Cellucci* was a future event, the signing of the contract, it was in the exclusive control of the defendant. Here settlement of the contract terms involved negotiation between the parties on a number of issues which were unresolved ...."). *See also Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 425 (D. Mass. 1995) ("To infer that deceit is at work any time contractual negotiations sour is untenable."); *Saxon Theatre Corp.*, 347 Mass. at 667 (plaintiff's reliance on representation of intent to draw up and execute a mutually acceptable lease where essential terms were still undecided held unreasonable).

## IV.     COLLISION'S QUANTUM MERUIT CLAIM FAILS

Collision disputes that it had to confer a benefit on Nokia in order to state a quantum meruit claim.  Ironically, one of the elements it identifies in its Opposition as required to state a claim is "that it conferred a measurable benefit upon the defendants."  *Id.* at 17.  That a plaintiff must show that it conferred a benefit on the defendant to state a quantum meruit claim is not subject to

---

[16]   This email, dated August 25, 2017, is erroneously dated June 25, 2017 in the Complaint. *See* Dkt. 17-10.

reasonable dispute.[17] The case *BBJ, Inc. v. MillerCoors, LLC*, No. 12-CV-11305-IT, 2017 WL 925004, at *7 (D. Mass. Mar. 8, 2017), is instructive. In that case, BBJ and Coors had a contract. BBJ argued that since Coors repudiated the contract Coors was obligated to pay for BBJ's Coors-related merchandise in inventory or on order from overseas. Judge Talwani rejected plaintiff's quantum meruit claim holding, among other things:

> Nor is there any evidence that Plaintiffs conferred a measurable benefit on Coors. The written exchanges between the parties provide that only final orders in the PTO Program would be compensated. Plaintiffs cannot now recover from Defendants for any excess inventory BBJ ordered. Moreover, Plaintiffs have offered no evidence that they conferred a measurable benefit on Coors by ordering excess inventory.

*Id.* at *7. In other words, Coors did not receive a benefit from BBJ's actions taken in anticipation of Coors' orders. That is the exact same dynamic here. Collision claims that it performed work in anticipation of entering into a contract with Nokia. Nokia is not responsible for that work because it only would have benefitted from it had it actually used Collision's technology, which is not the case.

Collision then points to paragraphs 83, 23, and 43 of its Complaint to argue that those paragraphs show that it did confer a benefit upon Nokia. Those paragraphs do no such thing. Paragraphs 23 simply states that Collision developed a technology that Nokia wanted, and paragraph 43 states that Nokia led Collision to believe that it if met certain milestones Nokia would deploy Collision's technology. The only allegation in those paragraphs that even comes close is that Collision "shar[ed] its highly valuable intellectual property with Nokia." *Id.,* ¶ 83. Since Collision does not allege that Nokia ever used Collision's technology, or even received a deliverable from Collision (other than under the Proof of Concept, for which Nokia paid Collision $600,000), simply sharing information with Nokia would not have conferred a measurable benefit upon Nokia.

---

[17] *See, e.g.*, *Commonwealth Aluminum Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 607 (D. Mass. 1997) ("One essential element for recovery in quantum meruit, however, is that the plaintiff conferred a measurable benefit on the defendant…. In this case, … there is no evidence that Plaintiffs conferred a measurable benefit on Jecon. Jecon is thus entitled to summary judgment…."); *Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 424 (D. Mass. 1995) ("No implied contract will be found in the absence of a benefit conferred.").

## V.  COLLISION'S CH. 93A CLAIM FAILS

Lastly, Collision seeks to avoid the dismissal of its ch. 93A claim by first arguing that Massachusetts law applies to the parties' dispute, but it provides no meaningful analysis as to why a dispute: (1) between a New Hampshire company and a Finnish company; (2) where the alleged "misstatements" were made in Germany (where Mr. Herrerias is based); (3) where the contract was to be performed in New Hampshire; and (4) where the alleged harm was presumably incurred in New Hampshire, should be governed by Massachusetts law.  *See* note 2, above.

Second, Collision argues that the limitation of liability clauses in the Integration and License Agreements do not bar its ch. 93A claim because its ch. 93A claim does not allege a breach of warranty.  *See* Opposition at 19.  Massachusetts law allowing the waiver of ch. 93A claims is not, however, only limited to ch. 93A claims effectively alleging a breach of warranty.[18]

Most critically, Collision's ch. 93A claim fails because the center of gravity for this dispute is not in Massachusetts.  This court has previously dismissed ch. 93A claims when the Complaint did not establish that the claim is centered "primarily and substantially" in Massachusetts.  *See*, *e.g.*, *Shea v. Millett*, No. 17-CV-12233-ADB, 2018 WL 2077599, at *4 (D. Mass. May 3, 2018) (dismissing 93A claim "because Defendants themselves are based in Colorado and the complaint does not specify which, if any, of the events it describes occurred in Massachusetts.").

