# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

COLLISION COMMUNICATIONS, INC.,

        Plaintiff,

    v.

NOKIA SOLUTIONS AND NETWORKS OY,

        Defendant.

C.A. No. 1:20-cv-00949-JD

## NOKIA SOLUTIONS AND NETWORKS OY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

Defendant Nokia Solutions and Networks Oy ("Nokia") respectfully submits this memorandum of law in support of its motion to dismiss plaintiff Collision Communications, Inc.'s ("Collision") Second Amended Complaint (the "Complaint") (Dkt. No. 54).

## INTRODUCTION

Between February 2017 and November 2018 Nokia and Collision negotiated to become technology partners.  In November 2018 Nokia broke off negotiations before the parties had signed a written agreement.  Refusing to accept Nokia's decision, Collision commenced this suit alleging that, notwithstanding the lack of a signed agreement, Collision and Nokia had in fact come to terms on an agreement which Nokia then breached.

The notion that a sophisticated party such as Nokia would agree to a $23 million agreement to integrate an unproven start-up's technology into its network architecture without a signed agreement carefully delineating each side's respective rights and responsibilities is as farfetched as it sounds. What utterly defies credulity, however, is Collision's contention that the agreement Nokia allegedly agreed to is not the one contained in the draft the parties exchanged after twenty-two months of negotiations, but rather is the one set forth in the first draft contracts Collision proposed to Nokia. Collision would have the Court believe that Nokia agreed to Collision's self-serving drafts without making any edits to them, although Collision simultaneously admits that it was repeatedly informed by Nokia that Nokia would only agree to documents drafted by its own procurement department.

In the final analysis, Collision's attempt to enforce a deal Nokia never agreed to fails because Collision is unable to allege facts establishing the basic elements of contract formation, such as acceptance and a meeting of the minds.  Likewise, Collision's conclusory allegations of reasonable reliance are undermined by the record properly before the Court.  For these reasons, and as further discussed below, Collision's Complaint should be dismissed in its entirety.

## BACKGROUND[1]

**I.      Nokia's Initial Interest in Collision's Technology**

Collision is a Delaware corporation doing business in Peterborough, New Hampshire. Complaint, ¶ 11.  Its principals are Stan Fry ("Stan") and Jared Fry ("Jared"), who are father and son. *See id.*  Nokia is a Finnish company with a principal place of business in Espoo, Finland.  *See id.*, ¶ 12.

Collision owns certain technology which allows cellular infrastructure manufacturers to improve their network's performance.  *See id.*, ¶¶ 16-20.  Its technology runs on a manufacturer's cellular base station and replaces the manufacturer's own solution.  *See id.*, ¶¶ 20, 22.  In order to integrate its technology into a manufacturer's base station, three steps must be performed:

(1) Collision must "port" its technology into a user's base station by writing the software code that allows its technology to run on its customer's software platform – which, in Nokia's case, is called the Texas Instruments ("TI") Kepler2 ("K2") platform (*id.*, ¶ 20(a));

(2) Collision must integrate the code so that it is compatible with its customer's software architecture and properly shares resources with the customer's chipset so that both its and its customer's software continue to work properly; (*id.*, ¶ 20(b)); and

(3) Collision must ensure that its software properly interfaces with the customer's software to ensure that its technology properly functions, interacts with, and transfers data to the customer's platform (*id.*, ¶ 20(c)).

To be able to perform these tasks, Collision must have support and documentation from its customer, including, in the case of Nokia, access to Nokia's hardware – called the Airscale. *Id.*, ¶¶ 21, 31.

In 2015, Nokia expressed interest in Collision's technology.  *See id.*, ¶ 23.  To further explore this technology, Nokia and Collision entered into a Project Agreement, also referred to as the "Proof of Concept" or "PoC."  *Id.*, ¶ 26-27.  Under the Project Agreement, Nokia paid Collision $600,000 for a study evaluating whether Collision's technology could work on Nokia's platform.  *Id.*  The Project Agreement concluded on April 4, 2017, with Collision's delivery of a final report. *Id.*, ¶ 43.

---

[1]      Nokia accepts as true the well-pleaded allegations of the Complaint for this motion only.  It reserves the right to challenge those allegations in any subsequent proceeding.

## II.    The Parties Attempt to Negotiate a Deal

As the Project Agreement was winding down, the parties began discussing entering into a "full commercial agreement."  Complaint, ¶ 45.  On May 16 and 17, 2017, Francisco (Paco) Lopez Herrerias ("Herrerias"), of Nokia, traveled to Collision's offices in New Hampshire to discuss the framework for a potential deal.  *Id.*, ¶ 55.  Collision alleges that:

> [d]uring this meeting, Collision and Nokia were able to discuss and come to consensus on a number of topics that would then make up the material terms of a commercial agreement.  Further, Nokia and Collision came to an understanding and agreement on what the structure would be of the written agreement that memorialized the commercial agreement.

*Id.*  In particular, during this meeting the parties agreed to focus on "a lump sum license model with an integration/non-recurring engineering or 'NRE' fee."  *Id.*, ¶ 56.  As for financial terms, Collision proposed a $30 million license fee and Nokia responded that it "could accept a license fee of $20M."  *Id.*, ¶ 57.  "The meeting adjourned with an agreement being reached for most of the terms, with the continued discussion remaining related to the license fee amount."  *Id.*, ¶ 58.

After the meeting, Jared, Collision's Chief Operating Officer (*id.*, ¶38), prepared "initial drafts" of the parties' contemplated deal and sent those drafts to Nokia on May 30, 2017.  *Id.*, ¶ 59.  These drafts are attached hereto as Exhibits 1 and 2.[2]  Jared's initial drafts left open numerous materials terms including: (1) the license amount (*id.*, ¶ 59); (2) the term of the license (*id.*); (3) the amount of additional payments for schedule delays (*id.*); (4) the amount of the "exclusivity fee" (*id.*); (5) a description of the work Collision was to perform (*see* Integration Agreement, Exhibit A); (6) the delivery date for the first deliverable (*see id.*); (7) Nokia's acceptance terms (*see id.*); (8) the assistance that Nokia would be obligated to provide in order for the parties to attempt to agree on a joint

---

[2]    The Court may consider these documents in deciding this motion because they are referenced in and integral to Collision's claims.  *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (holding that, in considering a motion to dismiss, a court may consider "documents the authenticity of which are not disputed by the parties; [] official public records; [] documents central to plaintiffs' claim; or [] documents sufficiently referred to in the complaint.").

architecture; (9) the parties' respective support obligations (*see id.; see also* License Agreement, Exhibit A); and (10) the amount Nokia would have to pay to Collision for support (*see id.*).[3]

On June 1, 2017, after Jared sent Herrerias the draft agreements, Herrerias responded:

> Thanks for sending these draft versions.  They are very helpful.  Meanwhile *I will review together with procurement and come back to you ASAP*.  From the meetings, outcome is good: I got support from LTE Business Line and Portfolio Management heads, accepting my 20m proposal (perpetual)….  *Meanwhile, the 20m (+3m NRE) is a bold number …, so I'll have to fund the case moving to higher layers (Marc Rouanne and possibly Rajeev) to release budget beyond annual plan from LTE BL, where we cannot shift OPEX from other activities at this point of time*.  That's one of the reasons of my replay [*sic*] delay.  For that *I am internally organizing many calls to get to that point to eventually [sign] the contract*.

