UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NOKIA SOLUTIONS AND NETWORKS OY, <br><br><br> Defendant. | C.A. No. 1:20-cv-00949 |

**COLLISION COMMUNICATIONS OPPOSITION TO
<u>NOKIA SOLUTIONS AND NETWORKS OY'S MOTION TO DISMISS</u>**

### i. Introduction

Large, multinational corporations are not above taking advantage of smaller companies. This case shows just how devastating such duplicity can be on a small company.

Specifically, Plaintiff Collision – a New Hampshire-based telecommunications technology company – owns proprietary, groundbreaking technology that significantly improves the performance of stressed mobile networks. See Complaint, ¶¶ 16-19, 22. For over two years, Defendant Nokia courted Collision and carefully evaluated its technology – Collision's most important asset. See id., ¶¶ 23-45, 64. Finally, in June 2017, Nokia offered to license the technology and Collision accepted that offer, which comprised the following, material terms: Nokia would license Collision's technology for $20 million on a perpetual basis; Nokia would pay an additional $3 million for Collision to integrate its technology onto Nokia's platform; Collision would be bound by a one-year exclusivity period; all integration work would proceed according to a schedule established by Nokia. See id., ¶¶ 4, 64.

In reliance on that agreement, and on Nokia's ongoing promises and representations, Collision devoted all its corporate resources towards performing the required work to integrate its technology with Nokia's, all with Nokia's full knowledge and involvement. See id., ¶¶ 8-9. Nokia strung Collision along for 18 months by urging that Collision continue performing the parties' agreement to meet Nokia's schedule. See id., ¶ 44. Nokia also insisted that Collision strictly comply with the exclusivity commitment under the parties' agreement. See id., ¶¶ 4-5, 9. Collision's performance in reliance on Nokia's promise of the $20 million licensing fee and $3 million integration fees secured for Nokia significant benefits, including that Collision's technology was readied for used by Nokia and was prevented from being shared with any of Nokia's competitors. See id., ¶¶ 9-10, 91, 106, 110. Nokia ultimately reneged on the agreement

1

and refused to pay Collision a cent – either for the technology or the integration work Collision had performed – and walked away entirely from the parties' relationship. See id., ¶¶ 6, 9.

Nokia's motion to dismiss argues with these facts, disputing such matters as whether Nokia intended to be bound and whether Collision reasonably relied on any promises or representations of Nokia – fact-based challenges that are unripe for resolution on a motion to dismiss. Nokia's motion also attaches a selective assortment of documents that are not incorporated in the Complaint and which this Court should decline to consider.

As argued below, Nokia's challenges to Collision's proper pleading are without merit for the following reasons: (1) the law of New Hampshire, rather than Delaware governs this case; (2) Collision has adequately pled a claim for breach of an oral or implied contract; (3) Collision's claim for breach of the implied covenant is based on Nokia's bad faith conduct during contract formation; (4) Collision has sufficiently set forth an alternative claim for promissory estoppel; (5) Collision's claim for misrepresentation is viable; (6) Collision has adequately pled an alternative claim under quantum meruit; and (7) the allegations of the Complaint support a claim for violation of RSA 358-A – New Hampshire's Consumer Protection Act. Taking the allegations in the Complaint as true and drawing all reasonable inferences for Collision, the Court should deny the motion to dismiss.

## ii.  Factual Allegations in the Complaint

*I.*    *Background Allegations Concerning Dealings Between Collision And Nokia*

Collision was formed in 2011. See id., ¶ 16. The principals of Collision are Stan Fry and Jared Fry, who are father and son. See id., ¶ 11. Collision's business is selling or licensing its unique and proprietary technology to original equipment manufacturers ("OEM's) such as

Nokia. See id., ¶ 20. In order to integrate its technology into an OEM's cellular base stations, Collision must take many steps over several months with the support of the OEM. See id.

In late 2015, Nokia expressed interest in Collision's technology and began a due diligence process into that technology. See id., ¶ 23. Thereafter, Nokia proposed moving into a "Proof of Concept ("PoC") phase that would provide further information regarding Collision's technology and its usefulness to Nokia. See id., ¶¶ 25-26. Collision agreed and the parties executed a written PoC agreement in mid-November 2016. See id., ¶ 27.

During the PoC process, Nokia proposed licensing Collision's proprietary technology following the PoC. See id., ¶ 28. As part of these discussions, in February 2017, representatives from Nokia came to Collision's offices in New Hampshire. See id., ¶ 29. During their meetings, the parties established and agreed upon a plan (including milestones) for Collision to work with Nokia past the end of the PoC period so that Collision could fully integrate its receiver into Nokia's hardware (called the "Airscale"). See id., ¶ 31. The parties agreed that the first two milestones would take place just a few months away, see id., ¶ 32, and that Collision would be required to demonstrate its work for Nokia at a large industry event one year later in February 2018. See id., ¶ 33. In order to have any possibility of making these deadlines, the parties understood and agreed that Collision would need to work continuously. See id. Nokia promised that Nokia would compensate Collision for this work. See id., ¶¶ 33-35. Nokia also confirmed that it would license Collision's technology. See id., ¶¶ 35-36.

II.     _The Parties Negotiate Towards A Final Agreement_

Soon after the parties' meetings in February 2017, and so as to enable Collision to meet the agreed-upon milestone targets, Nokia (a) arranged delivery of an Airscale for Collision to develop its technology onto, (b) arranged for support from Nokia experts to assist Collision in

developing its work, and (c) worked on preparing an extended PoC agreement to cover the first

agreed upon milestone, which was set to occur before a license agreement was in place. <u>See id.</u>, ¶

37. Nokia's instructions that Collision should work on integrating the technology to be licensed

led Collision to believe reasonably that Collision would be paid for this work and that Nokia was

concerned about delays in the integration process. <u>See id.</u>, ¶ 44.

  In keeping with Nokia's prior representations, on March 22, 2017, Francisco "Paco"

Lopez Herrerias ("Herrerias") sent Collision a draft extension to the PoC agreement. <u>See id.</u>, ¶

42. Collision, however, ended up completing the PoC effort prior to the parties ever executing

the proposed extension agreement, so Herrerias suggested the parties move directly to finalizing

a full license agreement. <u>See id.</u>, ¶¶ 43-45. On April 12, 2017, Herrerias sent Collision Nokia's

software for Collision to integrate with its receiver software and asked Collision to begin the

integration process in anticipation of the parties reaching an agreement on a price for Nokia to

license Collision's technology. <u>See id.</u>, ¶¶ 46-48.

