# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC.,<br><br>            Plaintiff,<br><br>   v.<br><br>NOKIA SOLUTIONS AND NETWORKS OY,<br><br>            Defendant. | C.A. No. 1:20-cv-00949-JD |

## NOKIA SOLUTIONS AND NETWORKS OY'S REPLY MEMORANDUM
## IN FURTHER SUPPORT OF ITS MOTION TO DISMISS

Nokia Solutions and Networks Oy ("Nokia") submits this reply in further support of its motion to dismiss (Dkt. 55) Collision Communications, Inc.'s ("Collision") Second Amended Complaint (the "Complaint" or "SAC") (Dkt. 54), and in response to Collision's Opposition (Dkt. 57). For any issue not addressed in this Reply, Nokia stands on the arguments made in its opening brief (Dkt. 55-1).

## DISCUSSION

### I. COLLISION AND NOKIA DID NOT FORM A CONTRACT AS A MATTER OF LAW

As noted in *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987), courts should avoid "trapping parties in surprise contractual obligations that they never intended." *Id.* at 497. "It is fundamental to contract law that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms. More is needed than agreement on each detail, which is overall agreement (or offer and acceptance) to enter into the binding contract." *Id.* Collision's attempt here to trap Nokia into an oral contract for a $23 million technology collaboration fails for the simple reason that the record does not establish the basic elements of contract formation, including offer and acceptance.

Collision's Opposition glosses over the elements of offer and acceptance and instead relies on the doctrine set forth in the Restatement (Second) of Contracts (the "Restatement"), § 27 which states:

> Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

*Id.* (emphasis added). Collision's reliance on this doctrine is misplaced, however, because under its express terms this doctrine requires, as a condition to contract formation, a "manifestation[] of assent that [is] in [itself] sufficient to conclude a contract …." That element is lacking in this case. The lack of that element here is also what distinguishes this case from the cases cited in Collision's Opposition.

For instance, in *Rochester Motorsports, Inc. v. Leighton's Kawasaki, Inc.*, No. 2005-0233, 2006 WL 8418219, at *2 (N.H. July 25, 2006), the court considered whether there was a binding

1

ME1 35221348v.1

agreement to purchase defendant's company. The court concluded that there was, holding:

> We conclude, as a matter of law, that the parties' May 19, 2004 letter of intent established that the parties had an enforceable contract. Under New Hampshire law, "[a] written memorandum," such as the May 19, 2004 letter of intent, "is sufficient to establish a contract if it demonstrates that the parties have manifested their intent to be bound to the essential terms of a more detailed forthcoming agreement."

*Id.* (citations omitted). Central to this holding was the fact that the parties' letter of intent "on its face, demonstrates that the parties intended to be bound by the essential terms of the more detailed agreement they reached, but did not sign….'" *Id.* Here, in contrast, there is no writing where the parties manifest their intent to be bound, nor is there an offer and acceptance sufficient to have created a binding commitment. To the contrary, the facts alleged in the Complaint make plain that Nokia *did not* intend to be bound because on June 6, 2017, the date Collision claims a contract was formed, Nokia representative Francisco (Paco) Lopez Herrerias expressly told Collision that "he was expecting markups from Nokia's procurement department" (SAC, ¶ 62). This statement conclusively shows that Nokia did not intend to be bound that day, but rather that it was planning on making a counteroffer.[1]

*Quint v. A.E. Staley Mfg. Co.*, 246 F.3d 11 (1st Cir. 2001), is distinguishable on the same grounds. In *Quint*, after a telephonic settlement negotiation, the defendant's attorney insisted that the plaintiff's attorney reconfirm with his client that the deal was final and that the plaintiff would not back out. The individual plaintiff so agreed. *Id.* The parties' oral agreement that their settlement was final without using conditional language is what rendered their agreement binding. *Id.* at 13-14. In *In re LP & D, Inc.*, No. 16-11129, 2020 WL 5128360, at *7 (D. Mass. Aug. 31, 2020), the court recently distinguished *Quint* and refused to find a binding agreement, holding, "Here, the parties used conditional language in their communications and, further, the writings on which Appellants rely did

