UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Collision Communications, Inc.

    v.         Civil No. 20-cv-949-LM
               Opinion No. 2023 DNH 100 P

Nokia Solutions and Networks OY

**O R D E R**

  Plaintiff Collision Communications, Inc., filed this suit against defendant Nokia Solutions and Networks OY alleging breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, negligent and intentional misrepresentation, quantum meruit, and violation of the New Hampshire Consumer Protection Act, RSA 358-A.  The dispute arises out of Collision and Nokia's negotiations toward a commercial technology partnership. Collision asserts that in June 2017 the parties formed a binding, $23 million oral contract for Nokia to use Collision's technology, which Nokia breached.  Nokia contends that these discussions were merely preliminary and no binding agreement was ever reached.

  Nokia moves for summary judgment (doc. no. 156) in its favor on all of Collision's claims.  Collision objects.  For the following reasons, Nokia's motion for summary judgment is granted as to Collision's claims for misrepresentation (Count IV) and violation of the New Hampshire Consumer Protection Act (Count VI). Nokia's motion is otherwise denied.

## STANDARD OF REVIEW

A movant is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmovant. Bonner v. Triple-S Mgmt. Corp., 68 F.4th 677, 690 (1st Cir. 2023).  Although the court draws all reasonable inferences in the nonmovant's favor, the court does not draw "unreasonable inferences" nor does it "credit bald assertions."  Id.

## BACKGROUND

Collision is a New Hampshire-based technology business.  Collision was formed to develop a technology which improves cellular network performance, specifically in circumstances when many people attempt to use a cellular network at once in a small area.[1]  During the time period at issue, Collision employed approximately 20 people, primarily engineers.

Nokia is a large multinational business headquartered in Finland.  Among other products, Nokia produces cellular base stations, which are devices used in conjunction with other technology to collect and disseminate cellular signals.  Cellular network operators, such as Verizon, AT&T, and T-Mobile, use these base stations to provide cellular service to consumers.  See doc. no. 156-9 at 2.

---

[1] Collision calls its technology the "Uplink Coordinated Multi-Point Physical Uplink Shared Channel receiver software module," or its "UL CoMP Software" for short.  For simplicity the court uses "Collision's technology" as shorthand.

I.      Collision and Nokia enter the Project Agreement and begin negotiations for an integration and license contract.

In late 2015, Collision and Nokia began discussing a potential collaboration, namely, an integration of Collision's technology into Nokia's base station. The goal of integrating Collision's technology with Nokia's base station was to improve the performance of Nokia's base station. The discussions for this collaboration occurred primarily between Collision principals Stan Fry and Jared Fry and Nokia's "M&A and Partner Ecosystem Manager"[2] Francisco "Paco" Lopez Herrerias. Consistent with the parties' usage in their briefs and evidentiary submissions, the court refers to the main players by their first or common names – i.e., Stan, Jared, and Paco.

In late November 2016, after their initial discussions, Collision and Nokia entered a contract called the "Project Agreement." Under the Project Agreement, Nokia paid Collision $600,000 to evaluate whether Collision's technology could work with Nokia's base station. The purpose of the "Project Agreement," which is also referred to as the "proof of concept," was to show that the theoretical improvements promised by Collision's technology could be integrated into Nokia's base station and provide those improvements in real-world circumstances. By all accounts, this deal was successful: Collision's technology would likely work with Nokia's base station, and it was likely to deliver its theoretical improvements in real-world circumstances.

---

[2] The court presumes that "M&A" means mergers & acquisitions. See doc. no. 156-3 at 147.

In April 2017, after the Project Agreement was completed, Collision and Nokia began discussing a contract to fully integrate Collision's technology into Nokia's base station, with a likely release of the integrated product for sale to third-party customers (such as Verizon, AT&T, or T-Mobile) in 2018. The parties' goal was to have the integrated product ready or nearly ready by February 2018 so that it could be announced at the Mobile World Congress, an annual event to be held that month. Jared stated in his affidavit that Mobile World Congress is the "most significant industry trade show," which made it "a significant opportunity for Nokia to market" the technology. Doc. no. 178-2 ¶ 22. Thus, it was important to both Nokia and Collision to have the integrated technology prepared by that time.

The proposed deal had two components: (1) Collision would integrate its technology with Nokia's base station in exchange for a fee known as a non-recurring engineering fee (sometimes referenced in the evidence as the "NRE fee"); and (2) Collision would license its technology to Nokia so that Nokia could sell base stations including Collision's technology to third-party customers.

II.   <u>Paco and Jared negotiate terms for integration and licensing in May 2017</u>

In May 2017, Nokia authorized Paco to travel to New Hampshire to negotiate contract terms with Collision. Paco and Jared exchanged emails about the planned negotiation in New Hampshire. In the emails, Paco wrote that they would have a two-day discussion "hopefully with a verbal agreement in transfer costs and NRE fees, even if not signed on paper." Doc. no. 156-7 at 2. He added that he wanted "[a]t least to have the view from both sides and the 'handshake' on the potential

conditions." Id.  Jared responded and expressed concerns about the timeline for finalizing the agreement.  He asked Paco to ensure that "the people you need to finalize any agreement are lined up in advance." Id. at 1.

Paco traveled to New Hampshire and met with Collision on May 16 and 17. Collision believed that Paco had the authority to negotiate and enter a contract with Collision on Nokia's behalf.  During negotiations, Paco told Collision that Nokia had approved an offer up to $23 million – $3 million for the non-recurring engineering fee and $20 million for a license.  Paco told Collision that "senior executives at Nokia had given him guidance and approval to extend that offer to Collision."  Doc. no. 178-3 ¶ 15 (Stan Fry Aff.).

Collision, however, asked for $30 million.  The parties did not reach an agreement during their May 16 and 17 meetings.

A few days later, on May 19, Collision proposed a $25 million deal to Paco, consisting of $3 million for the non-recurring engineering fee (the same amount communicated by Paco during the May 16 and 17 meetings) and $22 million for the license.  Collision also asked to limit the license term to two years.  Nokia rejected Collision's offer.  Paco reiterated Nokia's $23 million proposal, with a perpetual license term.

On May 23, Collision decided to accept those terms despite having some reservations about them.  For example, Collision was uncomfortable with a perpetual license.  Collision believed that a five-year license term would be just as good as a perpetual term because the technology would likely be obsolete within five

years in any event.  Jared prepared a draft written contract agreement with a proposed five-year license term and sent the draft to Paco on May 30.

