UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Collision Communications, Inc.</u>

      v.    Civil No. 20-cv-949-LM
                            Opinion No. 2025 DNH 011 P

<u>Nokia Solutions and Networks OY</u>


**O R D E R**

Plaintiff Collision Communications, Inc. ("Collision") brought this diversity action against defendant Nokia Solutions and Networks OY ("Nokia") alleging that the parties formed an enforceable $23 million oral agreement pursuant to which Collision granted Nokia a perpetual license for certain of Collision's proprietary software. A jury found Nokia liable to Collision under theories of breach of contract and promissory estoppel and awarded Collision $23 million in damages. The court must now determine issues of New Hampshire law relevant to Nokia's affirmative defenses, namely: (1) whether an oral contract containing a perpetual license for intellectual property granted by one corporation to another contains obligations which cannot be performed within one year such that the statute of frauds applies; (2) if the statute of frauds applies, whether the doctrine of part performance applies to oral contracts containing obligations which cannot be performed within one year; and (3) whether a plaintiff seeking to recover under promissory estoppel must prove that injustice can be avoided only through enforcement of the promise. Because

there is no controlling precedent from the New Hampshire Supreme Court on these three questions, and the answer to each question may be determinative of Collision's ability to recover some or all of the $23 million verdict, this court intends to certify three questions of law to the New Hampshire Supreme Court.

## STANDARD OF REVIEW

New Hampshire Supreme Court Rule 34 permits district courts to certify questions of law to the New Hampshire Supreme Court. Certification is appropriate when a case presents an issue of New Hampshire law (1) "which may be determinative" of the action, and (2) as to which "there is no controlling precedent" from the New Hampshire Supreme Court. N.H. Sup. Ct. R. 34. "Whether to certify a state law issue to the state's highest court is discretionary." Miller v. Sunapee Difference, LLC, Civ. No. 16-cv-143-JL, 2017 WL 11541727, at *1 (D.N.H. Dec. 1, 2017). "But, before exercising that discretion, this court 'must first undertake [its] own prediction of state law for [it] may conclude that the course the state court would take is reasonably clear.'" Gordon ex rel. Chapter 7 Est. of Hosch v. Envoy Mortg., Ltd., 569 B.R. 1, 11 (D.N.H. 2017) (alteration in Gordon) (quoting Nieves v. Univ. of P.R., 7 F.3d 270, 275 (1st Cir. 1993)). If the potentially determinative issues of New Hampshire law remain "close and difficult" despite the court's analysis, certification may be appropriate. Easthampton Sav. Bank v. City of Springfield, 736 F.3d 46, 51 (1st Cir. 2013) (quoting In re Engage, Inc., 544 F.3d 50, 53 (1st Cir. 2008)). Additional factors relevant to the certification decision include "the dollar

amounts involved, the likely effects of a decision on future cases, and federalism interests."[1] Id. at 52.

## BACKGROUND

This case's factual background is more fully set forth in the court's order on Nokia's motion for summary judgment. See Collision Commc'ns., Inc. v. Nokia Sols. & Networks OY, 687 F. Supp. 3d 201 (D.N.H. 2023). Here, the court will provide an overview of the facts "relevant to the questions [proposed to be] certified and showing fully the nature of the controversy in which the questions arose."[2] N.H. Sup. Ct. R. 34.

Collision is a technology company incorporated in Delaware but based in New Hampshire. Stan and Jared Fry formed Collision in late 2010. Shortly after formation, Collision purchased a portfolio of patents and software from BAE Systems ("BAE"). BAE had developed software technology that reduced interference in electronic telecommunications. However, BAE, as a military contractor, was focused on the application of this technology in the military context. Collision purchased the BAE portfolio with the goal of adapting this interference-reducing

---

[1] Although neither party has requested certification, the court may order certification sua sponte. Easthampton Sav. Bank, 736 F.3d at 50 n.4. The court notified the parties that it was considering the possibility of certification at a motion hearing on June 27, 2024, and permitted the parties to file post-hearing memoranda. The parties will also be afforded an opportunity to make suggestions as to the precise questions submitted to the New Hampshire Supreme Court.

[2] The facts discussed herein do not constitute this court's ultimate findings of fact for purposes of resolving Collision's part-performance argument or Collision's ability to recover under promissory estoppel.

software for use in consumer cellular telecommunications, and then selling or licensing its adapted software to a telecommunications company for installation in the hardware within such company's cell towers.

Nokia is a large multinational company headquartered in Finland. Among other products, Nokia produces cellular base stations, which are the devices affixed to cell towers that collect and disseminate cellular signals. Cellular network operators like Verizon use base stations to provide cellular service to consumers.

I.    Collision and Nokia Explore a Potential Partnership

In 2015, Collision and Nokia began discussing a potential collaboration to integrate Collision's technology into Nokia's base stations. Through simulated exercises, Collision demonstrated to Nokia that its technology was superior to the technology Nokia was then using to reduce cellular interference and process cell signals in its base stations. These exercises did not show, however, whether it would be feasible to integrate Collision's technology into Nokia's base stations.

To determine whether such an integration would be feasible, Collision and Nokia executed a "Proof of Concept" agreement in November 2016. The primary persons who negotiated this agreement were Jared Fry on behalf of Collision, and Francisco "Paco" Lopez Herrerias on behalf of Nokia.[3] Under the Proof of Concept agreement, Nokia agreed to pay Collision $600,000 to evaluate whether Collision's technology could be implemented in Nokia's base stations. Collision's work under

---

[3] The parties have referred to the Frys and Lopez Herrerias by their first or common names throughout the proceedings (i.e., Stan, Jared, and Paco). The court adheres to the parties' convention in this order.

the Proof of Concept agreement took place from November 2016 through approximately April of 2017. By all accounts, the Proof of Concept was a success: Collision's technology could be implemented into Nokia's base stations, and would deliver a substantial improvement in processing.

II.    <u>Negotiations</u>

In February 2017 (when it was becoming clear to the parties that the Proof of Concept would be successful), Collision and Nokia met to discuss the parameters of a contract to fully integrate Collision's technology into Nokia's base stations, with a likely release of the integrated product for sale to third parties (such as Verizon) in the first quarter of 2018. The parties' goal was to have the integrated product ready to be showcased at the Mobile World Congress, an annual event to be held in February 2018. Given the amount of work that integration would entail, the parties considered this to be an aggressive—but feasible—timeline.

The parties did not execute a new agreement at the conclusion of the February 2017 meeting, however. Between February and June 2017, Jared and Paco continued to negotiate the terms of a potential contract. Broadly speaking, the parties' negotiations centered around two primary components of a potential contract: (1) Collision would integrate its technology with Nokia's base stations in exchange for payment of a "non-recurring engineering" fee (often referred to as an "NRE" fee); and (2) Collision would license its technology to Nokia so that Nokia could sell base stations containing Collision's technology to third-party customers in exchange for a lump sum payment.

In May 2017, Paco travelled to New Hampshire to meet with Collision. The purpose of the meeting (which Paco had arranged) was to continue negotiating the terms of an integration and licensing agreement. Prior to the meeting, Paco told Jared that he hoped to have "a verbal agreement in transfer costs[4] and NRE fees" and a "'handshake' on the potential conditions" in place at the conclusion of the meeting, "even if not signed on paper." Pl. Ex. 64. In response, Jared expressed concerns about the tight timeline for finalizing an agreement, and asked Paco to ensure that "the people you need to finalize any agreement are lined up in advance." Id.

The meeting between Paco and Collision took place over two days on May 16 and 17, 2017. At the meeting, Paco communicated to Collision that he had spoken with his leadership and received authorization to offer $20 million for the license and $3 million for the NRE fee. However, while Collision was amenable to the proposed NRE fee, it proposed $30 million for the license. While the parties reached agreement on several aspects of a potential agreement by the conclusion of their May meeting, they left without a contract in place.

Jared wrote to Paco on May 19 to continue the parties' negotiations. Jared proposed a $25 million deal: $3 million for the NRE fee and $22 million for the license. Jared also proposed a two-year license term. Paco responded, reiterating "Nokia's position on pricing," which was that "the maximum Nokia can come up

---

[4] Jared testified at trial that the transfer cost referred to the money that would be paid to Collision in exchange for licensing its technology to Nokia.

with" for the license was $20 million, and explaining that Nokia would insist on a license of perpetual duration. Pl. Ex. 130.

Despite having some reservations about Nokia's terms, Jared and Stan decided to agree to them, with the exception of the perpetual license term (Collision intended to seek a five-year license term based on its belief that the technology would be obsolete within five years, rendering a perpetual license unnecessary). On May 30, Jared sent Paco drafts of an integration agreement and a licensing agreement, but explained the drafts "have not been reviewed by legal counsel," so "there may be adjustments from our side once reviewed by counsel." Pl. Ex. 218. The draft licensing agreement did not include a specific amount for the license, as Jared felt the parties still "need[ed] to come to terms on" that issue. Id. It did include Collision's proposed five-year license term, however.

