UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Collision Communications, Inc.</u>

    v.

                                    Civil No. 20-cv-949-LM
                                    Opinion No. 2026 DNH 081 P

<u>Nokia Solutions and Networks OY</u>

## **O R D E R**

Plaintiff Collision Communications, Inc. (Collision) brought this action against Nokia Solutions and Networks OY (Nokia) alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. Collision claimed that Nokia made an enforceable promise to pay Collision $23 million in exchange for the integration and licensing of Collision's software, and that Nokia thereafter breached this promise. After a lengthy trial, the jury found for Collision on its breach of contract and promissory estoppel claims.

After trial, the court must resolve whether the statute of frauds bars enforcement of the contract found by the jury. In addition, the court must determine (1) whether New Hampshire law requires a plaintiff pursuing a promissory estoppel claim to prove that injustice can be avoided only through enforcement of the promise upon which his claim relies, and (2) if such an element applies, whether Collision has adequately proven it. For the reasons that follow, the court finds that the statute of frauds does not bar enforcement of the contract, but that Collision has failed to prove promissory estoppel's "injustice" element as required by New Hampshire law.

**PREFACE**

Before reciting its findings of fact and rulings of law as required by Rule 52, the court offers the following description of the scope of its factual findings. The parties agreed prior to trial that the applicability of the injustice element of New Hampshire's promissory estoppel doctrine (to the extent that element exists) presents a question of law that the jury has no role in resolving. See doc. no. 270 at 4-6; doc. no. 278 at 2; see also doc. no. 297 at 10. The court makes the below findings of fact in support of its rulings of law regarding the injustice element of promissory estoppel.

However, these findings play no role in the court's resolution of Nokia's statute-of-frauds defense. As explained in this court's order certifying questions of law to the New Hampshire Supreme Court (doc. no. 372-1), the applicability of the statute of frauds under New Hampshire law is a mixed question of law and fact. Tsiatsios v. Tsiatsios, 140 N.H. 173, 176 (1995). When the parties dispute whether a contract contained certain terms that could implicate the statute of frauds, the jury determines whether the contract contained the relevant terms. Peabody v. Wentzell, 123 N.H. 416, 418 (1983); Tsiatsios, 140 N.H. at 176. The court then determines whether the statute of frauds applies based on the jury's findings. Tsiatsios, 140 N.H. at 176.

In this case, Collision's contractual claims were premised upon an oral contract whose formation and existence Nokia denied. It was therefore clear to the court and the parties prior to trial that, if the jury found that the parties entered

2

into a contract, resolution of Nokia's statute-of-frauds defense would require Nokia—in advance of trial—to articulate the contractual terms it believed triggered the statute of frauds so that the court could submit interrogatories to the jury requesting findings as to whether the contract contained those terms. See doc. no. 270 at 2-3 (Collision's opposition to Nokia's proposed jury instructions, asserting that the jury should "be asked to make fact[ual] findings about any terms that Nokia contends put the agreement within the statute of frauds" and that the court should then "determine whether the terms—as found by the jury—could have been performed within one year"); doc. no. 278 at 1 (Nokia's response to Collision's opposition, agreeing with the division of labor between jury and judge requested in Collision's opposition); doc. no. 297 at 5-9 (transcript of pretrial hearing, where court stated that Collision's request was correct under New Hampshire law, that the court would adopt Collision's request, and the parties reiterated their agreement). Indeed, the court issued an endorsed order prior to trial registering its concern about the complexity of the task before the jury and directing the parties to appear for a hearing the following day to discuss "the specific factual findings . . . the jury will need to make" to enable the court to resolve Nokia's statute-of-frauds defense. Endorsed Order of Feb. 20, 2024; see also doc. no. 319 (special verdict form; five pages long).

At the hearing, the court explained that, because Nokia was the party raising the statute of frauds as an affirmative defense, it "really has to be Nokia" making clear the contractual terms it believed triggered the statute of frauds, so that the

court could direct the jury to determine whether the contract contained those terms. Doc. no. 334 at 3; see also id. (court to Nokia: "[Y]ou need to tell me what are the . . . questions . . . that I have to ask the jury when I get to the statute of frauds defense"). In response, Nokia stated that "there's only a need to ask perhaps two questions" of the jury: (1) whether the contract contained a perpetual license, and (2) whether the contract contained a perpetual product support agreement. Id. at 4-5. Indeed, Nokia took the position that "that's all we would need to satisfy . . . th[is] statute of frauds" issue. Id. at 5. In response, Collision conceded that the June 6 contract contained a perpetual license but disputed whether it contained a perpetual product support agreement. Id. at 10-11.

Based on the parties' positions, the court asked the jury to make only a single factual finding as to the content of the June 6 contract: whether it contained a perpetual product support agreement. See doc. no. 319 at 1. The jury answered that question in the negative. What is more, despite receiving multiple iterations of drafts of the court's special verdict form prior to the charge, Nokia never asserted that its statute-of-frauds defense was premised on the existence of additional terms of the contract or that the jury needed to make any other findings.

New Hampshire law entitled Collision to insist that the jury determine whether the contract contained the terms that Nokia asserted brought the June 6 contract within the statute of frauds. See Peabody, 123 N.H. at 418; Tsiatsios, 140 N.H. at 176. In light of Nokia's pretrial representations to the court and Collision regarding the "only" contractual terms that the jury needed to decide, as well as the

4

jury's verdict finding that the June 6 contract did not contain a perpetual product support agreement, the only provision relevant to the statute of frauds' applicability is the perpetual license granted by Collision to Nokia pursuant to that contract.[1] The following findings of fact inform the court's assessment of Nokia's statute-of-frauds defense, but ultimately, the perpetual license contained in the June 6 contract is the controlling contractual term with respect to that defense.