In this case, the only connection to Massachusetts pertinent to the center of gravity analysis is that Nokia's alleged misrepresentations were received in Massachusetts.  That is not sufficient. "[C]ourts have found that Massachusetts is not the center of gravity when deceptive communications

---

[18]  *See Physician Ins. Agency of Mass., Inc. v. Inv'rs Capital Holdings, Ltd.*, No. 0303597, 2005 WL 3722373, at *3 (Mass. Super. Dec. 30, 2005) ("A commercial party to a contract waives its right to recover under G.L.c. 93A where the G.L.c. 93A claim is based on a breach of the contract and the contract contains a limitation of damages provision barring the recovery of indirect, special, incidental and consequential damages, so long as it does not frustrate public policy.").

are simply received in Massachusetts, without more." *In re Nat'l Century Fin. Enterprises, Inc.*, 846 F. Supp. 2d 828, 891 (S.D. Ohio 2012).

*Ezenia! Inc. v. Datacraft Mexico, S.A.*, No. 033390, 2004 WL 3091658, at *2 (Mass. Super. Nov. 23, 2004), is instructive. There, "the alleged unfair or deceptive communications emanated from" Mexico, where "Datacraft corresponded with Ezenia via email and telephone." *Id.* Based on those fact, the court concluded that "[t]he center of gravity in this case was Mexico. This is where the defendants spoke on the phone and emailed the plaintiff." *Id. See also id.*, *3 ("Although the deceptive acts were received in Massachusetts, the center of gravity in this case remains in Mexico."); *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 475 (2003) (finding where the allegedly unfair or deceptive statements were made in Washington and received in Massachusetts, the center of gravity was not Massachusetts); *BT Triple Crown Merger Co. v. Citigroup Glob. Markets Inc.*, 866 N.Y.S.2d 90 (Sup. Ct. 2008) (the "receipt of deceptive communications from parties located outside the state does not fulfill [the primarily and substantially] requirement.").[19]

Finally, as this Court has observed, "[t]he center of gravity inquiry examines the actionable conduct as opposed to conduct that is neither unfair nor deceptive." *Shea*, 2018 WL 2077599, at *3. Here, as shown above, because there is no actionable conduct, no ch. 93A claim is stated, much less

---

[19] Collision argues that *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622 (1985), supports its argument that the center of gravity is where the misstatements were received, acted upon, and where the loss was incurred. *See* Opposition at 20. The court in *Ezenia! Inc.* considered, and rejected, this argument under the facts of that case, holding:

> The Plaintiff relies on *Bushkin* ... for the proposition that the location where deceptive acts are received is the location in which the acts primarily and substantially occurred…. However the court in *Kuwaiti* made clear that a determinative factor for one case may not be determinative for another…. That is the case here. Although the deceptive acts were received in Massachusetts, the center of gravity in this case remains in Mexico.

*Ezenia! Inc.*, 2004 WL 3091658 at *3. *Bushkin* is also readily distinguishable because the misstatements at issue in this case were acted upon in New Hampshire (where the work was performed) and New Hampshire is where the loss was incurred. S*onoran Scanners, Inc. v. PerkinElmer, Inc.*, 585 F.3d 535 (1st Cir. 2009), also supports Nokia's position. In that case, the First Circuit held that Massachusetts was not the center of gravity because (like here) the losses did not occur in Massachusetts, but rather "were incurred in Arizona where Donahue and the CTP Business were located." *Id.* at 546. Also, Sonoran "acted upon PerkinElmer's allegedly deceptive conduct in Arizona." *Id.* Here, Collision acted upon Nokia's alleged deceptive statements in New Hampshire.

one whose center of gravity is in Massachusetts. *See Kuwaiti Danish Computer Co.*, 438 Mass. at 474 (considering whether certain conduct was unfair or deceptive and holding that conduct that was not "cannot be considered on the question whether the wrongful conduct occurred 'primarily and substantially' in Massachusetts.").

## CONCLUSION

For the foregoing reasons, Nokia respectfully requests that the Court grant its Motion to Dismiss and dismiss this case in its entirety.

Respectfully submitted,

NOKIA SOLUTIONS AND NETWORKS OY,

By its attorneys,

/s/ David Himelfarb
David Himelfarb, BBO #649596
dhimelfarb@mccarter.com
John Allen, BBO # 673081
jallen@mccarter.com
McCarter English, LLP
265 Franklin Street
Boston, MA  02110
Tel:  (617) 449-6500
Fax: (617) 607-9200

March 9, 2020

## CERTIFICATE OF SERVICE

I, David Himelfarb, hereby certify that on this 9th day of March, 2020, a true copy of the above document was served on counsel for all parties through the Court's ECF/CM system.

/s/ David Himelfarb
David Himelfarb

ME1 32754139v.5