*See* June 1, 2017 Email[4] (attached hereto as Exhibit 3) (emphasis added).

On June 6, 2017, Herrerias allegedly told Jared *by telephone* that: (1) "he had received all necessary approvals for Nokia's $20M license fee proposal"; (2) "he was expecting markups from Nokia's procurement department that day"; (3) "Nokia procurement was very pleased with the drafts provided by Collision"; (4) he "expected the written agreements to be signed the next week or the week of June 19, 2017"; and (5) "the amount of money agreed to crosses a 'mark' that required additional sign offs to 'release the funds.'"  *Id.*, ¶¶ 62-63.  Collision alleges that Herrerias' above statements amounted to Nokia's acceptance of Collision's proposal, resulting in a binding agreement.

Two days later (on June 8, 2017), "Herrerias … wrote that Nokia preferred to use its own template version of a written agreement…."  *Id.*, ¶ 66.  Herrerias' June 8, 2017 emails are attached hereto as Exhibits 4 and 5.[5]  First, Herrerias wrote:

---

[3]     While the Complaint attempts to suggest that only items (1) to (4) above were left open in the Agreements, a review of the draft Integration and License Agreements themselves make plain that items (5) to (10) also still needed to be agreed upon.  And, of course, the language of these Agreements, not Collision's characterizations of them, are what controls.  *See U.S. Bank, Nat'l Ass'n v. Foremost Ins. Co.*, No. 17-CV-114-JD, 2017 WL 2592420, at *1 (D.N.H. June 14, 2017) ("When [] documents [central to a plaintiff's claims] contradict an allegation in the complaint, the document trumps the allegation."); *Clorox Co. v. Proctor & Gamble Consumer Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (same).

[4]     The Court may consider these emails because they are relied on in paragraph 67 of the Complaint.  *See E. Coast Serv. Indus. Co. Inc. v. N.H. State Liquor Comm'n*, No. 19-CV-1182-JD, 2020 WL 5578332, at *1 (D.N.H. Sept. 17, 2020) ("When evaluating a motion to dismiss, '[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein …'").

> ***We agreed to work from Nokia frame agreement*** for integration with aggressive target of 3 weeks to be followed by the license agreement…   Agreed ***we will start from the Nokia SLA language and negotiate to reasonable terms for both Nokia and a start up***. Although ***we will not use CC*** [Collision Communications] ***contract drafts*** agreed they give us a good indication of what they are comfortable with….

June 8, 2017 1:33 pm Email (Exhibit 4) (emphasis added).  Later that day, Herrerias wrote to Stan:

> In line with your comments, ***we never agreed in solely using the documents coming from your side***, and I think this is of common logic, so I don't understand why this is coming to a disappointing surprise….
>
> During our meeting I considered that any documents coming from your side would help Nokia speed up the procurement process, as it is proven below….  As said, the documents you delivered will help us a lot, and will reuse many of the items, as you'll see during the process moving forward.  ***We need to engage procurement, legal and compliance and category management, beyond the business unit ownership, all under stringent Nokia quality processes, which is not an easy task***.  With regards of the efforts, Nokia is contributing with many people to this project as well, ***even not having any commercial agreement signed and in place yet***.

June 8, 2017 5:23 pm Email (Exhibit 5) (emphasis added).

The following day (on June 9, 2017), Nokia's procurement department wrote to Jared that "our next step is to work on the merge of applicable terms from your draft template into our Nokia Agreement template."  Complaint, ¶ 67.  "On June 15, 2017, Stan Fry wrote Mr. Herrerias to express concern that the written agreements had still not been signed and that now Nokia's Procurement wanted to use their own template."  *Id.*, ¶ 70.[6]

## III.    The Parties Fail to Reach a Deal

On November 20, 2017, Nokia sent draft agreements acceptable to Nokia to Collision for its review.  Complaint, ¶ 77.  Among other things, Nokia's drafts: (1) reduced the license fee from $20

---

[5]      The Court may consider both emails because: (1) Collision relies on Herrerias' June 8, 2017, communications with Collision; (2) these emails are central to Collision's claims; and (3) it is necessary to consider the entire email chain for purposes of completeness.  *See Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 923 (N.D. Ill. 1999) ("When parties engage in a chain of correspondence relating to a transaction within a short period of time, and then one party detaches and presents only certain links of the chain in its effort to state a claim for relief, the party against whom such an incomplete picture is painted is entitled to fill in the skeletal outline thus presented by the complaining party by adding the missing links.") (citing Fed. R. Evid. 106).

[6]      Herrerias responded to Stan's email on June 21, 2017.  *See* Complaint, ¶ 71 (this response is attached hereto as Exhibit 7).  He sent another email to Jared on June 28, 2017.  *See id.*, ¶ 72 (this response is attached hereto as Exhibit 8).

million to $7 million; (2) did not provide for any upfront payments; (3) had no commitment on Nokia's part to actually sell Collision's solution and pay the license fee; and (4) provided that Nokia would receive Collision's source code and would own that code. *See id.* Collision considered these drafts to constitute "a breach of the parties' agreement reached on June 6, 2017." *See id.*, ¶ 78. Collision made edits to these agreements, which it sent back to Nokia with a cover letter from Stan. *See id.*, ¶ 79. Stan's letter is attached hereto as Exhibit 9. "In response to Collision's edits and cover letter, Nokia's Tom Giers (from Nokia's Procurement department) wrote a letter to Collision on December 18, 2017 demanding that Collision agree that there had been no agreement between the parties." Complaint, ¶ 80. Mr. Giers' letter is attached hereto as Exhibit 10.

The Complaint then alleges that Nokia strung Collision along until November 2018 (the period of time during which the parties continued to negotiate a potential agreement). *See id.*, ¶ 82. Collision alleges that during this period Nokia sought to "induce Collision to continue investing all of its resources in the parties' partnership, even as Nokia sought to change the material terms of that relationship. This stringing along behavior included repeated false assurances that an agreement was in place and was close to be [*sic*] finalized." *Id.* No actual statements are identified to support this claim.

## DISCUSSION[7]

### I.    Choice of Law

"A federal court sitting in diversity applies state substantive law." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). "To determine the applicable substantive law, the federal court applies the choice-of-law principles of the forum state …" *Id.*[8] "Under New Hampshire choice-of-law principles, when more than one state may have an interest in the suit and the choice involves substantive law, the court must first decide whether relevant New Hampshire law actually conflicts

---

[7]    Given the Court's familiarity with the Rule 12 standard, it is not restated here. *See, e.g.*, *Saunders v. First Magnus Fin. Corp.*, No. 17-CV-27-JL, 2018 WL 3432721, at *1 (D.N.H. July 16, 2018) (reciting standard).

[8]    Although this case was commenced in Massachusetts, because it was transferred to New Hampshire based on a jurisdictional defect New Hampshire "substantive and choice of law rules apply …." *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 793 (10th Cir. 1998).

with the laws of the other interested states." *SIG Arms Inc. v. Emp'rs Ins. of Wausau*, 122 F. Supp. 2d 255, 258–59 (D.N.H. 2000).  When no actual conflict is shown, the court applies the law of the forum state.  *Aftokinito Props, Inc. v. Millbrook Vents., LLC*, No. 09-cv-415-JD, 2010 WL 3168295, at *3 (D.N.H. Aug. 9, 2010).  However, where parties to a contract select the law of a particular jurisdiction to govern their affairs, "that choice will be honored if the contract bears any significant relationship to that jurisdiction."  *Hobin v. Coldwell Bankr. Resid. Affs., Inc.*, 144 N.H. 626, 628 (2000).