  During the spring of 2017, Nokia repeatedly represented to Collision that Nokia's desire

was to reach a full commercial licensing agreement and to have it done in a matter of weeks. <u>See</u>

<u>id.</u>, ¶ 48. Collision confirmed to Herrerias that it continued to work diligently on Nokia's behalf,

but expressed a need to finalize the parties' license and integration agreements. <u>See id.</u>, ¶ 49. In

response, in early May 2017, Herrerias, on behalf of Nokia, reassured Collision that he would

meet with them the following week in New Hampshire, where Collision is based. <u>See id.</u>, ¶ 50.

Herrerias represented that the purpose of his visit would be to come to an agreement "to make

the workshop happen[,]" even if the parties would not be able to commit that agreement to

writing by that time. <u>See id.</u>, ¶¶ 50-51.

4

III.    _The Parties Reach Agreement_

Herrerias did travel to meet with Collision in New Hampshire on May 16 and 17, 2017.

See id., ¶ 55. During their meetings, Collision and Nokia came to an agreement on several

matters and Collision began preparing a licensing contract, forwarding a draft to Nokia on May

30, 2017. See id., ¶¶ 58-59. The parties continued to negotiate and Nokia ultimately made an

offer to Collision comprising the following, material terms: Nokia would license the technology

from Collision for $20 million (an amount for which Nokia confirmed it had approval), the

license would be perpetual, with a one-year exclusivity period, and Nokia would pay Collision

$3 million to perform the work necessary to integrate the licensed technology with Nokia's

platform. See id., ¶¶ 62-64. On June 6, 2017, Collision verbally accepted this offer. See id., ¶ 64.

On June 8, 2017, Nokia announced that it would use its own "template" for the parties'

written agreement, but re-assured Collision that it would be done in a matter of days and gave no

indication that material terms had changed. See id., ¶ 66.[1] A few days later, during a previously

scheduled trip to Nokia's offices in Finland on June 12, 2017, Stan Fry met with senior

management at Nokia, including Tero Kola, then Head of Radio Portfolio Management and

Strategy – a meeting that Nokia had proposed "to show our commitment in our partnership." See

id., ¶ 68. In these meetings, Mr. Kola expressed surprise to Mr. Fry that the parties had not yet

executed their written agreements. See id., ¶¶ 68-69. Mr. Fry explained that Collision had

nevertheless been working in reliance upon the parties' agreement. See id., ¶ 69. Mr. Kola said

he would get involved so that the documents would be completed. See id.

---

[1] Reinforcing this, the Complaint also alleges that, on June 9, 2017, Theresa Magalski from Nokia Procurement wrote to Collision that "our next step is to work on the merge [sic] of applicable terms from your draft template into our Nokia Agreement template" and "[m]y goal will be to provide you our draft for your review/redlining by Wed Jun 14 EoB." See id., ¶ 67.

After Collision expressed further concern about the delay in finalizing the parties' written documents, Mr. Herrerias responded reassuringly on June 21, 2017 that the material terms of the parties' June 6, 2017 agreement had not changed. See id., ¶ 71. His response, on which he copied many others at Nokia, gave Collision comfort that the parties' agreement was in place, notwithstanding the lack of a signed contract. See id. In reliance upon this, Collision continued to perform the integration work. See id., ¶ 71. When, on June 28, 2017, Collision again expressed concern about the delay in getting the contracts signed, Mr. Herrerias responded reassuringly with "trust our process, we will make this a success." See id., ¶ 72. In performing its obligations, Collision was in steady contact with Nokia's technical experts, who provided necessary information to Collision to support performance of the parties' agreements. See id., ¶ 73.

IV.   *Nokia Breaches The Agreement And Continues Stringing Collision Along*

On November 20, 2017, Nokia sent their draft agreements to Collision. See id., ¶ 77. Contrary to Nokia's prior representations, these drafts drastically changed material terms. See id. Immediately, Collision rejected Nokia's attempt to renege. See id., ¶ 78. In response, in a letter from Nokia's Thomas Giers, Nokia demanded that Collision agree that there had never been an earlier agreement and threatened that it would not move forward at all unless Collision made this concession. See id., ¶ 80. Nevertheless, Nokia continued to string Collision along by claiming that an agreement. See id., ¶ 82. As a result, Collision continued performing until approximately November 2018 and spent nearly $4 million performing work on Nokia's behalf. See id.

### iv. **Standard of Review**

In deciding a motion under Rule 12(b)(6), a district court conducts a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Douglas v. U.S. Bank Nat. Ass'n, No. 13-CV-101-LM,

2013 WL 1890728, at *1 (D.N.H. May 6, 2013) (quoted case omitted). Consequently, in

deciding such a motion, the court should "accept the factual allegations in the complaint as true

and draw all reasonable inferences from those facts in the plaintiff's favor." Foley v. Wells Fargo

Bank, N.A., 772 F.3d 63, 71, 75 (1st Cir. 2014). A pleading clears the Rule 12(b)(6) hurdle

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." Martin v. Mooney, 448 F. Supp. 3d 72,

77 (D.N.H. 2020).

     Beyond the complaint itself, the court may only "consider documents attached to the

complaint and documents expressly incorporated into it." Id. at 72. There is a "narrow

exception" to this rule, "'for documents sufficiently referred to in the complaint.'" Id. (quoting

Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)). This exception is strictly construed, and "not

every document referred to in a complaint may be considered incorporated by reference and thus

introduced by the moving party in support of a motion to dismiss." Fudge v. Penthouse Int'l,

Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988).[2]

     Here, Collision's Complaint easily meets this standard. In apparent awareness of this,

throughout its memorandum, Nokia impermissibly relies on eleven exhibits (comprising a draft

written contract, cherry-picked emails between the parties, and a December 2017 letter from

Nokia to Collision) that were not attached to the Complaint and insists that the Court should

weigh this evidence, make factual findings, and assess witness credibility. See generally Nokia's

Memorandum, citing Exhibits 1 through 11. This is inappropriate at the motion to dismiss stage.

Doe v. Trustees of Dartmouth Coll., No. 18-CV-40-LM, 2018 WL 2048384, at *1 (D.N.H. May

2, 2018) (rejecting Dartmouth's attempt on motion to dismiss to submit and rely upon exhibits

---

[2] Indeed, even "limited quotation does not constitute incorporation by reference." Goldman v. Belden, 754 F.2d
1059, 1066 (2d Cir.1985) (quoted in Fudge, 840 F.2d at 1015).

not to "clarify the content of a particular document that plaintiff references in his complaint" but "to challenge or supplement plaintiff's allegations"). Therefore, as argued more fully below, the Court should deny Nokia's motion in its entirety because Collision has adequately pled each of the causes of action in its Complaint.