---

[1] The two cases predominantly cited for the proposition that the lack of a written agreement does not preclude the formation of a contract are *Lower Vill. Hydroelectric Assocs., L.P. v. City of Claremont*, 147 N.H. 73 (2001), and *Estate of Younge by Bank of New England, N.A. v. Huysmans*, 127 N.H. 461 (1985). In *Lower Vill. Hydroelectric*, the intent to be bound was evidenced by an "April 2, 1997 letter [which] explicitly states that the city is willing to accept LVHA's offer." *Id.* at 76. In *Estate of Younge*, the intent to be bound was evidenced in "the Bank's August 31, 1981 letter [which] explicitly accepts the Huysmanses' offer." *Id.* at 466. Here, in contrast, there is no written or oral exchange which can plausibly be construed as an offer and acceptance or other form of manifestation to be presently bound.

not have sufficient terms to establish a binding agreement." *Id.* at *7. The same is true here. Herrerias both used conditional language (indicating that markups would be forthcoming) *and*, as further discussed below, the parties' alleged agreement does not have sufficient terms to establish a binding contract. As *Quint* expressly acknowledges, "[t]here are certainly instances in which no oral contract is formed where material terms are not yet agreed upon, and no agreement is reached until there is written agreement embodying those material terms." *Id.*, 246 F.3d at 15.

## II. A VALID OFFER AND ACCEPTANCE ARE LACKING IN THIS CASE

In all of the cases where a contract is found despite the lack of a later writing, there is a moment where the parties agree, either in writing or orally, that their agreement is final and binding so as to satisfy the elements of contract formation.[2] Such a moment is lacking in this case.

In Nokia's opening brief, Nokia shows that Herrerias' June 6 statements do not meet the legal requirements of contract acceptance. Collision does not dispute this, but instead argues that Herrerias' June 6 statements constituted an offer which Collision then accepted. *See* Opposition at 10. This theory, which contradicts what is actually alleged in the Complaint,[3] does not hold up to scrutiny.

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited ***and will conclude it***." *Lago & Sons Dairy, Inc. v. H.P. Hood, Inc.*, 892 F. Supp. 325, 333 (D.N.H. 1995) (citing Restatement (Second) of Contracts § 24 (1979)) (emphasis added).[4] Herrerias's June 6 statements cannot plausibly be construed as on offer, the acceptance of which would conclude the matter, because Herrerias made

---

[2] *See Rochester Motorsports, Inc.*, 2006 WL 8418219 at *2 ("In order for a valid contract to be formed, there must be an offer, acceptance, consideration and a meeting of the minds…. A meeting of the minds is present when the parties assent to the same terms.").

[3] The allegations of the Complaint, not Collision's characterization of them in its Opposition, are what controls. *See Passatempo v. McMenimen*, No. 05-10118-GAO, 2005 WL 1877146, at *2 (D. Mass. Aug. 3, 2005) ("What is tested on a motion to dismiss is the complaint, not arguments in a brief.").

[4] The question of whether a contract was formed is a question of law. *See Provencal v. Vermont Mut. Ins. Co.*, 132 N.H. 742, 745 (1990) ("While the plaintiff's factual allegations are assumed to be true, her assertion that a contract had been formed represents a legal conclusion."); *Jay Edwards, Inc. v. Baker*, 130 N.H. 41, 45 (1987) ("Whether a given factual transaction is or is not an 'offer' is a question of law….").

clear that he intended to provide a response to Collision's prior draft agreements. When one party says, "I'll get you my revisions to your proposed drafts tomorrow," responding, "I accept," does not a contract make. *See* Restatement, § 26 ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.").

## III. THE ALLEGED ORAL CONTRACT IS TOO INDEFINITE TO BE ENFORCEABLE

"[C]ontracts, both oral and written must be definite in order to be enforceable." *Sawin v. Carr*, 114 N.H. 462, 465 (1974). As the First Circuit noted in *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 426 (1st Cir. 1996) (applying New Hampshire law and holding that the alleged contract, based on "disjointed statements," was too indefinite to be enforceable):

> Definiteness … involves matters of degree. In the last analysis, the standard is reasonable certainty, not mathematical precision…. The provisions of a contract need only be "sufficiently certain to allow claims of breach to be resolved readily, and to enable a reasonably certain computation of damages."