On June 1, Paco thanked Jared for the draft.  Paco told Jared that he would review the contract with Nokia's internal procurement department and get back to him as soon as possible.  Paco relayed to Jared that Nokia had held meetings about the deal and the "outcome is good," as the "LTE Business Line and Portfolio Management heads" accepted the proposal for a $20 million license fee.  Doc. no. 156-18 at 1.  Paco, however, told Jared that because the $23 million total value of the offer was "a bold number," he would have to "fund the case moving to higher layers . . . to release budget beyond [Nokia's] annual plan . . . ."  Id.  Paco identified Nokia mobile networks president Marc Rouanne and "possibly" Nokia chief executive officer Rajeev Suri as these "higher layers."  Id.  And he told Jared that he was "internally organizing many calls to get to that point to eventually [sign] the contract."  Id.  As of June 1, Jared understood that Paco would need approval to fund the deal from executives higher up in Nokia's organization.

III.    **Collision accepts Nokia's $23 million offer during a phone call on June 6, 2017.**

On June 6, 2017, Jared and Paco spoke by telephone.[3]  During the call, Paco confirmed that he had internal approval for the $23 million offer, and Jared

---

[3] The evidence about the June 6 telephone call includes Jared's testimony and his contemporaneous notes.  Paco testified in his deposition that he had many calls with Jared but did not specifically remember the June 6 phone call.  Jared's recollection is also limited and premised largely on his notes, although he testified to recalling the phone call and the agreement itself.

accepted the offer on Collision's behalf.  Jared testified in his deposition that, during the call they agreed to a $20 million license fee with 60 percent paid up front and 40 percent paid in later installments; a $3 million non-recurring engineering fee paid up front; exclusivity for Nokia for one year; and a perpetual license term.  They also agreed to other terms, such as the provision of ongoing product support, deliverables, and required performance benchmarks.

Jared testified that, at the time, he understood that Nokia had an internal process to release funds for a deal of that size, but he believed that the deal was otherwise already approved.  Stan stated in his affidavit that "[w]e believed that if Collision accepted an offer presented by [Paco], that would result in an agreement between Collision and Nokia."  Doc. no. 178-3 ¶ 8.

Jared also took handwritten notes contemporaneously with his June 6 phone call with Paco.  In his notes, Jared wrote that they were "crossing a mark" and would "[g]o up to almost CEO level," but at the same time "support [f]or $20M" had "passed."  Doc. no. 156-9 at 5 (Jared Fry deposition testimony); doc. no. 156-19 (Jared Fry handwritten notes).  Jared's notes include a list of executives and indicates that they had "already approved" and Paco just needed to get the funds "released."  Doc. no. 156-9 at 6.[4]  During the call, Paco did not tell Jared that

---

[4] Jared's similar typewritten summary of the call, which he sent to Stan, states that "[t]he amount of money is passing a mark that needs additional sign-offs" and that "[t]his effort should be done this week or very beginning of next week."  Doc. no. 156-20 at 1.  Jared also noted that Paco "has support for the $20M" and quoted Paco as saying "it has passed," though Jared wrote he was "not sure what [Paco] really meant by that."  Id.

Rouanne still needed to approve the deal.  Jared's notes indicate that a contract signing would be the following week or June 19.

IV.    The parties continue discussing the content of a written agreement.

After the June 6 call, Collision "understood that the parties reached an agreement," so it "directed its engineers to aggressively pursue the integration work to meet" the targeted 2018 release.  Doc. no. 178-2 ¶ 49 (Jared Fry Aff.).   Collision also "ceased marketing" its technology to other base station manufacturers, stopped pursuing additional funding, and expanded its engineering staff to ensure it could timely complete the integration work.  Id. ¶ 53; doc. no. 178-3 ¶ 22 (Stan Fry Aff.). For its part, Nokia sent Collision some development materials for its base station to help facilitate Collision's integration work.  Doc. no. 178-3 ¶ 37.  Both Nokia and Collision expected to send engineers to take part in a "workshop" in Poland to expedite the integration work.  See doc. no. 178-2 ¶ 32 ("The 'workshop' referred to was an anticipated technical workshop for the parties to share more comprehensive technical and trade secret information to support the integration.").

In the meantime, Paco, Stan, and Jared continued to communicate about the terms that would be in the written contract, and Paco began the process of moving the deal through Nokia's internal bureaucracy.  During this time, Paco, Stan, and Jared discussed via email different contract terms, the status of the written contracts, and the parties' negotiating positions.  Paco indicated to Stan and Jared in these conversations that some of the terms, notably the timing of payments to Collision, would be different than what had been discussed in the preceding months.

For example, just a couple days after the June 6 phone call, on June 8, Paco emailed Stan and Jared to tell them about the process of producing a written contract.  In this email, Paco told Collision that Nokia intended to use its own templates for the written contract as opposed to the draft sent by Collision.  Paco further told Collision that Nokia may not be willing to pay part of the license fee up front.  In response, Stan Fry told Paco that Nokia's changes were a "disappointing surprise" because Collision went through the effort of creating draft written contracts only "to find out now there is another process."  Doc. no. 156-22 at 4.  Stan added that "[i]n early May, we agreed to your terms with an effort to get this completed quickly . . . ."  Id.

Paco replied, telling Stan that he believed they could start "the WS[5] without having signed the license agreement if we have a frame agreement in place which addresses the integration work of the technology and the commitment (and financial terms) after finalization."  Doc. no. 156-22 at 3.  Acknowledging Collision's concerns about disclosing its confidential information prior to having a written agreement in place, Paco told Collision that "[t]he basis of our partnership is trust from both sides."  Id. at 4.  He added that "Nokia is contributing with many people to this project as well, even not having any commercial agreement signed and in place yet," and "[n]othing has changed in what we agreed from the beginning, our interest and our commitment in moving forward as quick as possible."  Id.

---

[5] Presumably "WS" refers to the Poland workshop to aid the integration work.

In response, Stan reminded Paco that he had told them "the agreements (license and integration) would be completed and signed in a few weeks, and that at that time we would be paid the 60%." Doc. no. 156-21 at 1. Stan added that "[t]his was based on the fact that we were committing a lot of resources and giving you exclusivity . . . ." Id.