Paco responded on June 1, thanking Jared for the drafts and informing him that the "outcome [was] good" from Paco's internal meetings within Nokia. Pl. Ex. 112. Paco told Jared that the heads of two departments within Nokia had approved Paco's proposal of $20 million for a perpetual license. Nevertheless, Paco said that a $20 million license on top of a $3 million NRE fee was "a bold number," so he needed "to fund the case moving to higher layers . . . to release budget beyond [Nokia's] annual plan." Id. Paco identified Nokia mobile networks president Marc Rouanne and "possibly" Nokia chief executive officer Rajeev Suri as these "higher layers." Id.

III.    <u>The June 6 Phone Call and Its Aftermath</u>

Paco and Jared spoke over the telephone on June 6, 2017. They were the only ones on the call, and their diverging accounts of what transpired on that call are the heart of this lawsuit. According to Jared, Paco informed Jared that he had received all the approvals from within Nokia that he needed to formally extend Nokia's offer to Collision. In response, Jared accepted Nokia's offer on Collision's behalf. Stan and Jared therefore believed that they had entered into a binding, $23 million oral contract with Nokia for the integration and licensing of Collision's technology. By contrast, Paco testified that he did not recall whether he spoke with Jared on the phone on June 6 and that he never extended a formal offer to Collision the acceptance of which could have formed a binding contract.

In any event, following the June 6 call, Collision understood that the parties had reached an agreement, so its engineers continued to aggressively pursue the work necessary to integrate its technology into Nokia's base stations in order to meet the parties' target release date in early 2018. Collision also ceased most of its business development efforts to secure customers for its other technology, and it stopped marketing the technology it believed it had licensed to Nokia. Meanwhile, Paco and other Nokia employees communicated to Jared that they expected to have their written contract prepared and ready for signatures within a few weeks of June 6.

IV.    <u>The Parties' Relationship Breaks Down</u>

Nokia did not, however, provide Collision with a written contract within a few weeks of June 6. In the ensuing months, Nokia employees continually assured Stan and Jared that a written agreement was forthcoming. But it was not until November 2017 that Nokia presented Collision with a draft written contract. The draft contract was not consistent with the offer Paco had previously communicated to Stan and Jared. Instead of a $20 million payment for the license, the November 2017 draft contract proposed $7 million. In the time between the June 6 call and provision of the November draft contract, Nokia had analyzed the cost to develop its own version of Collision's technology and concluded that the cost would be $7 million. Therefore, Nokia's top executives believed that $20 million for the license was too high a price.

Collision refused to accept the $7 million figure. In the meantime, Collision continued the work it had begun for Nokia, and the parties attempted to find common ground. Ultimately, Nokia informed Collision in November 2018 that it was cancelling the project altogether. Having ceased its other business development efforts, and without a customer for its cellular technology, Collision was forced to lay off almost all its employees. Nokia did not pay Collision for any of the work it performed to integrate its technology into Nokia's base stations.

Collision thereafter instituted this action against Nokia. At trial, Collision pursued three claims: (1) breach of the June 6 oral contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) promissory estoppel. After a

ten-day trial, the jury returned a verdict in Collision's favor on its breach of contract

and promissory estoppel claims,[5] and awarded Collision $23 million in damages.

## DISCUSSION

Three issues remain pending after trial: (1) whether the June 6 contract

contained obligations that could not have been performed within one year,

triggering the statute of frauds; (2) if the contract contained such obligations,

whether it is nonetheless enforceable pursuant to the doctrine of part performance;

and (3) the applicability of the so-called "injustice" element of promissory estoppel

under New Hampshire law. All of these issues, in some form, present issues of law

that could not be resolved by the jury. More importantly for purposes of this order,

however, each issue presents difficult and potentially determinative questions of

New Hampshire law on which there is not binding precedent from the New

Hampshire Supreme Court. This court will outline those issues in turn below,

beginning with the statute of frauds.

I.      Statute of Frauds

Under New Hampshire's statute of frauds, "[n]o action shall be brought

. . . upon any agreement . . . that is not to be performed within one year from the

time of making it, unless such . . . agreement, or some note or memorandum thereof,

is in writing and signed by the party to be charged or by some person authorized by

him." RSA 506:2. "The statute of frauds . . . requires all agreements not to be

---

[5] Because the jury found for Collision on the breach of contract claim, it did not
return a verdict on the good faith and fair dealing claim.

performed within one year to be in writing and signed by the party to be charged."
Phillips v. Verax Corp., 138 N.H. 240, 245 (1994). The statute, however, renders
unenforceable "only those contracts which <u>cannot</u> be performed according to their
terms within a year from the time of their inception." Id. at 246 (emphasis added)
(quoting Davis v. Grimes, 87 N.H. 133, 135 (1934)). An oral agreement "will not run
afoul of the statute of frauds if it was <u>possible</u> for performance to be completed
within one year of the agreement without breach by either party." Proctor v.
MacDonald, 141 N.H. 621, 624 (1997) (emphasis added); accord, e.g., McLaughlin v.
Jones, No. 2020-0177, 2021 WL 861766, at *2 (N.H. Feb. 17, 2021) ("[T]he statute
does not apply when the agreement can be performed within one year without
breach by either party."); Restatement (Second) of Contracts § 130 cmt. a
(explaining that, under the "prevailing interpretation," the statute of frauds "covers
only those contracts whose performance cannot possibly be completed within a
year") [hereinafter "Restatement"]. This is true regardless of whether the parties
expected the contract's obligations to be performed within a year. Trexler's Marina,
Inc. v. P.F.C., Inc., No. CV-92-209-L, 1994 WL 258733, at *1 (D.N.H. Jan. 26, 1994)
(characterizing this proposition as "well settled" under New Hampshire law).

The court's discussion of this issue proceeds as follows. First, the court
explains the provisions of the June 6 contract that are relevant to the resolution of
Nokia's statute-of-frauds defense. Second, the court examines the obligations
imposed by the provisions identified. Third, the court discusses whether those
obligations could have been performed within one year.

A.    Relevant Provisions of the June 6 Contract

Under New Hampshire law, the applicability of the statute of frauds is a mixed question of law and fact. Tsiatsios v. Tsiatsios, 140 N.H. 173, 176 (1995). When the parties dispute whether a contract contained certain terms that could implicate the statute of frauds, the trier of fact determines whether the contract contained such terms. Peabody v. Wentzell, 123 N.H. 416, 418 (1983); Tsiatsios, 140 N.H. at 176. The court then determines whether the statute of frauds applies based on the jury's findings. Tsiatsios, 140 N.H. at 176.

In this case, because Collision's contractual claims were premised upon the existence of an oral contract, it was clear to the court and the parties prior to trial that resolution of Nokia's statute-of-frauds defense would require the jury to make express factual findings regarding the terms of the June 6 contract (to the extent the jury found that such a contract existed). See doc. no. 270 at 1-2 (Collision's opposition to Nokia's proposed jury instructions, asserting that the jury should "be asked to make fact[ual] findings about any terms that Nokia contends put the agreement within the statute of frauds" and that the court should then "determine whether the terms—as found by the jury—could have been performed within one year"); doc. no. 278 at 1 (Nokia's response to Collision's opposition, agreeing with the division of labor between jury and judge requested in Collision's opposition); doc. no. 297 at 5-9 (transcript of pretrial hearing, where court stated that Collision's request was correct under New Hampshire law, that the court would adopt Collision's request, and the parties reiterated their agreement). Indeed, the court issued an endorsed order prior to trial registering its concern about the complexity

of the task before the jury and directing the parties to appear for a hearing the following day to discuss "the specific factual findings . . . the jury will need to make" to enable the court to resolve Nokia's statute-of-frauds defense. Endorsed Order of Feb. 20, 2024.

At the hearing, the court explained that, because Nokia was the party raising the statute of frauds as an affirmative defense, it "really has to be Nokia" making clear the contractual terms it believed triggered the statute of frauds, so that the jury could determine whether the contract contained those terms. Doc. no. 334 at 3. In response, Nokia made clear that "there's only a need to ask perhaps two questions" of the jury: (1) whether the contract contained a perpetual license, and (2) whether the contract contained a perpetual product support agreement. Id. at 4-5. Indeed, Nokia took the position that "that's all we would need to satisfy . . . th[is] statute of frauds" issue. Id. at 5. In response, Collision conceded that the June 6 contract contained a perpetual license but disputed whether it contained a perpetual product support agreement. See id. at 10-11. Based on the parties' positions, the court asked the jury to make only a single finding as to the content of the June 6 contract: whether it contained a perpetual product support agreement. See doc. no. 319 (special verdict form). The jury answered that question in the negative. See id. For these reasons, the only provision relevant to whether the statute of frauds applies to the June 6 contract is the perpetual license granted by Collision to Nokia pursuant to that contract. Doc. no. 334 at 4-5; see doc. no. 319.