## FINDINGS OF FACT

### I.    Collision and Nokia Explore a Potential Partnership

Stan and Jared Fry formed Collision in late 2010. A father and son team, Stan and Jared[2] are well-educated, sophisticated businessmen with decades of experience in the telecommunications industry, including numerous licensing deals. They have founded and managed several technology companies.

Shortly after formation, Collision purchased a portfolio of patents and software from BAE Systems (BAE). BAE had developed technology that reduced interference in electronic telecommunications. However, BAE, as a military contractor, was focused on the application of this technology in the military context. Collision purchased BAE's portfolio with the goal of adapting this interference-

---

[1] Nokia's arguments to the contrary are not persuasive for the reasons stated in the court's certification order. See doc. no. 372-1 at 14-16.

[2] The parties have referred to the Frys as well as another key witness (Francisco "Paco" Lopez Herrerias) by their first or common names throughout the proceedings (i.e., Stan, Jared, and Paco). The court adheres to the parties' convention in this order. No disrespect is intended.

reducing software for use in consumer cellular telecommunications, and then selling or licensing its software to a telecommunications company for installation in the hardware within such company's cell towers.

Nokia is a large multinational business headquartered in Finland. Among other products, Nokia produces cellular base stations, which are devices affixed to cell towers used to collect and disseminate cellular signals. Cellular network operators like Verizon use base stations to provide cellular service to consumers. The name of Nokia's base station is the "Airscale."

In 2015, Collision and Nokia began discussing a potential collaboration that would involve the integration of Collision's technology into Nokia's Airscale. In order to begin these discussions, Collision and Nokia entered into a written, mutual nondisclosure agreement (NDA). The NDA states that it "shall come into force upon signature by both Parties." Def. Ex. 202 at COL949_00028569. Jared executed the NDA on Collision's behalf.

Through simulated exercises involving Collision's proprietary software, Collision demonstrated to Nokia that its technology was superior to the technology Nokia was then using to reduce cellular interference and process cell signals in its Airscales. These exercises did not show, however, whether it would be feasible to integrate Collision's technology into the Airscale. To determine whether such an integration would be feasible, Collision and Nokia executed a written "Proof of Concept" agreement in November 2016.

Jared was the primary negotiator for Collision with respect to the Proof of Concept, and Francisco "Paco" Lopez Herrerias negotiated it for Nokia. Jared and Paco agreed that Nokia would pay Collision $600,000 to evaluate whether Collision's technology could be implemented in Nokia's base station. However, Jared understood that, even after he and Paco agreed on that figure, Paco needed to obtain Nokia's approval before the parties could enter into the Proof of Concept agreement. Jared also understood (and conveyed to Collision's board) that, even after he and Paco reached an agreement, Nokia's legal and procurement departments would be involved in drafting and approving the contract. Finally, Jared understood (and communicated to Collision's board) that the parties would not be "officially under contract" until Nokia signed the written Proof of Concept agreement.[3] Doc. no. 330 at 88; see also Def. Ex. 12 at COL949_00026037. Once the written Proof of Concept agreement was executed, Jared emailed Stan a copy of the document and stated that "[w]e are now under agreement with Nokia." Def. Ex. 203 at COL949_00004676.

The parties executed the Proof of Concept agreement in November 2016. Collision's work under the Proof of Concept took place from November 2016 through approximately April of 2017. By all accounts, the Proof of Concept was a success: Collision's technology could be implemented into the Airscale, and would deliver a substantial improvement in processing.

---

[3] One of Collision's board members, Ross Bott, responded to Jared's email by stating: "I'm sure we'll all hold our breath a little until this is co-signed." Def. Ex. 12 at COL949_00026037.

II.     Initial Negotiations

In February 2017 (when it was becoming clear to the parties that the Proof of Concept would be successful), Collision and Nokia met for a multi-day workshop to discuss technical next steps to achieve integration of Collision's software into Nokia's Airscale, as well as the companies' future business relationship. The parties' goal was to develop a plan to achieve a release of the integrated product for sale to third parties (such as Verizon) in the first quarter of 2018, and to have the integrated product ready to be showcased at the Mobile World Congress, an annual event to be held in February 2018. Given the amount of work that integration would entail, the parties considered this to be an aggressive—but feasible—timeline.

The parties did not enter into an oral or written contract to integrate Collision's software into Nokia's Airscale at the February 2017 workshop. Collision understood that any commercial agreement would be substantially more complex than the Proof of Concept. However, Collision also believed that achieving the parties' goals would require Collision to immediately begin integration work, even in the absence of a commercial agreement. Although Jared and Paco discussed potentially extending the Proof of Concept agreement to encompass these new development efforts, they ultimately did not do so. Thus, Collision began work towards achieving integration by early 2018 in the absence of a commercial agreement, written or otherwise.

When the Proof of Concept expired in April 2017, Jared and Paco began discussions around forming a commercial agreement. Broadly speaking, the parties'

negotiations centered around two primary components of a potential contract: (1) Collision would integrate its technology into the Airscale in exchange for payment of a "non-recurring engineering" fee (often referred to as an "NRE" fee); and (2) Collision would license its technology to Nokia (so that Nokia could sell Airscales including Collision's technology to third-parties) in exchange for a lump sum payment.