Collision alleges in its Complaint that "the parties had a mutual agreement on all material terms of their relationship" and that "these material terms were memorialized in draft documents and emails that the parties exchanged."  Complaint, ¶ 85.  The draft documents Collision is referring to are the draft License and Integration Agreements (Exhibits 1 and 2) referenced in paragraphs 59, 60, and 62 of the Complaint.  Those Agreements both contain the following choice of law provision: "This Agreement will be governed by and construed in accordance with the laws of the United States and the State of Delaware."  See License Ag., Sect. 11.4; Integration Ag., Sect. 11.4.  Thus, the parties' contract claims should be decided under Delaware law.[9]

## II.     The Complaint Fails to Allege the Basic Elements of a Breach of Contract Claim

"Under Delaware law, the elements of a claim for breach of contract are: (1) the existence of a contract between the parties, whether express or implied; (2) a breach of an obligation imposed by the contract; and (3) resulting damage to the plaintiff."  *US Foods, Inc. v. EBA Tr., Inc.*, No. 17-CV-326-LM, 2018 WL 4259842, at *2 (D.N.H. July 18, 2018).[10]  "To state a claim for breach of contract, a plaintiff must first establish the existence of a valid contract.  A valid contract requires (1) an offer, (2)

---

[9]     As noted in the Complaint, Collision is a Delaware corporation.  *See* Complaint, ¶ 11.

[10]    New Hampshire law is the same.  *See Sears Roebuck & Co. v. W/S Lebanon LLC*, No. 14-CV-422-JL, 2017 WL 3913218, at *2 (D.N.H. Sept. 6, 2017) (to succeed on a breach of contract claim under New Hampshire law, a plaintiff must show: "(1) that a valid, binding contract existed between the parties, and (2) that [the defendant] breached the terms of the contract.").

acceptance, and (3) consideration." *See Brown v. City Library of Wilmington*, No. CV 2019-0663-KSJM, 2020 WL 4743514, at *3 (Del. Ch. Aug. 17, 2020).[11]

### A. Nokia Did Not Accept Collision's "Offer" on June 6, 2017

With regards to the element of "acceptance," Delaware applies the "mirror image" rule. *See Moscowitz v. Theory Entertainment LLC*, No. CV 2019-0780-MTZ, 2020 WL 6304899, at *26 (Del. Ch. Oct. 28, 2020) ("Delaware 'has adopted the mirror-image rule.'") (citation omitted). Under this rule, "[i]n order to constitute an 'acceptance,' a response to an offer must be on identical terms as the offer and must be unconditional. A response to an offer that is not on the terms set forth by the offeror constitutes a rejection of the original offer and a counteroffer." *Id.* (footnotes and citations omitted).[12] As further explained in Williston on Contracts:

> As a general principle, at common law an acceptance, in order to be effective, must be positive and unambiguous. Cases often treat this requirement as identical with the requirement that an acceptance may not change, add to, or qualify the terms of the offer, and to the extent that such changes or qualifications prevent an acceptance from being positive and unequivocal, such treatment is understandable. However, the requirement that an acceptance be unequivocal is in fact separate; even though no change in the offer is suggested in the reply by the offeree, the reply may not sufficiently clearly indicate assent to the offer so as to create a contract. In this sense, it is not enough to suggest that only changes, additions, or qualifications will prevent an acceptance, for any equivocation by the offeree in its purported acceptance will have the same effect.

2 Williston on Contracts § 6:10 (4th ed.) (footnotes omitted). For instance, a response indicating that "acceptance is contemplated, but has yet to occur" does not constitute an acceptance because "an acceptance which is merely contemplated in the future is no acceptance at all." *Id.*

In this case, Collision concedes that Nokia did not accept Collision's draft Integration and License Agreements as written, but rather Nokia expressly told Collision on June 6, 2017, that it was

---

[11]   *See also Durgin v. Pillsbury Lake Water Dist.*, 153 N.H. 818, 821 (2006).

[12]   New Hampshire also applies this rule. *See Arapage v. Odell*, 114 N.H. 684, 686 (1974) ("Fundamental in the making of a valid contract by offer and acceptance is the requirement that an offer be accepted unconditionally."). "There is no meeting of the minds where the acceptance of an offer is conditional." *Clark v. Mitchell*, 937 F. Supp. 110, 113 (D.N.H. 1996). For instance, where a party "accepts part of an offer, but rejects other parts, there is no agreement between the parties even as to those parts nominally 'accepted.'" *Id. See also* Restatement (First) of Contracts § 58 ("Acceptance must be unequivocal in order to create a contract.").

8

"expecting markups from Nokia's procurement department" (Complaint, ¶ 62).  The only plausible construction of this language is that Collision's drafts were *not* accepted by Nokia and that Nokia intended to edit those agreements to provid its own input.[13]  The Complaint further alleges that two days later, on June 8, 2017, Herrerias wrote to Collision that "Nokia preferred to use its own template version of a written agreement" (*id.*, ¶ 66), and the next day a member of Nokia's procurement department wrote to Collision that Nokia was working on merging the "applicable terms from your draft template into our Nokia Agreement template …."  *Id.*, ¶ 67.  These facts conclusively establish that Nokia never accepted Collision's "offer" unequivocally, but rather Nokia always made clear that it intended to have input on the terms of the parties' agreement.  At best, Herrerias' June 6, 2017, statements constitute a counteroffer because they did not accept Collision's draft documents unequivocally.  *See* Restatement (Second) of Contracts § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.").[14]

The case *Ramone v. Lang*, No. 1592-N, 2006 WL 4762877 (Del. Ch. Apr. 3, 2006), is instructive.  In that case, two partners sought to open a swim and fitness center together but their deal fell through after six months of efforts and negotiations.  The plaintiff claimed that he accepted a deal proposed to him in a July 8 email to which he responded as follows: "[t]his sounds like what I am looking for.  I do not understand the ... tax implications. I am also uncertain of some details concerning the additional parcel, however I think we are close enough to warrant us getting this done."  *Id.* at *5.

---

[13]      "An acceptance 'subject to a formal contract' or 'subject to a proper contract to be prepared by our solicitors' has been held in a number of cases not to be an operative acceptance."  1 Corbin on Contracts § 3.7 (2020).

[14]      Collision may respond that it alleges in the Complaint that during the June 6, 2017, phone call Herrerias "gave no indication that the draft agreements prepared by Collision were missing or misstating material terms."  Complaint, ¶ 62. This allegation does not amount to an acceptance for two reasons.  First, silence is generally not tantamount to acceptance. *See Corp. Serv. Co. v. Kroll Assocs., Inc.*, No. CIV.A.99C-12-210-JRS, 2001 WL 755934, at *4 (Del. Super. Ct. June 15, 2001) ("As a general rule, an offeree does not need to reply to an offer, and his silence and inaction will not be construed as an assent to an offer."); *Holt v. Gage*, 60 N.H. 536, 539 (1881) ("[M]ere silence may not amount to an acceptance of a contract.").  Second, while Herrerias may not have identified specific issues with Jared's draft agreements, he did indicate that Nokia was going to provide markups to Collision's proposed agreements.  Herrerias therefore made plain that Nokia was not accepting Collision's drafts as written.