## v. <u>Argument</u>

**I.     NOKIA'S MOTION APPLIES THE WRONG SUBSTANTIVE LAW; THE LAW OF NEW HAMPSHIRE RATHER THAN DELAWARE GOVERNS THIS CASE**

Well-established New Hampshire choice-of-law principles dictate that New Hampshire law governs each of Collision's claims. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.,</u> 313 U.S. 487, 496 (1941). Nokia, however, contends the Delaware choice-of-law provisions[3] in the parties' written agreements apply to Collision's contract claims, <u>see</u> Nokia's Memorandum at 7, but here Collision is alleging an oral agreement, not a written one. Therefore, Nokia cannot rely upon choice-of-law provisions in written documents that neither party is alleging embody the parties' agreement.[4] <u>See, e.g., Schnabel v. Trilegiant Corp.,</u> 697 F.3d 110, 119 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."); <u>B–S Steel of Kansas, Inc. v. Texas Indus., Inc.,</u> 439 F.3d 653, 661 n. 9 (10th Cir.2006) (noting "the logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid"). Thus, New Hampshire law governs contract formation here.

In addition, the choice-of-law clauses cannot govern the parties' enforceable oral agreement as there is no significant relationship between Delaware and the circumstances of this

---

[3] The choice-of-law clauses in the License Agreement and Integration Agreement both provide the contracts "will be governed by and construed in accordance with the laws of the United States and the State of Delaware." <u>See</u> Motion to Dismiss, Ex. 1 § 11.4; <u>id.</u>, Ex. 2 § 11.4.

[4] Indeed, a substantial portion of Nokia's breach of contract arguments attempt to persuade the Court that the parties did not consummate a binding agreement. <u>See</u> Nokia's Memorandum at 7-10, 13-17.

case. See, e.g., Allied Adjustment Serv. v. Heney, 125 N.H. 698, 484 A.2d 1189, 1191 (1984) (holding that New Hampshire courts enforce choice-of-law provisions only if the "contract bears any significant relationship" to the chosen jurisdiction); Contour Design, Inc. v. Chance Mold Steel Co., 693 F.3d 102, 107 (1st Cir. 2012) (affirming district court's application of New Hampshire law despite Colorado choice-of-law provision because only connection to Colorado was location of the drafting lawyer). Apart from Collision's incorporation in Delaware, there is no connection whatsoever between the parties' agreement (or their dealings) and Delaware. Collision is a New Hampshire-based business and Nokia is headquartered in Finland. Therefore, this dispute bears no significant relationship to Delaware.[5]

Finally, Nokia's argument also fails under New Hampshire's traditional choice-of-law analysis where the "initial task" is to "determine whether there is an actual conflict between the substantive law of the interested jurisdictions." See Levin v. Dalva Brothers, Inc., 459 F.3d 68, 73 (1st Cir. 2006). Here, no such conflict exists and Nokia offers no evidence of any conflict.[6] Thus, New Hampshire law applies. See Orono Karate, Inc. v. Fred Villari Studio of Self Def., Inc., 776 F. Supp. 47, 49–50 (D.N.H. 1991).

## II.   COLLISION HAS ADEQUATELY PLED A CLAIM FOR BREACH OF AN ORAL CONTRACT OR CONTRACT IMPLIED IN FACT

The Complaint presents a detailed series of allegations that amply establish that the parties formed an oral agreement (as further evidenced by multiple writings and Collision's

---

[5] Notably, the Delaware Superior Court that allowed Collision's motion to stay the Delaware Litigation also concluded that this case has no connection to Delaware: "Other than Collision's incorporation in this state, neither the parties nor the dispute have any apparent connection to Delaware. Collision seeks to enforce an oral agreement between the parties. That agreement was negotiated in various locations, but never in Delaware." Exhibit 1, hereto, (the Memorandum Opinion allowing Collision's motion to stay the Delaware Litigation) at 14.

[6] It appears there is no meaningful difference between the law of New Hampshire and Delaware with respect to Collision's claims. See, e.g., Baker v. Montrone, No. 18-CV-0913-PB, 2020 WL 128531, at *5 (D.N.H. Jan. 10, 2020), n.4 (concluding that court "need not address whether New Hampshire or Delaware law applies" to breach of contract and unjust enrichment claims because "the parties have not identified any meaningful difference between the two and I am able to discern none"); see also Atronix, Inc. v. Morris, 171 N.H. 429, 431, 197 A.3d 79, 81 (2018) ("Delaware's law regarding contract interpretation does not differ materially from our own.").

performance). See, e.g., McLane, Graf, Raulerson & Middleton, P.A. v. Rechberger, 280 F.3d 26, 35 (1st Cir. 2002) ("[a]n agreement that is not reduced to writing may be based on the parties' oral agreement or on their conduct").[7] Collision will address below each of Nokia's several arguments that the Complaint does not allege a valid agreement.

### A.   The Parties Reached Agreement On All Material Terms

As is well-established, "[o]ffer, acceptance and consideration are essential to contract formation." International Bus. Machines Corp. v. Khoury, 170 N.H. 492, 500, 177 A.3d 724, 731 (2017). "An offer is the manifestation of willingness to enter into a bargain," id. (quoting Restatement (Second) of Contracts § 24, at 71 (1981)), while an acceptance "is a manifestation of mutual assent on the part of two or more persons," id. (quoting Restatement § 3, at 13). "Consideration is present if there is either a benefit to the promisor or a detriment to the promisee." Id. In addition, a contract requires a meeting of the minds – "each party must have the same understanding as to the terms of the agreement." Id.

Here, as set forth above, the Complaint alleges that Nokia made a verbal offer to license technology based on specific terms. See Complaint, ¶¶ 62-64. Collision accepted that offer. See id., ¶ 64. Collision's performance (with the full knowledge, assent, and cooperation of Nokia) provided the consideration. See id., ¶ 69. The parties' meeting of the minds is confirmed by the fact that, while the parties were memorializing their agreement in writing, Nokia assured Collision that the material terms remained unchanged. See id., ¶¶ 70-74.

---

[7] Alternatively, these allegations support a finding that the parties had a contract implied in fact based on the parties' conduct – their performance and their multiple communications pursuant to the agreement. See In re Moultonborough Hotel Grp., LLC, 726 F.3d 1, 7 (1st Cir. 2013) (even absent an express agreement in writing or verbally, courts will also enforce an "implied contract," which "is an enforceable agreement that arises from "the conduct of the parties, apart from oral and written words"); see also Morgenroth & Assocs., Inc. v. Town of Tilton, 121 N.H. 511, 514–15, 431 A.2d 770, 772 (1981).