*Id.* at 426 (citation omitted). Here, Collision seeks to enforce a contract for a $23 million technology collaboration based on four alleged terms: (1) the licensing fee ($20 million) and the integration fee ($3 million); (2) a one year exclusivity provision prohibiting Collision from licensing its technology to Nokia's unspecified competitors; (3) the license term (which was to be perpetual); and (4) the following payment schedule: "[t]he first [(payment)] for 60% upon delivery, the second at 20% by March 1, 2018, and the last 20% upon final delivery." SAC, ¶¶ 4, 64, 65. The Complaint does not identify any other material terms such as: (1) a description of Collision's required deliverables; (2) Collision's required performance standards; (3) Nokia's acceptance, rejection, and termination rights; (4) an agreement as to who would own the source code in Nokia's receiver; (5) each parties' indemnification and support obligations; (6) a contract start date; (8) an agreement concerning the exchange of highly confidential information, etc. Indeed, it is impossible to determine what contract damages Collision would be entitled to, if any, given that there are no allegations that Nokia agreed to

4

have no termination rights. *See Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc.*, No. 09-CV-405-JL, 2012 WL 27917, at *6 (D.N.H. Jan. 5, 2012) ("[t]he omission of … critical terms renders the alleged agreements fatally indefinite and unenforceable as a matter of law.").

## IV. THE COMPLAINT DOES NOT ALLEGE AN IMPLIED IN FACT CONTRACT

Collision suggests in its Opposition that if there is no oral agreement, the Court should find that a contract was implied in fact. *See* Opposition at 10 n.7. There are no allegations in the Complaint alleging the formation of an implied in fact contract, however, and even if there were the facts of this case do not fit that legal theory.[5] The holding of *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir. 2005), is instructive. There, the court held:

> MEEI's implied contract claim fails for the same reason we have rejected its express contract claim – failure to reach agreement on the basic terms of the contract. In the prototypical implied contract case, the terms are already sufficiently clear, and the court looks to the actions of the parties only to determine whether their actions indicate that they, in fact, agreed on those terms. However, in this case, where the terms proposed by each side remain at odds, searching the actions of the parties for indicia of consent becomes a fruitless exercise. Without agreement on the essential terms of the agreement, MEEI's implied contract claim gets no further than does its express contract claim.

*Id.* The same result is merited here. The lack of an agreement on essential terms prevents the finding of an implied in fact contract, particularly since the theory is not even pled in the Complaint.

## V. COLLISION'S IMPLIED COVENANT CLAIM FAILS

Collision's Opposition asserts that Collision is asserting an implied covenant claim relating to Nokia's alleged conduct during contract formation. *See* Opposition at 17. In particular, Collision's Opposition alleges that Nokia made a misrepresentation to Collision to induce Collision to enter into a contract with Nokia. *See id*. Because this allegation is grounded in fraud, Collision must plead it with particularity under Fed. R. Civ. P. 9(b). *See* Section VII below. The only specific statement Collision

---

[5] "An implied in fact contract is a true contract that is not expressed in words; the terms of the parties' agreement must be inferred from their conduct." *Morgenroth & Assoc's, Inc. v. Town of Tilton*, 121 N.H. 511, 514 (1981). "Like all contracts, implied-in-fact contracts cannot be formed absent an offer, acceptance, consideration, and a meeting of the minds." *Portsmouth Quality Flooring Corp. v. Ballentyne*, No. 2017-0468, 2018 WL 2213519, at *1 (N.H. Apr. 13, 2018).

5

ME1 35221348v.1

identifies in its Opposition to support this count, however, is a March 9, 2017 email Herrerias sent to Jared Fry described in paragraph 40 of the Complaint (attached hereto as Exhibit 1).

As an initial matter, the allegations of the Complaint show that Herrerias' March 9, 2017 email was truthful. Herrerias states in this email that he was "drafting an extension of the PoC which will allow Collision to start right after the end of the PoC into porting code to our AirScale." SAC, ¶ 40. The Complaint then alleges, "On March 22, 2017, Mr. Herrerias sent to Collision a new draft Extension to the PoC agreement," which included an agreement to pay Collision $275,000 per month (*id.*, ¶ 42). Before that Extension was signed, however, Herrerias "told Collision that Nokia wanted to skip the PoC agreement extension step and move directly to finalizing a full commercial agreement" (*id.*, ¶ 45). Simply because the Extension was not signed does not mean the March 9 email untruthful.