The same day, Jared and Stan exchanged emails between themselves about negotiation strategy and how to respond to Nokia's proposals. Jared stated that Collision could "use this to put the terms in general back into question (to maybe freak [Paco] out)." Doc. no. 156-22 at 1. Jared speculated that Paco was changing the payments' timing because he only "got sign off on the $20M without going into detail" on the timing of payments. Considering this, Jared suggested that Collision may have "room to push" Paco on the timing. Id. Jared added that he had "th[e] attitude that we have conceded a lot and now want to stay strong on these other terms . . . ." Jared followed this up with a list of points to potentially raise with Paco, including stating that "[i]t is not clear at this date, what the deliverable really even is as it is undefined technically, so how can we have an agreement with the major term contingent on it." Id. at 2.

On June 11, Stan met with Nokia executives in Finland. During those meetings, Tero Kola, head of Nokia Radio Portfolio Management, told Stan that the necessary Nokia executives had approved the deal. Paco also told multiple executives during the visit that Nokia and Collision had reached a deal. No one at Nokia indicated to Stan that further approval for the amounts agreed during the June 6 phone call was necessary.

On June 15, Stan emailed Paco expressing concern about the lack of a written proposal or contract.  Doc. no. 156-24 at 1.  Stan stated that "[t]his is one of the multiple reasons we have not formally responded or agreed to your terms," and Stan said Collision was "very concerned that the situation seems to be changing from our prior understandings, new hurdles are being introduced, and this is in the context of not being content with the terms as they were proposed."  Id.  (In his affidavit, Stan stated that when he expressed concern about not having an agreement or contract in place, he was referring to the lack of a written contract).

Paco responded, stating that he had been "crystal clear" on the "high level terms and conditions," which were the same terms "as I got agreement from the LTE Business Unit and Portfolio Management . . . which cover the implementation fee for the work of integrating . . . and the license fee (perpetual) for the usage of the technology[.]"  Doc. no. 178-9 at 3.  Paco added, however, that "those need to be reviewed since Nokia needs to safeguard as well for eventual risks, even if we trust Collision as a partner."  Id.  In response to a question from Stan about the effect of "the agreements" not being completed by the end of June, Paco said that "[w]e need to [start implementing] the [base station] in August timeframe [at] the latest.  And if there is a clear risk we might not achieve a demo for [Mobile World Congress], we'll need to plan a non-commercial . . . demo, with much more support from Nokia R&D.  I am confident this won't occur."  Id.

On June 27, a Collision executive asked Jared whether Collision had "formally agree[d]" to the $20 million license payment.  Doc. no. 156-25 at 1.  The Collision executive stated that he knew Jared had "implied it" but was unsure

whether Jared "actually ever agree[d] to it."  Id.  Jared responded that Collision "never formally agreed to that (and Stan has even indicated that point to [P]aco somewhat recently). . . .  I think we are stuck on the $20M and so I am pointing to the other terms in attempt to stay firm on those.  Further, I am articulating these as not the terms we agreed to, but the terms that Paco proposed."  Id. at 2.

On July 10, Jared emailed Paco, expressing concern that Nokia was renegotiating the terms to which they had previously agreed.  For example, Nokia now asserted that the non-recurring engineering fee would be paid when Collision met certain development milestones instead of up front.  Nokia had also suggested bifurcating the written contracts: one for the integration and another for the license agreement.  In this context, Jared discussed Collision's position on those issues and told Paco that Collision had "continued our efforts without a contract – this shows an enormous commitment on our part to making this a success."  Doc. no. 156-50 at 3.  Jared added that Collision was nonetheless "willing to make some concessions here to help this get through smoothly."  Id.

V.   Marc Rouanne rejects the contract terms and Nokia offers a lower price.

Through June, July, and August 2017, the deal terms worked their way through Nokia's internal bureaucracy, which included Nokia executives and committees.  On August 20, 2017, Thomas Giers, a member of Nokia's procurement team, told Jared that written drafts of the contracts were 95% completed and that Collision should expect them the following week.

On September 5, however, the deal terms finally reached Nokia's mobile networks president, Marc Rouanne.  Rouanne appears to have been Nokia's final decisionmaker for a deal of this amount.  Rouanne rejected the terms because the $23 million price was too high.

On September 12,[6] Paco and Jared spoke by telephone.  According to Jared's notes of the call, Paco told him that "there have been a number of delays" which Paco said were partly caused by executive-level turnover at Nokia.  Doc. no. 156-35 at 1.  Paco informed Jared that Nokia was "price sensitive" and felt that the price was "heavy," so Nokia was going to "re-negotiate those terms."  Id.  Jared responded that Collision had already made several concessions in the interest of "getting the deal through Nokia" quickly and that those concessions were "off the table if Nokia is looking to renegotiate the terms."  Id.

In the same conversation, Paco told Jared that presenting the integrated product at the Mobile World Congress in February 2018 was not going to happen.  Jared told Paco that this change was a big deal, that Collision had "continued working towards our goals based on a common understanding," and that "even though there is not a contract in place," Collision viewed this "as a failure on Nokia's part."  Id.

---

[6] Most of the evidence about this phone call comes from Jared's notes, which are dated September 14, 2017, but indicate that the call occurred on September 12. In its brief, Nokia asserts that the discussion occurred on September 14.  Doc. no. 156-64 at 15.  Whether the discussion occurred on September 12 or 14 does not make a difference to the issues addressed by this order.

On November 15, 2017, Nokia approved[7] an $11 million total offer for Collision's technology.  The offer consisted of a $3 million non-recurring engineering fee and a $7 million license fee.  Nokia sent Collision a draft written contract with those terms.

Collision rejected Nokia's offer.  In rejecting the November 2017 offer, Collision wrote a lengthy letter to Nokia stating, in the most relevant part, that Collision had been working on the project in a "good faith effort" and on the "understanding that the agreements, which were to be forthcoming, would be similar in content to the proposal made by Nokia and the agreements we submitted to you last May."  Stan summed up Collision's position as follows:

> It was further indicated to us that Nokia had received internal support for the effort.  Then subsequently, we had communication from Nokia that this offer was approved by numerous executives at Nokia and that efforts were underway to release the funding.  No communication has been received that terms or funding would be significantly different, until Collision received the recent proposed agreements from Nokia.  But for proposed terms to change so dramatically, given the significant time, effort, and funds Collision has spent does [not] make us feel we are being treated equitably in this relationship.[8]

Doc. no. 156-41 (Stan Fry November 2017 letter to Nokia); see also doc. no. 156-40.

---

[7] It is unclear whether Nokia considers the November 2017 offer one which could have bound Nokia if accepted or — as it contends with the June 6 offer — which required further approval before it was binding.