Despite contending prior to verdict that only two components of the June 6 contract implicated the statute of frauds, Nokia strives mightily post-verdict to persuade the court that the contract contained numerous additional provisions implicating the statute of frauds. Nokia posits that the June 6 contract contains all of the proposed terms in the draft agreements Jared provided to Paco on May 30, and that many of those terms impose obligations that cannot be fulfilled within one year.

Nokia's argument is waived because it was not timely raised. See, e.g., SBA Towers II, LLC v. Town of Atkinson, Civ. No. 09-cv-447-LM, 2010 WL 5185108, at *1 (D.N.H. Dec. 15, 2010). Not only was Nokia on notice that the jury would decide whether the June 6 contract contained terms that potentially implicated the statute of frauds—Nokia expressly agreed with that approach. Prior to trial, the court asked Nokia in no uncertain terms what findings the jury needed to make to resolve Nokia's statute-of-frauds defense. And, despite numerous charging conferences to discuss the court's proposed jury instructions and the special verdict form, Nokia never asserted at such charging conferences that the jury needed to determine whether the June 6 contract included some or all of the terms contained in the May 30 draft agreements. Since Nokia made no such requests, the jury made no such findings. The court cannot now reconvene the jury. Because Nokia only raised this argument after the jury rendered its verdict, Nokia's argument is waived.[6] See id.

---

[6] For the same reason, Nokia's post-verdict argument that the June 6 contract contained a provision granting Nokia exclusivity for one year from the date an

Nokia contends that there is no need for the trier of fact to resolve whether the June 6 contract incorporated the May 30 draft agreements because Collision and its witnesses conceded as much at trial. Nokia is incorrect—neither Stan nor Jared Fry gave any testimony which could be interpreted as such a concession. Stan and Jared Fry did both testify as to the circumstances surrounding the May 30 draft agreements and their provision to Nokia. Stan testified that the draft agreements contained the "material terms" of the parties' agreement but also contained "lots of boilerplate" that Jared found in some of Nokia's prior agreements, and that "otherwise [Jared] used language from [Collision's] previous agreements." Doc. no. 335 at 19-20. According to Stan, "there wasn't an absolute" that the parties would use the May 30 draft agreements as the basis to formalize the parties' contract. Id. at 58. Jared testified similarly. See doc. no. 336 at 116-17; see also Pl. Ex. 218 (May 30 email from Jared to Paco containing draft agreements, stating that "[t]hese have not been reviewed by legal counsel on our side yet," "there may be adjustments from our side once reviewed by counsel," "there are still some holes and areas that could be improved upon here," and "this is very much the first attempt at

---

integrated base station containing Collision's technology became commercially available is unavailing. Whether the contract contained such a term is an issue of fact for the jury. The parties disputed at trial whether the exclusivity component of the June 6 contract began running from the time of the contract's execution or the time of productization. Despite numerous opportunities to do so, Nokia never asserted before or during trial that the jury needed to determine the existence or contours of any exclusivity provision in the June 6 contract to enable the court to resolve the statute of frauds issue.

[d]rafts"). Neither witness, however, testified that the parties' ultimate contract contained every term within the May 30 drafts.

Thus, the only provision relevant to whether the statute of frauds applies to the June 6 contract is the perpetual license granted by Collision to Nokia pursuant to that contract. The court next examines the obligations imposed by the perpetual license.

### B.    Obligations Imposed by the Perpetual License

Nokia asserts that the obligations imposed upon Collision by the perpetual license could not have been performed within one year, and that the contract, as a whole, is therefore unenforceable. See Restatement § 130(1) (explaining that, "[w]here any promise in a contract cannot be fully performed within a year from the time the contract is made, all promises in the contract are within the Statute of Frauds"); Emery v. Smith, 46 N.H. 151, 155 (1865) ("[A] note or memorandum is necessary if any part of the agreement is not to be performed within a year."). Collision asserts that the obligations imposed by the perpetual license could have been fully performed within a year of June 6, such that the statute of frauds does not apply. Resolution of this dispute requires the court to determine the obligations imposed upon Collision by the perpetual license.

This case is unusual in that the license at issue was contained within an oral contract, the scope of which remains largely undefined despite the jury's verdict. The jury found that the parties entered into a contract on June 6, and that the contract did not contain a perpetual product support agreement. For purposes of the

statute of frauds, the parties have stipulated that the June 6 contract (to the extent it existed) contained a perpetual license. The jury was not asked to make additional findings about the scope of the license or what it required of Collision or Nokia. Modern licensing agreements are usually "comprehensive agreement[s] setting forth a variety of rights, obligations, and terms and conditions governing an ongoing commercial relationship." Esoterix Genetic Lab'ys LLC v. Qiagen Inc., 133 F. Supp. 3d 349, 363 (D. Mass. 2015). Here, however, the court is without the benefit of a comprehensive, written licensing agreement defining the obligations imposed upon Collision. The only factual findings available to guide the court's analysis of whether the June 6 contract comes within the statute of frauds are that (1) it contained a perpetual license (2) but not a perpetual product support agreement. And all the court knows about the perpetual license is just that—it was a perpetual license.

Against this backdrop, the logical question is: what is an intellectual property license under New Hampshire law?[7] Scant guidance from the New Hampshire Supreme Court is available. While that court's jurisprudence on licenses in the real property context is well-developed, see, e.g., Waterville Ests. Ass'n v. Town of Campton, 122 N.H. 506, 509 (1982), the parties have not cited any New Hampshire caselaw sketching the contours of an intellectual property license, and the court's own research has revealed none.

_____

[7] It is undisputed by the parties that New Hampshire law governs all three certified questions.

The usual definition of a "license" is "permission . . . to commit some act that would otherwise be unlawful." License, Black's Law Dictionary (12th ed. 2024); see also Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1167 n.35 (1st Cir. 1994) (noting this definition), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnik, 559 U.S. 154 (2010); Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1031 (Fed. Cir. 1995) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent." (quoting Western Elec. Co. v. Pacent Reproducer Corp., 42 F.2d 116, 118 (2d Cir. 1930))). This usual definition extends to the intellectual property context. See Data Gen., 36 F.3d at 1167 & n.35; Rachel Gader-Shafran, Intellectual Property Law Dictionary Part II-26 (2013) (defining "license" as "permission to use an intellectual property right within a defined time, context, market line, or territory").

Historically, intellectual property licenses have been viewed as "no more than covenants not to sue: the license waives the licensor's right to sue the licensee for infringing actions but does no more than that." Raymond T. Nimmer & Jeff C. Dodd, Modern Licensing Law § 1:6 (Apr. 2023 update) [hereinafter "Nimmer & Dodd"]; see, e.g., Gen. Talking Pictures Corp. v. Western Elec. Co., 304 U.S. 175, 181 (a patent license is a "mere waiver of the right to sue" (quotation omitted)), aff'd on reh'g, 305 U.S. 124 (1938); Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed. Cir. 1987) ("[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee . . . [e]ven if couched in terms of

'licensee is given the right to make, use, or sell X . . . .'" (brackets omitted)). Thus, "[a] 'pure' intellectual property license is a contract consisting solely of a grant of rights or a covenant not to sue the licensee for conduct that would otherwise infringe an intellectual property right controlled by the licensor (e.g., 'Licensee may use Patent # 111003221.')." Nimmer & Dodd, <u>supra</u> § 1A:9.

From this conception, the next question is what obligations remain to be fulfilled by a licensor after the license is granted. One could argue that, upon conferral of the license to the licensee, nothing remains to be done by the licensor. <u>See</u> <u>id.</u> § 3.60 (explaining that, where the license is not tied to additional obligations such as the payment of ongoing royalties, the predominant statute of frauds "issue will be whether one views the license as fully performed when granted"). Some bankruptcy courts have so held when determining whether a licensing contract remains executory within the meaning of 11 U.S.C. § 365. <u>See</u> In re Gencor Indus., Inc., 298 B.R. 902, 912 (Bankr. M.D. Fla. 2003); In re Stein & Day Inc., 81 B.R. 263, 264, 266 (Bankr. S.D.N.Y. 1988).

In <u>Gencor</u>, for example, the court held that the covenant not to sue inherent in a licensing agreement does not create an ongoing obligation on the part of the licensor, and that the breach of such a covenant would not constitute a material breach of the licensing agreement. Gencor, 298 B.R. at 912; <u>see also</u> id. at 909 (explaining that a contract is executory for purposes of 11 U.S.C. § 365 only if "both parties have unperformed obligations that would constitute a material breach if not performed"). Instead, the court reasoned, the license merely "provides a defense to

the licensee if the licensee is sued for allegedly exceeding the scope of the license." Id. at 912. Similarly, in Stein & Day, an author provided the publisher of his book with the exclusive right to print, publish, sell, and license others to sell his work. 81 B.R. at 264. The bankruptcy court held that, after the author conferred these rights upon the publisher, he had no further obligations that if left unperformed would constitute a material breach. Id. at 266. If the license in this case is viewed in such a manner, the statute of frauds is seemingly inapplicable: after granting Nokia the license on June 6, no obligation remained for Collision to perform. The license simply conferred upon Nokia a defense to an infringement suit.