In May 2017, Paco travelled to New Hampshire to meet with Stan and Jared. Prior to the meeting, Paco told Jared that he hoped to have "a verbal agreement in [sic] transfer costs and NRE fees" and a "'handshake' on the potential conditions" at the conclusion of the meeting, "even if not signed on paper" so that the parties can "have the view from both sides." Pl. Ex. 64 at COL949_00000116. In response, Jared expressed concerns about the tight timeline for finalizing an agreement, and asked Paco to ensure that "the people you need to finalize any agreement are lined up in advance." Id. at COL949_00000115.

The meeting between Paco and Collision took place over two days on May 16 and 17, 2017. The parties were unable to reach an agreement. Following the meeting, Jared communicated to Paco that Collision and Nokia still had "terms left to resolve," but that their meeting was "productive" and the parties "were better able to understand some of the challenges we are both facing." Pl. Ex. 56 at NOK00007082. Jared also communicated a "concept" for an agreement that he was "not sure we are totally comfortable with," which would involve a $3 million NRE fee and a $22 million license fee, with a license term of two years and "limited"

exclusivity. Id. at NOK00007083. Paco responded that he had been unable to speak with Nokia's "senior leadership" following his meeting with Collision in New Hampshire and that he "need[ed] to have" a face-to-face meeting with the leadership team. Id. at NOK00007080. Paco said that the most likely outcome from any partnership with Collision would generate approximately $30.8 million in revenue for Nokia, which meant that "the maximum Nokia can come up with" would be $20 million for the license—a figure that still "is to be approved." Id. at NOK00007081-82. Paco later forwarded these email communications to his boss, Timo Viero, and commented in an email that he tried "to make clear to Collision that my proposal still needs to be approved," and that it would be "challenging" to obtain approval. Id. at NOK00007080.

On June 1, 2017, Paco wrote to Jared that he had obtained approval from two department heads within Nokia for a $20 million license fee, but that it remained a "bold number" requiring that Paco "mov[e] to higher layers" in order to "fund the case." Def. Ex. 56 at COL949_00000130. Paco communicated that these higher layers included Marc Rouanne (whom Collision understood to be President of Mobile Networks for Nokia) and "possibly" Rajeev Suri (Nokia's CEO). Id. Paco stated that he was "internally organizing many calls to get to that point to eventually [sign] the contract." Id.

III.   The June 6 Phone Call

Jared testified that he and Paco spoke over the telephone on June 6, 2017. Paco's and Jared's diverging accounts of that call are at the heart of this lawsuit.

10

According to Jared, Paco informed Jared that he had received all the approvals from within Nokia that he needed to formally extend Nokia's offer to Collision. In response, Jared said he accepted Nokia's offer on Collision's behalf. Jared testified that he understood based on this phone call that Collision and Nokia had formally entered into a binding agreement. Specifically, he testified that, during this phone call, Nokia made an enforceable promise to Collision that Nokia (1) would pay Collision $3 million in exchange for integrating its software into Nokia's Airscale and $20 million for the license and (2) would promptly memorialize the parties' agreement, which, according to Jared, would trigger a payment of 60% of the $20 million license fee. Jared also testified that, in order for Collision to fulfill its integration obligations, Nokia needed to provide Collision with an Airscale.

By contrast, Paco testified that:

- He did not recall whether he spoke with Jared on the phone on June 6;

- He had not obtained all necessary approvals to execute a $23 million contract with Collision;

- He never communicated to Collision that he had obtained those approvals; and

- He never extended a formal offer to Collision the acceptance of which could have formed a binding contract or that he otherwise made binding promises to Collision on such a phone call.

Although no one else was on the call, Jared testified that he took handwritten notes of what Paco communicated to him during the call, and that he later typed up his notes. Both the handwritten and typed notes were introduced in evidence at trial. See Pl. Exs. 104, 113. According to Jared's notes, Paco communicated that he

11

had "support for $20M" and that it has "passed," Pl. Ex. 104, though Jared was "not sure what he really meant by that," Pl. Ex. 113. Jared's notes reflected that Paco had "sign-offs" from Nokia's former CTO, its Architecture Head, its Portfolio Head, its "LTE [Business Line] Head," and from "Bell Labs." Pl. Ex. 104. However, Paco also told Jared that "[t]he amount of money is passing a mark that needs additional sign-offs," Pl. Ex. 113, including "up to almost CEO level," Pl. Ex. 104, and that Paco was "working on this now through documents and briefings," Pl. Ex. 113. Paco anticipated that he would obtain these additional sign-offs "this week or [the] very beginning of next week," and that he thought the parties would be in a position to have "legal agreements . . . signed next week or the week of the 19th." Id. Paco said that he was "not concerned about timing" so long as Collision "start[ed] [working] in July timeframe." Pl. Ex. 104. Jared's notes do not reflect that Paco stated he had received approval from Marc Rouanne or Rajeev Suri.

IV.     Communications After the June 6 Call

In the weeks following the June 6 phone call, Jared, Stan, and Paco communicated in various fashions an understanding that Collision and Nokia were not yet under contract. For example, two days after the June 6 phone call, Paco wrote an email to Jared and Stan noting that they had agreed on an "aggressive target of 3 weeks" to complete an agreement regarding Collision's integration work, "to be followed by [a] license agreement." Def. Ex. 61 at COL949_00028325. Paco stated that the integration agreement would contain a "statement alluding to [a] follow on license agreement with max amount referenced." Id. Paco also told

12

Collision that Nokia would not make upfront payments, but rather that Nokia would pay 60% of the license fee only after Collision had provided deliverables. Id. at COL_94900028324. In response, Jared stated that Collision's "concern on this is that we are looking for the license amounts to be committed here, not just referenced, . . . from the perspective of we are looking for the commitment from Nokia here, not just a partial commitment." Id. at COL949_00028325.