9

The court found that this email did not constitute an acceptance of the July 8 offer made to the plaintiff because it was not an equivocal acceptance.  The court held:

> For Ramone's email to have constituted acceptance, it must have included three general components: (i) an expression of commitment; (ii) the commitment must not be conditional on any further act by either party; and (iii) the commitment must be one on the terms proposed by the offer ***without the slightest variation***.  Although in that email Ramone signals his general agreement in moving forward on the structure Lang described, ***Ramone's words in the email do not reflect a commitment to the exact terms outlined by Lang*** - as reflected in his caveats that he does not understand certain aspects of Lang's proposal and that he is uncertain about another aspect.

*Id.* at *11 (emphasis added).  Ultimately, the court concluded that Ramon's July 8 email did not constitute acceptance.  "Ramone and Lang were merely moving forward in their negotiations to reach an agreement."  *Id.*  The same is true here.  Herreria's June 6, 2017, statements expressly made Nokia's acceptance conditioned on numerous further acts including: (a) Nokia's procurement department providing markups to the License and Integration Agreements; (b) the parties agreeing on those markups; (c) the parties signing written agreements; and (c) Nokia obtaining approval from senior management before releasing funds.  *See* Complaint, ¶¶ 62-63.  Even in the light most favorable to Collision, Herreria's June 6 statements simply do not satisfy the requirements of a valid acceptance.

Other factors present in *Ramone* that suggested no contract was formed are likewise present here.  In *Ramone*, the court noted that "a contract must contain all material terms in order to be enforceable. If terms are left open or uncertain, this tends to demonstrate that an offer and acceptance did not occur." *Id.* at *11.  Here, as discussed in greater detail below, numerous terms were left open as of the parties' June 6, 2017, discussion.  Likewise, the court in *Ramone* noted that  "negotiations continued throughout July, over various terms ….   These further negotiations on substantive issues demonstrate that an enforceable contract between Ramone and Lang was not in place based on the July 8 email exchange." *Id.*  Here, the Complaint notes that the parties continued their negotiations through November 2018 – *i.e.*, for 18 months after Collision alleges the parties had reached an agreement (*see* Complaint, ¶ 9), further evidencing that no agreement was reached on June 6, 2017.

**B.** **The Alleged Oral License Agreement Violates the Statute of Frauds**

Collision's contract claim is also barred by the Statute of Frauds, which states that:

[n]o action shall be brought to charge any person … upon any agreement that is not to be performed within the space of 1 year from the making thereof ... unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith, or some other person thereunto by the party lawfully authorized in writing ….

6 Del. C. § 2714(a).[15]   The purpose of the Statute of Frauds is "to protect defendants against unfounded or fraudulent claims that would require performance over an extended period of time." *Olson v. Halvorsen*, 982 A.2d 286, 291 (Del. Ch. 2008).

In this case, Collision is seeking to enforce an alleged contract to "integrate [Collision's software] into Nokia's hardware and software."  Complaint, ¶ 32.[16]  It alleges that the terms of the parties' agreement are stated in the unsigned Integration and License Agreements, as supplemented by the parties' discussions between May 30, 2017, and June 6, 2017.  *See* Complaint, ¶¶ 59-65, 85.[17]  One oral modification it alleges the parties agreed to is that the license for Nokia to use Collision's technology would be perpetual.  *Id.*, ¶ 64.

Under the License Agreement, Nokia was to sell its hardware containing Collision's technology to Nokia's customers (*see* License Agreement, p. 1) and then Nokia would have to report its sales to Collision each quarter (*see id.*, Section 4).  For its part, Collision was obligated to, among other things, provide support to Nokia, which Nokia would pay for on a time and materials basis (at a rate the parties never agreed to).  *See id.*, Sect. 7.2 ("Collision shall provide technical support to Nokia

---

[15]     The Delaware Statute of Frauds applies based on the parties' Delaware choice of law provision, which Collision claims Nokia agreed to.  *See Campbell v. CGM, LLC*, No. 15-CV-088-JD, 2017 WL 78474, at *9 (D.N.H. Jan. 9, 2017) (applying Georgia Statute of Frauds based on Georgia choice of law provision).

[16]     *See also* License Agreement, p. 1 ("Collision is integrating its technology, software, and solution(s) into Nokia product(s).").

[17]     Notwithstanding the fact that the License and Integration Agreements both provide that they can only be modified in writing.  *See* License Agreement, Sect. 11.14 ("No amendment to or modification of this Agreement will be binding unless in writing and signed by a duly authorized representative of both Parties."); Integration Agreement, Sect. 11.14.

as provided in the Technical Support Plan ….").  The Technical Support Plan (attached to the License

Agreement as Exhibit A) provides as follows:

> *Both parties agree in good faith to negotiate and develop reasonable support and service terms.*  The support and service terms will have the following elements:
> - Commitment from Collision to support issues that arise from Nokia or Nokia's customers in a timely manner using reasonable and diligent efforts.
> - A Commitment from Nokia to provide sufficient information, logs, etc., or otherwise provide the necessary elements to enable Collision to help solve any technical issues that arise.
> - A Commitment to provide such technical support over the lifecycle of the Licensed Software.
> - A Commitment from Collision to resolve any "bugs" found in the software.
> - A service fee (on time and material basis) paid by Nokia to Collision for any efforts by Collision in resolving any of Nokia's or Nokia's customers' issues as well as supporting marketing efforts and general customer support.

License Agreement, Exhibit A.

This Agreement could not have been performed in a year because it grants a perpetual license

to Nokia and each party assumes performance obligations to the other under the Agreement while the

Agreement is in effect.  *See*, *e.g.*, *Fabri-Com, Inc. v. Tex-Fi Indus., Inc.*, 696 N.Y.S.2d 447, 448–49

(1999) ("We find that insofar as plaintiff's claim was based on its contention that it was promised

perpetual commissions … it was properly dismissed.  Such a promise would not be capable of

performance within a year and would therefore fall within the writing requirement of the Statute of

Frauds.").  As such, the License Agreement fails under the Statute of Frauds, and for this independent

reason Collision's breach of contract claim should be dismissed.  *See*, *e.g.*, *Mosiman v. Madison Cos.,*

*LLC*, No. CV 17-1517-CFC, 2019 WL 203126, at *2 (D. Del. Jan. 15, 2019) (dismissing breach of

contract claim as to unsigned contract under statute of frauds).

It is also irrelevant under the Statute of Frauds that the License Agreement had a "Termination

for Convenience" provision (Section 9.2) because the fact that an agreement can be terminated early

does not mean the contract can be performed within a year.  *See Guyer v. Haveg Corp.*, 205 A.2d 176,

181 (Del. Super. Ct. 1964), aff'd, 211 A.2d 910 (1965) ("A contract to perform services for a specified

period exceeding one year violates the statute of frauds even though the contract may be terminated within one year."); *Thomas v. Delaware Adolescent Program, Inc*., No. 684, 1984 WL 8229, at *3 (Del. Ch. Mar. 30, 1984) ("An oral contract to perform services for a specified period exceeding one year violates the Statute of Frauds even though the contract may be terminated within one year.").

As the License Agreement alleged by Collision could not have been performed within a year and is not in a writing signed by Nokia, it is barred by the Statute of Frauds.