Nokia argues incorrectly that Collision's Complaint does not allege a contractual meeting of the minds. <u>See</u> Nokia's Memorandum at 9. This argument does not support dismissal; it raises a factual question for resolution by the fact finder. <u>See, e.g., Glick</u>, 157 N.H. at 252, 949 A.2d at 703 ("'The question of whether a 'meeting of the minds' occurred is a factual question to be determined by the trier of fact,' <u>Fleet Bank–NH v. Christy's Table</u>, 141 N.H. 285, 288, 681 A.2d 646 (1996), as is the issue of whether a valid contract was created, <u>Gulf Ins. Co. v. AMSCO</u>, 153 N.H. 28, 43, 889 A.2d 1040 (2005)").[8]

In addition, Nokia's apparent belief that Collision did not sufficiently allege the terms of the parties' agreement is not in accord with the law. The terms of a contract need only be reasonably certain to be enforceable. <u>See</u> <u>Sawin v. Carr</u>, 114 N.H. 462, 465, 323 A.2d 924, 926 (1974) ("pristine preciseness" not required); <u>accord</u> Restatement (Second) of Contracts § 33(1) (1981). According to the Restatement, "[t]he terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." <u>Id.</u> § 33(2). In keeping with this standard, the Complaint alleges that Nokia offered Collision $20 million to license Collision's technology and $3 million to perform the integration work according to Nokia's schedule. <u>See</u> Complaint, ¶¶ 4, 64. These allegations are sufficiently clear for this Court to determine that a breach occurred and award damages. <u>See</u> <u>Chisholm v. Ultima Nashua Indus. Corp.</u>, 150 N.H. 141, 145, 834 A.2d 221, 225 (2003).

In <u>Chisholm</u>, the defendant argued that an unsigned outline of a proposed employment agreement was "unenforceable because several of the terms" were "'not clear or specific or even complete.'" <u>Id.</u> The court rejected this argument and concluded that, "while some of the contract

---

[8] "A contract may be established by spoken or written words or by acts or conduct and where there is a disputed question of fact as to the existence and terms of a contract it is to be determined by the trier of the facts[.]" <u>Kane v. New Hampshire State Liquor Comm'n</u>, 118 N.H. 706, 708, 393 A.2d 555, 556 (1978); <u>see also</u> <u>Morgenroth & Assoc., Inc.</u>, 121 N.H. at 515 ("Whether [an implied in fact] contract has been formed is a factual question.").

11

terms are incomplete, it is reasonably clear that [the plaintiff] agreed to work for [the defendant] in exchange for the annual salary and benefits set forth in the proposed employment contract outline." Id. Therefore, "the trier of fact could have found that there was a valid contract." Id.

Here, as in Chisolm, the parties had a written outline of the terms of their agreement and from this and other written evidence, as well as the parties' verbal communications, it is reasonably clear that the parties had a binding agreement. See id.; see also Foundation for Seacoast Health v. HCA Health Servs. of New Hampshire, Inc., 157 N.H. 487, 502, 953 A.2d 420, 432 (2008). Given this, Nokia cannot rely on external documents to argue that Collision "knew" there was no agreement. As just one example, Nokia points to the December 18, 2017 letter from Nokia's Thomas Giers. See Nokia Memorandum at 19. This letter was sent six months *after* Collision alleges that the agreement was formed and *after* Collision had spent months performing under it. See Complaint, ¶¶ 80-81. On a motion to dismiss, this Court should not draw inferences in Nokia's favor, but in Collision's. See Foley, 772 F.3d 63 at 75. From the letter the Court may infer that Nokia knew there was an agreement and sent this letter to cover for Nokia's refusal to honor that agreement. See Complaint, ¶ 81. In any event, the consideration of such external documents is inappropriate in deciding a motion under Fed. R. Civ. P. 12(b)(6). See Trustees of Dartmouth Coll., No. 18-CV-40-LM, 2018 WL 2048384, at *1. Therefore, the Court should deny the motion.

### B.      The Statute of Frauds Does Not Bar Collision's Breach Of Contract Claim

As this Court has recognized, "where a contract could *possibly* be performed within one year, regardless of the expectations of the parties, it falls outside the statute of frauds and, therefore, need not be in writing." Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc., No. 09-CV-405-JL, 2012 WL 27917, at *6 (D.N.H. Jan. 5, 2012) (italics supplied). That is the case

here. Nothing about the terms of the alleged agreement suggest that it could not have been performed within a year – Collision could have completed the integration of its technology within 12 months and the licensing of the technology and payment of the agreed upon funds are things that could have been performed in a matter of months. See Complaint, ¶ 64.

Nokia argues incorrectly that the oral agreement between Collision and Nokia cannot be enforced under the Statute of Frauds based on a clause in Delaware's enactment of the Statute[9] that applies to contracts that cannot be performed within a year. See Nokia's Memorandum at 11. Nokia focuses on the "perpetual" nature of the license, see id., but this does not alter the analysis since the transfer of the license to Nokia could have occurred instantaneously and Nokia could always choose to surrender the license for some reason or no reason. See Phillips v. Verax Corp., 138 N.H. 240, 246, 637 A.2d 906, 911 (1994) (holding that Statute of Frauds renders unenforceable only those contracts which cannot be performed *according to their terms* within a year from the time of their inception).[10] Here, as is apparent from the Complaint, the parties' agreement could have been performed within a year. See Complaint, ¶ 64. Therefore, it is not within the Statute of Frauds and the Court should deny Nokia's motion. See FabriClear, LLC, No. CV 20-10580-TSH, 2020 WL 4938340, at *3.[11]

---

[9] While Nokia cites to Delaware's Statute of Frauds, New Hampshire's Statute contains the same provision. See Phillips v. Verax Corp., 138 N.H. 240, 245, 637 A.2d 906, 910 (1994) (citing RSA 506:2 (1983)).

[10] See also Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 551–52 (1st Cir. 1989) (contract for lifetime employment is not subject to the Statute of Frauds, because the contract may be performed within one year if employee dies); see also Wang Labs., Inc. v. Applied Computer Scis., Inc., 741 F. Supp. 992, 1000–01 (D. Mass. 1990), rev'd, 958 F.2d 355 (Fed. Cir. 1992) (citing Rowland v. Hackel, 243 Mass. 160, 162, 137 N.E. 265 (1922), agreement was not within Statute because agreement could be performed within year if party went out of business).

[11] In addition, "certain allegations within the complaint are consistent with the application of an exception to the Statute of Frauds (*e.g.*, estoppel or performance)." FabriClear, LLC v. Harvest Direct, LLC, No. CV 20-10580-TSH, 2020 WL 4938340, at *3 (D. Mass. Aug. 24, 2020). Collision performed and communicated with Nokia pursuant to the parties' agreement for months. See Complaint, ¶ 6. Therefore, the Court should not dismiss the claim based on the Statute. See id. (declining to dismiss oral agreement claim based on Statute where parties disputed whether agreement could be performed in less than a year and complaint alleged partial performance) (citing Blackstone Realty LLC v. F.D.I.C., 244 F.3d 193, 197 (1st Cir. 2001) "(noting that dismissal is only appropriate if 'review of the complaint ... 'leave[s] no doubt' that the plaintiff's action is barred by the asserted defense')."