In any event, there are simply no facts in the Complaint alleging that Herrerias sent this March 9 email (relating to a PoC extension) to fraudulently induce Collision to agree to enter into an oral agreement with Nokia on June 6 that Nokia did not intend to honor, or even that Collision relied on this email as a basis for its decision to agree to enter into that agreement. In short, this email lends no support to Collision's contract-formation implied covenant claim.

## VI. THE COMPLAINT FAILS TO STATE A PROMISSORY ESTOPPEL CLAIM

Rather than responding to Nokia's detailed showing that Collision's claims of detrimental reliance are implausible because: (a) Nokia never actually said what Collision claims it said; and (b) when considering Nokia's actual statements, any claimed reliance would not satisfy Rule 12(b)(6)'s plausibility standard, Collision urges the Court to ignore Nokia's actual statements and to simply hold that this claim cannot be decided as a matter of law.[6] That is not the law, however. As the court noted in *Reinach v. Hanover Co.*, No. CIV.A.07-12337-FDS, 2009 WL 6506883 (D. Mass. Sept. 19, 2009):

---

[6] Collision's Opposition recites the wrong elements for promissory estoppel. *See* Opposition at 18 n.14. The elements recited in footnote 14 are the elements of equitable estoppel, not promissory estoppel.

> "An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation." … Although reasonable reliance is ordinarily a question for the jury, ***the Court may dismiss such a claim if the facts alleged in the complaint preclude a finding of reasonable reliance***.

*Id.* at *10 (citations omitted and emphasis added). The *Reinach* court went on to explain that when an individual is confronted with conflicting statements, reliance on those statements is unreasonable as a matter of law. *Id.* at *10-11. Here, Collision does not identify any unambiguous promise that Nokia made to Collision that Collision would be paid for its pre-contract work, and the specific statements it does identify make clear both that no "unambiguous promise" was made and that any belief on Collision's part that it would be paid for its work before a contract was signed was unreasonable as a matter of law. As such, Collision's promissory estoppel claim fails.

## VII. COLLISION FAILS TO STATE A VALID MISREPRESENTATION CLAIM

Because Collision's misrepresentation claim sounds in fraud, it must satisfy the pleading requirements of Fed. R. Civ. P. 9(b). *See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009). In assessing whether the allegations of the Complaint satisfy Rule 9(b), the Court must first decide whether to consider the exhibits attached to Nokia's motion papers showing Nokia's actual statements. Collision urges the Court not to consider those exhibits, and to rely only on Collision's characterization of Nokia's statements. If the Court were to do so, then Collision's fraud claim should be dismissed for failing to identify the "content of the alleged misrepresentation with specificity." *See L'Esperance v. Manhattan Mortg. Corp.*, No. 11-CV-555-LM, 2012 WL 3839376, at *3 (D.N.H. Sept. 5, 2012) (citation and internal quotation marks omitted).

Collision's Rule 9(b) problem does not end there, however, because Collision's fraud claim also fails to "set forth specific facts that give rise to a reasonable inference that the defendant knew a particular statement was materially false or misleading." *In re Dial Complete Mktg. & Sales Practices Litig.*, No. 11-MD-2263-SM, 2013 WL 1222310, at *3 (D.N.H. Mar. 26, 2013). For instance, the

allegation that Nokia's representations were "false when made" (SAC, ¶¶ 97, 100) are identical to the allegations in *Meyer v. Callahan*, No. 09-CV-106-PB, 2010 WL 4852600 (D.N.H. Nov. 23, 2010), which the court held were "not entitled to a presumption of truth" because they were lacking in "any factual basis for inferring the knowledge they allege the defendants possessed…." *Id.* at *3.