[8] Considering the letter's context and the favorable construction given to the nonmoving party at the summary judgment stage, the court presumes that Stan meant to say that he felt Collision was being treated inequitably rather than "equitably."  To account for this apparent typographical error, the court has altered the quoted portion of the letter to add the word "not" to the last sentence.

On January 30, 2018, Nokia made another offer to Collision for $17 million total (consisting of a $3 million non-recurring engineering fee plus a $14 million license fee). Collision rejected this offer as well. Negotiations continued through summer 2018. Ultimately, Nokia withdrew from negotiations after undergoing internal changes and making budget cuts. Without a customer for its technology, Collision laid off all of its staff.

Collision brought this suit in 2020. In its Second Amended Complaint, Collision alleges several claims relating to the June 6 phone call and Nokia's subsequent conduct. Specifically, Collision brings claims for breach of contract (Count I); breach of the implied covenant of good faith and fair dealing (Count II); promissory estoppel (Count III); negligent or intentional misrepresentation (Count IV); quantum meruit (Count V); and violation of the New Hampshire Consumer Protection Act, RSA 358-A (Count VI).

## DISCUSSION

Nokia moves for summary judgment on all of Collision's claims. Collision objects.

I.    Count I: Breach of Contract

As to Count I, breach of contract, Nokia asserts that there is insufficient evidence to show a contract between it and Collision existed. Nokia also argues that Paco did not have authority to bind Nokia to a contract. Collision responds that a contract was formed during the June 6 phone call and that genuine disputes of material fact exist as to both issues.

15

A.   A genuine dispute of material fact exists as to whether Collision and
Nokia formed an enforceable contract during the June 6 phone call.

To be enforceable, a contract requires offer, acceptance, consideration, and a meeting of the minds.  E.g., Poland v. Twomey, 156 N.H. 412, 414 (2007).[9]  "A meeting of the minds occurs when there is mutual assent to the essential terms of the contract; that is, the parties have the same understanding of the essential terms of the contract and manifest an intention to be bound by the contract."  Id.  The simplest way to demonstrate a meeting of the minds is by offer and acceptance.  See Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 31 (1st Cir. 1988) (stating that the "most traditional method" of contract formation "involves an offer by one of the parties and an acceptance of that offer by the other").

To be enforceable, the contract and its terms must be "definite," meaning that its "general structure and specific provisions are reasonably clear."  Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc., No. 09-cv-405-JL, 2012 WL 27917, at *6 (D.N.H. Jan. 5, 2012) (quoting Chisholm v. Ultima Nashua Indus. Corp., 150 N.H. 141, 145 (2003)).  However, an offer or acceptance of an offer which contemplates "a further writing which never came into existence does not . . . establish as a matter of law that the parties did not intend to be bound without one."  Guy v. Starwood Hotels & Resorts Worldwide, Inc., No. 03-CV-183-JD, 2005 WL 2172034, at *3 (D.N.H. Sept. 7, 2005); Restatement (Second) of Contracts § 27 (1981) (stating that contracting parties' intent to prepare and sign a written

---

[9] The parties agree that New Hampshire law applies to Collision's claims in this case.

memorial of an otherwise completed contract does not prevent such contract from being enforceable, but that circumstances in individual cases "may show that the agreements are preliminary negotiations").  At the same time, when the parties contemplate "the future execution of a formal contract," a "strong inference" arises that the parties did not intend to be bound until the formal document is signed.  See Gel Sys. Inc. v. Hyundai Engineering & Const. Co., Inc., 902 F.2d 1024, 1027 (1st Cir. 1990) (applying Massachusetts law).

Taking the facts in the light most favorable to Collision, a reasonable jury could find that an oral contract existed between Collision and Nokia.  Jared testified in his deposition that Nokia offered and Collision accepted specific, definite terms for the contract: a $3 million fee in exchange for integrating Collision's technology with Nokia's base station to be released in 2018, and a $20 million fee in exchange for a perpetual[10] license to distribute that product.

Nokia contends that the parties' discussions about reducing the terms to a written agreement shows that Nokia did not intend to be bound without one.  That evidence, however, only permits an inference that the parties did not intend to be bound without a written contract; the finder of fact is not required to draw that inference.  See Gel Sys. Inc., 902 F.2d at 1027 (affirming district court's drawing of such inference after a bench trial).  A jury could conclude that, rather than showing that Nokia did not intend to be bound, the discussions about creating a written

---

[10] A jury could find that while Collision did not like the perpetual length, Collision nonetheless agreed to it.  Jared stated in his affidavit that Collision agreed to the license term length.  Doc. no. 178-2 ¶ 46.

17

contract show that Nokia promised Collision that it would reduce the terms of the June 6 oral agreement to writing.  <u>See</u> Restatement (Second) of Contracts § 27, cmt. a (1981) ("It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions.").  Thus, Nokia could have breached the June 6 oral agreement by failing to produce or execute a written agreement with those terms.

To be sure, some evidence can be construed to suggest that the parties did not intend to be bound by the June 6 terms.  Notably, there is evidence that when taken at face value indicates Collision did not genuinely believe a binding contract had been formed.  Jared, however, testified in his deposition that he accepted the offer on Collision's behalf notwithstanding his notes and some of Collision's other communications that could be construed to the contrary.

And, instead of viewing Collision's statements that no contract or formal agreement had been reached as evidencing the lack of <u>any</u> agreement, a jury could reasonably construe such statements as merely reflecting the reality that the parties had not yet signed the written contract their June 6 oral agreement contemplated.  This view is consistent with the evidence that shows the parties' intent was to memorialize the June 6 terms into a further writing, as well as with Stan's explanation in his affidavit.  Doc. no. 178-3 ¶ 29 ("In my communications with Nokia in which I expressed concern about not having an 'agreement,' or 'contract,' or 'commitment' in place, I was referring to written confirmation of the verbal agreement we had made.").

Lastly, taken in context, the parties' discussions (from June 2017 through Rouanne's rejection of the deal later that year) were built on and relate to the terms from the June 6 phone call. Until Rouanne's rejection of the terms, a jury could find that both Collision and Nokia treated the essential terms of the agreement as having been finalized – with certain issues about additional nonessential terms left to be negotiated and finalized in the written contract. So, many of Collision's statements after the June 6 phone call about the lack of a "formal" contract, as well as its threats to walk away from the negotiations, can be reasonably viewed as Collision's acknowledgement of that reality, as well as attempts to build leverage to obtain favorable language in that forthcoming written contract. At bottom, the matter is one of determining credibility and of assigning weight to the competing evidence, and these are tasks reserved for the finder of fact.