However, and as noted, these cases concern whether a license or similar agreement imposes an ongoing obligation upon the licensor which, if unperformed, would constitute a material breach of contract. A material breach of contract differs from an ordinary breach of contract. See, e.g., 23 Williston on Contracts § 63:3 (4th ed.) [hereinafter "Williston"]. An ordinary breach of contract "occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Lassonde v. Stanton, 157 N.H. 582, 588 (2008) (brackets omitted) (quoting Poland v. Twomey, 156 N.H. 412, 415 (2007)). By contrast, a breach of contract "is 'material' if: (1) a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions; (2) the breach substantially defeats the contract's purpose; or (3) the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract." Found. for Seacoast Health v. Hosp. Corp. of Am.,

165 N.H. 168, 182 (2013) (quotation omitted). Any breach of contract may result in liability on the part of the breaching party, but a material breach discharges the nonbreaching party from further performance and may prevent the party in material breach from recovering damages resulting from any nonmaterial breach of the other party. Williston, supra § 63:3.

Thus, cases such as Gencor and Stein & Day are perhaps best understood as holding not that the licensor owes no ongoing obligation to the licensee, but only that the covenant not to sue inherent in a license does not give rise to an obligation that, if breached by the licensor, would constitute a material breach of contract. Other courts have distinguished Gencor on this basis. See, e.g., In re W.B. Care Ctr., LLC, 419 B.R. 62, 73 (Bankr. S.D. Fla. 2009).

But even if Gencor is best read as holding that the grant of a license imposes no ongoing obligation upon the licensor, the majority of courts reach a contrary conclusion. The majority rule appears to be that a licensor "owes significant continued performance to the licensee: it must continue to refrain from suing it for infringement." Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.), 89 F.3d 673, 677 (9th Cir. 1996); see In re Patient Educ. Media, Inc., 210 B.R. 237, 241 (Bankr. S.D.N.Y. 1997) (noting that this is the majority rule); cf. Institut Pasteur v. Cambridge Biotech Corp., 104 F.3d 489, 490 & n.2 (1st Cir. 1997) (noting the parties' agreement that intellectual property cross-licenses imposed substantial ongoing obligations), abrogated in part on other grounds by Steel Co. v. Citizens For A Better Env't, 523 U.S. 83 (1998). In other words, even if the conveyance of a

license does not impose an <u>affirmative</u> obligation upon the licensor to undertake any particular action, the license imposes an ongoing <u>negative</u> obligation to <u>refrain</u> from taking a certain action—suing the licensee.

New Hampshire recognizes the executory nature of covenants not to sue. In Pro Done, Inc. v. Basham, 172 N.H. 138 (2019), the New Hampshire Supreme Court held that a covenant not to sue constitutes an ongoing, executory obligation, the breach of which may form the basis for a breach of contract action. 172 N.H. at 143. In contrast to a "release," which New Hampshire recognizes to be an immediate and "absolute extinguishment of a debt or obligation," a "covenant not to sue constitutes an agreement or promise of future forbearance." <u>Id.</u> "Thus, instead of extinguishing a claim, a covenant not to sue 'recognizes the continuation of the obligation or liability.'" <u>Id.</u> (quoting Stateline Steel Erectors v. Shields, 150 N.H. 332, 338 (2003)).

Given the historical understanding of the nature of intellectual property licenses, as well as <u>Pro Done</u>, this court predicts that the New Hampshire Supreme Court would hold that the grantor of an intellectual property license is subject to an ongoing obligation to refrain from suing the licensee for use of the property within the scope of the license for the duration of the existence of the license—though, technically speaking, there does not appear to be controlling New Hampshire precedent on this issue.

C.    <u>Possibility of Performance Within One Year</u>

It is at this point that the analytical signposts blur markedly. As a commonsense matter, one might think it straightforward that a perpetual negative

obligation (such as a perpetual covenant not to sue) by definition cannot be performed within a year—because the promisor must refrain from taking the forbidden action forever. Nokia cites numerous cases which have so concluded. See, e.g., Roberto Coin, Inc. v. Goldstein, No. 18-CV-4045(EK)(ST), 2021 WL 4502470, at *14 (E.D.N.Y. Sept. 30, 2021) (perpetual license could not be performed within a year); Nelson v. Peregrine Sports, LLC, No. 3:17-cv-1718-PK, 2018 WL 4524103, at *8 (D. Or. Apr. 26, 2018) ("[A]s a matter of Oregon law perpetual agreements, definitionally being agreements that cannot be performed within one year of their execution, are necessarily subject to the statute of frauds . . . ."), R&R adopted in pertinent part, 2018 WL 3129313 (D. Or. June 26, 2018); Auto. Prot. Corp. v. Jones, No. 1:04-CV-2368-WBH, 2007 WL 9747254, at *10 (N.D. Ga. Jan. 29, 2007) ("Oral agreements for perpetual contracts are subject to the statute of frauds.").

However, "[i]t has been repeatedly held that, if an agreement whose performance would otherwise extend beyond a year may be completely performed within a year on the happening of some contingency, it is not within the statute of frauds." Williston, supra § 24:3 (quoting Carnig v. Carr, 46 N.E. 117, 118 (Mass. 1897)); see, e.g., Loan Modification Grp., Inc. v. Reed, 694 F.3d 145, 150 (1st Cir. 2012) (applying Massachusetts law). The New Hampshire Supreme Court has long adhered to this view. See Blanding v. Sargent, 33 N.H. 239, 245-46 (1856) ("If by its terms, or by reasonable construction, the contract can be fully performed within a year, although it can be done by the occurrence of some contingency by no means likely to happen; . . . the statute has no application, and no writing is necessary.").

For example, where "the death of some party or person referred to in the contract" within a year of the contract's formation would result in the obligation's performance, the statute of frauds is inapplicable. Id. In this case, Collision contends that, despite the perpetual license, the statute of frauds does not apply because it could have dissolved within a year of the parties executing the June 6 contract.

The principle that the death of a party (or a person to whom a contractual obligation relates) may equate to performance of the obligation is well entrenched in New Hampshire law. For example, in 1921, the New Hampshire Supreme Court held in the case of Cox v. Pinkham, 80 N.H. 134 (1921), that a contract whereby a minor would provide services to the defendant in exchange for the defendant paying for the minor's support and care was not within the statute of frauds. 80 N.H. at 134-35. "[W]here the personal element enters into the contract," the Court explained, the statute of frauds does not apply because such contracts "might be completed within a year, without breach by either party, upon the cessation of some life to which the contract related." Id. at 135. While acknowledging that this principle does not apply to every contract, the Court explained that "contracts for support and education come under the principle that upon the death of the party to be supported the contract has been fully performed." Id. Because the boy could have died within a year, the contract was outside the statute of frauds. See id.

The Cox Court stated that "[i]n principle the present case is exactly like Martin v. Batchelder," 69 N.H. 360 (1898). Martin involved an oral agreement

pertaining to a horse whereby the defendant "was to keep the horse [for] a year" in exchange for the right to use the horse. 69 N.H. at 360. Applying the principle that, if the "contract can be fully performed . . . [by] the death of some party or person referred to in the contract, the statute [of frauds] has no application," the Court held that this contract was not within the statute of frauds because "the agreement would have been fully performed" if "the horse—the subject of the contract in this case—had died within the year after the agreement was made." Id. at 361. "Upon the happening of this event, [defendant] would have had the use of the horse for as long as the contract entitled him to it under the circumstances, and the plaintiff would have received full compensation therefor. Nothing would remain to be done by either party." Id.

Cox and Martin are consistent with the Restatement. The Restatement recognizes that the death of a party, or the death of the subject of the contract, "may be the equivalent of performance" in some circumstances. Restatement § 130 cmt. b. Thus, when "A, the maternal grandmother of a new-born illegitimate child, agrees with B, the father, that A will care for the child and B will make support payments until the child becomes 21 years old," the agreement is outside the statute of frauds because, "[i]f the child dies within a year, the primary object of furnishing necessaries to the child will be fully 'performed.'" Restatement § 130 cmt. b, illus. 8.