On June 15, 2017, Stan wrote to Paco expressing concern that he had not seen a formal document containing "the terms as you have proposed to us," which was "one of the multiple reasons we have not formally responded or agreed to your terms." Def. Ex. 62. Stan felt it was "imperative that the terms are circulated for all to understand," but "it appears that procurement is dealing with more hurtles and unable to send us agreements," and that, "[a]t this point [Collision] question[s] what [it] will receive." Id. Stan told Paco that Collision had been working on Nokia's project "without any guarantees on the part of Nokia," and questioned how much longer Nokia could reasonably expect Collision to proceed in this manner. Id.

Within a few weeks of the June 6 phone call, Jared completed a Nokia questionnaire disclosing "information for the review of Collision as a potential supplier." Def. Ex. 7 at NOK00020703. A Nokia employee, Theresa Magalski, communicated to Jared that, without Collision's adequate completion of the questionnaire, Nokia "cannot make a decision to move forward into [a] commercial relationship nor gain spending approvals." Id. In completing the questionnaire, Jared stated that "[c]urrently Collision does not have a 'live' contract with Nokia,"

13

but that "Collision has been under contract with Nokia in the recent past for exploratory efforts." Id. at NOK00020708. Jared stated that Collision and Nokia were "currently negotiating." Id. at NOK00020710; see also Def. Ex. 144 at COL949_00000137 (Jared discussing Collision's "continuation of development towards the goal even without a contract in place"); Def. Ex. 105 at COL949_00002362-64 (Jared to Paco: "We continue to feel strongly that for us to share the details that will need to be shared, that an agreement will be in place"; "[w]e have continued our efforts without a contract"; "[i]f Nokia eventually proposes other terms, Collision may need to renegotiate"; "I keep harping on needing a real commitment from Nokia"; "I have heard repeatedly that once we are under contract everything moves smoothly and swiftly, but it is hard for us to have that perspective at this point"; "[t]hese discussions include aspects of a deal that haven't necessarily been approved on Collision's side").

In any event, Collision continued to work towards completing the parties' goal of achieving integration of Collision's software into Nokia's hardware by early 2018, but were limited in what they could accomplish due to the fact that Nokia had not sent Collision an Airscale. Although Paco communicated in the months leading up to June 2017 that Nokia would be sending Collision an Airscale in short order, he also told them that, because the Airscale contained proprietary Nokia technology, Nokia could not provide one to Collision until the parties executed a formal, written agreement. See Def. Ex. 145.

V.     The Parties' Relationship Breaks Down

Throughout the summer of 2017, Paco and other Nokia employees communicated to Stan and Jared that Nokia would be sending Collision proposed draft agreements. Jared, Stan, and Paco spoke on the phone on September 19, 2017. According to Jared's notes from that call, Paco explained that Nokia was "in the process of translating [the] offer to" Collision. Def. Ex. 237 at COL949_00002820. Marc Rouanne decided that Nokia would undertake a "make-buy" analysis, pursuant to which Nokia would determine what the cost would be for Nokia to develop its own solution capable of achieving performance gains similar to what Collision's software could offer. According to Jared's notes from the call, Paco explained that the cost for Nokia to develop its own technology "will set the offer" to Collision. Id. Jared's notes also documented that "the offer, once it's [formalized], will go up to Marc [Rouanne]." Id. Jared noted that Collision "should frame any response to the offer with [Collision's] arguments in a form that can be provided to Marc so that we can actually dialogue back directly to him." Id.

In November 2017, Nokia provided a set of draft agreements to Collision that Nokia stated would be "the starting point" for negotiations. Def. Ex. 67 at NOK00004075. The draft agreements provided that Nokia would pay Collision $7 million for the license and a $3 million NRE fee. Jared's understanding was that the $7 million figure was based on Nokia's internal make-buy analysis. Collision rejected Nokia's offer and countered with a $20 million license fee. Throughout 2018, the parties attempted to reach a final agreement but were not successful in

15

doing so. Ultimately, Nokia informed Collision in November 2018 that it was canceling the project altogether.

## RULINGS OF LAW

Collision subsequently instituted this suit. At trial, Collision pursued three claims, but only two are relevant for present purposes: (1) breach of contract, and (2) promissory estoppel.[4] Collision contended that, during the June 6 phone call, Jared and Paco bound Collision and Nokia to a $23 million oral contract for the integration and licensing of Collision's software into Nokia's base station, and that Nokia subsequently breached that contract. In the alternative, Collision asserted that Nokia was liable to it under the doctrine of promissory estoppel based on the theory that Nokia made three enforceable promises to Collision: (a) to pay Collision $23 million; (b) to promptly memorialize the June 6 agreement to pay Collision this sum, which would trigger a 60% upfront payment of the license fee; and (c) to send Collision an Airscale so that Collision could fully perform the required integration work. Doc. no. 338 at 113-14. After a ten-day trial, the jury returned a verdict in Collision's favor on its breach of contract and promissory estoppel claims, and awarded Collision $23 million in damages.