### C.     The Integration Agreement Fails for Lack of a Condition Precedent

With regards to the Integration Agreement, it also fails for lack of a condition precedent. "[F]ailure to satisfy a condition precedent results in a forfeiture of that party's rights under the contract…   [I]n an action on a contract obligation ... the plaintiff must allege the occurrence of conditions precedent.  Thus where the benefit of a clause in a contract will inure to the plaintiff only on the occurrence of certain conditions, he must allege that those conditions existed." *Good v. Moyer*, No. CIV.A. N12C-03033RR, 2012 WL 4857367, at *4 (Del. Super. Ct. Oct. 10, 2012).  Here, Section 6.1 of the Integration Agreement states, "This Integration Agreement *is conditioned on and only valid upon the contemporaneous execution of the License Agreement*."  *Id.* (Exhibit 1) (emphasis added). As the License Agreement was never executed, the trigger for the Integration Agreement coming into existence was never satisfied.

### D.     Nokia Did Not Intend to Be Bound

"It is well settled Delaware law that three elements are necessary to prove the existence of an enforceable contract:  (1) intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration." *Gallagher v. E.I. DuPont De Nemours & Co.*, No. CIV.A. 06C-12-188 WC, 2010 WL 1854131, at *3 (Del. Super. Ct. Apr. 30, 2010).  Furthermore,  "[w]here it is clearly understood that the terms of a proposed contract, though tentatively agreed on, shall be reduced to writing and signed

before it shall be considered as complete and binding on the parties, there is no final contract until that is done." *Universal Prod. Co. v. Emerson*, 36 Del. 553, 179 A. 387, 394 (1935) (citation omitted).[18]

Collision's breach of contract claim also fails because Nokia clearly indicated that it did not intend to be bound until it signed a contract on forms prepared by its procurement department.  *See*, *e.g.*, Complaint, ¶ 61 (alleging that Nokia was contemplating signing a contract);  ¶ 62 (alleging Herrerias expected written agreements "to be signed"); ¶ 62 (alleging that Herrerias told Collision "he was expecting markups from Nokia Procurement"); ¶ 66 (alleging Herrerias told Collision that "Nokia preferred to use its own template version of a written agreement"); and ¶ 67 (alleging Nokia told Collision it wanted to merge Collision's forms with its own forms).

The documents referenced in the Complaint corroborate this essential fact.  *See*, *e.g.*, Exhibit 3 attached hereto ("For that I am internally organizing many calls to get to that point to eventually [sign] the contract."); Exhibit 4 ("We agreed to work from Nokia frame agreement for integration …. Agreed we will start from Nokia SLA language ….   Although we will not use CC [(Collision Communications)] contract drafts agreed they give us a good indication of what they are comfortable with."); Exhibit 5 ("we never agreed in solely using the documents coming from your side").

As Nokia made clear that it would only agree to a deal based on signed documents approved by its procurement department, it cannot be bound by an agreement that does not fulfill those conditions.

### E.      The Parties Did Not Agree on All Material Terms

The alleged agreement between the parties is also missing a number of material terms, rendering it too imprecise to be enforced.  *See Ramone*, 2006 WL 4762877 at *11 ("a contract must contain all material terms in order to be enforceable.  If terms are left open or uncertain, this tends to

---

[18]      *See also Transamerican S.S. Corp. v. Murphy*, 1989 WL 12181, at *1 (Del. Ch. Feb. 14, 1989) ("It is everywhere agreed that if the parties contemplate a reduction to writing of their oral agreement before it can be considered complete, there is no contract until the writing is signed.") (quoting Williston on Contracts § 28, pp. 66-67); Rest. (2d) of Contracts § 27 cmt. b. (1981) ("if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.").

demonstrate that an offer and acceptance did not occur.").  For instance, Exhibit A to the Integration Agreement begins, "*Both Parties agree in good faith to develop and refine a reasonable Description of Work*" (*see* Integration Agreement, Exhibit 2 (emphasis in original)), evidencing that no final description of work had been agreed to.  Likewise, the "<u>Target Delivery Date</u>" of the first deliverable in the Integration Agreement is "TBD [(to be determined)]."  *Id.*  The "<u>Target Delivery Date</u>" of the second deliverable is "At the date necessary in advance of the 2018 Mobile World Congress – To Be Determined, but expected to be late January or early February 2018."  *Id.*  The "<u>Target Delivery Date</u>" for the third component is: "At the date necessary in advance of the official FL18A release – To Be Determined, but expected to be in May 2018.  Earlier delivery date(s) to SI&T TBD.  <u>Acceptance Terms</u>: TBD."  *Id.*  This final point is critical because, without acceptance terms, there would be no way to determine if Collision's deliverable performed in the way Nokia expected it to perform.

The "Plan" in Exhibit A also makes clear that essential engineering discussions had not yet taken place.  It states, "For the ultimate goal of a commercialized product with an integrated Collision receiver, tight integration is necessary *and requires detailed joint architectural discussions between Nokia and Collision*….  In order to build a final commercial product, significant effort from Nokia is additionally necessary to determine joint architecture."  *Id.* (emphasis added).  Under "**Support**" the Agreement states, "*Both parties agree in good faith to determine, develop, and negotiate reasonable support to each other and this Work as a result of the details herein being better understood.*"  *Id.*  Again, this language makes clear that no agreement had been reached on support obligations and nothing in the Complaint alleges that an agreement on this open term was ever reached.

The License Agreement similarly fails to include a number of material terms.  For example, the "Technical Support Plan" (Exhibit A of the License Agreement) states, "*Both parties agree in good faith to negotiate and develop reasonable support and service terms.*"  *Id.* The Plan also notes that the parties had not agreed on the price Nokia would pay for support.  *See id.* ("The support and service

15

terms will have the following elements: … ● A service fee (on time and material basis) paid by Nokia to Collision ….").  Nowhere in the Complaint is it alleged that agreement was reached on these items.

In light of the above, it is clear that, *as of June 6, 2017*, the parties had not agreed on all material terms, rendering Collision's alleged agreement too indefinite to be enforceable.[19]

## III.   The Complaint's Implied Covenant Claim Fails

Count II of Collision's Complaint states, "By the conduct alleged more particularly above, Nokia breached the covenant of good faith and fair dealing implied under New Hampshire in the negotiating and performance of all contracts, causing Collision damages in an amount to be proven at trial."  Complaint, ¶ 89.  As an initial matter, this claim is governed by Delaware, not New Hampshire, law.[20]  And under Delaware law, an implied covenant claim fails if no binding contract exists.  *See Sanders v. Devine*, No. CIV. A. 14679, 1997 WL 599539, at *6 (Del. Ch. Sept. 24, 1997) (holding that since there was no contractual relationship between plaintiff and any of defendants, allegations that alleged misrepresentations or omissions made in connection with the formation of a contract violate the covenant of good faith "does not bear analysis.").

The result would be no different under New Hampshire law.[21]  While New Hampshire law does extend the implied covenant to contract formation, in that context the doctrine only prohibits misrepresentations directed at inducing the other party to enter into a contract, something Collision

---

[19]     *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at *7 (Del. Ch. Nov. 23, 2010) ("In order for a contract to be binding under Delaware law, the contracting parties must have agreed on all essential terms.  Moreover, where 'commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of this state, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree.'") (internal citations omitted).

[20]     As a form of contract claim, Collision's implied covenant claim is governed by Delaware law, not New Hampshire law.  *See Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 10 (1st Cir. 1994) ("the same substantive law that governs the contract claim also governs the implied covenant claim."); *Berlin Station, LLC v. Babcock & Wilcox Const. Co., Inc.*, No. 214-2014-CV-00014, 2015 WL 4163048, at *10 (N.H. Super. June 1, 2015) (applying New York law to an implied covenant claim due to a New York choice of law clause).