C.     **The Integration Agreement Is Not Invalid Due To A Condition Precedent**

Nokia next argues that the parties' Integration Agreement is not valid because it contains a condition precedent requiring the License Agreement to be executed before it becomes effective. See Nokia's Memorandum at 13. Under the "prevention doctrine," however, where the party raising the condition precedent is the party who prevented the condition from occurring, that party cannot use the non-occurrence of the condition as a defense. See Flo-Pro Inc. v. 10 Iron Horse Drive, LLC, No. 11-CV-158-JL, 2011 WL 4527416, at *11 (D.N.H. Sept. 28, 2011).

That is precisely what occurred here. Even Nokia acknowledges that it refused to execute the License Agreement. See Nokia's Memorandum at 13. Ultimately, it was Nokia's delay, its reneging on agreed upon material terms, and its ultimate breach of the parties' oral agreement that sabotaged the fulfillment of the alleged condition precedent. See Complaint, ¶¶ 5-10. As a result, even if the condition precedent were a material term it would not be a basis to dismiss the contract claim. See Flo-Pro Inc, No. 11-CV-158-JL, 2011 WL 4527416, at *11.

D.     **The Parties Intended To Be Bound**

In addition to properly alleging that the parties reached a meeting of the minds as to the material terms of their agreement, the Complaint also alleges that the parties intended to be bound. See Complaint, ¶ 64. In describing the formation of the agreement, Collision alleges that Nokia expressly stated that it intended to reach a verbal agreement and, after that agreement was reached, Nokia confirmed that while the parties documented their agreement in writing, the material terms remained in place and unchanged. See id., ¶¶ 50-51.

1.     *Whether The Parties Intended To Be Bound Is A Question Of Fact*

Nokia's primary argument that it did not intend to be bound is based on the fact that the parties' contemplated executing written documents. See Nokia's Memorandum at 14. The

statements on which Nokia relies, however, do not contain express statements of an intention *not* to be bound. See id. Instead, Nokia relies only on statements that it was expecting to sign a written agreement, but does not identify any statement that it would not be bound until such documents were signed. See id. On the contrary, the Complaint contains the allegation that Nokia wanted to come to a *verbal* agreement with Collision so that Collision would continue to work towards the integration of its technology with Nokia. See Complaint, ¶¶ 50-51.[12]

In addition, the fact that the parties contemplate but never execute a written agreement does not negate an underlying, oral agreement. See 11 S. Williston & R. Lord, Williston on Contracts § 30:3 (4th ed.1999); Rochester Motorsports, Inc. v. Leighton's Kawasaki, Inc., No. 2005-0233, 2006 WL 8418219, at *2 (N.H. July 25, 2006). "An enforceable agreement results under New Hampshire law when the parties 'manifest[ ] their intent to be bound to the essential terms of a more detailed forthcoming agreement' even if the more detailed agreement never materializes." Guy v. Starwood Hotels & Resorts Worldwide, Inc., No. CIV 03-CV-183JD, 2005 WL 2172034, at *3 (D.N.H. Sept. 7, 2005).

In emphatic terms, the First Circuit has expressly rejected the argument Nokia now advances. See Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 15 (1st Cir. 2001) (dismissing argument "that when the parties to an agreement contemplate a written document will memorialize a contract, there can be no agreement until the document is executed," as "a radical and doomed departure from the principles of contract law"). Where, as here, "the material terms were agreed upon," a party in Nokia's position "cannot escape the consequences of [its] agreement because [it] spoke but did not write." Id. More fundamentally, as with nearly all of

---

[12] Specifically, the Complaint alleges that Nokia's Mr. Herrerias came to negotiate with Collision in New Hampshire to reach "a verbal agreement" and represented "[e]ven if we don't achieve to have everything signed on paper by then, our agreement will help to make the workshop happen." See id. Plainly, Nokia intended to be bound even absent a written agreement.

Nokia's other arguments for dismissal, Nokia's claim that it never intended to be bound raises questions of fact that are inappropriate at the 12(b)(6) stage. See id.

The allegations of the Complaint also confirm that Nokia intended to be bound. For example, Nokia repeatedly told Collision that an agreement was in place, see Complaint, ¶ 71, that the parties had agreed to all material terms, see id., and that Collision should "trust [Nokia's] process, we will make this a success." See id., ¶ 72. Moreover, Nokia repeatedly urged Collision to meet Nokia's imposed deadlines which were premised on Collision's need to perform expeditiously under the parties' agreement. See id., ¶¶ 54, 61, 85, 91. These facts establish that Nokia intended to be bound by the material terms of the contract. Therefore, the Court should reject Nokia's argument that the Complaint does not allege that it intended to be bound.[13]

### 2. *Whether The Parties Agreed On All Material Terms Is A Fact Question*

The determination of whether all material terms are present in an alleged agreement is a question of fact and, where the facts are disputed, this is a question for resolution by a fact finder. See Chase Home for Children v. New Hampshire Div. for Children, Youth & Families, 162 N.H. 720, 727, 34 A.3d 1195, 1201 (2011); Dow v. Dow, No. 2014-0783, 2015 WL 11071913, at *1 (N.H. Sept. 18, 2015). Here, the terms that were material to the agreement included the license amount, the fee for Collision's integration work, the perpetual nature of the license, and the exclusivity period. See Complaint, ¶ 64. Nokia's and Collision's actions, all as alleged in the Complaint and argued above, are enough at the motion to dismiss stage for this

---

[13] Nokia's reliance on Ramone v. Lang, No. 1592-N, 2006 WL 4762877 (Del. Ch. Apr. 3, 2006), is misplaced. First, as explained above, Delaware law does not apply to this dispute. Thus, Ramone is not binding upon this Court. Further, Ramone is not a decision on a motion to dismiss; it was a post-trial decision, after discovery and motion practice. The court in Ramone also noted the plaintiff's "untraditionally lax and meandering" business style resulting in a "failure to finalize deal points." Ramone, 2006 WL 4762877 at *8, 10. Here, however, the Complaint explains that Collision did make a binding offer which Nokia verbally accepted on June 6, 2017; Nokia's subsequent reneging on material terms constitutes a breach of that agreement. See Complaint, ¶¶ 9, 64.

Court to conclude that Collision alleged that all material terms were agreed upon. See Chisholm,

150 N.H. at 145, 834 A.2d at 225. Therefore, the Court should deny Nokia's motion.

## III.    COLLISION'S CLAIM FOR BREACH OF THE IMPLIED COVENANT IS BASED ON NOKIA'S BAD FAITH CONDUCT DURING CONTRACT FORMATION

Collision has also pled a claim for breach of the covenant of good faith and fair dealing.