Similarly, Collision fails to allege any specific facts showing why or how the statements in paragraphs 96 and 99 of the Complaint were false.[7] *See L'Esperance*, 2012 WL 3839376 at *3 ("it is not at all clear that L'Esperance has adequately alleged that any of the statements on which she relies are false statements, which is a necessary element of a claim for either intentional or negligent misrepresentation."). And, as in *L'Esperance*, the Complaint "falls short with regard to alleging the requisite state(s) of mind of the speaker(s) responsible for the alleged misrepresentations." *Id.*

Moreover, because the statements at issue could not plausibly have caused Collision to infer what Collision claims it inferred, *i.e.*, that Nokia would pay Collision for its work without a contract in place, Collision's claimed reliance on these statements is unreasonable as a matter of law. *See Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 242 (D. Mass. 1999) ("Whether reliance is reasonable is ordinarily a question of fact for a jury. However, if, on the facts alleged in the complaint, no reasonable jury could find that the plaintiff's reliance was reasonable, the defendants are entitled to judgment as a matter of law.").

Lastly, Collision appears to agree that its misrepresentation claim is barred by the economic loss doctrine as to statements made *after* contract formation (*i.e.*, after June 6, 2017), but argues that it was fraudulently induced to enter into a contract with Nokia based on Herreria's June 1, 2017 email

---

[7] Paragraphs 96 and 99 of the complaint identify the following statements: (1) a **June 1, 2017** email from Herrerias (Dkt. 55-4); (2) a **June 6, 2017** call between Hererrias and Jared Fry (described in paragraphs 62-63 of the Complaint); (3) a **June 21, 2017**, email from Herrerias (Dkt. 55-8); (4) a **November 14, 2017** email from Herrerias to Collision (where Herrerias allegedly says "the material terms of [the] agreement have not changed" (Complaint, ¶ 96(c)), sent six days before Nokia sent its proposed agreements to Collision (*id.*, ¶ 70)); (5) a **June 9, 2017** email from Theresa Magalski to Collision (Dkt. 58-2); and (6) a **June 12, 2017** communication between Tero Kola and Stan Fry (further described in paragraphs 68-69 of the Complaint). The statements themselves, rather than Collision's characterization of them, reveal that the statements were either statements of future intent or simply do not state what Collision says they state.

8

(Dkt. 55-4). *See* Opposition at 22. The Complaint does not allege fraudulent inducement, however, and the Complaint does not satisfy the requirements of Rule 9(b) with regard to this June 1, 2017 email, or even allege that this email was false.[8]

## VIII. COLLISION NEVER PROVIDED ANYTHING OF VALUE TO NOKIA

Nokia points out in its Motion that Collision's quantum meruit claim fails for the simple reason that Collision never provided any benefit to Nokia. Collision responds by citing paragraph 82 of its Complaint where it alleges that it "shar[ed] its highly valuable intellectual property with Nokia." *See* Opposition at 22. Collision does not explain why this conferred a benefit on Nokia, however. After all, Collision does not allege that Nokia ever used Collision's technology. Moreover, Collision admits that Nokia paid Collision $600,000 for a proof of concept which involved Collision demonstrating its technology to Nokia, *see* Complaint, ¶¶ 26-27, and does not allege that it shared any technology with Nokia beyond what Nokia already paid for.

Collision also alleges that it conferred a benefit on Nokia by agreeing to a 1 year exclusivity provision. But there are no allegations that Nokia required Collision to agree to exclusivity prior to contract formation, and Collision does not identify what benefit, if any, Collision's alleged exclusivity conferred upon Nokia between June 6, 2017 (when it alleges a contract was formed (*id.*, ¶ 64)) and November 20, 2017 (when it alleges Nokia breached the contract (*id.*, ¶ 76)). For these reasons, and for the reasons stated in Nokia's Motion, this claim should be dismissed.

## IX. COLLISION'S RSA 358-A CLAIM FAILS TO STATE A CLAIM

Collision asserts an RSA 358-A claim based on Nokia's alleged "misrepresentations intended to induce Collision to enter into an agreement and to perform under the agreement, and intentional breaches of Nokia's obligations under the agreement." Complaint, ¶ 110. In addition to the arguments

---

[8] In this June 1, 2017 email (Dkt. 55-4), Herrerias states "I got support from the LTE Business Line and Portfolio Management heads, accepting my 20m proposal (perpetual)" but later states "Meanwhile, the 20m (+3m NRE) is a bold number … *so I'll have to fund the case moving to higher layers* (Marc Rouanne and possibly Rajeev) to release budget beyond annual plan from LTE BL, where we cannot shift OPEX from other activities at this point in time." *Id.* (emphasis added). Herrerias therefore made clear that he did ***not*** yet have the necessary approvals for a $23 million agreement.