Nokia also argues in its reply that "$23 million licensing agreements with publicly traded companies do not typically take the form of oral agreements." Doc. no. 191 at 3. Accepting Nokia's factual proposition for the sake of addressing its argument,[11] Nokia still is not entitled to judgment as a matter of law. Rather, the transaction's nature is just one circumstance among many which the jury may weigh in deciding whether a contract existed. See Restatement (Second) of Contracts § 27, cmt. c (discussing the "circumstances" that "may be helpful in determining" whether a contract has been formed). The jury is free to weigh many

_____

[11] There is no evidence in the summary judgment record about how license agreements are typically formed other than limited anecdotal observations by witnesses.

factors and accept or reject reasonable constructions of the evidence.  See, e.g.,
Chedd-Angier Prod. Co., Inc. v. Omni Publications Intern., Ltd., 756 F.2d 930, 935
(1st Cir. 1985) (characterizing this issue, under similar Massachusetts contract law
and Restatement (Second) of Contracts § 27, as "one of fact" and "whether the jury
had sufficient evidence before it to decide that the parties, intending to create a
written contract, orally agreed upon the essential terms of the contract prior to
memorializing the contract in writing").

For these reasons, Nokia is not entitled to summary judgment on the issue of
whether a contract was formed.

> B.   A genuine dispute of material fact exists as to whether Paco had
>       apparent authority to bind Nokia to the contract terms.

Next, Nokia argues that even if Jared and Paco agreed to terms, Paco had
neither actual nor apparent authority to bind Nokia to those terms.  Nokia contends
that there is no evidence that its conduct (as opposed to Paco's conduct) caused
Collision to reasonably believe that Paco had authority to enter an oral contract on
Nokia's behalf.  Collision argues that Paco had apparent authority.

Incorporated entities may only act through their agents.  E.g., Planet Fitness
Int'l Franchise v. JEG-United, LLC, 561 F. Supp. 3d 9, 13 (D.N.H. 2021) (citing
Coach, Inc. v. Sapatis, 27 F. Supp. 3d 239, 245 (D.N.H. 2014), and Daniel Webster
Council, Inc. v. St. James Ass'n, Inc., 129 N.H. 681, 683 (1987)).  To show that
Nokia assented to the terms of the contract, Collision must demonstrate that an
agent with authority to bind Nokia in fact did so.  See id.; Daniel Webster Council,
129 N.H. at 683.

"The necessary factual elements to establish agency involve: (1) authorization from the principal that the agent shall act for [it]; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions." Boynton v. Figueroa, 154 N.H. 592, 604 (2006). Authority to act can be actual or apparent. See State v. Zeta Chi Fraternity, 142 N.H. 16, 22 (1997). Proof of actual or apparent authority to act is evaluated from "all the circumstances and conduct in a given situation and the reasonable inferences to be drawn therefrom." Id.

Collision did not argue in response to Nokia's summary judgment motion that Paco had actual authority to bind Nokia, so the court addresses apparent authority only. "Apparent authority . . . exists where the principal so conducts itself as to cause a third party to reasonably believe that the agent is authorized to act." Zeta Chi Fraternity, 142 N.H. at 22 (quotation and brackets omitted). Apparent authority must stem from at least some conduct by the principal. Restatement (Third) of Agency § 2.03 cmt. c (2006). In other words, a purported agent's actions alone cannot support a finding of apparent authority. Id. ("A belief that results solely from the statements or other conduct of the agent, unsupported by any manifestations traceable to the principal, does not create apparent authority . . . . An agent's success in misleading the third party as to the existence of actual authority does not in itself make the principal accountable."). However, a principal's failure to disapprove of an agent's actions on the principal's behalf can permit a finding of apparent authority. Zeta Chi Fraternity, 142 N.H. at 24 (quoting 3 Am. Jur. 2d Agency § 79, at 586 (1986)).

Where the principal is an organization, facts that may indicate apparent authority include the agent's job title and whether it would be normal or expected that the agent would negotiate transactions of the type at issue.  See Binkley v. Eastern Tank, Inc., 831 F.2d 333, 337 (1st Cir. 1987) (applying Massachusetts law); Peoples Heritage Sav. Bank v. Pease, 797 A.2d 1270, 1276 (Me. 2002); Restatement (Third) of Agency § 1.03 cmt. c (2006) ("A juridical person that is an organization manifests its assent to be bound by the acts of individuals through the observable connections between the individual and the organization.  An organization manifests assent to an individual by appointing that person to a position defined by the organization.").  Generally, a person who has been given charge to negotiate a transaction by a principal (i.e., the lead negotiator) has been held to have broad apparent authority.  Binkley, 831 F.2d at 337.

If reasonable due diligence would have revealed that the purported agent was not, in fact, authorized to act, then the party which failed to conduct such due diligence cannot rely on apparent authority.  See Daniel Webster Council, 129 N.H. at 683 (stating that a party can rely on apparent authority only if a reasonably prudent person "in the exercise of reasonable diligence and sound discretion" would naturally have supposed the apparent agent to have authority); Shakra v. Benedictine Sisters of Bedford, New Hampshire, Inc., 131 N.H. 417, 422 (1989) (holding that contract for land transfer was unenforceable when exercise of reasonable diligence would have revealed that person signing the contract was acting beyond the scope of her actual authority).  However, when a person designated by an organization to speak on a particular matter does so "in a manner

that conforms to the established routine," a third party will be "justified in believing that the person speaks for the organization."  Restatement (Third) of Agency § 1.03 cmt. c (2006).

Questions of apparent authority are usually fact intensive, so summary judgment is only appropriate when the pertinent facts are undisputed.  Grube v. Amazon.com, Inc., No. 16-cv-126-LM, 2017 WL 3917602, at *6 (D.N.H. Sept. 6, 2017).

A genuine dispute of material fact exists about whether Paco had apparent authority to act on Nokia's behalf.  Nokia took several actions which a jury could find reasonably caused Collision to believe that Nokia had authorized Paco to offer contract terms which would be binding if accepted during the June 6 phone call.  Most importantly, Nokia authorized Paco to negotiate the contract on Nokia's behalf, and it appointed Paco to a position (M&A manager) consistent with that type of authority.  Paco had been a long-term liaison between Collision and Nokia.  In this role, Paco had also worked with Collision on the Project Agreement, which Nokia had treated as binding.