It is important to remember in all this, however, that a contract is taken outside the statute of frauds when it is possible for all obligations in the contract to be fully performed within one year without breach by either party. E.g.,

McLaughlin, 2021 WL 861766, at *2. Both the Restatement and Williston

distinguish contracts in which a death is "the equivalent of performance" from

contracts in which a death is an "excuse for nonperformance." Restatement § 130

cmt. b; Williston, supra § 24:10 (noting that courts often erroneously "fail to

distinguish between performance and an excuse for nonperformance"). The line

between the two is often fine; "it depends on the terms and the circumstances,

particularly on whether the essential purposes of the parties will be attained."

Restatement § 130 cmt. b. Thus, for example, if an employee promises to work for

an employer for five years in exchange for an agreed-upon salary, the possibility

that the employee could die within a year does not take the contract outside the

statute because, if the employee died within a year, the employer would not have

received the promised performance—five years' work. Id. cmt. b, illus. 5. By

contrast, if an employee promises to work for an employer for the duration of the

employee's life in exchange for an agreed-upon salary, the possibility of the

employee's death within a year removes the contract from the statute of frauds;

having worked for the employer for the remainder of his life, the obligation has been

fulfilled. Id. cmt. a, illus. 2.

New Hampshire recognizes the distinction between contracts in which a

death is the equivalent of performance from contracts in which a death excuses

nonperformance. In Emery v. Smith, 46 N.H. 151 (1865), the New Hampshire

Supreme Court held that an oral contract to work for an employer for two years was

within the statute of frauds "because it was not to be performed within a year." 46

N.H. at 151. And Cox distinguished Emery from the support agreement there at issue because, in Emery, "nothing but the rendition of the service could be considered performance." 80 N.H. at 135. But in Blanding, the court held that an agreement that the defendant would no longer work as a physician—i.e., a perpetual promise to forbear—was not within the statute of frauds because, "if the defendant had died within a year from the making of the contract, having kept his agreement while he lived, his contract would have been fully performed." 33 N.H. at 239, 245-46.

Against this backdrop, Collision contends that the perpetual license is outside the statute of frauds because it could have dissolved within a year of the June 6 contract's formation, and its dissolution would result in the performance of its obligation to perpetually refrain from suing Nokia.[8] If the foregoing discussion of

---

[8] Collision also contends that Nokia's dissolution would equate to performance. But Nokia is incorporated in Finland; therefore, its dissolution is governed by Finnish law. Federal Rule of Civil Procedure 44.1 governs determinations of foreign law. Under that rule, "the court is free to insist on a complete presentation" of foreign law from the party raising the issue. Fed. R. Civ. P. 44.1, adv. comm. notes; see also 9A Arthur R. Miller, Federal Practice & Procedure: Civil § 2444 (3d ed.) ("The rule recognizes that judges are reluctant to research and determine foreign law without some assistance from the attorneys and Rule 44.1 does not obligate them to undertake that burden."). In support of its contention, Collision has provided this court with three pages excerpted from an unknown and uncertified document that purport to translate sections of a Finnish act to English. See doc. no. 360-7. Collision has not provided this court with other authorities on Finnish law, such as an affidavit from an expert in Finnish law. See, e.g., Hartford Fire Ins. Co. v. CNA Ins. Co. (Europe) Ltd., 678 F. Supp. 2d 1, 8 (D. Mass. 2010); see also Miller, supra § 2444 (noting that expert testimony generally comprises "the basic mode of proving foreign law"). Collision's argument as to the circumstances in which Finnish law permits a corporation to terminate its corporate existence is insufficiently developed and is therefore not entitled to further consideration at this juncture. See United States v.

New Hampshire law represented the universe of relevant issues, Collision may well be right. But several issues remain unresolved.

First, to this court's knowledge, the New Hampshire Supreme Court has never extended this "death-is-the-equivalent-of-performance" exception to corporations. According to Williston, this exception "has been applied to promises of unlimited duration made by or to a corporation when performance of the promise is, by its nature, limited to the life of the corporation or the continuance of its business." Williston, supra § 24:5; see also, e.g., Loan Modification Grp., 694 F.3d at 150; Manwaring v. Martinez, 527 F. App'x 390, 397 (6th Cir. 2013); Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc., Civ. No. 09-cv-405-JL, 2012 WL 27917, at *6 n.6 (D.N.H. Jan. 5, 2012). But the New Hampshire Supreme Court has seemingly not yet adopted this view. And there are important differences between the death of a natural person and corporate dissolution.

Perhaps the most obvious difference is that a natural person's death is instantaneous, whereas corporate dissolution does not mark the immediate end of the corporation's life. This was not always the case. "Under the common law, the term 'dissolution' when applied to a corporation was defined as the extinguishment of its franchise and the termination of its corporate existence." 16A Fletcher Cyclopedia of the Law of Corporations § 7966 (Sept. 2024 update) [hereinafter "Fletcher"]. Upon dissolution, the corporation "ceased to exist for all purposes

---

Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . .").

. . . and accordingly could not sue or be sued." Id. § 8144. "Modern corporation law has reversed the view that dissolution is analogous to death, as modern corporation statutes authorize," or even require, "a dissolved corporation to continue its corporate existence for the purpose of winding up and liquidating its business and affairs, and all states provide for survival of remedies for a specified period of time after dissolution." Id. § 7966. As a general matter, the dissolved corporation's existence terminates only once it completes winding up its affairs—though the process for the termination of corporate existence post-dissolution differs somewhat from state to state. Id. § 8142.

Collision, while a New Hampshire-based entity, is incorporated in Delaware. See doc. no. 54 ¶ 11. Delaware law therefore governs its ability to dissolve as well as its post-dissolution capacity to sue and be sued. See Del. Code Ann. tit. 8, §§ 106, 121(b); Fed. R. Civ. P. 17(b)(1) (providing that a corporation's capacity to sue or be sued is determined "by the law under which it was organized"). A Delaware corporation may voluntarily dissolve upon the filing of a certificate of dissolution with the Secretary of State. Del. Code Ann. tit. 8, §§ 275, 103. However, in Delaware and elsewhere, dissolution does not terminate the corporation's existence. Id. § 278. To the contrary: "[a]ll corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct." Id. "Dissolution marks the start of the winding-up period: a three-year extension of the corporation's existence in which

the entity organizes its affairs in order to close." Gurney-Goldman v. Goldman, 321 A.3d 559, 582 n.69 (Del. Ch. 2024). For the three-year, post-dissolution extension of corporate existence, the corporation continues as a

> bod[y] corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized.

Del. Code Ann. tit. 8, § 278. "At the end of the winding-up period, the corporation's existence terminates. Termination means what it says: the end of the corporation's separate legal existence." Gurney-Goldman, 321 A.2d at 582 n.69.

From the foregoing, one can see that, even if Collision had immediately dissolved after entering into the June 6 contract with Nokia, it would have continued to exist for <u>at least</u> three years to wind up its affairs, and, pursuant to statute, would have had the power to sue. Thus, Collision's immediate dissolution would not have equated to the performance of the perpetual covenant not to sue, because Collision would have had to continue to fulfill its obligation not to sue Nokia during the three-year wind-up period mandated by Delaware law.

One would be forgiven for thinking the matter settled at this point—the possibility of Collision's immediate dissolution does not take the June 6 contract outside the statute of frauds because Collision's dissolution would not be the equivalent of performance of the perpetual license. But even still, further complications exist. Collison makes several counterarguments that its immediate

dissolution would nonetheless equate to performance of the June 6 contract despite the three-year mandatory wind-up period under Delaware law—some of which are easy to dispatch, some less so.

Beginning with the easily dispatched counterarguments, Collision points out that the three-year wind-up period set forth in § 278 does not allow the dissolved corporation to "continu[e] the business for which the corporation was organized," but rather, only permits them "to settle and close their business." Del. Code Ann. tit. 8, § 278. Collision contends that its corporate purpose is to develop and license its technology, and that suing Nokia for allegedly improper use of licensed technology would therefore be impermissible under § 278. This argument is a red herring. The import of § 278 is that it provides dissolved corporations with the capacity to sue during the three-year wind-up period. Capacity to sue is "a party's personal right to come into court," and does not relate to "whether a party has an enforceable right or interest" once in court. 6A Mary Kay Kane, Federal Practice & Procedure: Civil § 1559 (3d ed.). Phrased differently, "capacity is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate and typically is determined without regard to the particular claim or defense being asserted." Id. Even if Collision would have no enforceable right in an infringement suit against Nokia because of § 278, the statute nevertheless gives Collision the power to bring such a suit. See id.; see also Fletcher, supra § 3424 (explaining that "a corporation has the capacity, even if it does not have the authority, to do an ultra vires act"); id. § 3399 ("An ultra vires act or contract . . . is one not within the

express or implied powers of the corporation as fixed by its charter, governing statutes, or the common law."). Because § 278 would give Collision the capacity to sue during wind-up, Collision's immediate dissolution would not equate to performance of the perpetual license.