Following trial, the court took up Nokia's statute of frauds defense as well as Collision's rebuttal that, even if the statute of frauds applied, the June 6 contract is

---

[4] Collision also tried a claim for breach of the implied covenant of good faith and fair dealing. However, because the jury returned a verdict in Collision's favor on its breach of contract claim, it did not return a verdict on the good faith and fair dealing claim. See doc. no. 319.

enforceable pursuant to the doctrine of part performance. In addition, the court considered whether New Hampshire law requires that a party seeking recovery under promissory estoppel to demonstrate that injustice can be avoided only through enforcement of the promise relied upon. The court concluded that consideration of these matters required resolution of difficult and unclear questions of New Hampshire law, and therefore certified questions to the New Hampshire Supreme Court. See Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY, 764 F. Supp. 3d 19 (D.N.H. 2025) [hereinafter "Collision I"]. The New Hampshire Supreme Court answered this court's question regarding the statute of frauds and declined to answer its questions on the doctrines of part performance and promissory estoppel, concluding that its resolution of the statute of frauds issue was dispositive. See Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY, 2026 N.H. 4, ¶ 1 [hereinafter "Collision II"].

Upon remand from and with the guidance of the New Hampshire Supreme Court, this court first turns to Nokia's statute of frauds defense, then addresses the parties' arguments regarding the injustice element of promissory estoppel.

I.   The New Hampshire Supreme Court's Answer to This Court's First Certified Question Requires Rejection of Nokia's Statute-of-Frauds Defense

Under New Hampshire's statute of frauds, "[n]o action shall be brought . . . upon any agreement . . . that is not to be performed within one year from the time of making it, unless such . . . agreement, or some note or memorandum thereof, is in writing and signed by the party to be charged or by some person authorized by

him." RSA 506:2. "The statute of frauds . . . requires all agreements not to be performed within one year to be in writing and signed by the party to be charged." Phillips v. Verax Corp., 138 N.H. 240, 245 (1994). The statute, however, renders unenforceable "only those contracts which cannot be performed according to their terms within a year from the time of their inception." Id. at 246 (emphasis added) (quoting Davis v. Grimes, 87 N.H. 133, 135 (1934)). An oral agreement "will not run afoul of the statute of frauds if it was possible for performance to be completed within one year of the agreement without breach by either party." Proctor v. MacDonald, 141 N.H. 621, 624 (1997). This is true regardless of whether the parties expected the contract's obligations to be performed within one year. Collision II, 2026 N.H. 4, ¶ 11.

For the reasons discussed above, the only provision of the June 6 oral contract relevant to resolution of Nokia's statute of frauds defense is the perpetual license contained within that contract. In the New Hampshire Supreme Court's opinion addressing this court's certified question, the Supreme Court unambiguously "h[e]ld that it is possible to perform within one year the obligations imposed on the licensor by a perpetual intellectual property license." Id. ¶ 19. While acknowledging that the Court had previously held in Pro Done, Inc. v. Basham, 172 N.H. 138 (2019), that express covenants not to sue give rise to an ongoing obligation to forbear, the Court reasoned that intellectual property licenses merely operate as covenants not to sue. Id. ¶ 16. Absent an express promise not to sue, a perpetual intellectual property license "is performed upon the effective date of the license,"

18

and the "licensor does not have any ongoing obligations to the licensee."[5] Id. ¶ 17. Given the New Hampshire Supreme Court's answer to this court's certified question, Nokia has failed to demonstrate that the perpetual license contained in the June 6 contract renders that contract unenforceable pursuant to the statute of frauds.[6]  See Akwa Vista, LLC v. NRT, Inc., 160 N.H. 594, 600 (2010) (statute of frauds is an affirmative defense).

II.      Collision Fails to Demonstrate That Injustice Can Be Avoided Only Through Enforcement of Nokia's Promise

In light of the court's conclusion regarding Nokia's statute of frauds defense, Collision is entitled to recovery on its breach of contract claim. As breach of contract and promissory estoppel are mutually exclusive theories, Collision cannot also obtain recovery on its promissory estoppel claim. See Great Lakes Aircraft Co., Inc. v. City of Claremont, 135 N.H. 270, 290 (1992) ("[A]pplication of promissory estoppel is appropriate only in the absence of an express agreement."). However, in the event of an appeal affecting the jury's verdict on the breach of contract claim, judicial economy favors this court issuing rulings of law on Collision's promissory estoppel claim at this time.

---

[5] Nokia's contention that Collision previously represented to the court that the June 6 contract contained an express covenant not to sue (as opposed to a license which operates as an implied covenant not to sue) is without merit.

[6] Having so concluded, the court need not address Collision's contention that any partial performance of the June 6 contract by Collision removes the contract from the statute of fraud's ambit.

The parties dispute whether a successful promissory estoppel claim under New Hampshire law requires the plaintiff to demonstrate that injustice can be avoided only through enforcement of the promise upon which the plaintiff detrimentally relied. The court first addresses the applicability of this element. Then, after concluding that this injustice element applies, the court considers whether Collision proved at trial that enforcement of Nokia's promise is necessary to prevent injustice.

A. The New Hampshire Supreme Court Would Likely Hold That a Plaintiff Pursuing a Promissory Estoppel Claim Must Demonstrate that Injustice Can Be Avoided Only Through Enforcement of the Promise

In its order certifying questions to the New Hampshire Supreme Court, this court asked the Supreme Court to resolve whether New Hampshire's promissory estoppel doctrine includes the disputed injustice element. Collision II, 2026 N.H. 4, ¶ 1. Given the Supreme Court's resolution of the statute of frauds question, the Supreme Court declined to answer the promissory estoppel question. Id. This court must therefore predict how the New Hampshire Supreme Court would resolve it. Butler v. Balolia, 736 F.3d 609, 612-13 (1st Cir. 2013).