[21]     New Hampshire also does not allow an implied covenant claim without an underlying contract.  *See J & M Lumber & Const. Co. v. Smyjunas*, 161 N.H. 714, 724 (2011) ("New Hampshire law has not recognized a claim for breach of the implied covenant of good faith and fair dealing outside of the contractual context.").

ME1 34193683v.4

does not allege that Nokia did here.[22]  In fact, Collision alleges that a contract was formed on **June 6, 2017**, and does not allege that Nokia engaged in any misconduct before that date.  Once a contract is formed, the implied covenant applies "when the agreement grants a contracting party discretion in performing his duties under the agreement and an unreasonable exercise of that party's discretion causes harm to the other contracting party."  *Ruivo v. Wells Fargo Bank, N.A.*, No. 11-CV-466-PB, 2012 WL 5845452, at *3 (D.N.H. Nov. 19, 2012), aff'd, 766 F.3d 87 (1st Cir. 2014).  There are no allegations that Nokia acted in this fashion.  Lastly, to the extent Collision's implied covenant claim is merely duplicative of its misrepresentation claim (Count IV of its Complaint), it should be dismissed for this reason as well.  *See Berlin Station, LLC*, 2015 WL 4163048 at *10 n.4 ("even if New Hampshire law applied, [plaintiff's implied covenant claim] would be dismissed as duplicative of Counterclaims III-VIII, alleging misrepresentation and fraud in the inducement.").

## IV.   The Complaint Does Not State a Viable Promissory Estoppel Claim

Collision's promissory estoppel claim (Count III) also fails.  "Under the doctrine of promissory estoppel, a plaintiff must demonstrate by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Chrysler Corp. (Delaware) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003).[23]

---

[22]     *See, e.g., Centronics Corporation v. Genicom Corporation*, 132 N.H. 133, 139 (1989) (holding that the contract formation duty of good faith applies "insofar as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance upon it.").  *See also Berlin Station, LLC*, 2015 WL 4163048 at *10 n.4 ("the New Hampshire doctrine of the implied covenant of good faith and fair dealing does not create an independent cause of action for conduct during contract negotiations but simply restates the common law view that there is liability for fraudulent inducement to a contract.").

[23]     This claim is also subject to the Delaware choice of law provision in the License and Integration Agreements.  *See Steinke v. Sungard Fin. Sys., Inc.*, 121 F.3d 763, 775 (1st Cir. 1997) ("promissory estoppel is a 'contractually based cause of action' and thus should 'fall[ ] within the purview of the choice of law clause.'") (citations omitted).  New Hampshire and Delaware law are in accord, however, as both states follow the Restatement (Second) of Contracts.  *See Rockwood v. SKF USA Inc.*, 687 F.3d 1, 9–10 (1st Cir. 2012) (noting that New Hampshire "has adopted the definition of promissory estoppel from Section 90 of the Restatement (Second) of Contracts.") (citing *Marbucco Corp. v. City of Manchester*, 137 N.H. 629, 632 (1993)).

"Promissory estoppel thus protects only 'reasonable reliance' on the part of the promisor." *Rockwood v. SKF USA Inc.*, 758 F. Supp. 2d 44, 57 (D.N.H. 2010), aff'd, 687 F.3d 1 (1st Cir. 2012). *See also Lively v. Gov't Employees Ins. Co.,* No. CV N16C-07-085 AML, 2018 WL 2459096, at *4 (Del. Super. Ct. May 30, 2018) (same). Moreover, "[t]he promise [at issue] must be a real promise—mere expressions of expectation, opinion, or assumption are insufficient. The promise must also be reasonably definite and certain." *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 804 (Del. Ch. 2007), aff'd, 956 A.2d 32 (Del. 2008).

Here, the Complaint contains nothing but boilerplate allegations concerning the statements Collision claims to have relied on and concerning its alleged detrimental reliance. Such allegations are properly disregarded.[24] In fact, when evaluating the record properly before the Court it is clear that, at all pertinent times, Nokia make clear that it was it was expecting to sign an agreement prepared by its procurement department, it never told Collision that the parties had reached an agreement, and it never told Collision that Collision would be paid for any work performed prior to a contract being formed. For instance, in the June 8, 2017, emails cited in paragraph 66 of the Complaint, Herrerias states:

> We agreed to work from Nokia frame agreement for integration … to be followed by license agreement… Agreed we will start from Nokia SLA language and ***negotiate to reasonable terms for both Nokia and a start up***. Although ***we will not use CC*** [Collision Communications] ***contract drafts*** agreed they give us a good indication of what they are comfortable with….

June 8, 2017 1:33 pm Email (Exhibit 4) (emphasis added). Herrerias further wrote that day:

> In line with your comments, ***we never agreed in solely using the documents coming from your side***, and I think this is of common logic, so I don't understand why this is coming to a disappointing surprise….
>
> During our meeting I considered that any documents coming from your side would help Nokia speed up the procurement process, as it is proven below… As said, the documents you delivered will help us a lot, and will reuse many of the items, as you'll see during the process moving forward. ***We need to engage procurement, legal and***

---

[24]     *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) ("A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action.") (citation omitted); *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) ("If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal.").

ME1 34193683v.4

> ***compliance and category management, beyond the business unit ownership, all under stringent Nokia quality processes, which is not an easy task***. With regards of the efforts, Nokia is contributing with many people to this project as well, ***<u>even not having any commercial agreement signed and in place yet</u>***.

June 8, 2017 5:23 pm Email (Exhibit 5) (emphasis added).  Knowing that Nokia was preparing draft documents and did not believe a commercial agreement was in place, any alleged reliance on Collision's part would not have been reasonable.

> In the June 15, 2017, email cited in paragraph 70 of the Complaint, Stan writes to Herrerias:

> > Have you documented the terms as you have proposed to us?  I have not seen a document and would like to insure that everyone is operating from the same set of terms.  ***This is one of the multiple reasons we have not formally responded <u>or agreed to your terms</u>***.  ***We are very concerned that the situation seems to be changing from prior understandings, new hurdles are being introduced, and this is in the context of not being content with the terms as they were proposed.***  An important element of your proposal is the license fee.  ***We need a commitment from Nokia, both from the perspective of understanding there is really a commitment***, and to address that we are providing exclusivity to you.…  ***<u>How long are you expecting that we will continue to operate on your project without any guarantees on the part of Nokia?</u>***

*Id.* (emphasis added) (attached hereto as Exhibit 6).  The final line from this email conclusively establishes that Collision knew it was doing work without any payment commitment from Nokia.

> In the June 28, 2017, email cited in paragraph 72 of the Complaint, Herrerias writes, "We are in the heavy working process of setting terms that fit the most with the way Nokia understands covers [*sic*] risk best.…"  *Id.* (Exhibit 8).  In August 2017, Nokia is alleged to have stated that its draft contracts were not yet complete.  *See id.*, ¶ 74 ("In August of 2017, Mr. Herrerias told Collision that Nokia's version of the written agreements were 95% complete.").  Later, in Tom Giers' letter to Collision referenced in ¶ 80 of the Complaint (Exhibit 11), Mr. Giers states:

> > Nokia has neither been part of any Collision decision to begin any work to prepare for porting into AirScale nor has suggested that Collision should do so.  Further, Nokia did not authorize Collision to start porting at any point in time.  The decision to start this effort rests solely with Collision and is for Collision's benefit.