Under New Hampshire law, this covenant attaches during the contract formation stage. See

Skinny Pancake-Hanover, LLC v. Crotix, 172 N.H. 372, 379, 214 A.3d 166, 172–73 (2019).

Accordingly, a contracting party has "a duty to refrain from misrepresentation and to correct

subsequently discovered error, insofar as any representation is intended to induce, and is material

to, another party's decision to enter into a contract in justifiable reliance upon it." Centronics

Corp. v. Genicom Corp., 132 N.H. 133, 139, 562 A.2d 187, 190–91 (1989).

Nokia falsely claims that the Complaint contains no allegations that Nokia engaged in

any improper conduct during the formation of the parties' agreement. See Nokia Memorandum

at 17. This is demonstrably untrue as Collision expressly alleged that, before the parties' formed

their agreement on June 6, 2017, Nokia repeatedly misrepresented to Collision that it had to

continue working to integrate its technology with Nokia's in order to meet Nokia's deadlines and

that Collision would be paid for this work. See id., ¶ 40. This is the type of false promise that the

implied covenant is designed to guard against. See Centronics, 132 N.H. at 139, 562 A.2d at

190–91. Therefore, Collision has successfully pled this claim for relief.

## IV.    COLLISION HAS SUFFICIENTLY SET FORTH AN ALTERNATIVE CLAIM FOR PROMISSORY ESTOPPEL

In the third count of the Complaint, Collision asserts a claim for promissory estoppel.

Promissory estoppel presents an alternative "basis for recovery when no contract exists; if a

promisor should reasonably expect a promisee to rely on a promise, and the promisee in fact

does so, courts may enforce the promise to avoid injustice." In re Moultonborough Hotel Grp.,
LLC, 726 F.3d 1, 7 (1st Cir. 2013); see also Moore v. Mortg. Elec. Registration Sys., Inc., 848 F.
Supp. 2d 107, 136 (D.N.H. 2012). Each of the promissory estoppel elements raises fact
questions.[14] See, e.g., Hermel & Denyse Fortier Revocable Tr. v. Town of Loudon, No. 2012-
0449, 2013 WL 11992454, at *3 (N.H. Aug. 9, 2013); Cardinal Dev. Corp. v. Town of
Winchester Zoning Bd. of Adjustment, 157 N.H. 710, 715 (2008).

　　　In the Complaint, Collision alleges that "Nokia's repeated statements and assurances to
Collision that the parties had reached an agreement and that Collision would be paid for the work
that it was performing for Nokia's benefit, which work Nokia explicitly directed to proceed in
order to meet agreed upon deadlines[.]" Complaint, ¶ 91. Collision further asserts that when
Nokia made these statements, Nokia knew or reasonably should have known would induce the
reliance of Collision. See id. Collision next asserts that it "reasonably relied upon Nokia's many
statements and assurances . . . including by devoting all its corporate resources towards
performing work for Nokia in furtherance of the parties' contractual and business relationship."
Id., ¶ 92. These and other allegations in the Complaint state a claim for promissory estoppel. See
Sunapee Difference, LLC v. State, 164 N.H. 778, 792–93 (2013).

　　　Further, the Complaint is replete with allegations supporting Collision's reasonable
reliance, including:[15] Nokia assured Collision that Collision would be paid for its work,

---

[14] A party advancing a claim of promissory estoppel must prove four elements:

> first, a representation or concealment of material facts made with knowledge of those facts;
> second, the party to whom the representation was made must have been ignorant of the truth of
> the matter; third, the representation must have been made with the intention of inducing the other
> party to rely upon it; and fourth, the other party must have been induced to rely upon the
> representation to his or her injury.

Sunapee Difference, LLC v. State, 164 N.H. 778, 792–93, 66 A.3d 138, 150 (2013).

[15] Nokia asserts that the Complaint does not plead a claim in the alternative for promissory estoppel because the
Complaint includes only "boilerplate allegations" and fails to allege that Collision reasonably relied. See Nokia's

(Complaint, ¶ 40); Nokia was drafting an extension to the PoC contract to allow Collision to continue its work on Nokia's behalf (id.); Nokia urged Collision to meet tight deadlines before executing a written contract "through indicating if it met them, that Collision's solution would take over Nokia's solution roadmap" (id., ¶ 44); Herrerias provided Collision with Nokia's software and instructed Collision to start integrating it with Collision's receiver software (id., ¶ 46); the parties came to an agreement concerning all material terms of their anticipated written contract (id., ¶ 64); Nokia continued to stress the importance of meeting looming deadlines (id., ¶ 44); and Nokia repeatedly asserted that the material terms of the parties' contract had not changed (id., ¶ 71).

These specific statements and actions by Nokia were designed to induce Collision to perform work on its behalf. See id., ¶ 44. Further, Collision's reliance on those concrete statements was reasonable based on the existing relationship between the parties, the fact that the PoC phase had been a success, and the fact that Nokia continuously provided Collision the information and technology Collision needed to perform on Nokia's behalf. See id., ¶¶ 44, 92.[16]

The case of Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000), on which Nokia relies, is not to the contrary. Nokia cites this case merely for

---

Memorandum at 18. Nokia also claims that since it intended to sign a written agreement, any reliance on Nokia's promises was unreasonable. See id. Nokia falsely states that it "never told Collision that the parties had reached an agreement," and that it "never told Collision that Collision would be paid for any work performed prior to a contract being formed." Id. Nokia's self-serving statements of fact are disputed and not entitled to deference from this Court.
[16] Faced with these allegations, Nokia points to emails which were not incorporated in the Complaint, but which Nokia attaches and relies upon to claim Collision's work was "voluntary." Nokia's Memorandum at 18-19. The Court should not resolve this contested factual matter on a motion a dismiss. See, e.g., GE Mobile Water, Inc. v. Red Desert Reclamation, LLC, 6 F. Supp. 3d 195, 202 (D.N.H. 2014) (holding that allegations of promises intended to induce plaintiff to continue working on project in the face of nonpayment and plaintiff's reasonable reliance resulting in harm were sufficient to survive motion to dismiss); Embree v. Bank of New York Mellon, No. 12-CV-462-JL, 2013 WL 6384776, at *6 (D.N.H. Dec. 6, 2013) (denying motion to dismiss where plaintiff's alleged reasonable reliance on promise resulted in the loss of use of money).

the proposition that the allegations of a complaint cannot contradict a written document attached to the complaint. The allegations of the Complaint do not contradict any documents.[17]

Nokia's reliance on Gruen Indus., Inc. v. Biller, 608 F.2d 274, 282 (7th Cir. 1979) to assert that Collision is transforming the parties' negotiations into a "no lose" scenario is inapposite. In Gruen Industries (another decision not binding on this Court), the plaintiff's promissory estoppel claims were predicated entirely on oral assurances that the subject securities transaction would occur. Here, Nokia went far beyond mere oral assurances, inducing Collision to continue work on the project for Nokia's benefit by establishing project goals and deadlines, as well as collaborating with Collision to ensure the product would operate on Nokia's platform. Complaint, ¶¶ 44, 73. Collision's reasonable reliance on these concrete assurances does not create a "no lose" scenario; it allows Collision to enforce Nokia's binding promises.