raised in Nokia's opening brief, this claim should be dismissed for the following three reasons. First, because this claim is based on allegations of fraud, it must be stated with particularity under Rule 9(b).[9] Because, as noted above, Collision's fraud claims do not satisfy Rule 9(b), this claim too must fail.[10] Second, Collison's 358-A claim fails because the Complaint does not allege that Nokia engaged in any offending conduct in New Hampshire. In fact, Collision argued strenuously to the District of Massachusetts that all of Nokia's alleged offending conduct occurred in Massachusetts.[11] For this independent reason, Collision's 358-A claim should be dismissed. *See Precourt v. Fairbank Reconstruction Corp.*, 856 F. Supp. 2d 327, 343 (D.N.H. 2012) ("for GOPAC to be liable under the CPA, it must have made those alleged misrepresentations within New Hampshire.").[12] Third, the contention that because 358-A claims are fact-based they are not susceptible to resolution on a motion to dismiss is simply an incorrect statement of the law. If the facts in the Complaint do not adequately allege a 358-A claim or do not satisfy the *Iqbal* plausibility standard, the claim should be dismissed.[13]

## CONCLUSION

For the foregoing reasons, Nokia requests that the Court grant its Motion, dismiss the Second Amended Complaint in its entirety, and grant such other relief as it deems just and proper.

---

[9] *See Micronics Filtration Holdings, Inc. v. Miller*, No. 18-CV-303-JL, 2018 WL 4845749, at *6 (D.N.H. Oct. 4, 2018) ("Rule 9(b) applies to allegations supporting a NHCPA claim that sound in fraud.").

[10] In fact, because Collision's 358-A claim is derivative of its other failed claims, the 358-A claim must fail as well. *See Dennis v. Husqvarna Forest & Garden Co.*, No. CIV. 94-309-M, 1994 WL 759187, at *6 (D.N.H. Dec. 27, 1994) ("because the court has found plaintiff's allegations of vertical price fixing insufficient to support a claim under the Sherman Act, her derivative claim under the Consumer Protection Act necessarily fails as well.").

[11] *See* First Opposition at 18-19 (Dkt. 27) ("Nokia's 93A violations … are based upon Nokia's numerous misrepresentations made to Collusion [sic] ***in Massachusetts*** and breach of the agreement it formed with Collusion [sic] ***in Massachusetts***") (emphasis added). *See id.* at 20 ("***the deceptive acts occurred primarily and substantially in Massachusetts***.") (citations omitted and emphasis added).

[12] *See also Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 504 (D.N.H. 1996) ("It is the 'offending conduct' that must occur within the state—the 'unfair method of competition or any unfair or deceptive act or practice' in trade or commerce—not the actual sale.").

[13] *See Animal Hosp. of Nashua, Inc. v. Antech Diagnostics*, No. 11-CV-448-SM, 2012 WL 1801742, at *5-6. (D.N.H. May 17, 2012) (disposed of a 358-A claim on a motion for judgment on the pleadings); *Automated Transactions, LLC v. Am. Bankers Ass'n*, 172 N.H. 528, 547 (2019) (affirming dismissal of CPA claim for the failure of the underlying claims); *Karpinski v. Union Leader Corp.*, No. 18-CV-1214-PB, 2019 WL 3203144, at *8 (D.N.H. July 16, 2019) (dismissing CPA claim, holding "The complaint thus does not sufficiently allege an unfair or deceptive act.").

Respectfully submitted,

NOKIA SOLUTIONS AND NETWORKS OY,

By its attorneys,

/s/ David Himelfarb
David Himelfarb, NHBA # 19754
dhimelfarb@mccarter.com
John Allen, admitted *pro hac vice*
jallen@mccarter.com
McCarter English, LLP
265 Franklin Street
Boston, MA  02110
Tel:  (617) 449-6500
Fax: (617) 607-9200

December 14, 2020

## CERTIFICATE OF SERVICE

I, David Himelfarb, hereby certify that on this 14th day of December, 2020, a true copy of the above document was served on counsel for all parties through the Court's ECF/CM system.

/s/ David Himelfarb
David Himelfarb

ME1 35221348v.1