Nokia's subsequent conduct also appeared to confirm Paco's authority.  When Stan visited Nokia's offices in Finland a few days after the June 6 phone call, other Nokia executives acted like there was an agreement.  According to Stan, no one at Nokia suggested to Collision that Nokia had not, in fact, decided to offer the terms agreed during the June 6 phone call to Collision, or that Rouanne was the only person with authority to make such an offer on Nokia's behalf (or that he had not done so).

23

As with its arguments about whether the parties manifested an intent to be bound or agreed on all the essential terms of the contract, Nokia identifies contrary evidence. For example, taken in the light most favorable to Nokia, as opposed to Collision, some of Jared's notes suggest that he understood Paco needed further approval before the deal was binding. And the parties' previous contract, the Project Agreement, went through additional approval at Nokia before a written contract was signed. This evidence, however, merely confirms the existence of genuine disputes of material fact.

For example, there is a genuine dispute of fact about the extent to which Collision understood how Nokia's internal contract-approval bureaucracy operated. A jury could find that Collision reasonably relied on Paco's representations about that process – after all, Paco was Nokia's designate to communicate exactly that sort of information to Collision – and Paco told Collision that the essential terms of the agreement had already been approved. Jared testified that he believed there was a difference between approval to release the funds, which he thought was a budgeting issue that affected when the payments could be disbursed to Collision, versus approval of Nokia's legal commitment, which Jared believed had occurred. Construed favorably to Collision, Paco's communications were generally consistent with Collision's understanding, and Jared's notes and communications do not undermine his testimony such that Nokia would be entitled to judgment in its favor as a matter of law.

In sum, at this stage the court must take the evidence in the light most favorable to Collision. Construing the evidence in this way, a reasonable jury could

find that Nokia acted as if Paco had authority to bind Nokia to the terms of the
contract he negotiated with Collision and that Collision acted reasonably in relying
on that apparent authority.  For these reasons, Nokia's motion for summary
judgment is denied as to Collision's breach of contract claim, Count I.

II.    Count II: Good Faith and Fair Dealing

As to Count II, the implied covenant of good faith and fair dealing, Nokia
argues that, since there was no contract in place, there can be no implied covenant
of good faith and fair dealing.  As with Count I, Collision responds that there is a
genuine dispute of material fact as to whether the contract existed.

"In every agreement, there is an implied covenant that the parties will act in
good faith and fairly with one another."  Livingston v. 18 Mile Point Drive, Ltd., 158
N.H. 619, 624 (2009).  The implied covenant is "comparatively narrow"; it prohibits
"behavior inconsistent with the parties' agreed-upon common purpose and justified
expectations" or is inconsistent with "common standards of decency, fairness and
reasonableness."  Id. (quoting Richard v. Good Luck Trailer Court, 157 N.H. 65, 70
(2008)).

Since the court has found there is a genuine dispute as to whether a contract
existed, Nokia's argument that it is entitled to summary judgment as to Count II
because no contract existed necessarily fails.  Nokia developed no other argument
for summary judgment in its favor as to Count II, so Nokia's motion for summary
judgment is denied as to Count II.

III.   Count III: Promissory Estoppel

As to Count III, promissory estoppel, Nokia argues that Collision did not reasonably rely on any promises made by Nokia. Collision responds that it reasonably relied on Nokia's promise to pay Collision for the technology, a license to use the technology in the base station, and exclusivity.

Under the doctrine known as promissory estoppel, a promise that the promisor should have reasonably expected to induce an action – or forbearance of an action – by the promisee and which induces such conduct is binding, subject to equitable limitations. See Restatement (Second) of Contracts § 90 (1981). The promisee may enforce that promise if it relied on the promise to its detriment or to the promisor's benefit. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 92 (1st Cir. 2014) (citing Panto v. Moore Business Forms, Inc., 130 N.H. 730, 738 (1988)).

A genuine dispute of fact exists as to Count III for essentially the same reasons as Collision's breach of contract claim, Count I. A jury could find that Nokia promised to pay Nokia for – at minimum – its work integrating its algorithm into Nokia's base station in time for the Mobile World Congress in February 2018 and the 2018 release date. A jury could also find Collision reasonably relied on Nokia's promises regarding the license agreement and exclusivity.

Nokia understood and communicated to Collision that time was of the essence in completing the integration work, so that the product could be ready for release in a specific timeframe. Under these circumstances, a jury could find Nokia should have reasonably expected Collision to dedicate significant resources to completing that work in exchange for the promised payment. And, as discussed

above, there is at least some evidence that Nokia knew that Collision had dedicated those resources into its performance.  Nokia nonetheless failed to fulfill its apparent promise to pay.

Nokia characterizes the parties' discussions as preliminary, such that Collision could not have reasonably relied on them as constituting binding promises, but the evidence can be reasonably construed otherwise.  Prior to the June 6 phone call, negotiations had been occurring for several months and the parties had already completed a proof of concept demonstrating the technology's viability.  Considering all the evidence, the June 6 call can be viewed as a culmination of discussions, not a beginning.

During this timeframe, the parties' actions also suggest a level of seriousness that goes beyond mere preliminary discussions.  Paco had traveled from Europe to New Hampshire a few weeks prior to the June 6 call to discuss terms.  The parties exchanged several offers and counteroffers.  Collision decided to accept the terms proposed by Nokia and did so during the June 6 call.  Then, just a few days after the June 6 agreement, Nokia invited Stan to travel from New Hampshire to meet with Nokia executives in Finland.  During those meetings, Nokia's executives expressed excitement that Collision and Nokia had agreed to work together on the integration project.  After the June 6 deal and until Rouanne rejected it, Nokia outwardly treated the deal as if it were final with just the formalities to be resolved and papers to be signed.  These actions are not consistent with its argument that the May and June negotiations were merely preliminary.

Lastly, in its reply brief, Nokia argued that the court should "utilize Fed. R. Civ. P. 56(g) and enter an order stating that Collision cannot recover any reliance damages after either November 20, 2017, or December 22, 2017."  Doc. no. 191 at 13.  Nokia raised that argument for the first time in its reply brief, so it is waived for purposes of summary judgment.  See, e.g., Gonzalez Canton v. Mad Ruk Entertainment, No. 22-1458 (CVR), 2023 WL 4546545, at *9 (D.P.R. July 13, 2023) (collecting cases).