Even more easily dispatched is Collision's argument that, setting dissolution aside, it would have fully performed its obligation under the perpetual license if, after the June 6 contract's formation, "Nokia informed Collision that Nokia had decided never to use" the technology it licensed from Collision. Doc. no. 360 at 4. According to Collision, "if Nokia was not using Collision's licensed technology, there would be no basis for a lawsuit and nothing for Collision to forbear from doing." Id. at 5. Like Collision's previous argument, this argument misunderstands the law. Collision's obligation to refrain from suing Nokia exists regardless of whether Collision would be successful in an infringement suit. Even if Nokia never used Collision's technology, Collision would still be required to forbear from suing Nokia. Nokia electing to inform Collision that it never planned to use Collision's technology would not equate to performance of Collision's obligation to forbear from suing Nokia—it would just make it less likely that Collision would decide to bring suit.

Now comes the more difficult counterargument, which presents nuanced questions of New Hampshire law. Collision notes that Delaware allows for a corporation incorporated in that state to change its state of incorporation. See Del. Code Ann. tit. 8, § 266(a). The corporation need only file "a certificate of conversion to [a] non-Delaware entity" with the Secretary of State's office, and, having done so,

"the corporation shall cease to exist as a corporation of this State." Id. §§ 266(d); 103(d). Under New Hampshire law, a corporation can voluntarily dissolve on the date it files articles of dissolution, and New Hampshire has no mandatory minimum wind-up period. See RSA 293-A:14.03, .05. Therefore, Collision posits, it could transfer its state of incorporation to New Hampshire, immediately dissolve, and then complete its wind-up within a year, terminating its corporate existence.

Collision's argument appears meritorious. Nokia does not dispute that Collision could convert its state of incorporation from Delaware to New Hampshire, or that New Hampshire law would then govern Collision's post-conversion dissolution. To dissolve under New Hampshire law, the corporation need only adopt a proposal to dissolve and deliver articles of dissolution to the New Hampshire Secretary of State's office. See RSA 293-A:14.02-.03. "A corporation is dissolved upon the effective date of its articles of dissolution." RSA 293-A:14.03(b). And, while "[a] dissolved corporation continues its corporate existence" for the purpose of "doing every . . . act necessary to wind up and liquidate its business and affairs," RSA 293-A:14.05(a), and a dissolved corporation retains capacity to sue and be sued, RSA 293-A:14.05(c)(5), New Hampshire's corporate code does not contain a mandatory three-year wind-up period that is analogous to the Delaware provision.

But here too, unresolved questions of New Hampshire law remain. First, New Hampshire's corporate code does not specify when a corporation's existence terminates post-dissolution. See generally RSA 293-A:14. Collision assumes that corporate existence under New Hampshire law terminates upon completion of the

wind-up process, but that is not necessarily a foregone conclusion. The New Hampshire Supreme Court has held in the partnership context that a partnership "ceases to exist" after winding up is completed. Miami Subs Corp. v. Murray Fam. Tr., 142 N.H. 501, 512 (1997). But New Hampshire's partnership code contains a statute expressly providing that a partnership's existence terminates once "the winding up of partnership affairs is completed." RSA 304-A:30. And other provisions in New Hampshire's corporate code indicate that there may be some time-based constraints on a corporation's ability to complete the wind-up process or to otherwise terminate its existence. See RSA 293-A:14.06(b), (c)(2); RSA 293-A:14.07(b)(3), (c).

Moreover, New Hampshire appears to adhere to "the equitable rule that former shareholders succeed to the assets of a dissolved corporation," at least with respect to some categories of assets. Jenot v. White Mountain Acceptance Corp., 124 N.H. 701, 708 (1984). In Jenot, the Court held that a shareholder of a defunct corporation could foreclose on a mortgage and seek to enforce a promissory note given to the corporation because "the right to the mortgage and the promissory note automatically descend[ed] to the former shareholders" when the corporation failed to enforce or assign its rights under the mortgage and promissory note within the wind-up period that was then applicable.[9] Id. at 707. This result stemmed from the Court's acceptance of "the principle in equity that at dissolution of a corporation the

---

[9] At the time Jenot was decided, New Hampshire law contained a mandatory three-year wind-up period akin to the Delaware provision currently in effect. See Jenot, 124 N.H. at 707.

equitable right to a distributable share of the corporation's assets vests in the respective shareholders . . . and will be so distributed by a court of equity when no other mode of distribution is provided." Id. at 706 (quoting Fletcher, supra § 8134); see also Town of Hampton v. Hampton Beach Improvement Co., 107 N.H. 89, 94 (1966) (stating the Court's adherence to this principle). The Court further held that the shareholder's rights in the mortgage and note were "no different from that which he would have acquired by assignment." Jenot, 124 N.H. at 709.

While Collision appears to contend that it need not assign its rights to its technology as part of the wind-up process (in Delaware or New Hampshire), Jenot appears to hold that shareholders to New Hampshire corporations "acquire[ ] by operation of principles in equity" those corporate assets which are not liquidated to satisfy corporate debts or otherwise assigned during the wind-up process. Id. In these circumstances, the shareholder's rights in the corporate asset are no different than if she had received the asset outright via an assignment. Id.

In addition, "[i]t is a longstanding principle," of federal law at least, "that an assignee of a patent takes the patent subject to prior licenses . . . whether or not [the] assignee had notice." Innovus Prime, LLC v. Panasonic Corp., No. C-12-00660-RMW, 2013 WL 3354390, at *5 (N.D. Cal. July 2, 2013). This is because "[p]atent owners cannot transfer an interest greater than what they possess, so assignees 'take a patent subject to the legal encumbrances thereon.'" Id. (brackets omitted) (quoting Datatreasury Corp. v. Wells Fargo & Co., 522 F.3d 1368, 1372 (Fed. Cir. 2008)). "Thus, assignment results in the assignee 'stepping into the shoes [of the

assignor] with regard to the rights that the assignor held and not in an expansion of those rights.'" Id. (quoting Medtronic AVE, Inc. v. Advanced Cardio. Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001)).

This would all suggest that, even if Collision wound up within a year, it would have to distribute its rights in its technology either via outright assignment or distribution, see RSA 293-A:14.09(a) ("Directors shall cause the dissolved corporation to . . . make distributions of assets to shareholders after payment or provision for claims" (emphasis added)), or else its shareholders would automatically acquire such rights by operation of equitable principles, see Jenot, 124 N.H. at 707-09. In other words, the property interest in Collision's technology would necessarily pass to some other entity. Whoever ended up holding the rights to Collision's technology would take those rights subject to Nokia's license and would be required to forbear from suing Nokia for infringing the newly acquired technology. See Innovus Prime, 2013 WL 3354390, at *5. This would suggest that termination of Collision's corporate existence would not equate to the performance of the obligation contemplated by the license—since the entity that ended up with Collision's technology would be bound by the covenant not to sue.

But a further wrinkle arises because the rule discussed in Jenot—that corporate assets devolve to shareholders by operation of equitable principles if not assigned during the wind-up process—may not apply to all forms of corporate property. "[T]he classes of assets that courts have held devolve to shareholders upon dissolution are primarily interests in tangible real and personal property and

36

corporate claims asserted within the wind-up period." Hutson v. Fulgham Indus., Inc., 869 F.2d 1457, 1461 (11th Cir. 1989); accord Halliwell Assocs., Inc. v. C.E. Maguire Servs., Inc., 586 A.2d 530, 534-35 (R.I. 1991). The New Hampshire Supreme Court has held that at least some forms of corporate property, or at least rights held by a corporation, do not pass by operation of law to shareholders if not assigned during the wind-up process. See MBC, Inc. v. Engel, 119 N.H. 8, 12-13 (1979) (holding that defunct corporation's tort claims did not automatically devolve to shareholders; "[o]n these facts, we hold that equity will not intervene"). To this court's knowledge, the general rule discussed in Jenot has not yet been extended by the New Hampshire Supreme Court to intellectual property.

At the end of this analytical journey, "only one thing is clear: the law is not." Castagnaro v. Bank of N.Y. Mellon, 772 F.3d 734, 739 (1st Cir. 2014). Several unsettled areas of New Hampshire law impede resolution of Nokia's statute-of-frauds defense. Where, as here, "[t]he signposts . . . are more than modestly blurred," certification to the New Hampshire Supreme Court may be appropriate. Brady v. Sumski, 647 B.R. 835, 843 (D.N.H. 2022).