The Restatement (Second) of Contracts provides that a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90(1) (A.L.I. 1981). As discussed in this court's certification order, the

20

New Hampshire Supreme Court has not yet formally adopted § 90. Collision I, 764 F. Supp. 3d at 43-45. At the same time, the New Hampshire Supreme Court generally adheres to the Restatement, see, e.g., Skinny Pancake-Hanover, LLC v. Crotix, 172 N.H. 372, 377 (2019), and has approvingly cited § 90 on several occasions, see, e.g., Jackson v. Morse, 152 N.H. 48, 52-53 (2005); see also Collision I, 764 F. Supp. 3d at 44 (discussing the New Hampshire Supreme Court's § 90 jurisprudence). The majority of (or perhaps all) jurisdictions require a plaintiff pursuing a promissory estoppel claim to show that enforcement of the promise is necessary to prevent injustice. See State v. First Nat'l Bank of Ketchikan, 629 P.2d 78, 81 (Alaska 1981). Collision has identified no jurisdictions which hold that an injustice showing is not required.[7] That is unsurprising, given that the very purpose of promissory estoppel is to "provide a remedy for . . . promises or agreements that fail the test of enforceability under . . . traditional contract doctrines, but whose enforcement is necessary to avoid injustice." Dixon v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 336, 343 (D. Mass. 2011) (quotations omitted).

Collision contends that application of an injustice element would be in tension with Jackson v. Morse, where the New Hampshire Supreme Court held that

---

[7] The few cases Collision cites merely show that courts do not always analyze the injustice element using the same factors. See Harmon v. State, Del. Harness Racing Comm'n, 62 A.3d 1198, 1201-02 (Del. 2013) (affirming that plaintiff must show that "injustice can be avoided only by enforcement of the promise," but highlighting the import of harm suffered by plaintiff from reliance on the promise in determining injustice (quotation omitted)); Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv., 885 F. Supp. 2d 156, 190 (D.D.C. 2012) (similar, but also discussing relevant factors set forth in § 90).

an "indefinite" promise may form the basis for a successful promissory estoppel claim. 152 N.H. at 53. Collision is incorrect. <u>Jackson</u> merely held that, where the promise upon which the plaintiff detrimentally relied is indefinite or unclear, it is generally "inequitable" for the plaintiff to recover expectation damages and that recovery in such cases "will be limited to expenses incurred in reasonable reliance on the vague promise." <u>Id.</u> (first quoting <u>Goldstick v. ICM Realty,</u> 788 F.2d 456, 464 (7th Cir. 1986), and then quoting <u>Garwood Packaging, Inc. v. Allen & Co., Inc.,</u> 378 F.3d 698, 703 (7th Cir. 2004)). If anything, <u>Jackson</u> supports the view that New Hampshire's common law of promissory estoppel incorporates consideration of the extent to which enforcement of the defendant's promise is necessary to prevent injustice. And the Restatement itself makes clear that "[t]he remedy granted" under promissory estoppel "may be limited as justice requires." Restatement § 90(1).

For these reasons, the court predicts that the New Hampshire Supreme Court would hold in accordance with the Restatement that, in order to recover on a claim of promissory estoppel, the plaintiff must demonstrate that "injustice can be avoided only by enforcement of the promise." <u>Id.</u>

B.    <u>Awarding Collision $23 Million is Not Necessary to Prevent Injustice</u>

In this case, the jury's promissory estoppel verdict reflects the jury's determination that (a) Nokia made a promise to Collision that Nokia should have reasonably expected would induce Collision to take certain action or refrain from taking certain action, (b) Collision reasonably took or refrained from taking that action in reliance on Nokia's promise, and (c) Collision either suffered a detriment

22

to itself or conferred a benefit upon Nokia. <u>See</u> doc. no. 364 at 21-22 (jury instructions). Despite the jury's findings, the "very existence" of the injustice element demonstrates that, even when "all the other requirements of" promissory estoppel are met, "sometimes the answer should be No," injustice would not result from failing to enforce a promise upon which the plaintiff detrimentally and reasonably relied. 3 Timothy Murray, Corbin on Contracts § 8.9 (Matthew Bender 2026); <u>see</u> First Nat'l Bank, 629 P.2d at 81; <u>see also</u> Skebba v. Kasch, 724 N.W.2d 408, 411 (Wis. Ct. App. 2006) (explaining that, while the other elements of promissory estoppel are "facts to be found by a jury," the injustice element presents "a policy decision to be made by the court").

In evaluating the need to prevent injustice through enforcement of a noncontractual promise, courts should keep in mind that "promissory estoppel is fundamentally a narrow doctrine, designed to protect the legitimate expectations of parties rendered vulnerable by the very processing of attempting to form commercial relationships." Ramone v. Lang, No. Civ. A. 1592-N, 2006 WL 905347, at *14 (Del. Ch. Apr. 3, 2006). Even when promissory estoppel is narrowly deployed to award a plaintiff damages for expenses reasonably incurred in reliance on the defendant's promise,[8] "the doctrine of promissory estoppel hazards unfairness, as many possible contractual relationships in commerce require the hopeful partners to expend costs and put aside other opportunities in the hopes of forging an

---

[8] Expectation damages are also available under promissory estoppel in some circumstances, though not when such an award would be inequitable. Jackson, 152 N.H. at 53.

agreement. Id. "[C]ourts must be chary about invoking the doctrine lightly, lest the normal failure of parties to reach a binding contract be penalized by an imprecise judicial cost-shifting exercise." Id.; see also Dixon, 798 F. Supp. 2d at 341 ("To impose rights and duties 'at the stage of "imperfect negotiation"' would be to interfere with the liberty to contract—or not to contract." (citation omitted) (quoting Lafayette Place Assocs. v. Bos. Redevelopment Auth., 427 Mass. 509, 517 (1998))).