*Id.*  The conclusory allegations of the Complaint cannot trump the above documents showing that Collision was not lulled into complacency between June 6, 2017, and November 20, 2017 (when

19

Nokia is alleged to have breached the parties' contract), but rather it keenly understood during this time period that the parties were not under contract. *See Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").[25]  In fact, courts have expressly held that it is not reasonable for a party to expect to be paid for work undertaken before a contract is signed if it knows the other party intends for there to be a signed agreement – which the above record makes clear was Nokia's stated intent.  In *Gruen Indus., Inc. v. Biller*, 608 F.2d 274 (7th Cir. 1979), the court held:

> [T]he plaintiffs' promissory estoppel argument seeks to transform these complex negotiations into a "no lose" situation.  Every businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement.  It is difficult to find the degree of injustice necessary for recovery in estoppel when the promises incorporate so many contingencies and complexities and as a matter of sound business practice are to be formalized before the parties carry them out.  We conclude on this basis that the losses are best left where they have fallen, because it is clear that no injustice will result from not enforcing the alleged promise.

*Id.* at 282.  *See also Chromalloy American Corp. v. Universal Housing Systems of America, Inc.*, 495 F. Supp. 544, 551 (S.D.N.Y. 1980) (where the plaintiff had made statements "expressly disclaiming any intention to be bound until the execution of [a written agreement]," the defendant had not established reasonable reliance).  That Collision, on its own accord, decided to start preparations for its work while negotiations on the parties' potential agreement were being conducted is no fault of Nokia's and cannot form the basis for a promissory estoppel claim.[26]

---

[25]     Collision identifies the specific statements it alleges it relied on in paragraphs 96 and 99 of its Complaint.  All of those statements are alleged to have occurred between June 1, 2017 (when its admits no contract was in place) and November 14, 2017.

[26]     *See Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33–34 (1st Cir. 1988) (holding that when a party receives conflicting information, "a reasonable person investigates matters further; he receives assurances or clarification before relying. A reasonable person does not gamble with the law of the excluded middle, he suspends judgment until further evidence is obtained…. The law does not supply epistemological insurance. Nor does it countenance reliance on one of a pair of contradictories simply because it facilitates the achievement of one's goal.").  *See also* Restatement, Second, Torts § 548 (" "[t]he maker of a fraudulent misrepresentation is not liable to one who does not reply upon its truth but upon the expectation that the maker will be held liable in damages for its falsity.").

Collision also fails to identify any "definite and certain" statements, sufficient to base a detrimental reliance claim on. *See Territory of U.S. Virgin Islands*, 937 A.2d at 804 (granting motion to dismiss promissory estoppel claim, holding that "[t]he promise must be a real promise—mere expressions of expectation, opinion, or assumption are insufficient.").[27]  For these reasons, Collision's promissory estoppel claim should be dismissed.

## V. Collision's Negligent/Intentional Misrepresentation Claim Fails as a Matter of Law

Collision's "negligent/intentional misrepresentation" should be dismissed because it: (a) fails to properly allege reasonable reliance; and (b) is barred by the economic loss doctrine.

### A. The Complaint Fails to Show Reasonable Reliance

Misrepresentation claims require reasonable reliance.[28]  For the reasons discussed in Section IV above, the Complaint fails to show that Collision's alleged reliance in this case was reasonable.

### B. The Economic Loss Doctrine Bars Collision's Misrepresentation Claim

Collision's misrepresentation claim is also barred by the economic loss doctrine.  In *Schaefer v. IndyMac Mortg. Servs.*, No. 12-CV-159-JD, 2012 WL 4929094, at *5 (D.N.H. Oct. 16, 2012), aff'd, 731 F.3d 98 (1st Cir. 2013), the court noted that a claim for misrepresentation "can avoid dismissal under the economic loss doctrine … only when it is based on allegations of 'independent, affirmative representations unrelated to the performance of the contract.' … Thus, the alleged misrepresentation must not 'concern the quality or characteristics of the subject matter of the contract or otherwise relate to the offending party's expected performance." *Id.* at *4 (citations omitted).  Here, Collision's misrepresentation claims are not independent of its contract claims and thus are barred by the economic loss doctrine.

---

[27]     Statements such as that Nokia executive Tero Kola "expressed surprise" that the parties had not yet executed their written agreements, "reaffirmed his support and said that he would get involved so that the documents would be completed" (Complaint, ¶ 69) fall far short of this mark.

[28]     *See Isaacs v. Trustees of Dartmouth Coll.*, No. 17-CV-040-LM, 2018 WL 734182, at *10 (D.N.H. Feb. 5, 2018) (holding that for an intentional misrepresentation claim "a plaintiff must demonstrate justifiable reliance."); *Johnson v. Capital Offset Co.*, No. 11-CV-459-JD, 2013 WL 5406619, at *4 (D.N.H. Sept. 25, 2013) (for a negligent misrepresentation claim "the plaintiff must have reasonably relied on the misrepresentation to his detriment.").

ME1 34193683v.4

**VI.     The Complaint's Quantum Meruit Claim Fails as a Matter of Law**

Count V of the Complaint alleges quantum meruit.  "A valid claim in quantum meruit requires [that]: ... (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment."  *Gen. Insul. Co. v. Eckman Const.*, 159 N.H. 601, 612 (2010).  A party may not recover in quantum meruit, however, if it does not confer any benefit to the defendant.  *See Welch v. Coleman*, 95 N.H. 399, 402 (1949) (denying recovery under a quantum meruit claim as "there is no finding, nor evidence to support one, that [the plaintiff] conferred any benefits upon the defendant.").  Here, there are no allegations in the Complaint that anything Collision did provided *any* benefit to Nokia (or was even provided to Nokia) beyond mere conclusory allegations.  At most, the Complaint alleges that Collision "shar[ed] its highly valuable intellectual property with Nokia," *id.*, ¶ 82, but there is nothing to suggest that Nokia used or derived any benefit from Collision's intellectual property.  Indeed, despite prolonged negotiations that never resulted in a deal, and Collision's allegations that it began work on the expectation of a deal, *nothing* is alleged to have actually been delivered to Nokia.[29]  As a result, Collision's quantum meruit claim should be dismissed.[30]

**VII.    Collision's New Hampshire RSA 358-A Claim Fails to State a Claim**

The last Count in Collision's Complaint alleges a violation of New Hampshire RSA 358-A.  This claim fails because:  (a) New Hampshire law does not apply to Collision's contract-related RSA

---

[29]     Collision is alleged to have delivered a final report to Nokia on April 4, 2017, before the parties began the negotiations at issue in this case.  But Collision concedes that this report was part of the Proof of Concept for which Nokia paid Collision $600,000.  *See* Complaint, ¶¶ 26-27, 43.  The Complaint does not identify any deliverable after this report.

[30]     In fact, this claim amounts to nothing more than Collision's efforts to recoup its costs in seeking to come to terms with Nokia.  Such costs are not recoverable.  *See Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 926 (S.D.N.Y. 1984) ([P]laintiffs seek … compensation for their time, efforts and activities expended during the negotiations that they assert and [Defendant] denies resulted in an agreement for the sale of the [jet].  Those activities are not uncommon and are regularly engaged in by parties endeavoring to reach a mutual accommodation.  They are the common grist of negotiations aimed toward consummation of an agreement.  In such circumstances, the endeavors by either side, if they fail, do not warrant a claim that one party has been unjustly enriched at the expense of the other…. ***Every businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement.***") (emphasis added).