In addition, Nokia's argument that the parties' intention to enter into a signed agreement renders Collision's reliance unreasonable is to no avail.[18] Indeed, Nokia's proposition is contrary

---

[17] As just one example, Nokia points again to the letter of Mr. Giers to try to argue that it was not reasonable for Collision to rely, see Nokia's Memorandum at 19, but that letter was not sent until December 17, 2017. By that time, Collision had been relying for months on the oral representations of Nokia; pointing to the Giers letter does not negate the reasonableness of Collision's prior reliance. See, e.g., Aston Martin Lagonda of N. Am., Inc. v. Lotus Motorsports, Inc., No. 13-CV-11213, 2014 WL 1092864, at *6–7 (D. Mass. Mar. 18, 2014) (denying motion to dismiss promissory estoppel claim where plaintiff's allegations that defendant "had promised its annual sales would increase, that such projection was based upon a region-wide demographic . . . and that as a result of these express and implied promises, [plaintiff] expended $700,000 in a new facility to its detriment" were deemed sufficient).

[18] In addition, Gruen, 608 F.2d at 280 stands for the unrelated proposition that a party cannot recover expenses incurred in negotiating and drafting an agreement that does not come to fruition. This is obviously not the situation here as Collision is not seeking to recover expenses incurred in negotiations, but for work it performed in reliance upon promises of compensation. See Complaint, ¶¶ 91-92. The case of Chromalloy Am. Corp. v. Universal Hous. Sys. of Am., Inc., 495 F. Supp. 544, 550 (S.D.N.Y. 1980), aff'd, 697 F.2d 289 (2d Cir. 1982), is also inapposite. That case holds that reliance is not reasonable where a defendant "expressly disclaim[ed] any intention to be bound until the execution of [a written contract]." Id. at 550. No such express disclaimer was made here.

to the law. See, e.g., <u>Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc.</u>, No. 09-CV-405-JL, 2012 WL 27917, at *7 (D.N.H. Jan. 5, 2012).[19]

The allegations of the Complaint are similar to the facts in <u>Fin Brand</u> since, as in that case, here Collision was working under a contract – the PoC agreement – and then, during negotiations for a license agreement, Nokia induced Collision to continue working for Nokia's benefit based on the promise that Nokia would license Collision's technology. <u>See</u> Complaint, ¶ 44. Especially given that whether reliance was reasonable under the circumstances is a question of fact, <u>see</u> In re Estate of Laura, 141 N.H. at 636, the Court should not hesitate to deny Nokia's motion to dismiss the promissory estoppel count. <u>See</u> <u>Fin Brand Positioning</u>, No. 09-CV-405-JL, 2012 WL 27917, at *4-*9.

## V.      COLLISION'S CLAIM FOR MISREPRESENTATION IS VIABLE

Count IV asserts a count for negligent or intentional misrepresentation and identifies several specific misrepresentations that Nokia made to Collision to induce Collision's reliance by devoting all of its corporate resources towards integrating its technology with Nokia's. <u>See, e.g.,</u> Complaint, ¶¶ 95-96. While Nokia takes no issue with the specificity of Collision's pleadings, Nokia claims the Complaint does not allege facts sufficient to establish that Collision's reliance was reasonable. <u>See</u> Nokia's Memorandum at 21.

Collision's Complaint sets forth in detail the grounds for its reliance on Nokia's various representations. <u>See</u> Complaint, ¶¶ 44, 54, 69, 71, and 83. The reasonableness of the reliance is

---

[19] In <u>Fin Brand</u>, the parties were working pursuant to a contract, but after the contract expired, the plaintiffs continued to work for the defendant company while a new agreement was being negotiated in reliance on defendant's promise that they would become part owners of the company. <u>See id.</u>, at *4. The court ruled on summary judgment that, even though the parties contemplated a written agreement which never materialized, the plaintiffs' allegations were sufficient because a fact finder "could conclude from that evidence that defendants deceived the plaintiffs into believing that they would be part owners of [the company] . . . to induce them to provide their services for free." <u>See id.</u> at *9.

apparent on the face of the Complaint. Nokia's attempt to argue otherwise raises a question of fact. See In re Estate of Laura, 141 N.H. at 636.

Nokia's invocation of the economic loss doctrine also misses the mark because it ignores key components of the doctrine. In Wyle v. Lees, 162 N.H. 406, 411, 33 A.3d 1187, 1191–92 (2011), for example, the New Hampshire Supreme Court determined that the economic loss doctrine did not bar the plaintiff's negligent misrepresentation claim because the misrepresentations induced the plaintiff to enter into a contract. See id. at 411-12. When "the misrepresentation of present fact serves as an inducement for the contract," the negligence claim is not duplicative of the breach of contract claim. Id. (quotation omitted).

In the Complaint, Collision expressly alleges that it was induced to enter into the agreement with Nokia (and to perform under that agreement) based upon several misrepresentations, including the statement from Nokia on June 1, 2017 that it had approval to offer $20 million to Collision to license its technology. See Complaint, ¶ 96(a). That statement was false when made, but Collision relied on it in deciding to enter into the agreement with Nokia five days later. See id., ¶ 62. Thus, the misrepresentation claim, which is based on Nokia's false inducements to Collision to enter the agreement, is not duplicative of the breach of contract claim and should not be dismissed. See Wyle, 162 N.H. at 411.

## VI.   COLLISION HAS ADEQUATELY PLED AN ALTERNATIVE CLAIM UNDER QUANTUM MERUIT

The Complaint's fifth count is in quantum meruit. See Complaint, ¶¶ 104-107. Specifically, Collision alleges that through its assurances and representations, Nokia obtained Collision's valuable intellectual property. See Complaint, ¶ 82. This intellectual property was particularly valuable to Nokia, which had previously tried and failed to develop techniques similar to Collision's. See id., ¶ 24. Moreover, Nokia's misrepresentations and assurances caused

22

Collision to perform work for Nokia in order to meet Nokia's prescribed milestones. See id., ¶ 44. Perhaps most importantly, Nokia also benefitted from the exclusivity commitment it obtained from Collision – a commitment that kept Collision's valuable technology out of the hands of Nokia's competitors. See id., ¶ 4. As the Complaint alleges, Nokia knew that Collision was performing this work and providing these benefits to Nokia with the expectation of compensation, and Nokia accepted this work and gained a benefit from the work that Collision performed. See id., ¶ 106. These allegations articulate a claim in quantum meruit. See Moulton v. Bane, No. 14-CV-265-JD, 2015 WL 7274061, at *8 (D.N.H. Nov. 16, 2015)[20].