In a footnote alongside that argument, Nokia asserts that it "requested the use of Rule 56(g) in its Motion for Summary Judgment."  But all Nokia said in its motion was that the court should "issu[e] findings pursuant to Fed. R. Civ. P. 56(g) deeming any fact that is not genuinely in dispute as established in the case so as to narrow any issues (if any) not disposed of on summary judgment."  Doc. no. 156 at 5.  Nothing in Nokia's motion or accompanying initial brief related that assertion to promissory estoppel or reliance damages.  Nokia's perfunctory reference to Rule 56(g) in its motion for summary judgment is far from the type of developed argument which suffices to avoid waiver.  Thus, the court will not consider Nokia's argument relating to limitations on damages.

Nokia's motion for summary judgment as to Collision's promissory estoppel claim, Count III, is denied.

IV.   Count IV: Misrepresentation

As to Count IV, misrepresentation, Nokia makes several arguments, but the court need not address any of them because Collision conceded its

misrepresentation claims in response.  The court grants summary judgment in

Nokia's favor as to Count IV, misrepresentation.

V.   Count V: Quantum Meruit

Next, Nokia argues that Collision cannot prevail on Count V, quantum

meruit, because Collision did not confer any "measurable benefit" onto Nokia, which

is a requirement of New Hampshire law.  Collision contends that a reasonable jury

could find all the elements of quantum meruit met in this case.

"Quantum meruit is a restitutionary remedy intended for use by contracting

parties who are . . . unable to sue 'on contract.'"  R.J. Berke & Co., Inc. v. J.P.

Griffin, Inc., 116 N.H. 760, 764 (1976) (recognizing claim where party was in

material breach and could not sue under a breach of contract theory); 66 Am. Jur.

2d Restitution & Implied Contracts § 79 (May 2023 update) ("Recovery under the

quantum meruit theory is derived from principles of equity and fairness and is

allowed where there is substantial performance but not full completion of the

contract.").  For example, a plaintiff who has himself failed to substantially perform

his end of a bargain cannot recover under a breach of contract theory because he is

in material breach of the contract.  See R.J. Berke & Co., 116 N.H. at 764.

Quantum meruit provides an equitable remedy for such plaintiffs who are justified

in some recovery notwithstanding their inability to recover in contract.  Id.

In New Hampshire, a quantum meruit claim requires proof of three elements:

(1) services were rendered to the defendant by the plaintiff; (2) with the defendant's

knowledge and consent; and (3) under circumstances that make it reasonable for

the plaintiff to expect payment.  Gen. Insulation Co. v. Eckman Const., 159 N.H. 601, 612 (2010).  In quantum meruit, damages are measured by "the value of the services provided by the plaintiff."  Id. (quoting Paffhausen v. Balano, 708 A.2d 269, 271 (Me. 1998)).

Here, Collision submitted evidence that it provided services to Nokia, namely, work on integrating Collision's technology with Nokia's base station. Collision told Nokia that it was working on that integration, and Nokia never told Collision to stop that work, so a jury could find that the work was performed with Nokia's knowledge and consent.  Finally, a jury could find the circumstances made it reasonable for Collision to expect payment, as it had dedicated its entire workforce to the integration work, communicated those facts to Nokia, and communicated its expectation of payment.

Collision's damages are measured by the value of the services it provided.  A reasonable jury could find Collision provided to Nokia some services valued at some nonzero amount.  Nokia's argument that Collision cannot prove Nokia received a "measurable benefit" is misplaced.  While somewhat unclear, Nokia's argument appears to be that the quantum meruit claim must be dismissed because Collision's services were not worth anything to Nokia, as Nokia ultimately did not use Collision's technology in the integrated base station or receive the finished product. But whether Nokia ultimately took advantage of the services does not wholly undermine their value.  Ultimately, the purpose of quantum meruit is to provide some recovery (when equitable) in circumstances where a party has substantially performed its promise under a putative contract.

30

Thus, the performance of services by Collision at Nokia's behest is sufficient for Collision's quantum meruit theory to survive summary judgment, even if Collision's performance was only partial and even if the services were ultimately not used by Nokia for profit.  See Restatement (Second) of Contracts § 370, cmt. a (1981) ("The benefit is ordinarily conferred by performance by the party seeking restitution, and receipt by the other party of performance that he bargained for is regarded as a benefit. . . . [A] benefit may also be conferred if the party seeking restitution relies on the contract in some other way, as where he makes improvements on property that does not ultimately become his.").  Nokia's argument is one for the finder of fact as to the amount of damages, not an argument which precludes recovery by Collision as a matter of law.

Neither of the cases cited by Nokia support its contention that the services it received have no value such that it is entitled to summary judgment.  General Insulation Company outlines the elements of a quantum meruit claim, but in substance merely affirms a trial court's dismissal of a claim when the plaintiff alleged no supporting facts in its complaint.  And the other case cited by Nokia, Welch v. Coleman, is distinguishable.  95 N.H. 399, 402 (1949).  Welch involved a plaintiff who brought a quantum meruit claim to recover for services he supposedly rendered as a broker for the defendant's purchase of mica mines in New Hampshire and as general manager for such mines.  Id. at 401-02.  Per their contract, the plaintiff was to be paid from the mines' profits, but such profits were never realized.  See id. at 402.  After the plaintiff brought suit seeking to recover the value of his services, the trial court found that, in fact, the plaintiff had misappropriated funds

given to him by the defendant for the mines' purchase and operation, and, further, that he had tricked the defendant into investing in these "dubious" mines in the first place.  <u>Id.</u> at 400-01.  It is no surprise then that the court found no evidence the plaintiff had "conferred any benefits upon the defendant" and accordingly rejected the plaintiff's claim.  <u>Id.</u> at 402.  The facts here are not similar.

Nokia also relies on Restatement (Second) of Contracts § 370, comment a, to support its argument that Collision's quantum meruit claim fails as a matter of law.  But the Restatement provision cited by Nokia only states that expenditures a party makes in preparation for a performance do not give rise to a restitution interest.  Here, a jury could find that Collision's ongoing integration work was part of the performance contemplated by the parties, as opposed to merely preparation for a performance.  This is substantiated by the parties' communications which show that a payment was expected both for the integration work itself (the non-recurring engineering fee) and the license to use Collision's technology as integrated into the base station after that initial engineering work was completed.

Nokia's motion for summary judgment is denied as to Count V.

VI.    <u>Count VI: New Hampshire Consumer Protection Act, RSA 358-A</u>

Lastly, as to Count VI, violation of the New Hampshire Consumer Protection Act, Nokia argues that: (1) Collision has not identified evidence showing that Nokia acted with sufficient "rascality" to violate RSA 358-A; and (2) that even if there is such evidence of rascality, it did not occur in New Hampshire and RSA 358-A requires offending conduct to occur in New Hampshire.  Collision responds that

Nokia "intentionally made a string of misrepresentations and false or misleading statements that led to Collision performing the integration work exclusively for Nokia and to Collision's ultimate destruction."  Doc. no. 178 at 40.  Collision asserts that at least some of that conduct occurred in New Hampshire.