The dollar amounts involved in this case further counsel in favor of certification. See Easthampton Sav. Bank, 736 F.3d at 52. The jury found Nokia liable to Collision for $23 million in damages—a substantial award that "is surely an amount of significance to the parties." Richardson v. UPS Store, Inc., No. 18-cv-12338-ADB, 2019 WL 2578276, at *4 (D. Mass. June 24, 2019) (certifying question of law where $5.9 million was at issue). In addition, the statute of frauds and New

Hampshire's rules on contract enforceability involve areas of traditional state authority. See Phillips v. Equity Residential Mgmt., LLC, 844 F.3d 1, 7 (1st Cir. 2016) (certifying question of law regarding Massachusetts' security deposit law given that landlord-tenant law has historically been an area of state concern). When that is so, "considerations of federalism, comity, and practicality suggest that the state's highest tribunal is best positioned to make an informed and authoritative judgment." Acadia Ins. Co. v. McNeil, 116 F.3d 599, 605 (1st Cir. 1997).

For all of these reasons, this court proposes to certify the following question to the New Hampshire Supreme Court:

**Is it possible to perform within one year the obligations imposed by a perpetual intellectual property license where that license is granted by a Delaware corporation with a principal place of business in New Hampshire to a Finnish corporation?**

II.    Doctrine of Part Performance

If the statute of frauds does apply, the court must grapple with Collision's part-performance argument. "The part performance doctrine is a judicial device intended to prevent the terms of a formal statute from doing grave injustice." Winecellar Farm, Inc. v. Hibbard, 162 N.H. 256, 263 (2011) (quoting Greene v. McLeod, 156 N.H. 724, 728 (2008)). "The doctrine 'effectively withdraws contracts from the operation of the statute of frauds, when application of the statute would result in fraud or irreparable injury on the [party] who has performed his part of the agreement.'" Id. (quoting Greene, 156 N.H. at 728). Collision contends that, even

if the June 6 contract comes within the statute of frauds, it is nevertheless enforceable pursuant to this doctrine because Collision partially performed its contractual obligations and it would be unjust to leave Collision without a remedy.

Collision's argument, however, implicates an area of New Hampshire law that has recently become unsettled. The doctrine of part performance is often raised in oral contracts for the sale of real estate, which is governed by a separate statute of frauds than is at issue here. See Winecellar Farm, 162 N.H. at 263; RSA 506:1, :2. Historically, the New Hampshire Supreme Court has declined to apply the doctrine of part performance to contracts that cannot be performed within a year. See Emery, 46 N.H. at 155 ("[W]e are of the opinion that the execution of the agreement upon one side, whether partial or complete, does not take it out of the statute, but that a note or memorandum is necessary if any part of the agreement is not to be performed within a year."); McCrillis v. Am. Heel Co., 85 N.H. 165, 166 (1931) (oral contract that could not be performed within a year is unenforceable, "[a]nd performance in part or in full does not make an unenforceable contract enforceable").[10] New Hampshire's historical approach comports with the approach

---

[10] Both Emery and McCrillis state that neither partial nor full performance removes an oral contract that cannot be performed within a year from the statute of frauds. Other cases from around the same period, however, indicated that full performance of one party's obligations may remove an oral contract from the statute of frauds. See Blanding, 33 N.H. at 246. The New Hampshire Supreme Court cleared up this ambiguity as to full performance in McIntire v. Woodall, 140 N.H. 228, 231 (1995), where the court held that an oral contract which contains obligations that cannot be performed within one year may nevertheless be enforceable if one party can perform—and does perform—all their contractual obligations within a year. The doctrine of full performance is not at issue in this case.

set forth in the Restatement. Restatement § 130 cmt. e ("Part performance not amounting to full performance on one side does not in general take a contract out of the one-year provision.").

However, the New Hampshire Supreme Court seems to have departed from its historical approach in the recent case of <u>McLaughlin v. Jones</u>. <u>McLaughlin</u> was a small claims action to recover the balance due on a $7,000 loan. 2021 WL 861766, at *1. The plaintiff alleged that the defendant had asked her for a personal loan to pay off a credit card debt. <u>Id.</u> The plaintiff further alleged that the parties entered into an oral agreement that the plaintiff would loan the defendant the money and the defendant would pay her back, but the contours of the parties' agreement is otherwise unclear from the Supreme Court's order. <u>See id.</u> The trial court entered judgment for the plaintiff over the defendant's motion to dismiss on statute-of-frauds grounds. <u>Id.</u>

The Supreme Court affirmed. <u>Id.</u> at *2. Citing <u>Byblos Corp. v. Salem Farm Realty Trust</u>, 141 N.H. 726 (1997), which involved an oral contract for the sale of an interest in real estate, the <u>McLaughlin</u> Court stated that, "when certain factors, such as fraud, part performance, or other equitable considerations, are present, the trial court may dispense with the need for a written agreement." <u>Id.</u> (quoting <u>Byblos,</u> 141 N.H. at 731). The Supreme Court highlighted the trial court's finding that the defendant paid $1832.50 toward the loan balance. <u>See id.</u> In affirming, the Court "assume[d] that the trial court found that the statute of frauds did not apply, either because the agreement could have been performed within one year, or

because the defendant partially performed." Id. The Court held that the record supported both findings and that the trial court should therefore be affirmed. See id.

McLaughlin seems to be an abrupt departure from New Hampshire's traditional approach to the doctrine of part performance as applied to oral contracts that cannot be performed within one year. At the same time, McLaughlin does not cite Emery, McCrillis, or the Restatement. The New Hampshire Supreme Court "acknowledge[s] the reality that a case may be overruled sub silencio, [but] such a conclusion should not be reached except on inescapable grounds." Marshall v. Burke, 162 N.H. 560, 564-65 (2011) (citation omitted). It would seem all the more unusual for the Court to overrule longstanding precedent by implication in a non-precedential unpublished order. See N.H. Sup. Ct. R. 20(2); see also State v. Beattie, 173 N.H. 716, 724 (2020) (showing that the Supreme Court treats its unpublished orders as non-precedential).

Ultimately, although this issue is not as muddled as the statute of frauds issue, it is somewhat unclear given McLaughlin, and as this court is already certifying the statute-of-frauds question (as well as a question of law concerning the elements of promissory estoppel under New Hampshire law, see infra), judicial economy favors certification of the part performance issue too. See Adelson v. Harris, 774 F.3d 803, 811 n.4 (2d Cir. 2014) (explaining that court would certify "an uncertain issue of state statutory construction" given that court was "already certifying" a separate and more difficult issue, even though the less difficult issue

may not be appropriate for certification on its own); cf. Rodriguez v. Banco Central, Civ. No. 82-1835 JAF, 1990 WL 54820, at *1 (D.P.R. Jan. 25, 1990) (certifying five questions of law for interlocutory appeal where some of the legal issues presented by those questions were close ones), aff'd in part and vacated in part on other grounds, 917 F.2d 664 (1st Cir. 1990). If the June 6 contract comes within the statute of frauds, the applicability of the doctrine of part performance may determine whether Collision is able to recover some or all of the $23 million verdict. Moreover, as the New Hampshire Supreme Court's order in McLaughlin illustrates, this issue is important not just to sophisticated businesses like the parties in this case, but also to the people of New Hampshire who engage in small-scale, handshake transactions with friends, family members, and acquaintances. Thus, the factors militating in favor of certifying the statute-of-frauds issue counsel in favor of certifying this part-performance issue.

The court therefore proposes to certify the following question to the New Hampshire Supreme Court:

**Does the doctrine of part performance apply to oral contracts containing obligations that cannot be performed within one year?**

III.    Promissory Estoppel

Collision pursued a promissory estoppel claim at trial in the alternative to its breach of contract claim. As a general matter, promissory estoppel is an equitable remedy to enforce a promise where there is no contract between the parties. DiIorio-Sterling v. Capstone Mgmt., LLC, 596 F. Supp. 3d 306, 319-20 (D.N.H. 2022).

Promissory estoppel is also available "to enforce promises underlying otherwise defective contracts." Great Lakes Aircraft Co., Inc. v. City of Claremont, 135 N.H. 270, 290 (1992).

Prior to trial, the parties disputed whether, for a promise to be enforceable pursuant to a promissory estoppel theory under New Hampshire law, a plaintiff has to show that "injustice can be avoided only by enforcement of the promise." Restatement § 90(1). Nokia argued that promissory estoppel under New Hampshire law does contain this so-called "injustice" element, whereas Collision argued it does not. Both parties agreed, however, that if a plaintiff must demonstrate that enforcement of the promise is required to prevent injustice, whether a plaintiff has satisfied this element is a question of law.

At the time of the parties' dispute, the court indicated its belief, based on the First Circuit's opinion in Rockwood v. SKF USA Inc., 687 F.3d 1 (1st Cir. 2012), that New Hampshire law requires a plaintiff to satisfy this injustice element in order to succeed on a promissory estoppel claim. The court therefore instructed the jury on all elements of promissory estoppel except the injustice element and planned to resolve application of this element in the event the jury found for Collision on its promissory estoppel theory. As noted, the jury did find for Collision on promissory estoppel. However, after further consideration, the court now finds this area of New Hampshire law unsettled.