The injustice determination "cannot be applied by a mechanical process." Murray, supra § 8.9; accord Restatement § 90 cmt. b (highlighting the "flexible" nature of the inquiry). The Restatement lists several factors courts should consider: (a) "the reasonableness of the promisee's reliance"; (b) the "definite and substantial character" of the promisee's reliance "in relation to the remedy sought"; (c) "the formality with which the promise is made"; (d) "the extent to which the evidentiary, cautionary, deterrent, and channeling functions of form are met by the commercial setting or otherwise"; and (e) "the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant."[9] Restatement § 90 cmt. b.

Here, Collision contends that, on June 6, 2017, Paco promised that Nokia would pay Collision $23 million for the integration and licensing of Collision's

---

[9] Section 139(2) of the Restatement sets forth considerations for determining whether injustice can be avoided through enforcement of a promise where recovery for breach of the promise would otherwise be barred by the statute of frauds. In this case, the statute of frauds does not apply, so § 90 provides the appropriate framework. Regardless, the relevant factors under § 90 are not materially different from those set forth in § 139(2). See Restatement § 139 cmts. b & c.

software, and that Nokia would promptly reduce this promise to writing, which would trigger a 60% payment of the license fee. Although the jury's verdict reflects that the jury almost certainly found that Nokia made this promise, it is also undisputed that, two days after the June 6 call, Paco sent Stan and Jared an email making clear that Nokia had not yet committed to pay Collision $23 million and that Nokia would not make any upfront payments. The "conflicting content" of Paco's June 6 and June 8 statements substantially diminishes the reasonableness of Collision's reliance on the June 6 statement. Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 34 (1st Cir. 1988) ("The law . . . does [not] countenance reliance on one of a pair of contradictories simply because it facilitates the achievement of one's goal."). Throughout the summer of 2017, Paco and others at Nokia repeatedly informed Collision that any payment from Nokia to Collision was contingent on further approvals. Stan and Jared acknowledged many times in writing after the June 6 phone call that Nokia had not committed to pay Collision anything.

The parties' relative degrees of sophistication, as well as their history and course of dealings, are also instructive in ascertaining the reasonableness of the plaintiff's reliance. Gruen Indus., Inc. v. Biller, 608 F.2d 274, 281 (7th Cir. 1979); Greenberg v. Tomlin, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993). Jared and Stan are sophisticated, well-educated businessmen with substantial experience in the telecommunications field. They have executed several licensing deals, and have founded and managed several companies. In other words, "this is not a situation of an individual taken advantage of by a corporation or individual with superior

knowledge of legal and business practices." Gruen, 608 F.2d at 281 (brackets omitted) (quoting Silberman v. Roethe, 64 Wis. 2d 131, 146 (1974)). Moreover, the parties' course of dealing should have made it clear to Collision that Nokia did not believe it was subject to binding obligations in the absence of a signed agreement executed by authorized persons. The 2015 NDA expressly stated that the obligations set forth therein did not take effect until the document was properly signed, and Jared understood that Nokia's obligations under the subsequent Proof of Contract agreement were not "official[ ]" until Nokia signed that agreement.

Nor does the court conclude that Collision's reliance was of a "definite and substantial character . . . in relation to the remedy sought": $23 million. Restatement § 90 cmt. b. Collision contends that it relied upon Paco's June 6 promises in devoting resources to beginning integration work and by ceasing to market its technology to other companies. However, the promises that Collision alleged Paco made on June 6 would have involved payment of the full $23 million to Collision only after Collision successfully completed all integration work and licensed its technology to Nokia. While the parties' estimates differ greatly in describing the amount of integration work Collision was able to complete, it is undisputed that Collision never provided Nokia with a fully integrated product that was capable of being sold to Nokia's customers. And, while Collision makes much of the fact that it ceased business development efforts after June 6, the evidence shows that Collision stopped marketing its software to other businesses because Collision concluded that other businesses were unlikely to license Collision's technology. See

doc. no. 342 at 46-48. In any event, Paco explicitly told Collision in writing on June 21, 2017 that he "completely underst[ood] Collision might be working on other projects" while it waited for draft agreements from Nokia. Def. Ex. 136 at COL949_00000038. For all of these reasons, Collision's reliance was not so substantial that justice requires Collision be awarded $23 million.

The promises upon which Collision's promissory estoppel claim are based were not made with any degree of formality, which further weighs against a finding that justice requires the promises' enforcement. Restatement § 90 cmt. b. As discussed, the parties' Proof of Concept agreement was based upon a written, executed document, but Collision understood that any agreement to integrate and license its technology to Collision would be far more complex. See Said v. Nat'l R.R. Passenger Corp., 183 F. Supp. 3d 71, 79 n.10 (D.D.C. 2016) (plaintiff's reliance on oral promise to permit certain periods of leave from work not enforceable where it departed from the parties' "previous course of conduct of submitting formal, written requests for a leave of absence"). The informality of the promises upon which Collision's promissory estoppel claim relies is in stark contrast with the formality Nokia previously insisted upon in making binding promises to Collision.