358-A claim; (b) the claim has been waived; and (c) even if such a claim were permissible or not previously waived, Collision's allegations do not rise to the level necessary to sustain such a claim in the business-to-business context under New Hampshire law.

### A.    New Hampshire Law Does Not Apply to this Dispute

As noted, both the Integration and License Agreements contain Delaware choice of law provisions. Because Collision's RSA 358-A claim is contract-based, the choice of law provision bars the application of RSA 358-A.[31] In *Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F. 2d. 607, 608-610 (1st Cir. 1993), the First Circuit rejected the argument that all consumer protection act claims are necessarily tort claims and thus fall outside the scope of choice of law provisions that only apply to contract claims. The Court held: "Such reasoning would undermine the parties' choice of law agreement by permitting one of them, through artful pleading, to bring what is little more than a breach of contract claim, under law that both parties have agreed would not apply." *Id.* "[W]hen parties agree that 'contract related' claims will be tried under, say, the law of California, they do not mean that a claim of 'serious' or 'rascal-like' breach of contract will be tried under the law of Massachusetts." *Id.* This holding is in accord with the New Hampshire Supreme Court's holding that "[t]he determination of whether an action is a contract or a tort action is not controlled by the form of the action but by its substance." *Antoniou v. Kenick*, 124 N.H. 606, 610 (1984).

Here, Collision's RSA 358-A is plainly encompassed within the agreements' Delaware choice-of-law provision as the allegations amount to nothing more than alleged "serious" or "rascal-like" breaches of the contract by Nokia. *See, e.g.*, Complaint, at ¶ 110 ("the wrongful conduct in which Nokia engaged consisted of false statements, misrepresentations intended to induce Collision to enter

---

[31]      *See Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F. 2d. 607, 608-610 (1st Cir. 1993) (affirming dismissal of Mass. Gen. Laws c. 93A claim, holding, "We conclude that the parties, in their choice-of-law provision, meant that California law would govern both ordinary and 'rascal-like' breach of contract claims. We believe that the 'rascal-like' claims before us fit within that provision."); *New Eng. Surfaces v. E.I. du Pont de Nemours & Co.*, 460 F. Supp. 2d 153, 161-162 (D. Me. 2006) (dismissing New Hampshire RSA358-A claim and holding "[t]hrough the contractual choice of law provision in the Distribution Agreement, the parties intended for Delaware law to apply to claims arising from the contract, including any claim of unfair trade practices.")

23

into an agreement and to perform under the agreement, and intentional breaches of Nokia's obligations under the agreement.").  Such complained of conduct under New Hampshire law, tied directly to the parties' alleged contract, is barred by the parties' Delaware choice-of-law provision.

**B.      Collision's RSA 358-A Claim Has Been Waived**

Section 10.1 of the Integration and the License Agreement both state:

> <u>CONSEQUENTIAL DAMAGES.</u>… IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY KIND … HOWEVER CAUSED ANY ON ANY THEORY OF LIABILITY, WHETHER IN AN ACTION FOR CONTRACT, STRICT LIABILITY OR TORT (INCLUDING NEGLIGENCE) OR OTHERWISE ….

License Ag., Sect. 10.1; Integration Ag., Sect. 10.1 (the "Consequential Damages Provision").  This clause prohibits Collision's New Hampshire RSA 358-A claim against Nokia.  *See*, *e.g.*, *Canal Electric Co. v. Westinghouse Electric Corp.*, 406 Mass. 369, 379 (1990) (holding, under Massachusetts' similar consumer protection act law, that when a Mass. Gen Laws c. 93, § 11 claim "merely is an alternate theory of recovery under the contract," and when "the dispute is a purely commercial one that does not affect the public interest," the ch. 93A claim can be deemed waived by a contractual limitation of liability provision).[32]

**C.      Collision's RSA 358-A Does Not Rise to the Level of "Rascality" Necessary to State a Claim**

Lastly, even if Collision's RSA 358-A claim was not barred due to the parties' contractual choice-of-law provision and the waiver of consequential damages provision, Collision's claim still fails because, in the business-to-business context, it does not rise to the level of "rascality" necessary to state a claim.  New Hampshire law is clear that business-to-business claims under RSA 358-A are governed by the "rascality" test.  *See Barrows v. Boles*, 141 N.H. 382, 390 (1996) (adopting standard

---

[32]      *See also Physician Ins. Agency of Mass., Inc. v. Inv'rs Capital Holdings, Ltd.*, No. 0303597, 2005 WL 3722373, at *3 (Mass. Super. Dec. 30, 2005) ("A commercial party to a contract waives its right to recover under G.L.c. 93A where the G.L.c. 93A claim is based on a breach of the contract and the contract contains a limitation of damages provision barring the recovery of indirect, special, incidental and consequential damages, so long as it does not frustrate public policy."). "New Hampshire courts have frequently relied on Massachusetts law [regarding c. 93A] when interpreting RSA § 358-A." *Donovan v. Digital Equip. Corp.*, 883 F. Supp. 775, 786 (D.N.H. 1994).

and noting "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.").

The New Hampshire Supreme Court in *Barrows* further held that an "ordinary breach of contract claim does not present an occasion for the remedies under [RSA 358-A]" and that "selfish bargaining and business dealings will not be enough to justify a claim for damages under the Consumer Protection Act." *Id.  See also In re Clarkeies Market, L.L.C.*, 322 B.R. 487, 498 (Bankr. D.N.H. 2005) (dispute arising out of the purchase of two grocery stores between sophisticated parties "does not require the type of protection contemplated by [RSA 358-A]").  Collision's claims here amount to nothing more than alleged run-of-the-mill breaches of contract, and certainly nothing close to the level of rascality necessary to sustain a claim.  That the parties never reached an agreement and were unable to come to terms on a contract, despite prolonged negotiations and Collision's expectations, does not "raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  *See Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass. App. Ct. 596, 600 (1987) (holding, under same rascality test, that "[i]t is not … immoral, unethical, oppressive, or unscrupulous—and therefore not unfair or deceptive—to break off incomplete and imperfect negotiations of a commercial agreement.  Every deal that goes sour does not give rise to a c. 93A claim.").[33]

## CONCLUSION

For the foregoing reasons, Nokia requests that the Court grant this Motion, dismiss the Second Amended Complaint in its entirety, and grant such other relief as it deems just and proper.

---

[33]     "A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, unless it rises to the level of commercial extortion or a similar degree of culpable conduct." *Pappas Indus. Parks, Inc.*, 24 Mass. App. Ct. at 600.  Here, while Collision alleges that Nokia strung it along, there are no suggestions that Nokia did so with the expectation of receiving any benefit from Collision, or that it in fact received any benefit.

Respectfully submitted,

NOKIA SOLUTIONS AND NETWORKS OY,

By its attorneys,

/s/ David Himelfarb
David Himelfarb, NHBA # 19754
dhimelfarb@mccarter.com
John Allen, admitted *pro hac vice*
jallen@mccarter.com
McCarter English, LLP
265 Franklin Street
Boston, MA  02110
Tel:  (617) 449-6500
Fax: (617) 607-9200

November 11, 2020

## CERTIFICATE OF SERVICE

I, David Himelfarb, hereby certify that on this 11th day of November, 2020, a true copy of the above document was served on counsel for all parties through the Court's ECF/CM system.

/s/ David Himelfarb
David Himelfarb

26