Notwithstanding these well-pled allegations, Nokia summarily declares that Collision cannot plead a claim for quantum meruit because Collision did not confer any benefit on Nokia. See Nokia's Memorandum at 22. The case on which Nokia relies, however, simply stands for the proposition that, to sustain a claim for quantum meruit, a party must state facts rather than legal conclusions. See id. (citing General Insulation Co. v. Eckman Const., 159 N.H. 601, 612, 992 A.2d 613, 621 (2010)). As explained above, Collision included the predicate facts on which its claim is based. These are specific, factual allegations, not boilerplate statements of legal elements. Nokia's motion to dismiss the quantum meruit claim should be denied as well.

## VII.   THE ALLEGATIONS OF THE COMPLAINT, IF TRUE, SUPPORT A CLAIM FOR VIOLATION OF RSA 358-A, NEW HAMPSHIRE'S CONSUMER PROTECTION ACT

In the final count of the Complaint, Collision asserts that the allegations of the Complaint equate to a violation of the New Hampshire Consumer Protection Act ("CPA"), see Complaint, ¶ 110, which makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce." N.H.Rev.Stat. Ann.

---

[20] Stating that "A valid claim in quantum meruit requires that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." Id.

§ 358–A:2. "The statute provides a list of specific, prohibited acts, but the list is not exhaustive." State v. Sideris, 157 N.H. 258, 262 (2008).[21] Inquiries into whether alleged conduct does or does not violate the CPA are inherently factual. See CRMC Bethlehem, LLC v. N. Country Environ. Servs., Inc., No. 09–cv–344–JL, 2010 WL 3002025, *3 (D.N.H. July 29, 2010).

To resist the well-pled allegations of the Complaint, Nokia again claims that New Hampshire law does not apply. See Nokia's Memorandum at 22-23. According to the allegations of the Complaint, however, Nokia conducted negotiations with and made misrepresentations to Collision through email and by telephone, knowing that Collision was a New Hampshire-based entity. See, e.g., Complaint, ¶ 110. If the allegations of the Complaint are true, the CPA would apply. See, e.g., Campbell v. CGM, LLC, No. 15-CV-088-JD, 2017 WL 78474, at *12 (D.N.H. Jan. 9, 2017) (permitting claim to proceed under CPA despite Georgia choice of law clause applying to contract claims); Animal Hosp. of Nashua, Inc. v. Antech Diagnostics, No. 11-CV-448-SM, 2012 WL 1801742, at *5 (D.N.H. May 17, 2012) (California choice of law clause in agreement did not preclude application of CPA).[22]

Nokia also claims that its conduct did not rise to the requisite level of rascality to constitute a violation of the CPA. See Nokia Memorandum at 24. Whether or not the detailed allegations of the Complaint (which include the allegation that Nokia deliberately and persistently lied to Collision to keep it on the hook, performing work and maintaining exclusivity

---

[21] Under the familiar test to determine whether such non-enumerated conduct is proscribed by the CPA, "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." ACAS Acquisitions (Precitech) Inc. v. Hobert, 155 N.H. 381, 402 (2007); see also Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc., No. 09-CV-405-JL, 2012 WL 27917, at *9 (D.N.H. Jan. 5, 2012).

[22] Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F. 2d. 607, 608-610 (1st Cir. 1993), upon which Nokia relies to argue that Collision's CPA claims are barred by the Delaware choice-of-law provisions, is not applicable. As explained above, these choice-of-law provisions are not enforceable as this action bears no substantial relationship to Delaware. Moreover, in Northeast Data, the plaintiff asserted Massachusetts Chapter 93A claims based *solely* on defendant's breach of contract, which fell within the scope of the applicable choice of law provision. Northeast Data, 986 F2d at 609-10. Here, Collision's CPA claims are based in part on Nokia's repeated "false statements and misrepresentations" and "inducing Collision to spend millions of dollars" on a project Nokia wrongfully terminated. Complaint, ¶ 110. These allegations go far beyond a typical breach of contract claim.

on Nokia's behalf, <u>see</u> Complaint, ¶ 820), would violate the CPA is a question of fact that cannot be resolved short of trial. <u>See</u> <u>CRMC Bethlehem, LLC v. N. Country Environ. Servs., Inc.</u>, No. 09–cv–344–JL, 2010 WL 3002025, *3. Therefore, the Court should not dismiss this claim.

Nokia also asserts that Collision waived its claim for any consequential or exemplary damages under the CPA. <u>See</u> Nokia Memorandum at 24. This argument fails, however, because the waiver included in the Integration and License Agreement does not encompass the CPA claim that Collision has asserted against Nokia. As the Massachusetts case that Nokia cites explains, a consumer protection claim may be duplicative of a warranty claim and a clause excluding consequential damages can also bar such a claim. <u>See</u> <u>id.</u> at 24 (citing <u>Canal Elec. Co. v. Westinghouse Elec. Corp.</u>, 406 Mass. 369, 378 (1990)). Here, Collision is not seeking consequential damages as a result of any warranty claim, so the waiver does not affect Collision's CPA claim. Further, even if the waiver were to apply to Collision's CPA claims, it would have no bearing on Collision's claims for CPA violations arising from its quasi-contract or tort claims. <u>See</u> <u>Canal Elec.</u>, 406 Mass. at 378. Therefore, Nokia's argument fails.

### vi. <u>Conclusion and Request for Hearing</u>

For the foregoing reasons, Collision Communications respectfully requests that Nokia's motion to dismiss be denied in its entirety.

Pursuant to Local Rule 7.1(d), Collision requests a hearing on its opposition to Nokia's motion to dismiss.

Respectfully submitted,

COLLISION COMMUNICATIONS,

/s/ Tyler E. Chapman
Tyler E. Chapman, Admitted Pro Hac Vice (MA
BBO # 637852) tchapman@toddweld.com
Maria Davis, Admitted Pro Hac Vice (MA BBO #
675447) mdavis@toddweld.com
Tara D. Dunn, Admitted Pro Hac Vice (MA BBO #
699329) tdunn@toddweld.com
Joseph M. Cacace (NH Bar # 266082;
MA BBO # 672298) jcacace@toddweld.com
TODD & WELD LLP
One Federal Street
Boston, MA 02110
Dated:  December 7, 2020          Tel: (617) 720-2626

## CERTIFICATE OF SERVICE

I, Tyler E. Chapman, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Tyler E. Chapman
Dated:  December 7, 2020          Tyler E. Chapman