"It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  RSA 358-A:2.  Despite its name, the Consumer Protection Act applies not only to consumers but also to transactions which take place in a business context.  See Milford Lumber Co. v. RCB Realty, Inc., 147 N.H. 15, 17 (2001).  The statute lists several examples of unfair or deceptive acts or practices.  RSA 358-A:2.  When "the challenged conduct is not listed in RSA 358-A:2, to be actionable it 'must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'"  Moulton v. Bane, No. 14-cv-265-JD, 2016 WL 1091093, at * 11 (D.N.H. Mar. 21, 2016) (quoting Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 675 (2013)); ACAS Acquisitions (Precitech) Inc. v. Hobert, 155 N.H. 381, 402 (2007).  The parties agree that the "rascality" test applies here.

"Selfish bargaining" and broken promises do not meet the level of misconduct which meets the "rascality" test.  See, e.g., Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 370 (2009); Barrows v. Boles, 141 N.H. 382, 390 (1996) ("An ordinary breach of contract claim does not present an occasion for the remedies under the Consumer Protection Act."); Homes Development Corp. v. Edmund & Wheeler, Inc., No. 21-cv-633-SM, 2022 WL 4586480, at *21 (D.N.H. Sept. 29, 2022);

Romano v. Site Acquisitions, Inc., No. 15-cv-384-AJ, 2016 WL 50471, at *3 (D.N.H. Jan. 4, 2016).  "[M]aking promises and then failing to comply with the conditions the parties previously agreed upon" is conduct which is closer to ordinary breach of contract than the type of conduct which violates the Consumer Protection Act.  See Barrows, 141 N.H. at 390.  And when the parties are "sophisticated business entities who negotiated at arm's length . . . it is 'especially difficult' to show rascality . . . ."  Orion Seafood Intern., Inc. v. Supreme Group B.V., No. 11-cv-562-SM, 2012 WL 3765172, at *5 (D.N.H. Aug. 29, 2012).

There is insufficient evidence in the record to elevate Collision's ordinary commercial contract claims into the realm of misconduct which meets the rascality test.  Nokia's actions amount to nothing more than broken promises, selfish bargaining, and, potentially, false assurances of performance.  Thus, Collision's remedies for the harm it suffered from Nokia's actions fall under contract law and its equitable relatives, not the Consumer Protection Act.  See, e.g., McNeal v. Lebel, 157 N.H. 458, 469-70 (2008) (holding that trial court correctly found contractor did not violate Consumer Protection Act when it failed to construct a home according to specifications, as it was an "ordinary breach of contract"); Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 676 (2013) (affirming trial court's finding that defendant's "brinkmanship and hard bargaining" in relation to payment for change orders in construction contract were "hardly commendable" but nonetheless "far from uncommon" such that defendant did not violate the Consumer Protection Act); Orion Seafood Intern., 2012 WL 3765172, at *5 (dismissing Consumer Protection Act claim when "[d]efendant's alleged wrongful actions—its allegedly false

assurances of performance and, ultimately, lack of performance—relate primarily to expectations and obligations under" an agreement).

Collision relies on distinguishable cases, such as <u>Fin Brand Positioning</u>, where the court (Laplante, J.) permitted a Consumer Protection Act claim to proceed beyond summary judgment when the defendant falsely promised the plaintiffs an ownership share in a business to induce the plaintiffs into providing certain services for free.  2012 WL 27917, at *9.  The defendant then made a series of pretextual excuses to avoid fulfilling its promise.  <u>Id.</u>  Collision contends that, like <u>Fin Brand Positioning</u>, its evidence shows "Nokia intentionally made a string of misrepresentations and false or misleading statements that led to Collision performing the integration work exclusively for Nokia and to Collision's ultimate destruction."  Doc. no. 178 at 40.  But neither the specific evidence cited by Collision in its brief, doc. no. 178 at 40 n.78, nor the entire series of events considered as a whole bear this contention out.  Far from attempting to trick Collision into performing services for free, it is undisputed that Nokia consistently offered to pay Collision $3 million, plus an additional amount for the license.  And, unlike the defendants in <u>Fin Brand Positioning</u> who took advantage of the plaintiff's services and then knowingly made pretextual excuses to avoid fulfilling its own promises, Nokia did not take Collision's work or use it.

There is insufficient evidence for a reasonable fact finder to conclude Nokia's conduct was deceptive.  Nor does Collision cite to any evidence of a

misrepresentation or false or misleading statement in its brief.  Collision does not
submit evidence, for example, that Nokia was being deceitful when it told Collision
that its delay in providing written contracts was related to its internal bureaucratic
process and executive turnover.  And, Collision does not submit evidence that, when
Rouanne vetoed the June 6 terms, Nokia's explanation for that (i.e., Nokia felt the
price was too high) was false.  Perhaps Nokia's statements to Collision throughout
negotiations were overly optimistic about the deal's prospects or about Collision's
value to Nokia, but this kind of flattery is analogous to a merchant who provides
unrealistic assurances to placate unhappy consumers, actions which are insufficient
to create liability under the Consumer Protection Act.  Cf. Yorgo Foods, Inc. v. Orics
Indus., Inc., No. 08-cv-438-SM, 2011 WL 4549392, at *13 (D.N.H. Sept. 29, 2011)
("Repeated assurances of future performance by merchants, made to placate
unhappy customers, even unrealistic assurances, are not unknown in the rough and
tumble of the world of commerce.  When assurances of performance prove meritless,
the UCC provides a ready remedy.").

In sum, while Nokia may be liable for its failure to perform through breach of
contract or other equitable theories, the evidence is insufficient for a reasonable
factfinder to conclude that Nokia violated the Consumer Protection Act.  Nokia's
motion for summary judgment is granted as to Count VI.[12]

---

[12] Because the court finds that the alleged misconduct is insufficient to meet
the standard for violating the Consumer Protection Act, the court does not reach the
question of whether any claimed misconduct occurred in New Hampshire.

## CONCLUSION

Nokia's motion for summary judgment (doc. no. 156) is granted as to Counts IV (misrepresentation) and VI (consumer protection act).  The motion is otherwise denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 15, 2023

cc:     Counsel of Record