The Restatement provides that a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a

43

third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement § 90(1). In Rockwood, the First Circuit stated that "[t]he New Hampshire Supreme Court has adopted the definition of promissory estoppel from Section 90 of the Restatement (Second) of Contracts." 687 F.3d at 9. However, whether New Hampshire's promissory estoppel doctrine contained the Restatement's injustice element was not at issue in Rockwood. Indeed, the only real dispute regarding the contours of New Hampshire's promissory estoppel doctrine was whether that doctrine requires the promise "to meet a certain specificity threshold"—a dispute which the First Circuit found unnecessary to resolve. Id. at 10 n.3. The decisive promissory estoppel issue in Rockwood was whether there was sufficient evidence to survive summary judgment that the defendants did in fact make a particular promise. Id. at 10. Thus, to the extent Rockwood contains statements providing that New Hampshire's promissory estoppel doctrine includes an injustice element, those statements are dicta because they are not essential to Rockwood's holding or result. See Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 57 (1st Cir. 2014) (defining dicta as judicial observations that are not essential to the determination of the issues before the court and noting that dicta have "no binding effect" (quotation omitted)).

    In support of the assertion that the New Hampshire Supreme Court has adopted § 90 of the Restatement, Rockwood cites to Marbucco Corp. v. City of Manchester, 137 N.H. 629 (1993). In Marbucco, the New Hampshire Supreme Court cited to § 90 but did not explicitly adopt it. See Marbucco, 137 N.H. at 633. That

case involved an appeal from the dismissal of a construction company's action against a municipality brought when the municipality failed to award the company a contract despite submitting the lowest bid that complied with the municipality's requirements. See id. at 631-32. The trial court dismissed the case because it concluded that, absent a contract, the plaintiff could not recover damages sounding in contract. See id. at 631. Although the municipality reiterated this argument on appeal, the New Hampshire Supreme Court reversed the dismissal because the plaintiff's reasonable reliance on the municipality's promise to award the contract to the lowest bid that complied with all requirements "could" entitle the plaintiff to reliance damages under a promissory estoppel theory. Id. at 633-34.

The New Hampshire Supreme Court has cited to § 90 in other cases as well, but seemingly has not formally adopted its description of the elements of a successful promissory estoppel claim. In Jackson v. Morse, for example, the Court considered the proper measure for damages under promissory estoppel, and stated its agreement with a comment to § 90 that, while "full-scale enforcement by normal remedies is often appropriate" for a successful promissory estoppel claim, "relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise." Jackson v. Morse, 152 N.H. 48, 51-52 (2005) (quoting Restatement § 90, cmt. d). Had the Court formally adopted § 90 twelve years earlier in Marbucco, there would have been no need for it to explain its agreement with the Restatement or why the Restatement was consistent with its jurisprudence in this area.

45

In a more recent case, the Court noted a party's argument that an action for promissory estoppel is founded upon § 90, but took no position on whether the party's argument was correct. See XTL-NH, Inc. v. N.H. State Liquor Comm'n, 170 N.H. 653, 656 (2018). Nor have cases that preceded Marbucco and Jackson formally adopted § 90. See Panto v. Moore Business Forms, Inc. 130 N.H. 730, 738 (1988) (noting that promissory estoppel may provide a mechanism for enforcement of job security provisions in employee handbooks and citing to § 90, but declining to decide whether promissory estoppel did provide such an enforcement mechanism "[b]ecause we do not understand [plaintiff's] pleadings to raise an estoppel claim"); Blue Cross/Blue Shield of N.H.-Vt. v. St. Cyr, 123 N.H. 137, 144 (1983) (suggesting plaintiff may wish to amend his pleadings on remand to allege a promissory estoppel claim and citing § 90). In other circumstances, when the New Hampshire Supreme Court has adopted a particular Restatement provision, it has done so expressly. Compare Grady v. Jones Lang LaSalle Constr. Co., Inc., 171 N.H. 203, 211 (2018) (assuming without deciding that § 324A of the Restatement (Second) of Torts was a "valid statement of our law" despite noting that "we have not previously adopted § 324A"),[11] with Bloom v. Casella Constr., Inc., 172 N.H. 625, 629 (2019) (explicitly ruling that § 324A accurately reflects New Hampshire tort law).

---

[11] This statement in Grady was despite the fact that the Court had previously cited § 324A in support of its analysis in other cases. See Everitt v. Gen. Elec. Co., 159 N.H. 232, 237-38 (2009); VanDeMark v. McDonald's Corp., 153 N.H. 753, 757 (2006); Williams v. O'Brien, 140 N.H. 595, 599-600 (1995); Corson v. Liberty Mut. Ins. Co., 110 N.H. 210, 213-14 (1970). It was not until Bloom that the Court made clear that § 324A reflected New Hampshire tort law.

There is scant caselaw from the New Hampshire Supreme Court explaining the elements of promissory estoppel under New Hampshire law—and what little there is can be read to suggest that there is no injustice element. In Panto, the Court stated in dicta that "the theory of promissory estoppel" provides that "a promise reasonably understood as intended to induce action is enforceable by one who relies upon it to his detriment or to the benefit of the promisor." 130 N.H. at 738. The Court did not state that such a promise can only be enforced if it would be unjust not to do so. Similarly, in Marbucco, the Court stated that the plaintiff's "reasonable reliance on the [defendant's] promise . . . could entitle [it] to damages under the theory of promissory estoppel," but did not otherwise explain the elements of promissory estoppel under New Hampshire law, and did not state that the plaintiff could recover only to the extent it would be unjust to bar recovery. 137 N.H. at 633. And in Great Lakes Aircraft, the Court stated (1) that promissory estoppel may be used to enforce promises not supported by consideration, (2) it may also be used to enforce "otherwise defective contracts and promises made during the course of preliminary negotiations," (3) it may be employed "to provide a remedy for reliance upon offers subsequently withdrawn," but (4) "in all instances, application of promissory estoppel is appropriate only in the absence of an express agreement," and (5) it "provide[s] a remedy to the party who detrimentally relies on the promise." 135 N.H. at 290. None of these cases states that New Hampshire's promissory estoppel doctrine contains the injustice element set forth in § 90 of the Restatement.

This is a close call.[12] While this court is bound by First Circuit precedent on matters of New Hampshire law unless and until the New Hampshire Supreme Court has addressed such matters, see Vertex Surgical, Inc. v. Paradigm Biodevices, Inc., 648 F. Supp. 2d 226, 231 n.3 (D. Mass. 2009), for the reasons discussed above there does not appear to be authoritative First Circuit precedent here. Caselaw from the New Hampshire Supreme Court indicates that the court has approvingly cited to § 90 but has never expressly stated that § 90 presents the universe of relevant considerations in determining the availability of a remedy under promissory estoppel. Thus, despite the court's review, this issue appears unsettled. And while this court might not certify this issue to the New Hampshire Supreme Court if it was the only question of state law presented at this juncture, judicial economy favors certification of this promissory estoppel issue since the statute-of-frauds issue is already being certified. See Adelson, 774 F.3d at 811 n.4. Moreover, as with the statute of frauds and the doctrine of part performance, promissory estoppel is an important doctrine that has traditionally been a matter of state concern, such that interests of federalism and comity point in favor of certification.

The court therefore proposes to certify the following question of law to the New Hampshire Supreme Court:

---

[12] The undersigned acknowledges that other decisions from this court have held, consistent with Rockwood, that New Hampshire has adopted § 90. See Romano v. Site Acquisitions, LLC, Civ. No. 15-cv-384-AJ, 2017 WL 2634643, at *6 (D.N.H. June 19, 2017); Worrall v. Fed. Nat'l Mortg. Ass'n, Civ. No. 13-cv-330-JD, 2013 WL 6095119, at *6 (D.N.H. Nov. 20, 2013); Cin-Doo, Inc. v. 7-Eleven, Inc., No. Civ. 04-CV-50-SM, 2005 WL 768592, at *3-4 (D.N.H. Apr. 6, 2005).

**To recover under a promissory estoppel theory, must a plaintiff prove that injustice can be avoided only through enforcement of the promise?**

## CONCLUSION

The court proposes to certify the below questions of law to the New Hampshire Supreme Court. Within fourteen days of this order's issuance, the parties may submit filings of no more than ten pages addressed to the precise manner in which the below questions are to be phrased. The parties may file responsive pleadings within seven days of the opposing party's initial filing, and such responsive pleadings shall be no more than five pages.

1.    Is it possible to perform within one year the obligations imposed by a perpetual intellectual property license where that license is granted by a Delaware corporation with a principal place of business in New Hampshire to a Finnish corporation?

2.    Does the doctrine of part performance apply to oral contracts containing obligations that cannot be performed within one year?

3.    To recover under a promissory estoppel theory, must a plaintiff prove that injustice can be avoided only through enforcement of the promise?

SO ORDERED.

Landya McCafferty
United States District Judge

January 31, 2025
cc:    Counsel of Record