Regarding the next factor—"the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise"—Section 72 of the Restatement expands upon these functions. Restatement § 90 cmt. b (citing § 72). In particular, § 72 explains that "legal formalities" may serve an "evidentiary function, to provide evidence of the existence

27

and terms of the" promise, as well as a "channeling or signalizing function, to distinguish a particular type of transaction from other types and from tentative or exploratory assertions of intention."[10] Id. § 72 cmt. c.

Here, as noted, the promises upon which Collision's promissory estoppel claim are unaccompanied by any legal formalities that serve to provide evidence of the existence and terms of the promises. Jared did not even memorialize the promises upon which Collision's promissory estoppel claim relies in his handwritten or typed notes of his June 6 call with Paco. To the contrary, Jared's notes from that call reflected uncertainty as to what Paco meant in saying that "support for" $20 million had "passed." Pl. Ex. 113. His notes also evidence statements from Paco that, although Paco had received approval from several employees and business units within Nokia, the figures under discussion were "passing a mark that needs additional sign-offs," id., and would "go up to almost CEO level," Pl. Ex. 104.

Similarly, the lack of formality attendant to the promises upon which Collision relies materially distinguishes those promises from the highly formal and technical transactions that Collision and Nokia had previously executed. The promises underlying Collision's promissory estoppel claim are far more akin to "tentative or exploratory assertions of intention" than the highly formal binding promises Nokia made to Collision in the NDA and Proof of Concept. Restatement § 72 cmt. c. This is underscored by Paco's repeated reminders following the June 6

---

[10] Although § 72 also expands upon the cautionary and deterrent functions referenced in § 90, the court does not find consideration of those functions helpful as applied to this case.

call that the figures he and Jared were discussing were subject to further approvals. What is more, Jared himself testified that, in the commercial telecommunications setting, the functions of written form are desirable and expected because "a lot of processes, especially at Nokia, can't occur without things being documented in writing," and a written document ensures that "both parties have a common understanding . . . of what [the] agreement is." Doc. no. 330 at 19. In short, the "commercial setting" in which the promises were made—as well as the particular course of dealing between Collision and Nokia—is one in which the evidentiary and channeling "functions of form" are expected. Restatement § 90 cmt. b.

The final consideration under § 90 is the extent to which policies like "the enforcement of bargains and the prevention of unjust enrichment are relevant." Id. In this case, the bargain alleged by Collision was the payment of $23 million to Collision in exchange for a fully integrated Airscale with substantial performance gains over the software Nokia was then using within its Airscale, along with a license enabling it to commercialize Collision's prototype and sell it to Nokia's customers. Nokia did not receive any of the benefits of this bargain. Enforcement of this bargain would provide Collision with a windfall; Collision would obtain all of the benefits of the bargain despite failing to provide Nokia with the technology, license, and commercialization ability that the bargain contemplated. "To avoid injustice, it clearly is not necessary that plaintiff[ ] be placed in a better position for the alleged breach than they may have been had the promise been kept." Gruen, 608 F.2d at 281.

Collision contends that Nokia was unjustly enriched because, by promising to pay Collision for integrating its technology into Nokia's Airscale and for exclusive licensing rights, Nokia induced Collision to cease marketing its technology to other consumers. According to Collision, by preventing Nokia's competitors from obtaining Collision's technology, Nokia saved itself from the risk of lost market share at Collision's expense. Collision's argument is not persuasive. As discussed above, by summer 2017 it was clear that Nokia was the only large-scale manufacturer of base stations that was at all likely to license Collision's technology. Moreover, both Stan and Paco communicated to each other (in the weeks after the June 6 phone call) their understanding that Collision was not obligated to stop working on other projects for other customers in the absence of written agreement. See Def. Ex. 61 at COL949_00028323 (Stan to Paco on June 9: "it doesn't seem appropriate that we stop our sales activity to other customers without [a] commitment from you"); Def. Ex. 136 at COL949_00000038 (Paco to Stan on June 21: "completely understand that Collision might be working on other projects" while awaiting execution of contract). Unjust enrichment is "not a boundless doctrine," and instead requires Collision to demonstrate that it conferred "a benefit [upon Nokia] which would be unconscionable [for Nokia] to retain." Turner v. Shared Towers VA, LLC, 167 N.H. 196, 202 (2014) (emphasis omitted) (quoting Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 669 (2013)).

In light of the foregoing, the court concludes that Collision has failed to demonstrate that injustice can be avoided only through payment of $23 million to Collision.[11]

## CONCLUSION

The court finds that the statute of frauds does not bar enforcement of the contract found by the jury. The clerk is therefore directed to enter judgment in Collision's favor on the breach-of-contract claim. However, because the court finds that justice does not require enforcement of the promises upon which Collision's promissory estoppel claim relies, the clerk is directed to enter judgment for Nokia on Collision's promissory estoppel claim. After judgment is entered, the clerk is respectfully requested to close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

June 18, 2026

cc:     Counsel of Record

---

[11] Collision has not argued in the alternative that, even if justice does not require payment of $23 million from Nokia to Collision, justice nevertheless requires that Collision be awarded some smaller amount. See Restatement § 90(1) ("The remedy granted for breach may be limited as justice requires."). As such, Collision has waived this argument and the court does not consider it.